FILED

MAR 2 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA                )
                                        )
and                                     )
                                        )
KIRT WEST,                              )
INSPECTOR GENERAL OF THE                )
LEGAL SERVICES CORPORATION,             )
3333 K STREET, NW, 3RD FLOOR,           )
WASHINGTON, D.C. 20007,                 `

      Petitioners,

      v.

CALIFORNIA RURAL LEGAL                  )
ASSISTANCE, INC.,                       )
631 HOWARD ST., #300,                   )
SAN FRANCISCO, CA 94105                 )
                                        )
      Respondent.              )
                                        )

Case: 1:07-mc-00123
Assigned To : Sullivan, Emmet G.
Assign. Date : 3/23/2007
Description: USA v. CALIFORNIA RURAL

## PETITION FOR SUMMARY ENFORCEMENT OF
## ADMINISTRATIVE SUBPOENA DUCES TECUM

1.    The United States of America and Kirt West, Inspector General of the Legal Services

Corporation ("LSC-OIG") respectfully petition the Court for summary enforcement of an

administrative subpoena duces tecum ("Subpoena") issued by LSC-OIG to Respondent

California Rural Legal Assistance, Inc. ("CRLA")  pursuant to 5 U.S.C. app. 3 § 6(a)(4) (2000).

Attached to the memorandum in support of this petition are a copy of the Subpoena (Ex. A),

CRLA's response to the Subpoena (Ex. B), and the Declaration of Laurie Tarantowicz, Assistant

Inspector General and Legal Counsel to the Inspector General of the Legal Services Corporation

(Ex. C).  For the reasons stated in the accompanying Memorandum of Points and Authorities,

Petitioners hereby move for an order requiring summary enforcement of the Subpoena. As the basis for their Petition, Petitioners aver as follows:

## PARTIES

2.    Petitioners are the United States of America and LSC-OIG. LSC-OIG was created by the Inspector General Act of 1978, as amended ("IGA"), as an "independent and objective unit[]"possessing the power to, <u>inter alia</u>, "conduct and supervise audits and investigations relating to the programs and operations" of the LSC. 5 U.S.C. app. 3 § 2. LSC-OIG's address is 3333 K Street, NW, 3rd Floor, Washington, D.C. 20007.

3.    Respondent CRLA is a private California not-for-profit corporation receiving federal funding under 42 U.S.C. § 2996, <u>et seq.</u> ("LSC Act") to provide legal assistance to eligible low-income persons. CRLA's central office is located at 631 Howard St., #300, San Francisco, CA 94105.

## JURISDICTION AND VENUE

4.    Because this case arises under Section 6(a)(4) of the Inspector General Act of 1978, as amended ("IGA"), which authorizes LSC-OIG to issue subpoenas <u>duces tecum</u>, <u>see</u> 5 U.S.C. app. 3 § 6(a)(4), this Court has federal question jurisdiction under 28 U.S.C. § 1331.

5.    The IGA provides that a subpoena issued under the Act "shall be enforceable by order of any appropriate United States district court." 5 U.S.C. app. 3 § 6(a)(4). Venue in this district is appropriate because CRLA receives federal LSC funding from this jurisdiction, and CRLA is bound by reporting requirements under the LSC Act to this jurisdiction, including the requirements that led to the issuance of the Subpoena out of this jurisdiction, requiring

production in this jurisdiction. See 28 U.S.C. § 1391(b). In addition, LSC-OIG's investigation

of CRLA stems from this jurisdiction.

### STATUTORY PROVISIONS

6.     The IGA charges LSC-OIG with "the duty and responsibility . . . to conduct, supervise,

and coordinate audits and investigations relating to the programs and operations" of LSC

grantees. 5 U.S.C. app. 3 § 4(a); see also id. § 6(a)(2) ("Inspector General . . . is authorized to

make such investigations and reports relating to the administration of programs and operations of

the applicable establishment as are, in the judgment of the Inspector General, necessary or

desirable."). To facilitate such investigations, the IGA grants LSC-OIG "subpoena powers

coextensive with that authority." United States v. Aero Mayflower Transit Co., Inc., 831 F.2d

1142, 1145 (D.C. Cir. 1987). Specifically, LSC-OIG is authorized "to require by subpena [sic]

the production of all information, documents, reports, answers, records, accounts, papers, and

other data and documentary evidence necessary in the performance of the functions assigned by

[the IGA]." 5 U.S.C. app. 3 § 6(a)(4). In cases, like the present one, where a party resists such a

subpoena, LSC-OIG may seek enforcement in "any appropriate United States district court." Id.

7.     Entities receiving federal funding under the LSC Act are bound by reporting requirements

and are subject to audits by LSC and LSC-OIG. See 42 U.S.C. §§ 2996g, Omnibus Consolidated

Rescissions and Appropriations Act of 1996, Pub. L.101-134, 110 Stat. 1321 (1996), § 509(f)

[hereinafter 1996 Appropriations Act].

8.     Separately from LSC-OIG's responsibilities and powers under the IG Act, Congress

granted LSC-OIG supplemental powers. LSC-OIG is also empowered "to conduct on-site

monitoring, audits, and inspections [of LSC grantees] in accordance with Federal standards."

1996 Appropriations Act § 509(g). LSC grantees are obligated to make available to auditors or monitors of its activities "financial records, time records, retainer agreements, client trust fund and eligibility records, and client names, . . . except for reports or records subject to the attorney-client privilege." 1996 Appropriations Act § 509(h).

## BACKGROUND

9.      LSC is a private, District of Columbia nonprofit corporation, established "for the purpose of providing financial support for legal assistance in noncriminal proceedings or matters to persons financially unable to afford legal assistance." 42 U.S.C. § 2996b(a). LSC is authorized to provide financial assistance and to make grants to corporations and other qualified organizations for the purpose of providing legal assistance to the poor. Id. § 2996e(a)(1)(A); 1996 Appropriations Act, § 502. LSC must ensure that the federal grants are expended in accordance with statutory directives and the terms of the contractual grant. For example, LSC must ensure that "grants and contracts are made so as to provide the most economical and effective delivery of legal assistance to persons in both urban and rural areas;" that grantees refrain from political activity; that no federal funds are used in any fee-generating cases; and that no grants are awarded to corporations expending 50 percent or more of its resources or time litigating issues "in the broad interests of a majority of the public." Id. § 2996f; see also §§ 501-509, Pub. L. 104-134, 110 Stat. 1321, 1321-1359 (Apr. 26, 1996). See Decl. of Laurie Tarantowicz ("Tarantowicz Decl.") ¶ 2.

10.     CRLA is a private, California not-for-profit corporation, founded in 1966 to provide legal assistance and representation to low-income communities throughout California. It provides services through 49 attorney employees in 23 offices to low-income residents in 16 of

California's counties.  CRLA receives federal funding from LSC under the LSC Act; in 2006,

$6.8 million of its $11.2 million budget derived from federal LSC grants.  See Tarantowicz Decl.

¶ 3.

11.     In late September 2005, Congress forwarded to LSC-OIG a complaint about the CRLA

from a confidential source dated August 31, 2005.  The confidential source alleged principally

that CRLA impermissibly focused its resources on "impact work," rather than legal services

work; devoted its resources to farm worker and Latino issues, to the detriment of urban and non-

Latino populations (like the Hmong and African-Americans in CRLA's service area); solicited

clients; and performed significant work on cases and issues without clients in violation of the

terms of CRLA's federal funding.  Upon receipt of the complaint, LSC-OIG launched an

investigation pursuant to its powers under the Inspector General Act of 1978, 5 U.S.C. app. 3 § 6.

See Tarantowicz Decl. ¶ 4.

12.     On March 16, 2006 and in connection with its investigation, LSC-OIG served CRLA with

an administrative request for information and documents, including documents sufficient to show

CRLA client names, addresses, dates of representation, and "problem codes" (codes indicating

the subject matter for which the client sought assistance).  LSC-OIG also requested documents

pertaining to CRLA's required setting of substantive priority areas, such as material disbursed to

priority setting conference attendees, documents pertaining to CRLA task force meetings, and

documents revealing CRLA's interactions with state and local regulatory and policy-making

bodies.  CRLA purports to have provided 6000 pages of documents and some megabytes of

electronic data, but refuses to provide client names and other client information.  See

Tarantowicz Decl. ¶ 5.

13.     LSC-OIG provided an interim report on the details of its investigation of CRLA to the

Subcommittee on Commercial and Administrative Law of the House Committee on the Judiciary

on September 14, 2006.  Based on the information that LSC-OIG did obtain from CRLA, LSC-

OIG found "substantial evidence that CRLA violated federal law by:  soliciting clients; working

a fee generating case; requesting attorney fees; and associating CRLA with political activities."

See Tarantowicz Decl. ¶ 8.  LSC-OIG also reported that CRLA may have been "conducting work

. . . that appears to be impact oriented – raising serious concerns that CRLA deviat[es] from

Congress' intended purpose[.]"  Id.  LSC-OIG concluded that it would require "additional

information from CRLA to make final determinations of the appropriateness of [CRLA's]

activities" and to investigate the allegation that CRLA disproportionately focused its resources on

farmworker and Latino issues.  Id.

14.     Between March 2006 and October 2006, LSC-OIG continued discussions with CRLA in

an attempt to access the requested client identification documents, documents pertaining to

CRLA's required setting of substantive priority areas and CRLA task force meetings, and

documents revealing CRLA's interactions with state and local regulatory and policy-making

bodies.  No resolution was reached.  The Subcommittee on Commercial and Administrative Law

of the House Committee on the Judiciary is awaiting a final report upon the conclusion of the

investigation.  See Tarantowicz Decl. ¶¶ 5-8.

## ATTEMPTS TO OBTAIN DOCUMENTS FROM RESPONDENT

15.     Based on CRLA's continued refusal to provide access to the requested information and

pursuant to LSC-OIG's authority to issue subpoenas, 5 U.S.C. app. 3 § 6(a)(4), LSC-OIG served

CRLA with a subpoena duces tecum on October 17, 2006 seeking nine categories of documents

in connection with its investigation. Among the categories of documents LSC-OIG requested

were "KEMPS" (computer data program) and TTime data fields reflecting client names,

"problem codes," dates of representation, and adverse parties. LSC-OIG specifically exempted

from the request those fields in KEMPS containing client social security numbers and case

summaries. See Tarantowicz Decl. ¶ 10. LSC-OIG again requested documents pertaining to

CRLA's required setting of substantive priority areas and CRLA task force meetings, and

documents revealing CRLA's interactions with state and local regulatory and policy-making

bodies. Finally, LSC-OIG requested non-redacted versions of all previously erroneously redacted

documents provided pursuant to the administrative request. Id.

16.    On November 17, 2006, CRLA produced some documents in response to the subpoena,

but continued to refuse to produce any client identification data, properly redacted versions of

previously redacted materials, all responsive documents pertaining to CRLA task force meetings

and documents pertaining to CRLA's interactions with state and local regulatory and policy-

making bodies. See Tarantowicz Decl. ¶ 11.

17.    LSC-OIG issued the Subpoena duces tecum to CRLA for a lawful purpose within its

statutory authority under the IG Act. The Subpoena seeks non-privileged documents directly

relevant to the aforementioned investigation, which CRLA is now impeding. Because CRLA

refuses to produce relevant documents, LSC-OIG cannot complete its investigation of CRLA's

activities unless this Court orders CRLA to turn over the documents requested in the Subpoena.

18.    This document request is not unduly burdensome. CRLA has had over 12 months to

compile the requested documents, which are limited in both scope and time duration.

## RELIEF REQUESTED

WHEREFORE, Petitioners respectfully request this Court:

A.      To issue the accompanying Order to Show Cause requiring CRLA to appear and show cause why the Court should not grant this petition and the relief requested herein;

B.      Upon the return of said Order to Show Cause, adjudge that CRLA be compelled by this Court to produce such documents as are identified in the Subpoena.

C.      Grant such other and further relief as may be appropriate to effect compliance with the Subpoena.

Respectfully submitted,


PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney


OF COUNSEL:                        ARTHUR R. GOLDBERG, D.C. Bar 180661
LAURIE TARANTOWICZ                 HELEN H. HONG, CA Bar 235635
LSC-Office of Inspector General    Attorneys, Department of Justice
3333 K Street, NW, 3rd Floor       20 Massachusetts Ave., N.W., Room 6107
Washington, D.C. 20007             Washington, D.C.  20530
Tel: (202) 295-1660                Tel: (202) 514-5838
                                   Fax: (202) 616-8470
                                   E-mail: helen.hong@usdoj.gov

*Attorneys for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on ___May 23___, 2007, a copy of Petitioners' Petition for

Summary Enforcement of Administrative Subpoena Duces Tecum, supporting memorandum,

Motion for Order to Show Cause, and Proposed Order to Show Cause were sent by first class

mail, postage prepaid, to:

> William G. Hoerger
> Director of Litigation, Advocacy and Training
> California Rural Legal Assistance, Inc.
> 631 Howard St., #300
> San Francisco, CA 94105
> (415) 777-2752

HELEN H. HONG

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>and )<br><br>KIRT WEST, )<br>INSPECTOR GENERAL OF THE )<br>LEGAL SERVICES CORPORATION, )<br>3333 K STREET, NW, 3RD FLOOR, )<br>WASHINGTON, D.C. 20007, )<br><br>       Petitioners, )<br><br>       v. )<br><br>CALIFORNIA RURAL LEGAL )<br>ASSISTANCE, INC., )<br>631 HOWARD ST., #300, )<br>SAN FRANCISCO, CA 94105, )<br><br>       Respondent. )<br>                   ) | Misc. No. _____ |

**MEMORANDUM OF POINTS AND AUTHORITIES IN**
**SUPPORT OF PETITION FOR SUMMARY ENFORCEMENT OF**
**ADMINISTRATIVE SUBPOENA DUCES TECUM**

Petitioners United States of America and Kirt West, Inspector General of the Legal

Services Corporation ("LSC-OIG"), respectfully submit this memorandum of points and

authorities in support of their petition for summary enforcement of an administrative subpoena

_duces tecum_ issued pursuant to LSC-OIG's subpoena powers under 5 U.S.C. app. 3 § 6(a)(4)

(2000) in connection with its investigation of Respondent California Rural Legal Assistance,

Inc.'s ("CRLA") alleged noncompliance with the terms of CRLA's federal funding, 42 U.S.C.

§ 2996, _et seq._ ("LSC Act").

## INTRODUCTION

The Court should summarily enforce the administrative subpoena <u>duces tecum</u> ("subpoena") issued to CRLA.  An administrative subpoena is enforceable as long as (1) the subpoena was issued for a lawful purpose within the statutory authority of the agency that issued it; (2) the documents requested are relevant to that purpose; and (3) the subpoena demand is reasonable and not unduly burdensome.  <u>United States v. Hunton & Williams</u>, 952 F. Supp. 843, 848 (D.D.C. 1997).  Because all of these factors are met here and because CRLA's objections to disclosure are without merit, this Court should enforce the subpoena.

## STATUTORY BACKGROUND

LSC is a private, District of Columbia nonprofit corporation, established by the LSC Act "for the purpose of providing financial support for legal assistance in noncriminal proceedings or matters to persons financially unable to afford legal assistance." 42 U.S.C. § 2996b(a).  LSC is authorized to provide financial assistance and to make grants to corporations, like CRLA, for the purpose of providing legal assistance to the poor.  <u>Id.</u> § 2996e(a)(1)(A).  In connection with its authority to award grants, LSC must ensure that federal funds are expended in accordance with statutory directives and the terms of the contractual grant.  For example, LSC must ensure that "grants and contracts are made so as to provide the most economical and effective delivery of legal assistance to persons in both urban and rural areas;" that grantees refrain from political activity; that no federal funds are used in any fee-generating cases; that funds not be used for legal assistance for or on behalf of an alien, unless the alien meets one of six enumerated requirements; and that no grants are awarded to corporations expending 50 percent or more of their resources or time litigating issues "in the broad interests of a majority of the public," as

opposed to individual cases on behalf of specific clients. Id. § 2996f; see also §§ 501-509,

Omnibus Consolidated Recissions and Appropriations Act of 1996, Pub. L. 104-134, 110 Stat.

1321, 1321-1359 (Apr. 26, 1996) (prohibiting grantees from, for example, undertaking class

action suits, participating in litigation with respect to abortion, participating in litigation on

behalf of incarcerated persons, claiming or collecting and retaining attorneys' fees, and soliciting

clients) [hereinafter 1996 Appropriations Act].

     In addition, entities receiving federal funding under the LSC Act are bound by reporting

requirements and are subject to reviews or audits by LSC and LSC-OIG.  See 42 U.S.C.

§§ 2996f–2996h; 1996 Appropriations Act § 509(g).  LSC grantees are obliged to make available

to auditors or monitors of its activities "financial records, time records, retainer agreements,

client trust fund and eligibility records, and client names, . . . except for reports or records subject

to the attorney-client privilege."  1996 Appropriations Act § 509(h); 42 U.S.C. § 2996e(b)(3)

(generally prohibiting LSC from abrogating "the authority of a State or other jurisdiction to

enforce the standards of professional responsibility generally applicable to attorneys in such

jurisdiction[,]" and requiring LSC to "ensure that [grantee attorneys'] activities are carried out in

a manner consistent with attorneys' professional responsibilities. ).[1]

     Congress enacted the Inspector General Act of 1978 ("IGA"), 5 U.S.C. app. 3 § 1, et seq.

(2000), to combat "fraud, abuse, and waste in the operations of Federal departments and

agencies." United States v. Aero Mayflower Transit Corp., 831 F.2d 1142, 1145 (D.C. Cir.

1987) (quoting legislative history).  That Act created an independent Office of the Inspector

---

[1] This provision obviously does not constrain Congress from creating exceptions to the general rule against abrogation, as it subsequently did in § 509(h) of LSC's 1996 Appropriation Act.

General within numerous federal agencies, including the Legal Services Corporation ("LSC-OIG"). <u>See</u> 5 U.S.C. app. 3 §§ 8G(a)(2), 8G(b).[2]  Under the IGA, LSC-OIG  possesses authority to audit and investigate, including the power to, among other things, "conduct, supervise, and coordinate audits and investigations relating to the programs and operations" of LSC grantees. Id. § 4(a); <u>see also</u> <u>id.</u> § 6(a)(2) ("Inspector General . . . is authorized to make such investigations and reports relating to the administration of programs and operations of the applicable establishment as are, in the judgment of the Inspector General, necessary or desirable.").  To facilitate this investigatory authority, the IGA grants LSC-OIG broad subpoena powers "coexistent with that [investigative] authority." <u>Aero Mayflower Transit Corp.</u>, 831 F.2d at 1145.  Thus, LSC-OIG may "require by subpena [sic] the production of all information, documents, reports, answers, records, accounts, papers, and other data and documentary evidence necessary in the performance of the functions assigned by this Act." 5 U.S.C. app. 3 § 6(a)(4). "[I]n the case of contumacy or refusal to obey" the subpoena – as CRLA has demonstrated – "shall be enforceable by order of any appropriate United States district court." <u>Id.</u>

## STATEMENT OF FACTS

In late September 2005, Congress forwarded to LSC-OIG a complaint about the CRLA from a confidential source dated August 31, 2005.  The confidential source alleged principally that CRLA impermissibly focused its resources on "impact work," rather than legal services work; devoted its resources to farm worker and Latino issues, to the detriment of urban and non-Latino populations (like the Hmong and African-Americans in CRLA's service area), solicited

---

[2] The LSC is a "designated Federal entity" under the IGA. <u>See</u> 5 U.S.C. app. 3 § 8G(a)(2).  Section 8G(b) of the IGA created a separate OIG in each "designated Federal entity" and granted that OIG the powers set out in sections 4, 5, 6, and 7 of the Act. <u>See</u> <u>id.</u> § 8G(g)(1).

clients in violation of the terms of CRLA's federal funding, and performed substantial work without any clients or for clients already represented by other counsel. Upon receipt of the complaint, LSC-OIG launched an investigation pursuant to its powers under the IGA. See Tarantowicz Decl. ¶ 4.

On March 16, 2006, LSC-OIG served CRLA with an administrative request for information and documents, including documents sufficient to show CRLA client names, addresses, dates of representation, and "problem codes" (codes indicating the subject matter for which the client sought assistance). CRLA claims to have provided several boxes of documents and some megabytes of electronic data, but refused to provide some client information, including client names, claiming that the information is protected by the attorney-client privilege and California privacy laws. CRLA also heavily redacted large portions of many of the documents provided, claiming the information is protected by the work-product doctrine. CRLA also asserted that reviewing all of its 39,000 client files would consume over 3,200 attorney hours, diverting its resources from servicing clients and unduly burdening CRLA for a putatively limited benefit to LSC-OIG. See Tarantowicz Decl. ¶ 5.

Based on LSC-OIG's interviews, the documents CRLA did produce, and documents obtained from other sources, LSC-OIG published an interim report on the details of its investigation of CRLA to the Subcommittee on Commercial and Administrative Law of the House Committee on the Judiciary on September 14, 2006. In the report, LSC-OIG stated it found "substantial evidence that CRLA violated federal law by: soliciting clients; working a fee generating case; requesting attorney fees; and associating CRLA with political activities." See Tarantowicz Decl. ¶ 8. LSC-OIG also reported that CRLA may have been "conducting work . . .

-5-

that appears to be impact oriented – raising serious concerns that CRLA deviat[es] from Congress' intended purpose[]" and leads CRLA afoul of the congressionally mandated restrictions. LSC-OIG concluded that it would require "additional information from CRLA to make final determinations of the appropriateness of [CRLA's] activities" and to investigate the allegation that CRLA disproportionately focused its resources on farmworker and Latino issues. See Tarantowicz Decl. ¶ 8.

Given CRLA's continued refusal to provide client identifying and other information and pursuant to LSC-OIG's authority to issue subpoenas in connection with its investigation, 5 U.S.C. app. 3 § 6(a)(4), LSC-OIG served CRLA with a subpoena duces tecum on October 17, 2006, seeking nine categories of documents in connection with its investigation. Among the categories of documents LSC-OIG requested were "KEMPS" (computer data program) data fields in the "CLIENTSW" and "TTIME" tables reflecting client names, "problem codes," dates of representation, adverse parties and a renewed request for complete, non-redacted versions of inappropriately redacted documents provided by CRLA pursuant to LSC-OIG's March 2006 administrative request. Mindful of the federal attorney-client privilege, LSC-OIG specifically exempted from the request any fields containing case summaries. LSC-OIG also specifically exempted client social security numbers from its request in an attempt to respect client privacy concerns. See Tarantowicz Decl. ¶ 10.

On November 17, 2006, CRLA produced some documents in response to the subpoena, but continued to refuse to produce client identification data. Namely, CRLA refused to turn over KEMPS data fields reflecting client identification information and redacted significant portions of client identifying information from client intake forms, client retainer agreements and client

statements of facts, citing attorney-client privilege and client confidentiality concerns.  See

Tarantowicz Decl. ¶ 11; Ex. B (Resp. to Request No. 1 ("CRLA objects to producing the

following requested KEMPS data fields in the CLIENTSW table: CLName, CFName, CMI,

CAddress, CPhone, SLName, SFName, RhoneRef, RACardNum, Receipt, Record A/D, Temp

Res Info, Employment Auth Info, Refugee/Asylee Info, AG Withhold Deportation Info, H2A

Info, and Emergency Reason."), and Resp. to Request No. 2).  CRLA implicitly conceded that at

least some of the disputed documents were not privileged or confidential, but maintained that it

did not want to sustain the burden of assessing its 39,000 client files "on a case by case basis" to

produce them.  In other correspondence with LSC-OIG, CRLA asserted that it could not produce

the requested client identification data because of California professional codes requiring that it

maintain inviolate the confidences and secrets of its clients.  See Tarantowicz Decl. ¶ 11; Ex. B.

　　　　CRLA also refused to produce documents pertaining to CRLA's required setting of

substantive priority areas, such as material disbursed to priority setting conference attendees,

documents pertaining to CRLA task force meetings, and documents revealing CRLA's

interactions with state and local regulatory and policy-making bodies.  CRLA justified its non-

production under claims of protection by the California and/or federal attorney-client privilege

and work-product doctrines and by claiming that production would impose an undue burden.  See

Tarantowicz Decl. ¶ 11.

## ARGUMENT

### I.    LSC-OIG SATISFIES THE REQUIREMENTS NECESSARY FOR SUMMARY ENFORCEMENT OF THE SUBPOENA

A court's role in enforcing an administrative subpoena "is a strictly limited one." FTC v. Texaco, Inc., 555 F.2d 862, 871-72 (D.C. Cir. 1977) (en banc). "It is well established that a court is compelled to enforce an administrative subpoena, if the court concludes that: (1) the subpoena was issued for a lawful purpose within the statutory authority of the agency that issued it; (2) the documents requested are relevant to that purpose; and (3) the subpoena demand is reasonable and not unduly burdensome." Hunton & Williams, 952 F. Supp. 843, 848 (D.D.C. 1997); see also Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 509 (1943); Resolution Trust Corp. v. Walde, 18 F.3d 943, 946 (D.C. Cir. 1994); Linde Thompson Langworth Kohn & Van Dyke, P.C. v. Resolution Trust Co., 5 F.3d 1508, 1513 (D.C. Cir. 1993); FTC v. Invention Submission Corp., 965 F.2d 1086, 1089 (D.C. Cir. 1992); Aero Mayflower Transit Co., 831 F.2d at 1145; Resolution Trust Co. v. American Cas. Co., 787 F. Supp. 5, 7 (D.D.C. 1992). So long as the three aforementioned criteria are met, an agency has "a right to judicial enforcement of the subpoena[]." Id. at 872 (citing Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 209 (1946)). The subpoena in this case meets the three requirements for summary enforcement.

### A.    LSC-OIG Issued the Subpoena for a Lawful Purpose

LSC-OIG is authorized to investigate allegations and suspicions of statutory and regulatory violations by its grantees, such as this investigation of CRLA. "The question of whether the subpoena was issued for a lawful purpose turns on whether [LSC-OIG] possessed the requisite statutory authority to investigate" the CRLA. Hunton & Williams, 952 F. Supp. at

843. LSC-OIG's authority to conduct this investigation derives from the Inspector General Act ("IGA"), charging LSC-OIG with "the duty and responsibility . . . to conduct, supervise, and coordinate audits and investigations relating to the programs and operations" of LSC grantees. 5 U.S.C. app. 3 § 4(a); see also id. § 6(a)(2) ("Inspector General . . . is authorized to make such investigations and reports relating to the administration of programs and operations of the applicable establishment as are, in the judgment of the Inspector General, necessary or desirable."). The LSC is a designated federal entity to which the IGA applies. Id. § 8G(a)(2). LSC-OIG is also authorized to "conduct on-site monitoring, audits, and inspections in accordance with Federal standards" as necessary for programmatic, financial and compliance oversight, see 1996 Appropriations Act, § 509(g). Clearly, LSC-OIG is authorized to undertake an investigation into violations of statutory and regulatory restrictions by one of LSC's grantees.

In addition to the authority to conduct audits and investigations, LSC-OIG is authorized to obtain the necessary information to carry out its investigatory responsibilities. As with all Inspectors General, the IGA grants LSC-OIG authority to "require by subpoena the production of all information, documents . . . and other data and documentary evidence necessary in the performance of functions assigned by this Act." See id. § 6(a)(4). Independent of subpoena powers, Congress mandates that "financial records, time records, retainer agreements, client trust fund and eligibility records, and client names, for each [LSC] recipient shall be made available to any auditor or monitor . . . except for reports or records subject to the attorney-client privilege."

1996 Appropriations Act, § 509(h). This subpoena falls squarely within LSC-OIG's statutory authority and requests information that CRLA is obligated to provide.[3]

CRLA does not argue, nor could it, that LSC-OIG lacks authority to issue the subpoena in connection with LSC-OIG's investigation. See also United States v. Legal Servs. for New York City, 100 F. Supp. 2d 42, 47 (D.D.C. 2000) (Robertson, J.) (summarily enforcing petition for enforcement of subpoena issued by LSC-OIG), aff'd 249 F.3d 1077 (D.C. Cir. 2001); Bronx Legal Servs. v. Legal Servs. Corp., No. 00-3423, 2002 WL 1835597 (S.D.N.Y. Aug. 8, 2002) (granting summary judgment in favor of LSC-OIG to enforce a subpoena), aff'd 64 Fed. Appx. 310 (2d Cir. 2003) (summary order). As CRLA is aware, both LSC and LSC-OIG are tasked with reviewing whether federal grants are expended in accordance with the prescriptions and proscriptions set forth in the LSC Act and 1996 Appropriations Act. See supra discussion at 2 (discussing restrictions under 42 U.S.C. § 2996f; 1996 Appropriations Act, §§ 501-509).

**B.     The Requested Documents are Relevant to the Investigation**

The documents sought are relevant to LSC-OIG's investigation into allegations and concerns of statutory and regulatory violations by CRLA. The items sought in the subpoena need only be "reasonably relevant," meaning "merely that the information must be relevant to *some* (any) inquiry that the [agency] is authorized to undertake" and not "plainly incompetent or irrelevant to any lawful purpose of the agency." Hunton & Williams, 952 F. Supp. at 854. In an administrative proceeding, the standard for judging relevancy "is more relaxed than in an

---

[3] Separate from LSC-OIG's statutory authorization to obtain the requested documents, CRLA is contractually obliged to provide the requested documents pursuant to Grant Assurances ¶¶ 1, 9, and 10, which were executed and agreed to by CRLA as a precondition to receiving a federal grant award. See Tarantowicz Decl. ¶ 2.

adjudicatory one;" the requested material "need only be relevant to the investigation – the boundary of which may be defined quite generally." Invention Submission Corp., 965 F.2d at 1090. And where "the dispute turns on the *relevance* of the information sought by a government agency we have said that the district court should not reject the agency's position unless it is 'obviously wrong,' and that the burden, as a practical matter, is on the defendant to meet that test." Director, Office of Thrift Supervision v. Vinson & Elkins, LLP, 124 F.3d 1304, 1307 (D.C. Cir. 1997) (quoting FTC v. Invention Submission Corp., 965 F.2d 1086, 1089 (D.C. Cir.1992)); see also Hunton & Williams, 952 F. Supp. at 854.

LSC-OIG's administrative subpoena clears this low bar. The subpoena requests documents directly related to allegations lodged by the confidential source and other concerns resulting from independent OIG research that are the subject of the investigation. Client names and identifying information is not "obviously wrong" to seek – indeed it is directly relevant – in an investigation about the focus of CRLA's legal assistance, CRLA's litigation activities involving no clients or clients represented by other counsel, CRLA's alleged solicitation of clients and CRLA participation in "impact" work to the detriment of legal services work. Likewise, documents pertaining to CRLA's setting of substantive priority areas, such as material disbursed to priority setting conference attendees,[4] documents pertaining to CRLA task force meetings which help establish and implement CRLA's priorities,[5] and documents revealing CRLA's interactions with state and local regulatory and policy-making bodies are directly

---

[4] CRLA employees, as well as outside persons, are invited and attend CRLA priority setting conferences.

[5] CRLA employees, as well as outside persons, are invited and participate in CRLA Task Force meetings.

relevant to an investigation implicating specific instances of noncompliance with statutory and regulatory restrictions.

Nonetheless, CRLA complains that "no effort is made . . . to link currently disputed or unfulfilled requests for documents and information to the subjects of the Investigation . . . and no reasonable nexus between the subject matter of the Investigation and many of OIG's outstanding demands exists that justifies the burden[.]" See Tarantowicz Decl. ¶ 7; Ex. B.  CRLA's abstract objection notwithstanding, the requested information is obviously "reasonably relevant" to the subject of the investigation and CRLA cannot sustain the burden of proving that the request is "obviously wrong." See Legal Servs. for New York City, 100 F. Supp. 2d at 47 ("Respondents do not argue, nor could they, that client names are not reasonably relevant to a congressionally-mandated assessment of LSC recipients' case statistics.").

C.    **The Subpoena Demand is Reasonable and Not Unduly Burdensome**

Agencies are accorded "extreme breadth" in conducting their investigations.  Linde Thomson, 5 F.3d at 1517.  The "burden of showing that the request is unreasonable is on the subpoenaed party."  Texaco, 555 F.2d at 882.  The burden of proving undue hardship, borne by the subpoenaed party, "is not easily met where . . . the agency inquiry is pursuant to a lawful purpose and the requested documents are relevant to that purpose."  Id. (internal quotation and citation omitted).

CLRA cannot meet this high burden because the LSC-OIG subpoena will not cause CRLA undue hardship.  The majority of the information LSC-OIG seeks is either electronic and easily transferable or has already been gathered by CRLA.  The information sought from CRLA's case management system is a simple download of information onto a disc.  Indeed,

CRLA has already provided portions of the information without difficulty. CRLA previously gathered the majority of the remaining requested documents, but provided inappropriately redacted versions of the documents to LSC-OIG. As the documents have already been gathered, to make non-redacted duplicates cannot possibly be considered unduly burdensome. Although CRLA complains that it may have to duplicate efforts to provide unredacted copies of the documents, CRLA may not justify nondisclosure based on its first efforts which were inadequate and the result of CRLA's own errors.

CRLA claims that reviewing its client files to ensure that no attorney-client privilege or privacy rights are implicated will be an arduous task, requiring over 3,200 attorney hours and over 4,000 staff hours. LSC-OIG disagrees with CRLA's burden estimates, as CRLA's estimation is based on an erroneous application of California privilege and privacy laws, as outlined below.[6] Even presuming the estimate to be true, however, courts have enforced subpoenas imposing far greater burdens. See, e.g., United States v. Firestone Tire & Rubber Co., 455 F. Supp. 1072, 1083 (D.D.C. 1978) (enforcing subpoena requiring production of documents within 3 week time frame, even though the respondent alleged that compliance would require

---

[6] LSC-OIG disagrees in the first instance with the applicability of California privacy laws to the requested material here. Even assuming its applicability, however, California case law indicates that a balancing must take place between a requester's need to access the information and the a client's privacy interest. Accordingly, no blanket claim of protection is appropriate. See Hooser v. Super. Ct. of San Diego, 84 Cal. App. 4th 997, 1005 (Cal. Ct. App. 2000); Willis v. Super. Ct. of Los Angeles, 112 Cal. App. 3d 277, 297 (Cal. Ct. App. 1980).

Moreover, CRLA also claims that providing documents previously withheld under California's work-product doctrine would be burdensome. As discussed in Section II below, however, LSC-OIG is entitled to all requested information not subject to the federal attorney-client or work-product privileges -- not as CRLA would like, the California privacy laws, or California attorney-client and work-product privileges. As such, the cumbersome review CRLA insists it must undertake to comply with the subpoena is misguided.

over 100,000 man hours and $2 million); see also Oklahoma Press Club v. Walling, 327 U.S.

186 (1946) (enforcing subpoena for records of all trading in interstate commerce during

company's history); S. E. C. v. Wall Street Transcript Corp., 422 F.2d 1371 (2d Cir. 1970)

(requiring production of all correspondence with management, advertisers and subscribers over a

four year period).  Given that CRLA has had over 12 months since the first request for client

identification information to begin gathering the information, CRLA cannot object to producing

the requested documents with its undue burden argument.  See Firestone, 455 F. Supp. at 1083

("It cannot be said in this case that Firestone will be severely hampered in conducting its business

if it is forced finally to produce information which it has known for six months was being

sought.").

## II.    FEDERAL LAW, NOT STATE LAW, GOVERNS LSC-OIG'S ACCESS TO SUBPOENAED DOCUMENTS

Although this subpoena clearly satisfies the three-part test for enforcement of an

administrative subpoena, CRLA maintains that it should not have to comply with LSC-OIG's

document request because California law protects the sought information.  See Tarantowicz

Decl. ¶¶ 7, 11; Ex. B.  CRLA's reliance on state law is misplaced where it must respond to an

appropriately issued LSC-OIG subpoena.

CRLA does not dispute that federal law obligates it to provide the information sought in

LSC-OIG's subpoena.  Indeed, the LSC Act and 1996 Appropriations Act unambiguously

provide that CRLA should produce the requested information.  Instead, CRLA erroneously

contends that state law preempts its federal obligations by asserting professional obligations and

claims of privilege under the California attorney-client and work-doctrines.

**A.    Federal Law Preempts any Conflicting State Law and Defines CRLA's Obligations to Comply with the Subpoena**

The Supremacy Clause of the U.S. Constitution prohibits CRLA from avoiding its federal duties by asserting contrary state obligations. See U.S. Const. Art. VI, cl. 2 (supremacy clause). The "Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail." Gonzales v. Raich, 545 U.S. 1, 29 (2005). Indeed, in an unpublished opinion, the Ninth Circuit reversed a district court's conclusion that releasing information in a subpoena enforcement proceeding would violate a person's right to privacy under the California Constitution justifying non-enforcement of a subpoena, instead holding that "whatever state law privacy rights are implicated must yield to the [agency's] power to vindicate federal interests . . .." EEOC v. Sears, Roebuck & Co., 885 F.2d 875, *3 (9th Cir. 1989) (referring to supremacy clause).

CRLA's principal objection to the LSC-OIG subpoena is that California ethics laws do not permit disclosure of requested information. CRLA asserts that California Business & Professions Code § 6068 mandates that it "maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client" and that the requested client information is such a "confidence" or "secret," implicating its clients' privacy rights. "

This precise issue has been settled by this Court and affirmed by the D.C. Circuit, in favor of LSC-OIG. In United States v. Legal Services for New York City, this court – affirmed by the D.C. Circuit – granted a petition to enforce an LSC-OIG subpoena compelling client identification information, despite protests that disclosure would violate New York and Model Code of Professional Responsibility rules prohibiting disclosure of client "secrets." 100 F. Supp.

2d at 46-47. The court concluded that the broad mandates of § 509(h) granting auditors and monitors access to client identification information "expressly supersedes the broad undertaking of" state professional codes and requires production of client names." Id. at 47. Similarly, in Bronx Legal Services, the district court – affirmed by the Second Circuit – rejected contentions that New York state professional responsibility obligations trumped § 509(h) disclosure requirements. 2002 WL 1835597 at *4. It, too, determined that "even if the requested [ ] information does constitute a client secret, plaintiffs are relieved of any perceived ethical obligations to withhold client names and the nature of the representation because they are required by law to disclose the requested information." Id.

In another case, this court also rejected a similar argument that Virginia Disciplinary Rules prohibited disclosure of secrets, including client names and information, in response to an administrative subpoena. The court stated that "[f]ederal law, however, not state law, applies to this instance so [the respondent] may not use any state law to prevent disclosure of the subpoenaed information." Hunton & Williams, 952 F. Supp. at 856. Accordingly, by virtue of LSC-OIG's subpoena powers pursuant to the IGA and separately by LSC-OIG's access to grantee records pursuant to § 509(h), Congress has authorized LSC-OIG's access to the relevant material, and CRLA must comply notwithstanding state law. See also Legal Servs. Corp., 249 F.3d at 1083 ("Since we conclude that grantees' ethical obligations do not prevent the Inspector General from compelling production of client names associated with problem codes, we need not reach the sufficiency of the Chinese wall instituted to prevent that association.").

CRLA attempts to distinguish prevailing case law from the present case, contending that the ethics laws at issue in those cases permitted disclosure of secrets if "required by law," while

CRLA is bound by California ethics laws that purportedly contain no such exception.[7]  This case, however, is on all fours with both <u>Legal Services</u> and <u>Bronx Legal</u>.  CRLA must provide all responsive documents to the LSC-OIG subpoena that are not protected by the federal attorney-client or work-product privileges irrespective of contrary California ethics obligations.  Accordingly, by virtue of the Constitution of the United States, federal law and prevailing case law, CRLA's attempt to avoid its duty to comply with a properly issued LSC-OIG subpoena by invoking California laws must be rejected.

**B.    Federal Privilege and Work-Product Doctrines Apply**

CRLA also contends that state privilege and work-product laws justify nondisclosure .  Courts have uniformly held, however, that subpoena enforcement proceedings "rest soundly in federal law, and federal law of privilege governs any restrictions on the subpoena's scope."  <u>Linde Thomson</u>, 5 F.3d at 1514.  Because the LSC-OIG subpoena served upon CRLA does not implicate the federal attorney-client privilege or work-product protections, CRLA must tender all requested documents pursuant to the LSC-OIG subpoena.

---

[7]  California does provide an "otherwise required by law" exception to an attorney's duty to maintain client confidences, just as the laws examined in <u>Legal Services</u> and <u>Bronx Legal</u>.  The California Rules of Professional Responsibility provide that "a member may not reveal" information otherwise protected by section 6068, "except with the consent of the client <u>or as authorized or required by the State Bar Act, these rules, or other law</u>." Cal. Rules of Prof'l Responsibility R. 3-100, Discussion [2] (emphasis added); <u>see also</u> ABA Model Rules of Professional Conduct 1.6 (providing that attorneys may reveal confidences if required by law); <u>Frye v. Tenderloin Housing Clinic, Inc.</u>, 38 Cal. 4th 23, 52 n. 12 (2006) (We note that although California has not adopted the ABA Model Rules, they may be "helpful and persuasive in situations where the coverage of our Rules is unclear or inadequate.").

1.    **Blanket Claims of the Federal Attorney-Client Privilege do not Justify Non-disclosure**

The client identifying information requested in the LSC-OIG subpoena is not, as CRLA asserts, protected by the federal attorney-client privilege.  Under federal law, client identity is not protected by the attorney-client privilege, absent special circumstances.  Although the attorney-client privilege is necessary to encourage clients to "make full disclosure to their attorneys" in order to obtain fully informed legal advice, United States v. Fisher, 425 U.S. 391, 403 (1976), the privilege must be construed narrowly since it is an exception that is a "derogation of the search for the truth." United States v. Nixon, 418 U.S. 683, 686 (1974).  "[S]ince the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose.  Accordingly, it protects only those disclosures -- necessary to obtain informed legal advice -- which might not have been made absent the privilege." Fisher, 425 U.S. at 403.[8]  The special circumstances shielding client information from disclosure are "extremely narrow" and limited to circumstances where disclosure would implicate the client in criminal wrongdoing, or when "disclosure, in conjunction with information already provided, would be tantamount to revealing an 'indubitably confidential communication.'" Legal Servs. for New York City, 100 F. Supp. 2d at 45.  Thus, courts have found permissible disclosure of the identity of a client, the amount of a fee, or the general purpose of legal work performed. Id. at 44-45 (citing Clarke v. Am. Commerce Nat'l Bank, 974

---

[8]  In addition, the "protection of the privilege extends only to communications and not to facts.  A fact is one thing and a communication concerning that fact is an entirely different thing.  The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." Upjohn Co. v. United States, 449 U.S. 383, 395-96 (1981).

F.2d 127, 129 (9th Cir. 1992)). Significantly, because of the "extremely narrow" circumstances justifying non-disclosure, blanket assertions of privilege "are strongly disfavored . . . and must be rejected." Id. at 46.

CRLA makes no specific showing of privilege to protect some or all of its client identifying information here. Rather, CRLA asserts only a generic claim of privilege for its client identifying information. Even generically, however, CRLA has not advanced claims that any of its clients would be implicated in criminal wrongdoing or sufficiently proved that disclosure would be tantamount to revealing an indubitably confidential communication. Instead, CRLA insufficiently contends that its clients would suffer immediate retaliation in firings or evictions (and possibly physical harm) from employers or landlords learning that the client had met with CRLA. Federal law, however, maintains no attorney-client privilege protection for such speculative and dubious claims.

Moreover, CRLA suggests that revealing client names in conjunction with date of representation, problem codes, and adverse party "is more than enough information to infer the particular client's specific motivation for the consultation." See Ex. B; Tarantowicz Decl. ¶ 7. CRLA fails to explain how a request for basic client identifying information, coupled with generic problem codes or service eligibility information or adverse party information, could possibly reveal a client's specific motivation for seeking services. Indeed, CRLA cannot show that the LSC-OIG subpoena requests any information "necessary to obtain informed legal advice," as required under federal privilege law. Fisher, 425 U.S. at 403. CRLA offers no more than a conclusory statement to support its contention that motivation would be revealed by the data requested here. Such conclusory, blanket claims have been rejected in similar situations and

courts have expressly found that, in general, client names and problem codes provided in

conjunction do not reveal client confidences.  See Legal Servs. Corp., 100 F. Supp. 2d at 46

(enforcing request for client identification information and problem codes, but not foreclosing the

possibility that specific claims of privilege could be raised where disclosure of both name and

problem code would reveal a client's motive for seeking representation).  CRLA's general,

blanket complaints are insufficient to justify nondisclosure.

### 2.    Blanket Claims of the Federal Work-Product Doctrine do not Justify Non-disclosure

CRLA attempts to shield as work-product documents pertaining to CRLA's setting of

substantive priority areas, such as material disbursed to priority setting conference attendees,

documents pertaining to CRLA task force meetings, and documents revealing CRLA's

interactions with state and local regulatory and policy-making bodies.  None of the documents

requested in the LSC-OIG subpoena, however, appear to be protected by the federal work-

product doctrine.  "At its core, the work-product doctrine shelters the mental processes of the

attorney, providing a privileged area within which he can analyze and prepare his client's case."

United States v. Nobles, 422 U.S. 225, 238 (1975).[9]  "The federal work product doctrine does not

extend to every written document generated by an attorney, . . . rather, work product covers only

_____

[9] Moreover, "[t]he privilege derived from the work-product doctrine is not absolute.
Like other qualified privileges, it may be waived."  Nobles, 422 U.S. at 239.  CRLA likely
waived any work-product privileged attached to many of the documents by sharing them with
outsiders who did not have a common interest in any actual or contemplated litigation.  For
example, at least one LSC Board member attended CLRA's Priorities Setting Conference in
November 2003.  LSC-OIG is informed that conference materials were made available to all
attendees.  See Tarantowicz Decl. ¶ 11.  Furthermore, documents "prepared in anticipation of
litigation or for trial" are discoverable upon a showing of "substantial need."  Fed. R. Civ. P.
26(b)(3).

documents prepared in contemplation of litigation." Senate of Puerto Rico ex rel. Judiciary

Comm. v. United States Dep't of Justice, 823 F.2d 574, 586 (D.C. Cir. 1987) (internal citations

omitted). A document is protected by the work-product doctrine if "in light of the nature of the

document and the factual situation in the particular case, the document can fairly be said to have

been prepared or obtained because of the prospect of litigation." Id. at 586 n.42. In order for a

document to meet this standard, "the lawyer must at least have had a subjective belief that

litigation was a real possibility, and that belief must have been objectively reasonable." In re

Sealed Case, 146 F.3d at 884.

   None of the requested documents appear protected by the work-product doctrine. In fact,

the documents requested pertain to either administrative, organizational planning or

organizational contact with regulatory and policy-making bodies. Neither category of documents

are client specific or performed on behalf of a client. Accordingly, none of the documents could

have been prepared in anticipation of litigation or on behalf of a particular client or particular

case. Even if some documents contain protected material, CRLA must specifically demonstrate

that a portion of a document is protected by the federal work-product doctrine.[10] CRLA's blanket

and general assertions are insufficient to withhold the requested documents from LSC-OIG.

---

   [10] CLRA cannot withhold any portion of a document that could have been protected
work-product but for which CRLA waived the privilege by disclosure to a party not having a
common interest in the specific litigation. For example, any work-product contained in one of
the white papers produced for the November 2003 Priorities Setting Conference was likely
waived by virtue of the fact that outsiders, such as the member of the LSC Board, were provided
with a copy of the document.

## **CONCLUSION**

LSC-OIG, as part of its lawful investigation into CRLA's activities, issued a subpoena for documents directly relevant to that inquiry. This request was neither unreasonable nor unduly burdensome. This Court should therefore order summary enforcement of the subpoena.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

OF COUNSEL:
LAURIE TARANTOWICZ
LSC-Office of Inspector General
3333 K Street, NW, 3rd Floor
Washington, D.C. 20007
Tel: (202) 295-1660

ARTHUR R. GOLDBERG, D.C. Bar 180661
HELEN H. HONG, CA Bar 235635
Attorneys, Department of Justice
20 Massachusetts Ave., N.W., Room 6107
Washington, D.C. 20530
Tel: (202) 514-5838
Fax: (202) 616-8470
E-mail: helen.hong@usdoj.gov

*Attorneys for Petitioners*

**LEGAL SERVICES CORPORATION**
**OFFICE OF THE INSPECTOR GENERAL**

_FILED_
_MAR 2 3 2007_
_NANCY MAYER WHITTINGTON, CLERK_
_U.S. DISTRICT COURT_

---

**SUBPOENA DUCES TECUM**

Subpoena Number: <u>07-001</u>

TO:    Jose Padilla
       Executive Director
       California Rural Legal Assistance, Inc.
       631 Howard Street, #300
       San Francisco, CA 94105

      **YOU ARE HEREBY COMMANDED TO APPEAR BEFORE** Karena Dees, Assistant Counsel, an official of the Office of Inspector General, at 3333 K Street, NW, 3rd Floor, in the city of Washington, D.C., on the 17th day of November, 2006, at 12:30 p.m. of that day, in connection with an ongoing investigation into allegations against California Rural Legal Assistance. And, you are hereby required to bring with you and produce at said time and place originals or copies of the following documents in your possession and regardless of the manner in which or source from which you obtained the documents:

See <u>Appendix A</u>

which are necessary in the performance of the responsibility of the Inspector General under the Inspector General Act of 1978, as amended, 5 U.S.C. App. 3 § 6(a)(4), to conduct and supervise audits and investigations and to promote economy, efficiency and effectiveness in the administration of and to prevent and detect fraud, waste and abuse in the programs and operations of the Legal Services Corporation.

You are also directed to complete and return the attached Certification along with all responsive documents at 12:30 p.m. on 17th day of November, 2006.

**IN TESTIMONY WEHREOF**

      Kirt West, the undersigned official
      of the Office of Inspector General
      of the Legal Services Corporation,
      has hereunto set his hand this 17th
      day of October, 2006.

           _Kirt West_
              (Signature)

**UNITED STATES OF AMERICA**
**LEGAL SERVICES CORPORATION**
**OFFICE OF INSPECTOR GENERAL**
**WASHINGTON, D.C.**

**SUBPOENA DUCES TECUM**

**UPON CONTUMACY OR REFUSAL TO OBEY, THIS SUBPOENA SHALL BE ENFORCEABLE BY ORDER OF THE APPROPRIATE UNITED STATES DISTRICT COURT.**

**RETURN OF SERVICE**

g a person over 18 years of age, hereby
that a copy of this subpoena was duly
on the person named herein by means

onal delivery to an individual, to wit:

_____
(Name)

_____
(Title)

_____
(Address)

onal delivery to an address, to wit:

_____
(Description of Premises)

_____
(Address)

stered or certified mailing to:

_____
(Name)

_____
(Address)

( ) a.m.
( ) p.m.    on    _____

_____
(Signature)

_____
(Title)

## APPENDIX A

Please index all documents provided to the OIG in response to this subpoena in accord with this appendix and Attachments A and B of Appendix B.

1. All KEMPS data fields that reside in the CLIENTSW table with the exception of the SSN (Social Security Number) field and the SUMMARY (case memo) field. When copying the selected fields from the KEMPS Tables and subTables use the KEMPS Table or subTable name for the file created.

2. All KEMPS data fields that reside in the TTIME table for matters, activities and all cases (regardless of the date the case was actually initiated), that were in an open status for part or all of the period between January 1, 2003 to October 31, 2005, and that CRLA provide such data in an access database format. When copying the selected fields from the KEMPS Tables and subTables use the KEMPS Table or subTable name for the file created.

3. Unredacted copies of all documents provided pursuant to the Office of Inspector General's Data and Document Request of March 16, 2006, see Appendix B, and not protected by the federal attorney-client privilege or the federal work product doctrine.

4. For the period January 2003 to the present, for each of the following activities, provide all case or matter numbers, client names, intake sheets, statements of facts, retainer agreements, co-counsel agreements that are now or ever have been associated with the activity. Fore each of the activities, also provide all timekeeping records, including records of time spent by those in any way connected with the activity, and the funding source for the work:

   a. work in connection with WorkSafe;

   b. work in conjunction with Friends of Farmworkers;

   c. work in conjunction with California Affordable Housing Law Project;

   d. work in connection with California Coalition for Rural Housing;

   e. work in conjunction with Migrant Education State Parent Advisory Council (SPAC); and

   f. comment(s) or testimony on California Department of Industrial Relations current of proposed regulations or other policies.

5. For the period January 1998 to the present, for each of the following activities provide all case or matter numbers; client names; intake sheets; statements of facts; retainer agreements; co-counsel agreements that are now or ever have been associated with the activity. For each of the activities, also provide all timekeeping records, including records of time spent by those in any way connected with the activity, and the funding source for the work:

   a. work in connection with Census 2000; and

   b. work in connection with the Poverty & Race Research Action Council (PRRAC).

6. For the period January 1, 2003 to present, with regard to all CRLA Asilomar and/or annual conferences, a list of all conference attendees.

7. For the period January 1, 2003 to present, with regard to all CRLA Asilomar and/or annual conferences, a copy of all materials disbursed to conference attendees, conference agendas, conference meeting agendas, conference meeting minutes and/or other summaries of meetings.

8. For the period January 1, 2003 to present, a copy of all CRLA Board of Directors Meeting Packets, complete with press clippings and that may or may not have been circulated to CRLA field offices.

9. For the period January 1, 2003 to present, with regard to CRLA task forces, provide copies of meeting agendas, minutes and/or other summaries of meetings relating to task force activities, and task force reports.

**<u>APPENDIX B</u>**

**LSC**

Legal Services Corporation
Office of Inspector General

Inspector General
Kirt West

March 16, 2006

Jose Padilla, Executive Director
California Rural Legal Assistance, Inc.
631 Howard Street, #300
San Francisco, CA 94105

Dear Mr. Padilla:

The Office of Inspector General (OIG) requires the data and documents set out in attachments A and B, respectively, in order to complete a Congressionally-requested investigation of the activities of California Rural Legal Assistance, Inc. (CRLA).

As we have previously indicated, the OIG is conducting an investigation pursuant to the Inspector General Act of 1978, as amended, 5 U.S.C. Appendix, and Section 509(g) of Public Law 104-134, incorporated by reference in the 2006 LSC Appropriation. Section 509(h) of Public Law 104-134 specifically provides the OIG access to all financial records, time records, retainer agreements, client trust fund and eligibility records, and client names with the only exception being reports or records subject to the attorney-client privilege. *See also* Section 504(a)(8), regarding client statements of fact. Pursuant to Grant Assurance 9, CRLA assured and certified that the OIG shall have access to all records, agreements and client names as set forth in Section 509(h). Additionally, Grant Assurance 10 provides CRLA's assurance that it will cooperate with all reasonable and necessary information collection and Grant Assurance 12 provides CRLA's agreement that the OIG may access any and all records and information to which it is entitled under the IG Act.

We request that CRLA first provide documents responsive to document request 10(A), concerning the case, *CCC v. Modesto*, and then provide the other requested information as it is compiled. The *CCC v. Modesto* information should be provided within seven to ten days; the remaining information should be provided within thirty days. If CRLA finds it cannot meet these time frames, please contact OIG counsel Laurie Tarantowicz.

As mentioned, the OIG does not have access to privileged attorney-client communications. In formulating the attached data and document requests, the OIG has made every effort to ensure that we are not asking for records

containing such communications. If you believe that any particular category of data or documents requested includes confidential attorney-client communications that should be withheld from production, or if you have any other questions or concerns, please contact Ms. Tarantowicz to discuss the matter.

Sincerely,

*Kirt West*

Kirt West
Inspector General

Attachments (2)

2

Attachment A

# DATA REQUEST

I.    It is requested that California Rural Legal Assistance, Inc (CRLA) provide the following KEMPS data fields for matters, activities and cases that were in an open status for all or part of the period January 1, 2003 to October 31, 2005 (regardless of the date actually initiated), and that CRLA provide such data in an access database format:

A.    All KEMPS data fields that reside in the AGCOUNTY table.

B.    All KEMPS data fields that reside in the AGENCY table.

C.    All KEMPS data fields that reside in the AGSUBJECTS table.

D.    All KEMPS data fields that reside in the CALENDAR table.

E.    All KEMPS data fields that reside in the CALLBACK table with the exception of the NOTES (notes about initial client call) field.

F.    All KEMPS data fields that reside in the CALLBACKFROM table with the exception of the NOTES (notes about call from client) field.

G.    All KEMPS data fields that reside in the CALLBACKTO table with the exception of the NOTES (notes from call to client).

H.    All KEMPS data fields that reside in the CLIENTSW table with the exception of the SSN (Social Security Number) field and the SUMMARY (case memo) field.

I.    All KEMPS data fields that reside in the COMPENS table

J.    All KEMPS data fields that reside in the CONFLICT table with the exception of the SSN (Social Security Number) field and the USERADV (Adverse party SSN, birth date or other info) field.

K.    All KEMPS data fields that reside in the ELIGIBILITY table.

L.    All KEMPS data field that reside in the HOTLINE table with the exception of the NOTES (Notes for text on letter) field.

M.    All KEMPS data fields that reside in the LAWYERSUBJECT table.

N.    All KEMPS data fields that reside in the LITIGATION table.

Attachment A

O.   All KEMPS data fields that reside in the LITIGATIONPARTY table.
P.   All KEMPS data fields that reside in the OSERVICE table

Q.   All KEMPS data fields that reside in the PBI table

R.   The following KEMPS data fields (by name or function) that reside in the LAWYERS table:

| FIELD REQUESTED | KEMPS FIELD NAME | TYPE FIELD |
|---|---|---|
| 1. Unique Attorney Number | VATNUM | TEXT |
| 2. Lawyer's Last Name | VLNAME | TEXT |
| 3. Lawyer's First Name | VFNAME | TEXT |
| 4. Salutation for Attorney | VSALUTATE | TEXT |
| 5. Firm | VFIRM | TEXT |
| 6. Address | VADDRESS | TEXT |
| 7. Phone | VPHONE | TEXT |
| 8. City | VCITY | TEXT |
| 9. County | VCOUNTY | TEXT |
| 10. Will Consult On | VCONSULT | TEXT |
| 11. Hours Spent of PBI Case | VHOURS | NUM-DOUBLE |
| 12. Number of PBI Cases Taken | VCASES | NUM-BYTE |
| 13. Zip Code | VZIP | TEXT |
| 14. Miscellaneous Comments | VMISC1 | TEXT |
| 15. Title | VTITLE | TEXT |
| 16. Number of Refusals | VREFUSALS | NUM-BYTE |
| 17. Dates Refused Comments | VDREFUSE | TEXT |
| 18. Is Lawyer Currently on Panel | VONPANEL | YES/NO |
| 19. Current ongoing PBI case | VONGOING | YES/NO |
| 20. Volunteer Panel | VVLSP | YES/NO |
| 21. Secondary or Lawyer Referral Panel | VLRS | YES/NO |
| 22. Area Code | VACODE | NUM-INTEGER |
| 23. State | VSTATE | TEXT |
| 24. Last Date Lawyer Took A PBI Case | VLASTCASE | DATE/TIME |
| 25. Memo Field about Lawyer | VSUMMARY | MEMO |
| 26. Year Joined PBI Panel | VJOINPANEL | DATE/TIME |
| 27. Will Speck On | VSPEAK | TEXT |
| 28. FAX Number | VFAX | TEXT |
| 29. Reduced Fee Panel | VRPANEL | YES/NO |
| 30. Serves on These Panels | VPANELS | TEXT |
| 31. Position or Occupation of Volunteer | VPOS | TEXT |
| 32. Usual Hourly Fee | VHFEE | NUM-SINGLE |
| 33. Handles Trials | VHANTRL | YES/NO |
| 34. Handle Advice | VHANADV | YES/NO |

Attachment A

| | | |
|---|---|---|
| 35. Handle Administrative Matters | VHANADM | YES/NO |
| 36. Handle Appeals | VHANAPP | YES/NO |
| 37. Handle Mentoring | VHANMEN | YES/NO |
| 38. How Recruited | VRECRUIT | TEXT |
| 39. Training Information | VTRAIN | TEXT |
| 40. Complaints about | VCMPLT | YES/NO |
| 41. Text About Complaints | VCMPLTT | TEXT |
| 42. User Defined Field | VUSER | TEXT |
| 43. Cases Owed by Attorney And Reason | VOWED | TEXT |
| 44. Miscellaneous Comment 2 | VMISC2 | TEXT |
| 45. Miscellaneous Comment 3 | VMISC3 | TEXT |
| 46. Extension of Lawyer's Name | VEXT | TEXT |

S.   The following KEMPS data fields (by name or function) that reside in the SMEMBER table:

| FIELD REQUESTED | KEMPS FIELD NAME | TYPE FIELD |
|---|---|---|
| 1. Staff Member's Number | SNUM | NUM-LONG INT |
| 2. Staff Member's Initials | SINITIALS | TEXT |
| 3. Staff First Name | SFNAME | TEXT |
| 4. Staff Last Name | SLNAME | TEXT |
| 5. Position | SPOSITION | TEXT |
| 6. Office | OFFICE | TEXT |
| 7. Memo Field | NOTE | MEMO |
| 8. Date Started Work | STARTDATE | DATE/TIME |
| 9. Date Ended Work | ENDDATE | DATE/TIME |
| 10. Current Employee | CURRENTEMPLOY | YES/NO |
| 11. Security Level | SECLEVEL | NUM-INTEGER |

II.   It is requested that California Rural Legal Assistance, Inc. provide the table values in printed format (i.e. code/number and corresponding text value) for the following KEMPS tables:

A.   subCALLCODE

B.   subCASEACTIVITY

C.   subCCITY

D.   subCLINIC

E.   subCOUNTIES

F.   subELIGIBILE

3

Attachment A

G.  subFUNDS

H.  subINCSOURCE

I.  subLANGUAGE

J.  subLIVE

K.  subMAINBENEFIT

L.  subNONCASE

M.  subOFFICE

N.  subOSERVICE

O.  subOUTCOME

P.  subPCODE

Q.  subPROGRAM

R.  subRCLOSED

S.  subRCLOSEDTEXT

T.  subRREJECT

U.  subSPCODE1, subSPCODE2 and subSPCODE3

V.  subTIME

W.  subTINTAKE

X.  subUCODE

Y.  subWORKER

III.  When copying the selected fields from the KEMPS Tables and subTables use the KEMPS Table or subTable name for the file created.

Attachment B

## DOCUMENT REQUEST

It is requested that California Rural Legal Assistance, Inc. (CRLA), provide the following records, information and/or documents maintained by CRLA in physical or electronic form.  Materials requested should be accompanied by an index identifying each document or other materials and the item or items to which it relates.

1. For the period January 1, 2003 to present, copy of written internal policies, procedures and/or manuals in force with respect to the following, including those applying CRLA-wide and those specifically applicable in the Modesto and Stockton offices:

   A. Time keeping;

   B. Case handling and office procedures;

   C. Retention and disposal for documents, records and data;

   D. Internal compliance;

   E. Client intake;

   F. Accumulation and reporting of cases, matters or other categories of activity.

2. For the period January 1, 2003 to present, copy of individual time and attendance records used for payroll for all Modesto staff.

3. For the period January 1, 2003 to present, copy of the following personnel records for CRLA Modesto staff: performance plans, performance evaluations, and/or special awards.

4. For the period January 1, 2003 to present, copy of three- and/or six-month employee plans for all CRLA Modesto staff and any resulting reports or other memoranda.

5. For the period January 1, 2003 to present, copy of CLRA Board meeting agendas, transcripts and/or minutes.

6. For the Modesto office, for the period January 1, 2003 to present, copy of intake logs/sign-in sheets.

7. For Modesto and Stockton office staff, copy of all expense reports, requests for reimbursement, submitted with respect to activity occurring during the period January 1, 2003 to present.

8.  For the period January 1, 2003 to present, with regard to all CRLA Asilomar conferences, copy of materials disbursed to conference attendees, conference agendas, meeting agendas, meeting minutes and/or other summaries of the conference(s) or meetings.

9.  For the period January 1, 2003 to present, with regard to CRLA task forces, copy of agendas, minutes and/or other summaries of meetings; any other summaries of task force activities; task force reports.

10. For each of the following cases, provide all case or matter numbers, client names, intake sheets, statements of facts, retainer agreements, eligibility waivers and co-counsel agreements that are now or ever have been associated with the case. For each of the cases, also provide all timekeeping records, including records of time spent in any way connected with the case, and also provide the funding source(s) for the work:

   A.  CCC v. Modesto;

   B.  Prima Frutta;

   C.  McBride education case;

   D.  Ochoa v. J.B. Martin & Sons Farms, 287 F.3d 1182 (9th Cir. 2002);

   E.  Rucker v. Davis, 237 F.3d 1113 (9th Cir. 2001);

   F.  Arakelian v. Conquest, No. B161037, 2003 Cal. App. Unpub., LEXIS 11258 (Cal. Ct. App. Dec. 2, 2003);

   G.  Wasatch Property Management v. Degrate, 126 Cal Rptr. 2d 923 (Cal. Ct. App. 2002);

   H.  Murphy v. Kenneth Cole Productions, 36 Cal. Rptr. 3d 418 (Cal. Ct. App. 2005);

   I.  Cortez v. Purolator Air Filtration Products Co., 999 P. 2d 706 (Cal. 2000);

   J.  Post v. Palo/Haklar & Associates, 4 P.3d 928 (Cal. 2000);

   K.  Lolley v. Campbell, 48 P.3d 1128 (Cal. 2002);

   L.  Smith v. Rae-Venter Law Group, 58 P. 3d 367 (Cal. 2002).

11. For the period January 1, 2003 to the present, for each of the following activities, provide all case or matter numbers, client names, intake sheets, statements of

facts, retainer agreements, co-counsel agreements that are now or ever have been associated with activity. For each of the activities, also provide all timekeeping records, including records of time spent in any way connected with the activity, any summaries or statements of work done in connection with the activity, and the funding source(s) for the work:

A.  Comment(s) and other work on California AB 712, a bill redefining base residential densities;

B.  Comment(s) on Santa Barbara County Association of Governments -- Transit Needs Assessment 2005;

C.  Comment(s) on Housing Elements in all jurisdictions where comments were provided by CRLA;

D.  Comment(s) on Yuba City Housing Element via participation in Affordable Housing Task Force;

E.  Participation in Cal/OSHA Regulatory Advisory Committee for 8 CCR 3456;

F.  Participation in Cal/OSHA Hand Weeding Advisory Committee;

G.  Comment(s) re: "Advance Path" at Pajaro Valley Unified School District  Board Meeting;

H.  "An Analysis of the Labor Provisions of McCain/Kennedy [Immigration Reform Bill, S. 1033];"

I.  Letter to President of California State Board of Education re: "Recent State Board of Education Actions Against Latino, Asian and Language Minority Students" (November 6, 2000);

J.  Senate and Assembly Joint Housing Committee Hearing on the Housing Element Working Group (Jan. 26, 2004);

K.  Work in connection with WorkSafe;

L.  Work in conjunction with Friends of Farmworkers;

M.  Work in conjunction with the California Affordable Housing Law Project;

N.  Work in connection with the California Coalition for Rural Housing;

O.    Work in conjunction with the Migrant Education State Parent Advisory Council (SPAC);

P.    Comment(s) at City of Watsonville Council meetings;

Q.    Comment(s) or testimony on California Department of Education current or proposed regulations or other policies;

R.    Comment(s) or testimony on California Department of Housing current or proposed regulations or other policies;

S.    Comment(s) or testimony on California Department of Pesticide Regulation current or proposed regulations or other policies;

T.    Comment(s) or testimony on California Department of Environmental Protection current or proposed regulations or other policies;

U.    Comment(s) or testimony on California Department of Industrial Relations current or proposed regulations or other policies.

12.    For the period January 1, 1998 to the present, for each of the following activities, provide all case or matter numbers, client names, intake sheets, statements of facts, retainer agreements, co-counsel agreements that are now or ever have been associated with activity.  For each of the activities, also provide all timekeeping records, including records of time spent in any way connected with the activity, any summaries or statements of work done in connection with the activity, and the funding source(s) for the work:

A.    Work in connection with Census 2000;

B.    Work in connection with the Poverty & Race Research Action Council (PRRAC):

C.    Comment on A.B. 2399 (Poochigian), a bill to require continuing education for California farm labor contractors.

4

## **CERTIFICATION**

(To be returned along with all responsive documents at 12:30 p.m. on the 17th day of November, 2006.)

I certify, to the best of my knowledge, that I have produced to the Office of Inspector General of the Legal Services Corporation all documents in my possession that are required to be produced by subpoena number 07-001 to which this Certification was attached.

I further understand that this Certification is for purposes of an Inspector General investigation and that intentional false statements may result in criminal penalties or other sanctions.

NAME (please print):

TITLE:

SIGNATURE:

DATE:

PHONE NUMBER:

1  CALIFORNIA RURAL LEGAL
   ASSISTANCE, INC.
2  631 Howard Street, No. 300
   San Francisco, California 94105
3  Tel:   (415) 777-2752
   Fax:   (415) 543-2752
4

5

6

7

8

9

10

11

12

13  IN RE SUBPOENA DUCES TECUM NO.          Response to Subpoena Duces Tecum No.
    07-001, DATED OCTOBER 17, 2006,         07-001, dated October 17, 2006, to
14  ISSUED BY LEGAL SERVICES                California Rural Legal Assistance, Inc.
    CORPORATION OFFICE OF INSPECTOR         Issued by Legal Services Corporation
15  GENERAL TO                              Office of Inspector General

16
    CALIFORNIA RURAL LEGAL
17       ASSISTANCE, INC.,

18               Respondent.

19

20

21

22

23

24

25

26

27

28

1  and the manner in which such materials could be provided. These requests were made so

2  that the documents and information requested and provided could be tailored in scope and

3  volume to the actual scope and reasonable needs of the Investigation; and so that more

4  manageable protocols could be developed for inspection and production of documents and

5  information. As explained each time the requests were made, their purpose was to reduce

6  the burden and expense on CRLA (and, correspondingly, on OIG) so that the Investigation

7  could be conducted effectively and efficiently while more of CRLA's resources could be

8  devoted to its core mission of providing legal services to the poor; and to allow the OIG

9  access to the documents and information it genuinely needed while preserving the rights of

10  CRLA's clients and others to whom it owes duties, and ensuring CRLA's and its personnel's

11  compliance with their legal, professional and ethical rights and duties. While reaching

12  certain limited accommodations on a few limited points, the OIG by and large has refused to

13  discuss these issues with CRLA. CRLA renews its request to meet and confer on all

14  outstanding points. CRLA's correspondence with OIG and with LSC relative to these issues

15  is in the possession of and known to OIG, and is incorporated in this Response. Some (but

16  not necessarily all) of that correspondence is attached hereto as Exhibit A. CRLA objects to

17  OIG's failure to meet and confer, and its refusal to discuss mitigating the oppressive and

18  undue burden it has imposed on CRLA as described herein.

19        (b)    Notwithstanding the foregoing, in response to the Administrative Demand

20  and otherwise CRLA has previously produced to OIG in excess of 6,000 pages of documents

21  and many megabytes of electronic data, all of which is in the possession of and known to

22  OIG, and is incorporated in this Response. Some (but not necessarily all) of the

23  correspondence describing what has and has not been furnished prior to this Response is

24  attached hereto; all such correspondence, which is in the possession of and known to the

25  OIG, is incorporated in this Response. CRLA objects to producing any document or

26  information previously produced to the OIG, whether pursuant to the Administrative

27  Demand or otherwise, on the grounds that such a request is overbroad, unduly burdensome

28  and oppressive, duplicative, and involves materials now equally or more easily available to

1       3.    CRLA objects to the Subpoena and each Request therein to the extent that the

2  OIG thereby demands that CRLA produce documents or information in violation of its

3  clients', applicants' for legal assistance, or other third parties' rights under state law,

4  including but not limited to rights of privacy or confidentiality. CRLA similarly objects to

5  the Subpoena and each Request therein to the extent OIG thereby demands that CRLA

6  produce documents or information in violation of CRLA's or its personnel's legal,

7  professional and/or ethical duties, including but not limited to duties of confidentiality under

8  state law. Such demands exceed the scope of the OIG's authority by, among other reasons,

9  failing to exercise the OIG's powers "in a manner consistent with attorneys' professional

10  responsibilities" as required by federal law; and to the extent such demands are actually

11  purportedly authorized by federal law, such federal law exceeds the scope of LSC's, the

12  OIG's and Congress's statutory and constitutional powers and is invalid and unenforceable.

13       4.    Without limiting the generality of the preceding two paragraphs, CRLA objects to

14  the Subpoena, and to each Request therein, to the extent that they demand the production of

15  identifying information concerning every client or applicant for legal assistance who has

16  consulted CRLA over an extended period of time, comprising in excess of 39,000 clients.

17  These demands are objectionable, among other reasons, because (in addition to the reasons

18  stated in the two preceding paragraphs):

19       (a)    Identification (and/or the production of identifying or personal or financial

20  information or documents) of what CRLA estimates is thousands of those clients and

21  applicants for legal assistance, and their spouse's confidential information, would violate

22  California and federal attorney-client privilege, the clients' and applicants' for legal

23  assistance rights of privacy and confidentiality under California law, and CRLA's and its

24  personnel's legal, professional and ethical duties under California law, including but not

25  limited to their duties of confidentiality.

26       (b)    Demands for these materials exceed OIG's authority for, among others, the

27  reasons stated above.

28       (c)    Even reviewing this volume of client files and other records to determine

1  which documents and information were subject to which Privileges and Immunities would
2  be grossly and unduly burdensome and oppressive. At the request of LSC, CRLA conducted
3  a study on the time, effort and resources that would be necessary to undertake this review.
4  CRLA's two reports on this subject are attached hereto as Exhibit B. These documents
5  describe the thousands of person-hours, hundreds of thousands of dollars, extended periods
6  of time, and profound disruption to CRLA's professional activities and responsibilities that
7  would required by this undertaking. This is unreasonably and unduly burdensome and
8  oppressive, especially in light of the fact that the documents and information at issue, in
9  bulk, have no reasonable nexus to any subject of the Investigation as disclosed to the
10 Congressional Subcommittee in the OIG's Report dated September 14, 2006 or otherwise,
11 and no effort has been made to consider more limited production or the availability of
12 alternative, less intrusive means of obtaining that information genuinely and reasonably
13 pertinent to any legitimate investigative purpose. CRLA accordingly objects to conducting
14 such a review, and further objects to preparing a "privilege log" or similar report asserting
15 and substantiating individualized claims of privilege as to each requested item for which
16 such a claim may be asserted.

17      5.    CRLA generally objects to the Subpoena, and each Request therein, to the extent
18 that they are unduly burdensome or oppressive, or call for burden, effort or expense not
19 reasonably justified by the investigative purpose served.

20      6.    CRLA reserves the right to redact from otherwise responsive and non-privileged
21 documents portions thereof that contain information that is irrelevant, non-responsive,
22 confidential or subject to any Privilege or Immunity.

23      7.    CRLA reserves the right to withhold all or any part of any document or
24 information that is confidential or subject to any Privilege or Immunity that might be
25 preserved if the document or information is produced subject and pursuant to an appropriate
26 and binding nondisclosure or confidentiality agreement, or protective or confidentiality order
27 of a court of competent jurisdiction, until and unless such protections are fully and securely
28 in place. CRLA notes that it has previously requested such arrangements from OIG, and that

1  OIG has refused to consent to them.

2      8.    CRLA's production of any given document or information is not an admission or

3  acknowledgement that it is authentic or relevant to the subject matter of the Investigation or

4  any proceeding in which it may be introduced. CRLA's production of any document or

5  information will not prejudice its right to contend at any juncture in these proceedings or any

6  other proceedings that such document or information is irrelevant, immaterial or otherwise

7  inadmissible. Production does not constitute a waiver of any claims or positions advanced

8  by CRLA at any time during the pendency of these or any other proceedings. To the extent

9  that CRLA agrees to produce the documents or information identified in any particular

10  Request, such agreement is not intended to suggest that such documents or information exist,

11  but merely that CRLA will produce such documents or information if they exist, are in

12  CRLA's possession, custody or control, are not subject to any applicable Privilege or

13  Immunity, and are reasonably accessible.

14      9.    CRLA objects to searching for, organizing and/or producing documents or

15  information equally or more easily available or accessible to OIG.

16      10.    CRLA objects to the Subpoena, and to each Request therein, to the extent that

17  they call for production of "all" or "any and all" documents or information in CRLA's

18  possession. To the extent that CRLA undertakes to produce documents or information,

19  CRLA will use reasonable diligence to locate responsive materials.

20      11.    CRLA objects to the Subpoena, and to each Request, to the extent they purport to

21  require the assembly and review of emails and electronically stored information from an

22  unspecified number of CRLA employees, and to the extent that they seek the production of

23  electronically stored information from sources that are not reasonably accessible, such as

24  (without limitation) back-up tapes, deleted files contained in hard-drive slack space,

25  dynamic databases, proprietary systems, audio recordings, or other sources that cannot be

26  readily searched, filtered or converted into a reasonably useable format.

27      12.    CRLA objects to the Subpoena, and to each Request therein, to the extent that

28  they require production of documents not in CRLA's possession, custody or control.

13.    CRLA objects to the Subpoena as not properly served.

14.    CRLA objects to the extent that the Subpoena demands production of documents or information, or personal appearance by a CRLA representative, at an unreasonably burdensome and/or inconvenient time or place. Specifically, but without limitation, CRLA objects to producing materials and/or appearing in Washington, D.C. in the absence of mutually agreeable arrangements.

15.    To the extent the Subpoena's or any Request's use of the terms "activity," "in connection with," and/or "in conjunction with," exceeds CRLA's agreement with the OIG regarding the meaning of these terms, CRLA objects to these terms as vague, ambiguous, overbroad and unduly burdensome. Pursuant to prior agreement with the OIG, CRLA will interpret these terms to refer to formal relationships or co-sponsoring with the subjects of these Requests.

16.    CRLA objects to the use in the Subpoena, and each Request, of the terms "comment(s) or testimony", and "other policies" as vague and ambiguous. In attempt to reasonably construe these terms consistent with CRLA's obligations with federal statutes and regulations, CRLA is providing documents with respect to activities provided for in 45 C.F.R Part 1612.

17.    Discovery and investigation are continuing. The responses and objections herein are based upon information and documents presently known to CRLA. As set out in the Responses to the Specific Requests below, CRLA is continuing to work to gather and provide certain requested materials, and is undertaking to review certain materials previously withheld or redacted and reevaulate its position with respect thereto.

18.    CRLA reserves the right to assert additional objections or supplemental responses should it discover that there is information or grounds for such additional objections or supplemental responses, and to supplement or amend this Response accordingly.

The foregoing General Objections should be deemed incorporated in full in the response to each Request set forth below, and any such response is subject to the limitations, objections and exceptions set forth therein. Subject to and without waiving the foregoing

1  General Objections, CRLA responds to the Subpoena's specific Requests in Appendix A

2  thereto as follows:

3

4  **RESPONSES TO SPECIFIC REQUESTS**

5  **REQUEST NO. 1**

6      All KEMPS data fields that reside in the CLIENTSW table with the exception of the

7  SSN (Social Security Number) field and the SUMMARY (case memo) field. When copying

8  the selected fields from the KEMPS Tables and subTables use the KEMPS Table or

9  subTable name for the file created.

10  **RESPONSE TO REQUEST NO. 1**

11      Subject to and without waiving the General Objections stated above, CRLA objects to

12  this Request as overboard and unduly burdensome because it would require that CRLA

13  produce privileged and confidential information or undergo an assessment of over 39,000

14  records on a case by case basis.   As such, CRLA objects to producing the following

15  requested KEMPS data fields in the CLIENTSW table: CLName, CFName, CMI, CAddress,

16  CPhone, SLName, SFName, RhoneRef, RACardNum, Receipt, Record A/D, Temp Res Info,

17  Employment Auth Info, Refugee/Asylee Info, AG Withhold Deportation Info, H2A Info,

18  and Emergency Reason. CRLA further objects that this Request is vague as to time because

19  it does not specify a time period for which the data is requested.   CRLA has already

20  produced to the OIG all remaining, requested KEMPS data fields in the CLIENTSW table

21  for the period of January 1, 2003 to October 31, 2005; this information is equally accessible

22  to the OIG and would be duplicative and burdensome to produce again.

23  **REQUEST NO. 2**

24      All KEMPS data fields that reside in the TTIME table for matters, activities and all

25  cases (regardless of the date the case was actually initiated), that were in an open status for

26  part or all of the period between January 1, 2003 to October 31, 2005, and that CRLA

27  provide such data in an access database format. When copying the selected fields from the

28  KEMPS Tables and subTables use the KEMPS Table or subTable name for the file created.

1    **RESPONSE TO REQUEST NO. 2**

2    Subject to and without waiving the General Objections stated above, CRLA objects to

3    this Request as overboard and unduly burdensome because it would require that CRLA

4    produce privileged and confidential information or undergo an assessment of over 260,000

5    records on a case by case basis. As such, CRLA objects to producing the UCode and

6    Reason data fields in the TTime table. CRLA produces herewith all remaining, requested

7    KEMPS data fields in the TTime table for the period of January 1, 2003 to October 31,

8    2005.

9    **REQUEST NO. 3**

10    Unredacted copies of all documents provided pursuant to the Office of Inspector

11    General's Data and Document Request of March 16, 2006, see Appendix B, and not

12    protected by the federal attorney-client privilege or the federal work product doctrine.

13    **RESPONSE TO REQUEST NO. 3**

14    Subject to and without waiving the General Objections stated above, CRLA produces

15    herewith copies of client intake forms for which client identity was redacted; in these cases

16    CRLA has unredacted the client financial information. Client intake forms for which CRLA

17    did not previously redact client identity are also being produced herewith; in these cases

18    CRLA has unredacted financial information and redacted client identity information. In

19    cases were CRLA previously produced client intakes without redacting client identify

20    information, this information is equally accessible to the OIG and would be duplicative and

21    burdensome to produce again. CRLA is reviewing the remaining redacted documents that it

22    has provided in response to the OIG's March 16, 2006 request and will reevaluate whether

23    such information will continue to be withheld.

24    **REQUEST NO. 4**

25    For the period January 2003 to the present, for each of the following activities, provide

26    all case or matter numbers, client names, intake sheets, statements of facts, retainer

27    agreements, co-counsel agreements that are now or ever have been associated with the

28    activity. For each of the activities, also provide all timekeeping records, including records of

1   time spent by those in any way connected with the activity, and the funding source for the

2   work:

3       a. work in connection with WorkSafe;

4       b. work in connection with Friends of Farmworkers;

5       c. work in connection with California Affordable Housing Law Project;

6       d. work in connection with California Coalition for Rural Housing;

7       e. work in connection with Migrant Education State Parent Advisory Council (SPAC);

8   and

9       f. comment(s) or testimony on California Department of Industrial Relations current of

10  proposed regulations or other policies.

11  **RESPONSE TO REQUEST NO. 4**

12      Subject to and without waiving the General Objections stated above, CRLA objects to

13  the terms "activity", "in connection with" and "in conjunction with" as vague, ambiguous

14  and overbroad. Pursuant to prior agreement with the OIG, CRLA will construe these terms

15  to refer to formal relationships or co-sponsoring with the subjects of this Request. CRLA

16  represents:

17      (a)   Worksafe –  CRLA is in the process of conducting a reasonable search of

18  reasonably accessible documents within its custody, control, or possession  Subject to the

19  General Objections, CRLA will produce all responsive documents upon completing this

20  search.

21      (b)   Friends of Farmworkers –  CRLA has conducted a reasonable search of

22  reasonably accessible documents within its custody, control, or possession and has identified

23  no documents responsive to this request. However, without waiving General Objection No.

24  15, CRLA refers you to documents submitted to the OIG in response to Document Request

25  No. 11.H.

26      (c)   California Affordable Housing Law Projects ("CAHLP") – CRLA is in the

27  process of conducting a reasonable search of reasonably accessible documents within its

28  custody, control, or possession  Subject to the General Objections, CRLA will produce all

W03 111506-001600020/1323593/v2                     -10-

1   responsive documents upon completing this search.

2      (d)   California Coalition for Rural Housing ("CCRH") – Having conducted a

3   reasonable search of reasonably accessible documents within its custody, control, or

4   possession, CRLA produces herewith documents responsive to this Request.

5      (e)   Migrant Education State Parent Advisory Council ("Migrant SPAC") -

6   Having conducted a reasonable search of reasonably accessible documents within its

7   custody, control, or possession, CRLA produces herewith documents responsive to this

8   Request.

9      (f)   California Department of Industrial Relations – Having conducted a

10   reasonable search of reasonably accessible documents within its custody, control, or

11   possession, CRLA produces herewith documents responsive to this request.   CRLA is

12   undergoing further search and will produce, subject to the General Objections, any

13   additional responsive documents.

14   **REQUEST NO. 5**

15   For the period January 1998 to the present, for each of the following activities provide

16   all case or matter numbers; client names; intake sheets; statements of facts; retainer

17   agreements; co-counsel agreements that are now or ever have been associated with the

18   activity. For each of the activities, also provide all timekeeping records, including records of

19   time spent by those in any way connected with the activity, and the funding source for the

20   work:

21   a. work in connection with Census 2000; and

22   b. work in connection with the Poverty & Race Research Action Council (PRRAC).

23   **RESPONSE TO REQUEST NO. 5**

24   Subject to and without waiving the General Objections stated above, CRLA objects to

25   the terms "activity", "in connection with" and "in conjunction with" as vague, ambiguous

26   and overbroad. Pursuant to prior agreement with the OIG, CRLA will construe these terms

27   to refer to formal relationships or co-sponsoring with the subjects of this Request. CRLA

28   represents:

1       (a)   Census 2000 - CRLA has already produced to the OIG documents

2  responsive to this Request; this information is equally accessible to the OIG and would be

3  duplicative and burdensome to produce again.

4       (b)   Poverty & Race Research Action Council ("PRRAC") – Having conducted

5  a reasonable search of reasonably accessible documents within its custody, control, or

6  possession, CRLA produces herewith, documents in response to this Request.  In addition,

7  CRLA is in the process of obtaining from storage travel expense records potentially

8  responsive to this Request; upon review, and subject to the General Objections, CRLA will

9  produce any such travel expense records that are responsive to this Request.  CRLA has

10  already produced to the OIG documents responsive to the Census 2000 Request which also

11  relates to PRRAC; this information is equally accessible to the OIG and would be

12  duplicative and burdensome to produce again.

13  **REQUEST NO. 6**

14  For the period January 1, 2003 to present, with regard to all CRLA Asilomar and/or

15  annual conferences, a list of all conference attendees.

16  **RESPONSE TO REQUEST NO. 6**

17  Subject to and without waiving the General Objections stated above, as it relates to

18  "annual conferences" and the 2003 Asilomar conference CRLA submits documents

19  responsive to this request.

20  **REQUEST NO. 7**

21  For the period January 1, 2003 to present, with regard to all CRLA Asilomar and/or

22  annual conferences, a copy of all materials disbursed to conference attendees, conference

23  agendas, conference meeting agendas, conference meeting minutes and/or summaries of

24  meetings.

25  **RESPONSE TO REQUEST NO. 7**

26  Subject to and without waiving the General Objections stated above, CRLA is

27  currently in the process of reviewing documents as it relates to this Request.  Upon

28  completion of this review, and subject to the General Objections, CRLA will produce

1    documents responsive to this Request.   CRLA has already produced to the OIG some

2    documents responsive to this Request as it relates to the "Asilomar" conferences; this

3    information is equally accessible to the OIG and would be duplicative and burdensome to

4    produce again.

5    **REQUEST NO. 8**

6         For the period January 1, 2003 to present, a copy of all CRLA Board of Directors

7    Meeting Packets, complete with press clippings that may or may not have been circulated to

8    CRLA field offices.

9    **RESPONSE TO REQUEST NO. 8**

10        Subject to and without waiving the General Objections stated above, CRLA submits

11   documents responsive to this request

12        **REQUEST NO. 9**

13        For the period January 1, 2003 to present, with regard to CRLA task forces, provide

14   copies of meeting agendas, minutes and/or other summaries of meetings relating to task

15   force activities, and task force reports.

16   **RESPONSE TO REQUEST NO. 9**

17        Subject to and without waiving the General Objections stated above, CRLA submits

18   documents responsive to this request.   CRLA is currently in the process of retrieving

19   additional documents regarding the Task Force Reports.  Upon completion of this retrieval

20   and review, and subject to the General Objections, CRLA will produce documents

21   responsive to this Request.

22

23   DATED: November 17, 2006.

24                                        Respectfully submitted,

25                                        CALIFORNIA RURAL LEGAL ASSISTANCE, INC.

26                                        By: _____

27                                             Jose Padilla,
                                               Executive Director

28

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA )
)
and )
)
KIRT WEST, )
INSPECTOR GENERAL OF THE )
LEGAL SERVICES CORPORATION, )
3333 K STREET, NW, 3RD FLOOR, )
WASHINGTON, D.C. 20007, )
) Misc. No. _____
Petitioners, )
)
v. )
)
CALIFORNIA RURAL LEGAL )
ASSISTANCE, INC., )
631 HOWARD ST., #300, )
SAN FRANCISCO, CA 94105 )
)
Respondent. )

FILED
MAR 2 3 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## DECLARATION OF LAURIE TARANTOWICZ

I, Laurie Tarantowicz, declare as follows:

1.      I am the Assistant Inspector General and Legal Counsel to the Office of Inspector
General ("OIG") of the Legal Services Corporation ("LSC").  I have been employed at LSC for
approximately 20 years.  My current business address is LSC-OIG, 3333 K Street, NW, 3rd
Floor, Washington, D.C. 20007.

2.      The OIG was established as an independent unit within the LSC in 1988, as
required by the Inspector General Act of 1978, as amended (IG Act).  See 5 U.S.C. app. 3 §
8G(a)(2) (2000).  Among other things, the OIG is responsible for conducting internal

investigations to prevent and detect fraud, waste and abuse in the LSC's programs and operations. See id. § 4(a). These include "investigations and reports relating to the administration of programs and operations of the applicable establishment as are, in the judgment of the Inspector General, necessary or desirable." The LSC Inspector General is appointed by the LSC Board of Directors and reports both to the LSC Board and the Congress. The Inspector General is expressly empowered by Section 6(a)(4) of the IG Act to issue subpoenas requiring the production of documentary evidence necessary in the performance of the functions assigned by the Act. See id. § 6(a)(4). Additionally, Section 509(g) of LSC's 1996 appropriations act empowers the OIG to conduct on-site monitoring, audits and inspections of LSC programs. See Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L.101-134, 110 Stat. 1321, § 509 (g) [hereinafter 1996 Appropriations Act]. Separately from the OIG's access to documents and information pursuant to the IG Act, Section 509(h) provides the OIG access to "financial records, time records, retainer agreements, client trust fund and eligibility records, and client names, . . . except for reports or records subject to the attorney-client privilege." 1996 Appropriations Act, § 509 (h). In addition, grantees are contractually obliged to provide documents under Grant Assurances, which are executed and agreed to by a grantee as a precondition to receiving federal aid. See Ex. 1 (CRLA's Grant Assurances).

3.     As Assistant Inspector General and Legal Counsel to the Inspector General, I am responsible for overseeing the regulatory investigation of California Rural Legal Assistance, Inc. ("CRLA"). Upon information and belief, CRLA is a private, California not-for-profit corporation, founded in 1966 to provide legal assistance and representation to low-income communities throughout California. It provides services through 49 attorney employees in 23 offices to low-income residents in 16 of California's counties. CRLA receives federal funding

from LSC under the LSC Act; in 2006, $6.8 million of its $11.2 million budget derived from federal LSC grants. I am personally involved in the OIG's investigation of CRLA due to its serious and complex nature. I also review and approve the work of the other OIG attorneys conducting the investigation. I report directly to the Inspector General.

4.     Pursuant to Sections 4(a) and 6(a) of the IG Act, the OIG is conducting an internal investigation into allegations of misconduct by CRLA made by a confidential source to members of Congress. In late September 2005, Congress forwarded to LSC-OIG a complaint about the CRLA from a confidential source dated August 31, 2005. The confidential source alleged principally that CRLA impermissibly focused its resources on "impact work," rather than legal services work; devoted its resources to farm worker and Latino issues, to the detriment of urban and non-Latino populations (like the Hmong and African-Americans in CRLA's service area); solicited clients in violation of the terms of CRLA's federal funding; and performed substantial work without any clients or for clients already represented by other counsel. Upon receipt of the complaint, LSC-OIG launched an investigation pursuant to its powers under the Inspector General Act of 1978, 5 U.S.C. app. 3 § 6.

**Efforts to Obtain Documents from CRLA**

5.     On March 16, 2006 and in connection with its investigation, LSC-OIG served CRLA with an administrative request for information and documents, including documents sufficient to show CRLA client names, addresses, dates of representation, and "problem codes" (codes indicating the general subject matter for which the client sought assistance). CRLA claims to have provided several boxes of documents and some megabytes of electronic data, but refused to provide some client information, including client names, claiming that the information is protected by the attorney-client privilege and California privacy laws. CRLA also heavily

redacted large portions of many of the documents provided, claiming the information is

protected by the work-product doctrine.

      6.     Between March 2006 and October 2006, LSC-OIG attempted to access the

requested information from CRLA through written and oral discussions. As indicated above,

LSC-OIG issued a document and data request (request) to CRLA on March 16, 2006. The

request asked CRLA to provide responsive documents and data to a portion of the request within

ten days (initial information) and the remainder of their response within 30 days (remaining

information). Without explanation, CRLA failed to provide significant portions of the initial

information within ten days. On March 31, 2006, LSC-OIG asked LSC Management to take

appropriate action to induce CRLA to comply with the request for the initial information. LSC

Management spoke with CRLA and reported to LSC-OIG that CRLA would provide further

responsive information if the OIG made another specific request. In an April 10, 2006 letter,

LSC-OIG provided to CRLA a detailed list of the documents CRLA had failed to provide.

      7.     CRLA failed to provide a full and complete response to the LSC-OIG request

within the thirty day deadline. Ten days later, on April 27, 2006, LSC-OIG again asked LSC

Management to take necessary action to induce CRLA to comply with the LSC-OIG request.

LSC Management again spoke with CRLA. Through conversations with LSC Management and

LSC-OIG and in letters to LSC-OIG, CRLA continued to object to portions of the request,

including client identifying information, documents pertaining to CRLA's required setting of

substantive priority areas (such as material disbursed to priority setting conference attendees),

documents pertaining to CRLA task force meetings, and documents revealing CRLA's

interactions with state and local regulatory and policy-making bodies. CRLA's objections were

based generally on putative federal and California attorney-client privileges, CRLA clients' right

to privacy under California law, the federal and California work-product privileges and burdensomeness. (See Ex. 2 (Objections of CRLA).) On August 9, 2006, LSC-OIG asked LSC Management for a third time to take the necessary action to induce CLRA to comply with the LSC-OIG request. On September 6, 2006, LSC Management requested that CRLA undertake a privilege review process for the outstanding responsive information, based upon federal standards for invoking the attorney-client privilege.

8.    Despite the access problems caused by CRLA's refusal to provide documents, LSC-OIG provided an interim report on the details of its investigation of CRLA to the Subcommittee on Commercial and Administrative Law of the House Committee on the Judiciary on September 14, 2006. Based on the information that LSC-OIG obtained during the course of the investigation, including from CRLA, LSC-OIG found "substantial evidence that CRLA violated federal law by: soliciting clients; working a fee generating case; requesting attorney fees; and associating CRLA with political activities." Ex. 3 (Report). LSC-OIG also reported that CRLA may have been "conducting significant work without a client . . . that appears to be impact oriented – raising serious concerns that CRLA deviat[es] from Congress' intended purpose[.]" Id. LSC-OIG concluded that it would require "additional information from CRLA to make final determinations of the appropriateness of [CRLA's] activities" and to investigate the allegation that CRLA disproportionately focused its resources on farmworker and Latino issues. Id.

9.    In September 2006, CRLA claimed to create a protocol for reviewing responsive documents and data for attorney-client privilege. The protocol CRLA proposed to undertake failed accurately to analyze and appropriately apply the relevant law governing the federal attorney-client privilege.

**The Subpoena to CRLA**

10.    Based on CRLA's continued refusal to provide client identifying information,
documents pertaining to CRLA's required setting of substantive priority areas, documents
pertaining to CRLA task force meetings, and documents revealing CRLA's interactions with
state and local regulatory and policy-making bodies; and pursuant to LSC-OIG's authority to
issue subpoenas, 5 U.S.C. app. 3 § 6(a)(4), LSC-OIG served CRLA with a subpoena <u>duces</u>
<u>tecum</u> on October 17, 2006 seeking nine categories of documents in connection with its
investigation.  Among the categories of documents requested were "KEMPS" (computer data
program) and TTime data fields reflecting client names, "problem codes," dates of
representation, adverse parties, classifications of each undertaking as a case, matter or activity
and the amount of time spent on each undertaking.  LSC-OIG specifically exempted from the
request KEMPS fields containing client social security numbers and case summaries.

11.    On November 17, 2006, CRLA produced some documents in response to the
subpoena, but continued to refuse to produce any client identification data.  Namely, CRLA
refused to turn over KEMPS data fields reflecting client identification information, citing
attorney-client privilege and client confidentiality concerns.  <u>See</u> Ex. C to Mem. of P&A, Resp.
to Request No. 1 ("CRLA objects to producing the following requested KEMPS data fields in
the CLIENTSW table: CLName, CFName, CMI, CAddress, CPhone, SLName, SFName,
RhoneRef, RACardNum, Receipt, Record A/D, Temp Res Info, Employment Auth Info,
Refugee/Asylee Info, AG Withhold Deportation Info, H2A Info, and Emergency Reason."), and
Resp. to Request No. 2.  CRLA implicitly conceded that at least some of the disputed documents
were not privileged or purportedly confidential, but maintained that it did not want to sustain the
burden of assessing its 39,000 client files "on a case by case basis" to produce them.  <u>Id.</u>  CRLA

also continues to refuse to produce non-redacted versions of improperly redacted documents, documents pertaining to CRLA's required setting of substantive priority areas, documents pertaining to CRLA task force meetings, and documents revealing CRLA's interactions with state and local regulatory and policy-making bodies under claims of protection by the California and/or federal work-product doctrine and/or burdensomeness. On information and belief, at least one LSC Board member attended CLRA's Priorities Setting Conference in November 2003 where the conference materials were made available to all attendees.

**The Subpoena Was Issued for a Proper Purpose and Requests Relevant Documents**

12.    The purpose of the OIG's investigation is to conduct a complete and thorough investigation into CRLA's activities, as requested by Congress. The authority to conduct such an investigation is clearly provided by Sections 4(a) and 6(a) of the Inspector General Act and § 509(g) of the 1996 Appropriations Act. In order to perform a complete and thorough investigation, the OIG needs to know the specific details of CRLA's legal service not protected by the attorney-client privilege, including the makeup of its clientele and the types of cases CRLA litigates and the types of other work CRLA undertakes. The information sought in the subpoena is critical to a thorough investigation of alleged continued and widespread regulatory violations, including but not limited to solicitation, inappropriate lobbying activities and disproportionately focusing resources on Latino and farmworker issues.

13.    All of the documents requested to be produced in the Subpoena are directly relevant to the OIG's investigation into CRLA's activities.

**The OIG Does Not Already Possess All of the Subpoenaed Documents**

14.    As detailed above, the OIG has not been able to obtain from CRLA the client identification information, non-redacted copies of client intakes, client retainer agreements,

client statements of facts, all documents prepared for and presented at CRLA's priority setting conferences, Task Force meetings, and information regarding interactions with state and local regulatory bodies requested in the subpoena.

15.    CRLA continues to object to the document requests, claiming California attorney-client privilege and privacy rights in response to requests for client identifying information. Furthermore, though CRLA indicated to LSC-OIG that it would reevaluate responsive information previously withheld under claim of California work-product for conformance with the federal work-product doctrine, CRLA continues to redact large portions of documents under the claim of California work-product. In response to all outstanding information, CRLA claims burdensomeness. LSC-OIG and CRLA have yet to resolve this access issue.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of March                , 2007.

Laurie Tarantowicz
Assistant Inspector General and Legal Counsel
Legal Services Corporation
Office of Inspector General

Form I                                                                          Page 1 of 2

APPLICANT NAME:    CALIFORNIA RURAL LEGAL ASSISTANCE, INC.

APPLICANT NUMBER:    805260

FILED
MAR 2 3 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

---

**FORM I
CERTIFICATIONS
(2004 Grants Competition)**

---

**INSTRUCTIONS: This form requires the signature of the Executive Director/ Chief Executive Officer and the signature of the Governing/Policy Body Chairperson.**

**The Applicant hereby certifies that if it is a non-profit organization, it has current articles of incorporation and has either been granted IRS tax-exempt status or has an application for tax-exempt status pending with the IRS.**

**The Applicant hereby certifies that its attorney staff and private attorneys under contract with the applicant to provide civil legal services to low-income eligible clients are insured against malpractice, errors and omissions, and fidelity and liability claims, and that the insurance is in effect.**

**The Applicant hereby certifies that it maintains and will make available to the Legal Services Corporation, upon request, the following documents:**

1. Resumes of current or proposed governing/policy body members.

2. IRS tax-exempt certification, if applicable. If an application for tax-exempt status is pending, a copy of the IRS acknowledgment of receipt.

3. The coverage limit page(s) of any current malpractice, errors and omissions, fidelity and liability insurance coverage, and reports of all claims made under these policies during the past three years.

4. Articles of Incorporation, Bylaws, partnership articles, or other governing documents.

LEGAL SERVICES CORP
RECEIVED
2003 SEP 25 AN 11: 56

**The Applicant hereby certifies that it will comply with the LSC Grant Assurances if funds are awarded to the applicant. The Applicant understands that if this application is approved for funding, the grant and all funds derived there from will be subject to the 2004 LSC Grant Assurances. The Applicant certifies that it has complied with the 2003 LSC Grant Assurances (for recipients of 2003 grants only). The Applicant certifies that it understands and agrees that if the application is approved, this certification is made as a condition of receiving the grant. If this certification is made falsely or if Applicant fails to comply in any material respects with the grant assurances or any applicable law or regulation, the Applicant and/or the signatories below may be subject to civil and/or criminal penalties under Federal law, see 45 CFR Part 1640.**

**The Applicant hereby certifies that the undersigned has been authorized to bind the organization for which this application is submitted.**

Form I                                                                                          Page 2 of 2

The Applicant hereby certifies that it and any and all persons authorized to act on behalf of the
Applicant as employees, agents or otherwise, consent to the exclusive jurisdiction of the United
States District Court for the District of Columbia over any and all claims or disputes regarding
this application, any LSC grants or contracts resulting from or related to this application, and
the process by which such application, grants or contracts are awarded, administered,
suspended, terminated, evaluated, audited, investigated or otherwise handled by the
Corporation.

Applicant hereby certifies that it has made available to each member of its governing/policy
body a copy of the proposal submitted in response to this request for proposals.

We have read these certifications and understand that by signing this form, we are agreeing to
the truth of the above statements.

| Jose R. Padilla | RIchard Fajardo |
|---|---|
| Name of Executive Director/Chief Executive (or functional equivalent) | Name of Governing/Policy Body Chair (or other organization official authorizing this application) |
| Executive Director | Board Chairman |
| Title | Title |
| Signature | Signature |
| 9/24/03 | 9/23/03 |
| Date | Date |

**LSC Grant Assurances**
**For Calendar year 2004 Funding**
**Form C**

If applicant is successful and receives an LSC grant or contract,

**APPLICANT HEREBY ASSURES AND CERTIFIES THAT:**

1.  It will comply with the Legal Services Corporation Act of 1974 as amended (LSC Act), and any applicable appropriations acts and any other applicable law, all requirements of the rules and regulations, policies, guidelines, instructions, and other directives of the Legal Services Corporation (LSC), including, but not limited to, the LSC Audit Guide for Recipients and Auditors, the Accounting Guide, the CSR Instruction Handbook, and the 1981 LSC Property Manual, as amended, the Property Acquisition and Management Manual, and with any amendments of the foregoing adopted before or during the period of this grant. It understands that successful applicants may be expected to sign further assurances before the awarding of the grant.

2.  It will not use funds from LSC or any other sources for any activity inconsistent with the requirements of any and all LSC appropriations acts applicable during the grant term.

3.  The Applicant's governing board will set specific priorities in writing, consistent with the requirements of 45 C.F.R. Part 1620.

4.  It agrees to be subject to all provisions of federal law relating to the proper use of federal funds listed in 45 C.F.R. §1640.2(a)(1). Before the initiation of the contract, the Applicant will inform employees and board members of the federal law and its consequences as required in 45 C.F.R. §1640.3.

5.  It has the legal authority to apply for and receive a grant from LSC.

6.  It will provide legal services in accordance with the plans set out in its grant application, as modified in further negotiations with LSC, and agrees to provide high quality, economical, and effective legal assistance, as measured by the ABA Model Rules of Professional Conduct and amendments thereto, LSC Performance Criteria, ABA Standards for the Providers of Civil Legal Services to the Poor, ABA Standards for Programs Providing Civil Pro Bono Legal Services to Persons of Limited Means, other generally accepted professional standards, the provisions of the LSC Act, or a rule, regulation or guidance issued by LSC.

7.  It will not discriminate on the basis of race, color, religion, gender, age, disability, national origin, sexual orientation, or any other basis prohibited by law against: (1) any person applying for employment or employed by the Applicant; or (2) any person seeking or

provided assistance from the Applicant or other program(s) supported in whole or in part by this grant.

8.    It will provide LSC with copies of its Equal Opportunity Policy Statement, including its Complaint Review Procedure or internal means of handling employee grievances; and its Sexual Harassment Policy, including an effective complaint procedure. The governing or policy board must have approved each of these within the last three years. It will notify LSC prior to the implementation of changes to its Equal Opportunity Policy Statement.

9.    As provided in the LSC statutes applicable during the grant terms, notwithstanding any other grant assurance, §1006(b)(3) of the LSC Act, 42 U.S.C. §2996e(b)(3), or any rule of professional responsibility, it shall, upon request provide access to and copies of financial records, time records, retainer agreements, client trust fund and eligibility records, and client names, except for those reports or records subject to the attorney-client privilege, to LSC and the LSC OIG and to any federal department or agency that is auditing or monitoring the activities of LSC or of the Applicant and any independent auditor or monitor receiving federal funds to conduct such auditing or monitoring, including any auditor or monitor of LSC.

10.   It will cooperate with all reasonable and necessary information collection, including surveys, questionnaires, monitoring, audits, case statistical report (CSR) data collection, and compliance or evaluation activities undertaken by LSC or its agents. Except as provided herein, during normal business hours and upon request, it will give any authorized representative of LSC or the Comptroller General of the United States access to and copies of: all original records, books, papers and documents pertaining to the grant in its possession, custody or control; materials with information otherwise available in the public record (e.g., pleadings filed in open court); and all program financial records (e.g., negotiable instruments, vendor files, travel records, journals and ledgers). This requirement does not apply to any such materials that may be properly withheld due to applicable rules of attorney-client privilege, applicable rules of professional responsibility or applicable attorney work product doctrine (except as required by Grant Assurance 9.) It agrees to provide LSC with the requested materials in a form determined by LSC while, to the extent possible consistent with these requirements, preserving applicable client secrets and confidences and respecting the privacy rights of the applicant's staff members. Should it withhold any records or information, it shall inform LSC of the withholding and the basis therefore. LSC may require the grantee to disclose the information if LSC determines that the justification for withholding it is inadequate or that LSC is entitled to the information.

11.   Applicant will not take any disciplinary action against any person, including employees and volunteers, because of any appropriate cooperation with or release of information to LSC pursuant to the provisions of any grant assurance.

12.   It understands and agrees that nothing in these Grant Assurances in any way restricts or limits the authority of the LSC OIG to access any and all records and information which it is entitled under the Inspector General Act of 1978, as amended, 5 U.S.C. app. §3.

13.   It agrees to implement all specific record keeping requirements contained in the LSC Act, regulations, appropriations act, other applicable law, and other applicable LSC directives and to implement, as required, any additional specific record keeping requirements that may be forthcoming from LSC during the grant period.

14.   It will give written notice to LSC within thirty (30) calendar days after any of the following occurrences that involve activities funded by the grant:

   a.   a decision to close and/or relocate any main or staffed branch office;

   b.   change of Chairperson of the governing/policy body;

   c.   change of chief executive officer;

   d.   change in its Charter, Articles of Incorporation, By-laws, or governing body structure;

   e.   receipt of any notice of a claim for attorneys' fees under the provisions of §1006(f) of the LSC Act, 42 U.S.C. §2996e(f). The Applicant also will forward, upon receipt, a copy of the pleading requesting these attorneys' fees; or

   f.   change in the Independent Public Accountant performing the grantee's annual financial audit. This notice is to be sent to the OIG.

15.   It agrees that, prior to any merger or consolidation or other change in its current identity or status as a legal entity, it will provide LSC with sixty (60) days written notice. If it proposes to transfer its interests in its LSC grant to another entity pursuant to a merger or consolidation, it will seek approval from LSC for such transfer and will submit a Successor in Interest Agreement for approval by LSC. It will not transfer its interests in its LSC grant without LSC approval.

16.   In the event that the applicant merges with another LSC grantee, or ceases to be a direct recipient of LSC grant funds at the end of the grant term or during the grant term for whatever reason:

   a.   It agrees to provide LSC with written notice at least sixty (60) days before the Applicant voluntarily ceases to be a recipient of LSC grant funds during the term of this grant.

   b.   It will submit to the LSC Office of Program Performance, either at the time that it provides the written notice in (a) above that it is voluntarily ceasing to be a recipient of LSC grant funds, or within fifteen (15) days from being notified by LSC that it will cease to be a recipient of LSC grant funds, a plan for the orderly conclusion of the role and responsibilities of the applicant as a recipient of LSC funds. The plan should describe:

1. The immediate transition planning with the new provider, particularly as related to intake, accounting of all open cases (including PAI cases) and transfer of existing cases and contracts;

2. The projected LSC fund balance remaining after the cessation of funding, including an estimate of any anticipated unrealized derivative funds. The applicant understands that the expenditure of any LSC funds after the cessation of LSC funding shall have the express written approval of LSC pursuant to 45 CFR section 1630.5(b)(1). The applicant further understands that the existing LSC fund balance amount, if any, shall be returned to LSC at the time of the submittal of the closing audit, and that any later realized derivative funds, whether anticipated at the time of close out or not, shall be returned to LSC within 15 days of their receipt by the applicant;

3. An accounting of all real property purchased in whole or in part with LSC funds. The applicant agrees to abide by any agreement it has with LSC governing the purchase of real property purchased in whole or in part with LSC funds. The accounting should include:

   i.    the address and a brief description of the property and the date it was acquired;

   ii.   the total amount of funds expended to acquire or improve the property, including principal and interest payments, and payment for capital improvements;

   iii.  the total amount of LSC funds expended to acquire or improve the property, including principal and interest payments, and payment for capital improvements;

   iv.   an independent valuation of the fair market value of the property;

   v.    a statement indicating the program's proposed plans for disposing of the property pursuant to the Property Acquisition and Management Manual, if applicable, and any real property agreement between LSC and the program; and

   vi.   copies of any agreements or contracts between LSC and the applicant related to the property, including any agreements or contracts governing the disposition of the property and any correspondence relating to the initial approval of use of LSC funds to acquire the property.

4. The total costs associated with cessation of LSC funding, and funds available to meet those costs, supported by a budget detailing the planned close out expenditures, and plans for securing payment or reimbursement due under contract from non-LSC sources; and

5. An accounting of all personal/non-expendable property purchased after October 15, 2001 in whole or in part with LSC funds that has a current book or market value exceeding $5,000. The accounting list should include for each item of property:

    i.    a brief description of the property item;

    ii.    the date of acquisition of the property item;

    iii.    the total amount of funds expended to acquire the property;

    iv.    the amount of LSC funds expended to acquire the property;

    v.    the fair market value of the property;

    vi.    a proposed plan for disposing of all such property pursuant to the 1981 Property Management Manual or the Property Acquisition and Management Manual, as applicable, that includes: if the property is proposed to be transferred to an LSC recipient, the name of the LSC recipient to whom the property will be transferred; or if the property is proposed to be transferred to another non-profit organization serving the poor in the applicant's service area, the name and address of such organization. The applicant understands that such transfers must have the prior approval of LSC.

c.    It shall certify at the time it submits the plan(s) as required by (b) above that an Independent Public Accountant will audit the recipient's financial statements, internal controls and compliance with applicable laws and regulations in accordance with the LSC Audit Guide for Recipients and Auditors and Government Auditing Standards. The audit must encompass the full period of the grant term and any transitional funds awarded by LSC unless otherwise directed in writing by LSC. It shall submit to LSC's Office of the Inspector General an engagement letter from its Independent Public Accountant that includes an estimate of the LSC-funded portion of the total estimated audit cost under section 509(c) of Public Law 104-134, as incorporated by Public Law 105-277, Public Law 104-208, Public Law 105-119, Public Law 106-113, Public Law 106-553, and Public Law 107-77.

d.      It shall certify at the time it submits the plan(s) as required by (b) above that it will submit Grant Activity Reports in a format specified by LSC in a timely manner;

e.      It shall participate in an orderly and professional transition of functions to the new provider to deliver services in the service area;

f.      It understands and agrees that, after it gives notice to LSC or after receipt of notice from LSC of the cessation of funding, the receipt of all future installments after such notice shall be contingent upon satisfactory completion of all closeout obligations imposed by LSC including the obligations described herein; and

g.      It agrees that any attorneys' fees claimed or collected and retained by the applicant after the cessation of funding that relate to LSC funded work performed during the grant term shall be considered derivative income, subject to return to LSC in accordance with paragraph b (2), above.

17.      It will notify the LSC Office of Inspector General (OIG) by telephone within two (2) working days of the discovery of any information that indicates the Applicant may have been the victim of misappropriation, embezzlement or other theft or loss of any funds (LSC funds, non-LSC funds used for the provision of legal assistance or client funds). For any loss of $200 or more, such notice shall be followed by written notice by mail, e-mail or facsimile within ten (10) calendar days. Written notice of a theft of any property with a value of $200 or more will be provided to the OIG within ten (10) calendar days from the time of the discovery of the theft. The required notice shall be provided regardless of whether the funds or property are recovered.

18.      It will notify LSC's Office of Compliance and Enforcement within twenty (20) days of any of the following arising from an LSC funded activity: a monetary judgment, sanction or penalty entered against the program for matters such as Rule 11 sanctions; malpractice judgments; EEO claims; IRS penalties; penalties arising out of the Americans with Disabilities Act; voluntary settlement of any similar action or matter; or any other matter which may have a substantial impact on its delivery of services. It will also notify LSC's Office of Compliance and Enforcement within twenty (20) days of any force majeure event that has a substantial impact on its delivery of services.

19.      It understands and agrees that it will arrange for an audit and execute an agreement with its auditor that meets the requirements of LSC's Audit Guide for Recipients and Auditors. The Applicant also understands and agrees that if it fails to have an audit acceptable to LSC's Office of Inspector General (OIG) in accordance with LSC's Audit Guide for Recipients and Auditors, the following sanctions shall be available to LSC as recommended by the Office of Inspector General: (1) disallowance of the cost of the audit as a charge against LSC funds; (2) the withholding of a percentage of the recipient's funding until the audit is completed satisfactorily; and (3) the suspension of the recipient's funding until an acceptable audit is completed.

20.  It shall cooperate with LSC in its efforts to follow up on the reportable conditions, findings, and recommendations found by the LSC Office of Inspector General, the General Accounting Office, and/or the Applicant's independent public accountant to ensure that instances of deficiencies and noncompliance are resolved in a timely manner. Applicant management shall expeditiously resolve all such reported conditions, findings, and recommendations, including those of sub-recipients, to the satisfaction of LSC.

21.  It understands that in accordance with 45 CFR Part 1641, the LSC Office of Inspector General may remove, suspend or bar an independent public accountant, upon a showing of good cause and after notice and an opportunity to be heard.

22.  It certifies that:

(a)  Each case handler of the Applicant has a computer at her or his desk that can perform all of the following functions: word processing, access to the case management system, access to time-keeping, access to the Internet, including the ability to download files from the Internet, and e-mail capability with the capacity to send and receive messages and attachments both internally and externally. This assurance does not apply to students and volunteers. It understands that the above functions describe the minimum functionality of existing computers only, and further certifies that any new computer purchased will perform the above functions and be at least a Pentium III (or Celeron), 1.0 GHz (or equivalent system) with at least 256 megabytes of RAM and a 17 inch CRT or 15 inch LCD monitor.

(b)  It has the capacity to convert paper documents into Portable Document Format (PDF), and the capacity to transmit those documents as electronic files.

(c)  It has a plan for backing up case management data, financial data, documents and other critical data. It further certifies that it regularly performs these backups and checks the integrity of these backups by restoring test files. Further, it regularly stores copies of these backups offsite where they are protected from fire and other disasters.

23.  It will do its part, in cooperation with other organizations that are part of the state justice community, to build and maintain a quality statewide web site for legal information. If a statewide web site is not currently in operation, it will be fully functional by December 30, 2005. The web site will publish a full range of community legal education/pro se related materials and referral information, at least covering the common topics facing the client community on the subject matters that are the program's priorities. In regard to the statewide web site, the program will assure that a mechanism is in place to: (i) regularly update the web site; (ii) review at least annually the information on the site for accuracy; (iii) regularly engage in outreach to the client community for usage and to providers in the state justice community for content; and (iv) periodically evaluate the usage and

accessibility of the site and content. The program understands that LSC does not sanction LSC funds going to support websites that are duplicative of each other.

24. It will submit, for each year of the grant and for each service area for which a grant is awarded, Grant Activity Reports in a format and at a time determined by LSC. If, during the course of the grant year, Grant Activity Reports no longer accurately reflect actual activity (e.g., CSR, budget, and staffing data) of the program, it will revise and resubmit affected Grant Activity Reports to LSC.

25. It is aware of and agrees that an award of a multi-year grant under the competitive bidding process does not obligate LSC to disburse any funds that are not authorized or appropriated by Congress nor does it preclude the imposition of additional conditions, by LSC or the Congress, on any funds that are so disbursed. Non-renewal of the grant does not constitute a termination or suspension under LSC regulations. During the term of the grant, Congress may rescind authority for LSC to disburse some of the funds under the grant award, or sequestered, thereby reducing the actual amount of funds disbursed under the grant. Further, additional restrictions may be imposed on the use of funds as a result of such appropriation, authorization legislation, or other law. In subsequent years, the amount of and conditions upon funding may be changed to conform to Congressional appropriation levels and legislated restrictions. Such changes and reductions, however implemented by the LSC, shall not constitute a termination or suspension.

26. It will do its part, in cooperation with other organizations that are part of its state justice community, to develop, foster and maintain a comprehensive, integrated statewide civil legal services delivery system for the benefit of clients. Effective planning should result in a delivery system that is responsive to the most compelling needs of all eligible clients; ensures the highest and most strategic use of all available resources; and, maximizes the opportunity for all clients throughout the state to receive timely, effective and appropriate civil legal services. Effective state planning will result in expanded and diverse leadership, greater client access, stronger statewide partnerships, resulting in the provision of more effective civil equal justice services to low income individuals, families and communities. In pursuit of these state planning goals, the program will work to assure that resources are devoted to statewide planning in order to achieve and maintain: 1) broad-based and inclusive state planning; 2) periodic review and updating of state plans; and 3) oversight and evaluation of state planning implementation.

27. It will maintain all records pertaining to the grant during the grant period and for a period of six (6) years after termination of the grant. If the Applicant is the non-surviving entity in a merger with another organization, the Applicant will ensure that the surviving organization will maintain the Applicant's records in accordance with this provision for a period of six (6) years from the date of the merger.

28. With respect to financial records, it will maintain records and supporting documentation sufficient for LSC, or an independent auditor selected by LSC, to audit those records and determine whether the costs incurred and billed are reasonable, allowable and necessary under the terms of the grant. In this regard, the Applicant will permit LSC or its auditor to

review the originals of all financial records and supporting documentation, procedures and internal control systems. Additionally, LSC retains the right to perform, or engage independent auditors to perform such an audit, whether during or subsequent to the grant period.

29.  It shall retain and assures that there are provisions to preserve closed client files for a period of not less than five (5) years from the date the file is closed.

30.  In all of its major activities, and insofar as it is reasonable, the Applicant shall give due recognition and acknowledgement of the funding provided by LSC. At a minimum, Applicant agrees to use the LSC logo on any Internet Website page that may serve as a "homepage" for the Applicant, and in its Annual Report, press releases and official letterhead, provided that Applicant may use up currently held stocks of stationery prior to ordering new stock containing the logo. The LSC logo is a registered service mark of LSC and permission to use the logo is hereby provided to Applicant under a limited license such that the logo may be used only in the manner described above and only while Applicant is receiving LSC funds. Other uses of the logo are not permitted unless expressly authorized in writing by LSC. LSC will provide Applicant with both a camera-ready copy and an electronic version of the logo in an LSC-approved size and format.

We have read these assurances and conditions and understand that if this application is approved for funding, the grant and all funds derived therefrom will be subject to these assurances. We hereby certify that the Applicant has complied (for recipients of 2003 grants only) and, if the application is approved, will comply with these assurances and all applicable laws and regulations. We hereby certify that we understand and agree that if the application is approved, this certification is made as a condition of receiving the grant. If this certification is made falsely or if Applicant fails to comply in any material respects with these Assurances or any applicable law or regulation, the Applicant and/or the signatories below may be subject to civil and/or criminal penalties under Federal law, see 45 CFR Part 1640.

---

Name of Executive Director
(or functional equivalent)

Name of Governing/Policy Board Chairperson
(or other organization official authorizing this application)

---

Title

Title

---

Signature

Signature

---

Date

Date

# CALIFORNIA RURAL LEGAL ASSISTANCE, Inc.

**Central Office**
631 Howard St., #300
San Francisco, CA 94105
Telephone 415.777.2752
Fax 415.543.2752
www.crla.org

**José R. Padilla**
*Executive Director*

**Luis C. Jaramillo**
*Deputy Director*

**Ralph Santiago Abascal**
*General Counsel*
**(1934-1997)**

**William G. Hoerger**
**Ilene Jacobs**
**Michael Meuter**
**Cynthia L. Rice**
*Directors of Litigation, Advocacy, and Training*

**Michael Meuter**
*Migrant Unit Director*

**Regional Offices**

Coachella
Delano
El Centro
Fresno
Gilroy
Lamont
Madera
Marysville
Modesto
Monterey
Oceanside
Oxnard Basic
Oxnard Migrant
Paso Robles
Salinas
San Luis Obispo
Santa Barbara
Santa Cruz
Santa Maria
Santa Rosa
Stockton
Watsonville

 LSC

[via Federal Express]
[via e-mail transmission]

April 14, 2005

Kirt West, Inspector General
Laurie Tarantowicz, Assistant Inspector General and Legal Counsel
LEGAL SERVICES CORPORATION
3333 K Street, N.W.,  3rd  Floor
Washington, DC 20007-3522

RE:   OIG compliance investigation of California Rural Legal Assistance, Inc.
Data and Document Requests of March 16, 2005

Dear Mr. West and Ms. Tarantowicz:

Executive Director Jose Padilla has asked me to coordinate CRLA's response to your above-referenced Requests of March 16.

With respect to your **Data Request**, our responses are being sent to you today directly by Karen Smith, CRLA's Administrative Director of Training, Technology & Other Support, from her office in Stockton.  These responses include:

— We are currently providing full responses to item I. A, B, C, D, E, F, G, I, L, M, N, O, P, Q, R, and S.
— We are currently providing partial responses to item I. J, H and K.
— We are also currently providing full responses to item II. A through Y without exception.
— We are also providing the information in the form you have requested under item III.

With respect to your **Document Request**, please find accompanying this letter five cartons of material responding to the large majority of your Requests.  With respect to each enumerated request, you will find a cover sheet that I hope adequately apprises you as to what we are providing today; identifies where we are continuing to assemble information and documentation in anticipated further response(s); notes where we need additional clarification from you as to the scope or nature of your Request; and alerts you to requests that we are currently unable to respond to for various reasons ranging from failure to find any responsive information or records to the apparent existence of legal impediments to providing the requested information.  Let me note that with respect to those items for which we continue to assemble information, we will do our best to forward this

Kirt West and Laurie Tarantowicz
April 14, 2006
Page 2

information as it becomes available.

As I am certain you can appreciate, your request for data and documents was very broad and has required very substantial time to amass the materials that we are providing today. We hope that we can work with you now to focus more specifically on the issues you are investigating, and that you can inform us of those so that we can respond directly to them.

It seems appropriate to review with you at this point the difficulties CRLA confronts under California law in responding to certain, limited portions of your Requests concerning client identities for files that were open during the period of 2003 through 2005. While we have previously discussed with your Office orally and in writing the underlying California law applicable to this issue, the majority of those discussions occurred during the tenure of Mr. West's predecessor. Additionally, Ms. Tarantowicz recently advised us informally that the OIG believes that the litigation before the District and Circuit Courts of Appeal in the Legal Services of New York City and the Bronx Legal Services cases confirms the OIG's position vis a vis access to client names. We welcome your appreciation of the value in discussing this issue; and we here further respond with our views concerning the different issues that appear to be raised under California law by some of your pending requests.

**California Law Generally Protects the Existence of Non-Publicly-Manifested Attorney-Client Relationships and the Identities of Those Clients**

For Mr. West's benefit, we begin by reviewing the applicable California law that generates our core concern. California's Business and Professions Code (statutory enactments of general applicability) mandate California attorneys to assert on behalf of their clients not only all privileges of which the clients are holders (*e.g.*, lawyer-client privilege as defined in California Evidence Code Sections 950-955), but additionally and separately "to maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." (*Id.*, § 6068, subd. (e)(1).) I emphasize that this is a statutory mandate and not a normative opinion of a private or professional association.

California appellate courts have ruled that the "confidence" and "secrets" protected under Section 6068, subd. (e)(1) include the identities of clients and the existence of attorney-client relationships unless and until the relationship is disclosed or manifested to third parties through, *e.g.*, the filing of a lawsuit, the open representation of the client in dealing with third parties, etc. (Hooser v. Superior Court (2000) 84 Cal.App.4th 997, 1005-1006 [101 Cal.Rptr.2d 341, 347]; People v. Speedee Oil Change Systems, Inc. (1999) 20 Cal.4th 1135, 1147-1148 [86 Cal.Rptr.2d 816, 825].) Again, it is appropriate to emphasize that application of this statutory mandate to matters of client identity and the existence of the attorney-client relationship is not a normative or

Kirt West and Laurie Tarantowicz
April 14, 2006
Page 3

disciplinary interpretation by a private, professional association but is the result of express statutory mandates enacted by the California Legislature and interpretative rulings by the State's appellate courts that have the direct force of law.   I note parenthetically that the attorney's duty under those laws  to preserve these confidences continues after the attorney's services end. (Speedee, *supra*, 20 Cal.4th, at 1147 [86 Cal.Rptr.2d, at 825].)

It is also worth recalling here that not every "appearance" by counsel on behalf of a client results in revelation of client identity.  This issue was discussed between us during your earlier compliance audit of 2002-2004; it arises in the context of advocacy and proceedings before certain federal and state administrative agencies.  Under the respective federal or state statutory schemes that authorize those agencies and their respective administration of benefits or services, the identities of recipients or persons using or claiming the services, and/or contesting applicability of services or sanctions, is confidential and may not be made a matter of public record nor otherwise disclosed.  In January 2002, we provided you a series of memoranda explaining the confidentiality requirements and protections for clients participating in the proceedings of some six agencies.  Our view was and remains that the confidentiality protections afforded participants or recipients under those acts are not waived by their election to proceed by counsel.

Allow me to close this portion of my discussion with the reassurance that the concerns articulated here do not arise only when the OIG is reviewing CRLA compliance.  CRLA confronts these concerns and asserts our clients' statutory rights during the ordinary course of providing legal assistance and representation.

## The "LSNYC" Litigation Did Not Address California's Obligations Upon Its Lawyers and Protections of Its Residents Who Consult Lawyers

I address here the two cases which Ms. Tarantowicz recently, informally advised us judicially establish in your view the OIG's authority for accessing all client names under any circumstance except when client identity is protected by the federal attorney-client privilege. (U.S. v. Legal Services for New York City (D.C. Cir. 2001) 249 F.2d 1077, *affirming*, (D.D.C. 2000) 100 F.Supp.2d 42 (collectively, the "LSNYC case"); Bronx Legal Services, et al. v. Legal Services Corp. (2nd Cir. 2003) 64 Fed.appx. 310 [2003 U.S.App. LEXIS 10299], *affirming*, (S.D.N.Y. 2002) 20002 U.S.Dist. LEXIS 14674 (collectively, the "Bronx case") .)   Our analysis leads to the conclusion that these decisions neither address nor resolve the legal issues raised by some of your Office's recent requests to CRLA.

The OIG initially required LSC's New York City grantee, LSNYC, to provide a list of case numbers and legal problem codes for cases closed during the relevant period.  LSNYC

Kirt West and Laurie Tarantowicz
April 14, 2006
Page 4

complied. Subsequently, the OIG required LSNYC to provide for the same period the list of case numbers and corresponding client names. LSNYC refused, arguing that compliance would allow the OIG to match client names and problem codes revealing the subject matters of clients' consultations and/or representations. LSNYC argued that these revelations would violate "attorney-client privilege" and "its attorneys' professional obligations". (LSNYC case, *supra*, 100 F.Supp., at 44.) The district court, in rejecting LSNYC's assertion of the attorney-client privilege relied upon the federal, common-law definition.

> The attorney-client privilege does not ordinarily protect the identity of a client, the amount of a fee, or the general purpose of the legal work performed. [citations omitted] Some courts . . . have recognized an "extremely narrow" exception to this rule, when disclosure would implicate the client in criminal wrongdoing, or when disclosure, in conjunction with information already provided, would be tantamount to revealing a "indubitably confidential communication[]. [citations omitted]

(*Id.*, 100 F.Supp., at 44-45; *aff'd*, 249 F.3d, at 1081-1082.) While it's unclear whether the D.C. Circuit relied on the federal attorney-client privilege, in any event it concluded that under applicable New York law and ABA standards, the privilege does not protect generalized information about the subject matter of the representation - although particularized, individual exceptions may be established. (LSNYC case, *supra*, 249 F.3d, at 1080, 1081-1082).

In the Bronx case, the recipient (an LSNYC subgrantee) asserted similarly that its attorneys were prohibited from producing the requested client names because, when coupled with the problem codes previously disclosed, the information constituted a "client secret" under Section 1200.198 of New York's Disciplinary Rules. (Bronx case, *supra*, 20002 U.S.Dist. LEXIS 14674, at 3rd page.) The New York district court rejected this claim on two grounds: *first*, the same Disciplinary Rule provided an exception permitting lawyers to reveal client secrets when "required by law or court order" (*id., aff'd*, 2003 U.S.App LEXIS 10299, at 2nd page); and, *second*, the court, concluding that ABA ethical opinions do not have the force of law, rejected Bronx' reliance on an ABA ethical opinion in the grantee's assertion that the subject matter of the representation constituted a "client secret" within the meaning of the Disciplinary Rule. (*Id.*)

In our view, neither the LSNYC nor Bronx cases address the California situation for at least the following reasons. First, we are not concerned here with the scope of the attorney-client privilege (regardless of which jurisdiction's privilege is relevant), but with the separate California statutory mandate to protect the client's "confidence" and "secrets". Second, unlike the New York disciplinary rule, the California statutory mandate does not provide a comparable exception to the mandate. Third, again unlike the Bronx situation, application of the California

Kirt West and Laurie Tarantowicz
April 14, 2006
Page 5

statutory mandate to client identity and/or existence of the attorney-client relationship is not premised upon a normative or private opinion which does not have the force of law, but instead upon reported appellate decisions which clearly do have the force of law.

As you are aware, our attorneys are members of the California State Bar, an integrated or mandatory bar.

One other issue is worth consideration here. The LSNYC courts concluded that the attorneys' ethical obligations imposed under New York's Code of Professional Responsibility were trumped by Section 509(h) of the 1996 Appropriations Act. The court's decision not to enforce the *attorneys'* ethical obligations as a limitation on the grantee's disclosure obligations was based on the conclusion that those *attorneys'* duties were expressly qualified under the very law they asserted by an exemption for complying with a legal duty to disclose under Section 509(h). (LSNYC case, *supra*, 2003 U.S. App LEXIS 10299, at p. 2.) That reasoning appears inapplicable here. Not only are California attorneys' state-law duties of non-disclosure here not qualified as were those duties under the law relied upon by the LSNYC lawyers, but the instant situation features third parties whose rights were never considered, let alone decided by the LSNYC cases - - the state-resident clients whose rights to confidentiality and maintenance of their secrets (including the fact of their consultations with lawyers) are expressly guaranteed by Section 6068(e)(1). Whether or not California lawyers may be immune from professional sanction for disclosing information pursuant to federal demand does not address the *client's* right under California law to have the information not disclosed - an issue separate from the question of attorney professional responsibility.

These concerns are very real for persons who seek CRLA assistance. Section 509 subd. (i) authorizes the OIG to provide any information obtained under subd. (h) to any local, State or Federal law enforcement agency without limitation and without any predicate suspicion of criminal wrong-doing (by the client, the attorney or any other individual). Law-enforcement officials, particularly local officials, have been historically mis-used (at times unwittingly) by, among others, employers and landlords to achieve extra-legal "remedies" such as forcible evictions from housing (both conventional rental and labor camps), forcible removal from employment sites, and intimidation. These mis-uses of authority may and do occur solely upon the employer or landlord learning that their employee or tenant has consulted with CRLA. Not infrequently, clients and would-be clients are so fearful that their consultation with CRLA might be found out, that it is necessary for our staff to arrange off-site and "after hours" interviews. Indeed, some agricultural workers, prohibited by employers from leaving their labor camps on pain of not merely termination but physical assaults, can only consult with CRLA staff under cover of darkness when they can slip away from their camps un-noticed. Finally, it is our impression from previous discussions with your staff that, notwithstanding the apparent

Kirt West and Laurie Tarantowicz
April 14, 2006
Page 6

limitations on disclosure of subd. (i), it is virtually impossible for your Office to withhold information from members of Congress particularly where, as here, an investigation is Congressionally-requested.

This question of clients' entitlement to have their statutory confidences protected cannot be separated from the question of whether our lawyers are exposed to prejudice by complying with your Requests since the state law mandates that attorneys assert those rights on behalf of the clients. (§ 6068, subd. (e), *supra*.)  In short, CRLA does not merely have "standing" to assert the rights of those who consult with us - - we are obligated to do so.

Your current Document Request requires production of, *inter alia*, the client names for *all* cases that were open at any time during 2003 through 2005 (somewhere between 30,000 and 40,000 files) regardless of the nature of the representation and regardless of whether the lawyer-client relationship was ever revealed or disclosed to third parties (as is critical under, *e.g.*, Hooser, *supra*).   We are currently attempting to estimate the staff time that would be required to evaluate each file in accord with Hooser.  The considerations described above suggest, and indeed apparently require, your and our mutual attempts to satisfy your legitimate needs for information appropriate to your investigation and our statutory obligations.  Indeed, whatever your entitlement to the requested information may be, better practice would appear to me to compel a resolution that does not compromise either the recipients' obligations to their clients nor those clients' state-afforded rights.

Inasmuch as Mr. West was not then the Inspector General, allow me to recall that during the prior 2002-2004 compliance audit, the issue of revealing client names also arose with respect to CRLA representation before agencies whose proceedings were confidential.  Conscientious discussions of your needs and uses of the information resulted in developing a procedure that satisfied both OIG and CRLA concerns.  I believe that process is appropriate to invoke, again. While our ability in such a process to evaluate whether we are reasonably protecting the interests of our clients is vastly more difficult when we are not advised of the nature of the investigation or of the compliance issues, we are more than willing and able to work with you to develop practices appropriate to the legitimate needs of all concerned.

Kirt West and Laurie Tarantowicz
April 14, 2006
Page 7


     I look forward to working further with you to achieve appropriate, reasonable resolution of our respective concerns.

                    Very truly yours,

                    William G. Hoerger
                    Director of Litigation, Advocacy and Training

cc:    Helaine Barnett, LSC President

# LEGAL SERVICES CORPORATION

## OFFICE OF INSPECTOR GENERAL

FILED

MAR 03 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# Report to the
# Subcommittee on Commercial and
# Administrative Law of the House
# Committee on the Judiciary Regarding
# Activities of California Rural Legal
# Assistance, Inc.

## September 14, 2006

## Executive Summary

This Interim Report contains the findings to date of the Office of Inspector General (OIG) of the Legal Services Corporation (LSC) resulting from an investigation into allegations from a confidential source lodged against California Rural Legal Assistance (CRLA), an LSC grantee. The allegations were referred to the OIG for investigation by the Chairman of the House Judiciary Committee's Subcommittee on Commercial and Administrative Law and by Congressman Devin Nunes (CA 21). The complaint alleges that CRLA focuses its resources on impact work, to the detriment of basic services work, and farmworker and Latino issues, to the detriment of the urban and    non-Latino populations in CRLA's service area. The complaint also alleges specific violations of restricted activities imposed upon LSC grantees and directly resulting from CRLA's desire to engage in impact work.

The OIG developed evidence from multiple sources and conducted its own research on CRLA activities. The OIG finds substantial evidence that CRLA has violated federal law by:

- soliciting clients;
- working a fee generating case;
- requesting attorney fees;
- associating CRLA with political activities.

The OIG, however, could not complete its investigation at this time due to CRLA's failure to provide the OIG certain requested information as required by federal law and LSC grant requirements. In addition, the OIG has encountered difficulties in trying to determine whether other activities comply with federal law because of inadequate LSC timekeeping requirements

The OIG also uncovered several additional CRLA practices, including conducting significant work without a client, that appear to be impact oriented -- raising serious concerns about CRLA's deviation from Congress' intended purpose in enacting the 1996 reforms, to refocus LSC grantees on the provision of basic legal services to indigent persons seeking assistance -- but that may or may not violate specific provisions of federal law:

- potential lobbying activities;
- monitoring employers and public agencies;
- the filing of amicus briefs in its institutional capacity;
- filing cases on behalf of the "general public" under California's unfair competition law;
- CRLA's timekeeping and case management practices at least create the condition in which representing ineligible aliens is possible without detection.

The OIG is concerned that in addition to diverting scarce resources away from the provision of services from those who request assistance, much of this clientless work may lead to specific violations of the LSC regulations, such as solicitation. The OIG requires additional information from CRLA to make final determinations of the appropriateness of these activities.

Finally, the OIG has only begun to examine whether CRLA disproportionately focuses its resources on farmworker and Latino work, and if so, whether such practice is inappropriate for an LSC grantee. The OIG, therefore, is not prepared to make any findings regarding this allegation at this time.

## Note

The OIG has found substantial evidence to establish the findings contained herein. This report, however, is not a comprehensive review of the confidential source's allegations or ensuing concerns. Though the OIG submitted a document and data request to CRLA on March 16, 2006, the grantee, as of this report, has failed to provide some requested materials and refused the OIG access to other materials. We are awaiting the additional responsive materials from CRLA and thrice referred CRLA's failure to comply with the OIG's requests for information to LSC management for action. LSC management has had several contacts with CRLA in an effort to induce the grantee to comply and is now considering appropriate action to ensure CRLA's compliance.

Based on the information and documentation provided by the confidential source and LSC; original OIG research; other evidence gathered during the course of our investigation and the materials that the OIG has been able to acquire from CRLA, the OIG finds substantial evidence that CRLA is in violation of several provisions of the LSC Act, the 1996 Appropriations Act and LSC regulations.

Additional evidence raises serious concerns that CRLA may be violating other provisions of federal law. In order to further determine CRLA's compliance status the OIG requires all materials thus far requested from CRLA and is working on a supplemental data request for CRLA that will likely bear on the investigation. The OIG also anticipates the need to conduct additional interviews of CRLA staff, including employees not previously interviewed. We had hoped to have completed some of these additional interviews before issuing any report, interviews that would have included CRLA senior management, thereby affording CRLA the opportunity to address some issues raised in this report. Such interviews cannot take place, however, before the OIG obtains the documents and data requested from CRLA, but which CRLA has either failed to or refused to provide.

Finally, the OIG planned to request records from CRLA in hopes that we would be able to determine the amount of human resources, i.e. time, CRLA expended on alleged activities and whether LSC funds were used to support CRLA's involvement in such activities. The OIG understands, however, that LSC's timekeeping requirements do not require grantees to disaggregate their funding for payroll purposes. That is to say, under the regulation, there is no identifiable nexus between the expenditure of employee time and the funding source against which the employee's time is charged. Rather, employees are paid from the grantees' aggregated grant funds. In the case of CRLA, employee positions are designated as funded by a particular grant(s), however, the employee's work is not limited to the type of work for which the particular grant was awarded. LSC requirements provide no way of actually deriving from grantees' time keeping records, either from the case management systems or the payroll systems how grant funds are actually being spent, or ensuring grant funds are not being

diverted to subsidize non-grant related activity.    At best, imprecise record keeping of this sort forecloses opportunities to promote programmatic efficiencies and to hold grantee's accountable for results; at worse, it cloaks the detection of fraudulent or abusive expenditure of tax dollars.

For these reasons, the OIG reiterates that though the OIG has obtained substantial evidence to support some findings of noncompliance with the LSC Act, the 1996 Appropriations Act and LSC regulations; and other evidence suggesting additional noncompliance by CRLA, the findings contained in this report are not comprehensive.

## Table of Contents

I. Summary of the Complaint .................................................................................1

II. OIG Process ....................................................................................................3

III. Findings to Date ..............................................................................................4

    A. CRLA Prioritizes Impact Work Over Services Work Which Results in Specific Violations of LSC Regulations. ...............................................4

        1. Internal Documents and Culture Illustrate CRLA's Preference for Impact Work Over Providing Basic Legal Services. .........................6

        2. CRLA's Preference for and the Deleterious Effects of Engaging in Impact Work Are Illustrated by CRLA's Involvement in Two Example Cases. ......................................................................7

            a. CCC v. Modesto Illustrates CRLA's Engagement in Impact Litigation. ..............................................................................8

            b. The McBride Case Provides an Example of CRLA's Participation in Impact Litigation Originating in a Branch Office Other Than Modesto. ................................................................12

            c. CRLA's Desire to Participate in Impact Litigation Causes CRLA to Violate LSC Restrictions. ...............................................14

                i. CRLA Performs Work Without a Client. ...........................14

                ii. CRLA Solicits Clients. ...................................................17

                iii. CRLA Inappropriately Worked a Fee Generating Case. ....18

                iv. CRLA Inappropriately Requested Attorneys Fees. ............20

    B. CRLA Officials Associate the Grantee with Political Activities. ..............20

III. Areas of Continuing Concern ........................................................................21

    C. CRLA Engages in Other Activities That Tend to Support the Claim that CRLA Prioritizes Impact Work Over Service Work. ...........................21

        1. CRLA Engages in Activities that May Violate Restrictions Prohibiting Lobbying. ...........................................................................21

      a.  CRLA's Comments on the Housing Elements May Be Considered Lobbying. ...................................................................................22

      b.  CRLA Attempts to Influence Other State and Local Officials Regarding Legislation and Executive Branch Statements of General Applicability and Future Effect. ................................................24

           i.  Information Regarding CRLA's Lobbying Activities is Readily Available on the Internet. ...................................................24

          ii.  CRLA Describes Potentially Impermissible Contact with State and Local Regulatory Agencies............................................25

   2.  CRLA Engages in Various Types of Monitoring Activities. ............................27

   3.  CRLA Filed Cases Under California's Unfair Competition Law on Behalf of the General Public and Who Are Otherwise Not Named Plaintiffs. ...........................................................................................29

   4.  CRLA Files Amicus Briefs. ........................................................................30

      a.  CRLA Files Amicus Briefs in Its Institutional Capacity and Not on Behalf of Any Client. ...............................................................30

      b.  Even When CLRA Files Amicus Briefs on Behalf of Clients The Quality of Timekeeping Records Is Questionable.....................................31

D.  CRLA's Timekeeping and Case Management Practices Create Conditions in Which Advocates Can Serve Undocumented Persons Without Detection. ....................................................................................................32

E.  CRLA Allegedly Focuses Its Resources on Latino Work....................................33

## I.  **Summary of the Complaint**

In late September 2005, Congress forwarded a complaint from a Confidential Source (CS) dated August 31, 2005 to the Office of Inspector General (OIG) of the Legal Services Corporation (LSC).  The complaint alleges California Rural Legal Assistance, Inc. (CRLA), an LSC grantee, is focused on advancing the organization's own social and political agenda, resulting in a decline in the provision of basic legal services to prospective clients who walk into the CRLA offices requiring service.  Additionally, the complaint alleges that CRLA focuses a disproportionate amount of resources on farmworker and Latino issues.  Based on the personal knowledge of the CS, the complaint provides several examples of activities supporting this alleged practice and also alleges some specific instances of noncompliance with LSC Regulations resulting from CRLA's desire to promote its own agenda.

The CS offered her motivation for coming forward; she stated that she believes many eligible citizens in the large urban populations in CRLA's service areas are not being served by CRLA and that this is in large part due to CRLA's focus on impact work, its practice of affirmatively seeking clients for the litigation of cases in which CRLA senior management wishes to be involved, and its involvement in cases in which clients are already represented by other counsel.   The CS, a Latina herself, also stated that CRLA's work is focused disproportionately on impact cases involving Latino issues to the detriment of other populations within CRLA's service area, for example the Hmong population and the African-American population, and to the detriment of the critical legal needs of individual clients.

The CS stated that CRLA pressures employees to engage in "impact work," rather than "service work."  Based on personal knowledge of the CRLA Case Handling and Procedures Manual, the CS described "impact work" as that which "is designed to produce benefits for a large number of persons and can include litigation, legislation and community education.  It can be law reform (changing the law to benefit clients and others) as well as law enforcement (enforcing the law to benefit clients and others)."  According to the CS, service work is "the day-to-day legal assistance provided to individual eligible clients," and CRLA's Case Handling and Procedures Manual defines "service work" as work that primarily benefits an individual client and is not brought to establish a broader rule of law or to enforce laws that would benefit a larger number or clients.

The CS identified an example of managements' pressure on employees to perform impact work.  She stated that Cynthia Rice, the CRLA Director of Litigation, Advocacy and Training (DLAT)[1] responsible for the Modesto office,

---

[1]  The DLATs report directly to the CRLA Executive Director.  Each DLAT has program-wide operational duties and responsibilities and is responsible for CRLA-wide policy and advocacy in designated substantive areas.   Additionally, with the Deputy Director, the DLATs provide supervision to all the CRLA branch offices.

told the Modesto office staff on more than one occasion that the Modesto office was not doing enough impact work and was expected by CRLA management to increase the amount of impact work performed.   According to the CS, DLAT Rice stated that the Modesto office "could and should do more impact work."

The CS described a list of activities undertaken by CRLA to illustrate CRLA's lack of focus on basic legal needs in favor of impact work, some of which may violate LSC restrictions. The CS listed the following:  CRLA staff involvement in cases in which CRLA did not have a client and CRLA staff performing work in these cases on behalf of individuals who may or may not qualify for CRLA services and are already represented by other counsel; CRLA searching for a client in order to become counsel of record in cases already being brought by other counsel; a CRLA-wide effort undertaken without a client to comment to city and county officials regarding housing development plans; CRLA Executive Director, DLAT and staff travel to Mexico for the purpose of providing training; and a lack of accountability of Community Worker's time (particularly those working on migrant farmworker issues).   In addition, the CS stated her belief that the working environment at CRLA Modesto fostered the provision of legal assistance to undocumented persons.   The CS stated that she personally provided legal services to undocumented aliens on CRLA time, she is aware that other staff in the Modesto office did so as well, and the former Directing Attorney of the office was aware that undocumented persons were being served.   The CS stated that the client intake and other procedures in place during her tenure allowed for this to take place.

The OIG undertook to review several of these allegations in order to determine whether they could be substantiated.  Most of our work thus far has focused on the following allegations: CRLA staff involvement in cases in which CRLA did not have a client and CRLA staff performing work in these cases on behalf of individuals already represented by other counsel; CRLA searching for a client in order to become counsel of record in cases already being brought by other counsel; and a CRLA-wide effort undertaken without a client to comment to city and county officials regarding housing development plans.  The CS provided the OIG with some specific information supporting these allegations and we have requested information from CRLA to undertake a comprehensive review of the allegations.

## II. **OIG Process**

The OIG investigated the overarching complaint that CRLA focuses its scarce resources on impact work in furtherance of farmworker and Latino issues to the detriment of both basic services work and other client populations within CRLA's service area, and each of the specific allegations of noncompliance with LSC restrictions generally resulting from CRLA's alleged pursuit of its institutional agenda.

After reviewing the information sent in by the CS, the OIG, including the Inspector General, began by interviewing the CS.[2] First, the OIG interviewed the CS by telephone and preliminarily determined that the CS was likely credible. Because the CS's information indicated that CRLA may have engaged in activities violative of the LSC restrictions, we arranged an in person interview with the CS. We spent approximately one and one-half days with the CS, gathering additional and clarifying information. We determined the CS was credible. The CS provided the OIG with a sworn statement indicating that the information contained therein is true and accurate to the best of the CS's knowledge.

The OIG conducted background research on a broad range of CRLA's activities. The OIG researched publicly available sources on the Internet as well as information available at LSC headquarters, such as CRLA's funding application, to ascertain whether CRLA activities indicate a preference by CRLA's to engage in "impact cases" and those that benefit a particular segment of California's population and that limit CRLA's ability to support "services cases."

The OIG conducted extensive interviews with CRLA employees. The OIG interviewed several employees at CRLA's Modesto office, including attorneys, community workers and other support staff.

Finally, the OIG requested that CRLA produce relevant documents and data. Although CRLA refused to provide key documents and data,[3] the OIG reviewed the material provided for relevant facts to support or refute the allegations, to attempt to discern how CRLA expends its scarce resources and to determine whether CRLA's activities comply with the LSC restrictions.

---

[2] The Inspector General was involved personally and substantially in the initial stages of the review, due to the serious nature of the issues raised by the CS's allegations.
[3] See supra p. iii.

III.    **Findings to Date**

For some of the allegations, the OIG found substantial evidence to support findings of noncompliance with the LSC Act,[4] the 1996 Appropriations Act,[5] and LSC Regulations.[6]

A.    CRLA Prioritizes Impact Work Over Services Work Which Results in
        Specific Violations of LSC Regulations.

The OIG found information indicating CRLA's preference for impact work.  The OIG also found substantial evidence to support specific violations of the LSC Act, LSC's 1996 Appropriations Act and LSC regulations that appear to be driven by the desire to engage in impact work.

At the outset, it is important to note that a grantee bringing a case on behalf of a particular client that may also have broader reaching effects, thus making it an "impact" case, does not violate the LSC regulations.  However, a grantee that expends its limited precious resources prioritizing such cases in order to push an impact agenda causes some concern regarding the implementation of the 1996 reforms, which appear to have been intended to refocus legal services delivery on the day-to-day legal problems of the poor rather than on activism and impact oriented work perceived to be the focus prior to 1996.

An informative discussion of Congressional intent regarding the 1996 reforms may be found in LSC's Brief to the U.S. Supreme Court in the Velazquez case.[7] In Part B of the brief, under the heading, *Congress Decides to Continue Funding the LSC Program As Long As the Program Focuses on Basic Legal Services*, LSC wrote (internal footnotes omitted):

> Despite these restrictions, some members of Congress came to believe that LSC was under the influence of "liberal activists who favor a militant agenda." 141 Cong. Rec. S14,592 (Sept. 29, 1995). See also Pet. App. (99-603) at 48a-49a. In the mid-1990s, some of these representatives attempted to eliminate LSC entirely.

> In 1996, rather than cease funding for LSC, Congress enacted compromise legislation that imposed new restrictions designed to refocus LSC on its central mission: "to ensure that funding is used to provide the traditional legal services that are most needed by poor people." 141 Cong. Rec. S14,605 (Sept. 29, 1995) (Sen.

---

[4] Legal Services Act, 42 U.S.C. §§ 2996-2996(I).
[5] Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L.101-134, 110 Stat. 1321 (1996).
[6] LSC Regulations, 45 C.F.R. §§ 1600-1644.
[7] LSC v. Velazquez, In the Supreme Court of the United States, Brief for Petitioner Legal Services Corporation, pp. 2-5.

Stevens). See also S14,590 ("These restrictions provide the necessary guidance to take Legal Services back to its primary mission." (Sen. Kassebaum)); 142 Cong. Rec. H8178 (July 23, 1996) ("the purposes which we all endorsed [were] to meet the day-to-day legal problems of the poor.") (Rep. Fox); H8180 ("They are supposed to be doing the ham and eggs work for poor people.") (Rep. Hunter); 142 Cong. Rec. H8189 (July 23, 1996) (emphasizing "bread-and-butter services") (Rep. Torkildsen); 141 Cong. Rec. S18,160 (Dec. 7, 1995) (emphasizing "such routine legal matters as consumer problems, housing issues, domestic and family cases, and . . . public benefits") (Sen. Sarbanes).

The new restrictions, which were incorporated in the 1996 Omnibus Appropriations Act, Pub. L. No. 104-134, 110 Stat. 1321 (the "1996 Act"), [ ] were designed to prevent federal funds from subsidizing, for example, class action litigation or cases in which attorneys' fees are sought; representations of certain aliens or incarcerated persons; or certain lobbying and advocacy activities. 1996 Act § § 504(a)(2)-(4), (7), (11), (13), (15), and (18).

The congressional debates make clear that the 1996 compromise legislation was intended to save LSC and preserve its original focus and mission. As Senator Domenici, one of the principal architects of the legislation, stated: "While some may not like these restrictions, they are necessary to . . . protect LSC from the negative perceptions of those who wish to see its termination." 142 Cong. Rec. S1963 (Mar. 13, 1996). See also 141 Cong. Rec. S14,607 (Sep. 29, 1995) ("Many of these restrictions are necessary to ensure that the program as a whole is supported and funded.") (Sen. Lautenberg); S14,612 ("Some restrictions are necessary to ensure support for the program. . . . The [compromise] . . . would correct the harsh injustice of the committee bill and enable [LSC] to continue its important work.") (Sen. Kennedy).

With this in mind, the OIG undertook the following review of CRLA's basic-field grant application for LSC's Service Area CA-31, internal CRLA documents provided by CRLA, the CS and other sources, anecdotal evidence from the CS and other witnesses regarding the work culture of CRLA, internal CRLA communications[8], two sample cases, CRLA's involvement in California's Housing Elements and other lobbying type activities. The review clearly reveals CRLA's propensity to engage in "impact" work and the ensuing problems stemming from

---

[8] None of the internal CRLA communications received by the OIG contain attorney client information. The provider of the materials redacted any information protected as confidential attorney client information before turning the materials over the OIG.

behavior more akin to activism than providing basic legal services to the indigent.[9]

1. Internal Documents and Culture Illustrate CRLA's Preference for Impact Work Over Providing Basic Legal Services.

In addition to the CS's statement that CRLA management pressures staff to engage in more "impact" work, internal CRLA documents reveal CRLA management's desire for the organization to prioritize "impact" work. CRLA's Case Handling and Office Procedures Manual states:

> It is CRLA's goal to have all of its case handlers spend at least 50% of their time working on impact cases and projects. "Impact" work is designed to produce benefits for a large number of persons. It is work that should provide real as opposed to "paper" victories for our clients and others. "Impact" work can include litigation, legislation and community education. It can be law reform (changing the law to benefit clients and others), as well as law enforcement (enforcing the laws to benefit clients and others). Impact work normally involves one of CRLA's areas of emphases.

> "Service" work primarily benefits an individual client; it is not brought to establish a broader rule of law or to enforce laws that would benefit a large number of clients. There may be instances, however, where individual cases become "impact" cases. For example, an individual case which targets a particular defendant engaged in illegal practices which affect a substantial number of persons might become an "impact" case.[[10]]

Additionally, CRLA internal documents provided by CRLA and the CS indicate that in substantive priority areas, such as housing, education, and environmental justice, CRLA plans a litigation and advocacy strategy based on CRLA desired goals and outcomes, and not necessarily in response to client initiated contact. For example, a memorandum from DLAT Jacobs and Darryel Nucua, Co-Chairs for CRLA's Housing Task Force[11] (Housing Elements Priorities Memo), explains that CRLA adopted goals and objectives in the area of housing, including "…increasing the use of pro per packets in order to allow more attention to

---

[9] This concentration on "impact" work and lack of focus on basic legal services is particularly disturbing in light of LSC's recently released "Justice Gap Report." According the Justice Gap Report, LSC grantees generally self-reported turning away of half of all eligible clients who seek services for lack of financial resources. LSC management has agreed not to release the specific data provided by each grantee, however CRLA's self-reporting is consistent with the national average.

[10] CRLA Case Handling and Office Procedures Manual, Volume 1, Section IV.E., p. 7.

[11] The last six years of CRLA's Case Statistical Reporting data (from 2000 through 2005) indicates that roughly half of all of CRLA's cases are Housing related. Note: LSC is currently undertaking to revamp its definition of "case" for LSC reporting purposes.

impact work..."[12]   Another memorandum presented and discussed at CRLA's 2003 Asilomar Priorities Setting Conference from Salinas Office Director Mike Mueter and Migrant Unit Advocates explains how CRLA's DLAT structure "has done a very good job of increasing CRLA's impact litigation around Labor and Housing issues."[13]   The memorandum expresses the view that "[CRLA needs] to strengthen the planning, selection, and targeting of all of [CRLA's] advocacy, including impact litigation, to insure that [CRLA's] limited resources are used in the most strategic manner possible."   The memorandum goes on to complain, however, "[w]e share the general feeling that little or no institutional support is provided for the myriad [of migrant unit] tasks *other than impact litigation* that field offices engage in on a daily basis, including case referrals, brief service, individual services cases, community education and outreach, comite [committee] development, personal and staff development, and private attorney recruitment."[14]   These are but a few examples illustrating CRLA management's preference for "impact" work contained in CRLA's basic structure and planning within both Basic Field and the Migrant units.

> 2. <u>CRLA's Preference for and the Deleterious Effects of Engaging in Impact Work Are Illustrated by CRLA's Involvement in Two Example Cases.</u>

The following two cases exemplify how forcing the organization to focus on "impact" litigation can lead grantees afoul of the LSC regulations and the intent of the 1996 reform legislation.[15]

---

[12] Memorandum to 2003 Priority Setting Conference from Ilene J. Jacobs & Darryel Nacua, re: Housing Priorities, June 2, 2003, p. 1.

[13] Memorandum to Jose Padilla, CRLA Board of Directors, CRLA Staff from Mike Meuter and Migrant Unit advocates, re: Migrant Unit Report and Recommendations for 2003 Priorities Conference, October 17, 2003, p. 3.

[14] <u>Id</u>. (emphasis added).

[15] The CS also described a third illustrative case, but has not been able to obtain sufficient information to include CRLA's involvement in the discussion.  The facts of the case raise concern that many of the issues surrounding focus on engaging in impact work, discussed herein, will likely arise in this case. Thus far, the OIG has learned the following:

The CS indicated that CRLA undertook a case involving claims made against the Ceres, CA, Police Department for civil rights violations in relation to gang sweeps following a gang related shooting of a police officer.  The OIG obtained internal CRLA communications indicating that shortly after the shooting, in late January 2005, Executive Director Padilla instructed the same new CRLA attorney working the CCC v. Modesto case to "...obtain a client and investigate the pattern of law enforcement here and run it by [DLAT Rice] and Jack Daniel and maybe LCCR counsel." Two weeks later, on February 10, 2005, the ACLU issued a press release entitled "Civil Rights Groups Seek Police Records Following Widespread Sweeps in Ceres" that states "[t]he ACLU-NC, CRLA, LCCR and the Stanislaus County ACLU Chapter will continue to monitor the situation."  Statement of ACLU of Northern California, "Civil Rights Groups Seek Police Records Following Widespread Sweeps in Ceres," February 10, 2005.  Apparently no action was taken regarding the matter until August 2005, see Modesto Bee, Aug. 5, 2005, p. A-1, "10 file claims in Ceres post-shooting gang sweeps."   Additionally, according to the CS, two of the ten complainants represented by CRLA are CRLA employees, one is the wife of one of the complainant employees, and one is the cousin of another employee.  The article indicates that

a. <u>CCC v. Modesto Illustrates CRLA's Engagement in Impact Litigation.</u>

The CS identified a particular lawsuit CRLA's Modesto Office is pursuing at the direction of top level CRLA management as an example of CRLA's preference for expending its resources on "impact cases." CRLA became involved in this case even though it did not have a client in the case and CRLA staff performed work in this case on behalf of individuals already represented by other counsel. Additionally, CRLA allegedly expended significant time searching for a client in order to join the list of counsel of record.

This case, CCC v. Modesto,[16] addresses the disparate provision of municipal services, such as street lights and sewer hook-up, by the City of Modesto to people who live in pockets of county land unincorporated by the city though the area is surrounded by or is on the periphery of the city's limits. The CS explained that the disparate services issue first came to the attention of the Modesto Office in the Spring of 2003 when at a conference, a CRLA staff attorney met a woman who was a resident of an area within the City of Modesto known as Robertson Road. According to the CS, the community in the Robertson Road area was well organized and for many years had been seeking to become annexed to the City and connected to the City sewer. The CS stated that she discussed this issue with CRLA DLATs Ilene Jacobs, responsible CRLA-wide for the substantive area of housing issues, and Cynthia Rice, responsible for the Modesto office. Neither

---

the claimants are represented by CRLA and further corroborates the CS's assertion that two of the claimants are indeed CRLA employees and indicates that another complainant may also be related to one of the complainant employees. <u>Id</u>.

Similarly, the OIG recently learned of a fourth such case. A knowledgeable witness explained that CRLA Management is particularly interested in pursing impact cases involving issues affecting the Latino community. As an example, the witness described an instance in which CRLA Management was uninterested in a mobile home park case impacting residents in three different mobile home parks owned by a single corporation until DLAT Rice learned that one park contained predominantly Hispanic residents, which meant there was a language issue instead of just an older Americans issue. The witness explained that the case originally came to the Modesto Seniors Unit because many of the clients were Seniors. The witness stated that there were no Hispanic clients at first; only Seniors came into the Modesto Office seeking assistance. The witness stated that CRLA learned from the Seniors clients who sought assistance that one park is mostly Hispanic.

The witness stated that the original attorney handling the case left and another took over. The witness further indicated that DLAT Rice directed the new attorney to work the case under one senior client and to keep the case open so that CRLA could find Hispanic clients. The witness also stated that at the time of the witness' interview the new attorney was looking for co-counsel in the case because some of the clients are ineligible for CRLA services.

[16] <u>The Comm. Concerning Cmty. Improvement v. City of Modesto</u>, No. CIV-F-04-6121  REC DBL (E.D. Cal. Filed Aug. 18, 2004) [hereinafter CCC v. Modesto].

expressed interest in pursuing the issue and, in any event, CRLA did not have a qualified client to pursue the issue.

The CS stated that in the Fall of 2003 the Lawyers' Committee for Civil Rights (LCCR) and their co-counsel, the San Francisco firm Heller Ehrman, White & McAuliffe, contacted CRLA Modesto and asked for assistance with "leg work" in connection with possible disparate services litigation. Although earlier, CRLA management had not expressed interest in the disparate services issue, the CS indicated that CRLA management became interested once LCCR became involved in the issue. In fact, according to the CS, management did not want LCCR litigating the disparate services issue in CRLA's service area without also being involved. Email traffic obtained by the OIG indicates that DLAT Rice plainly stated in the Spring of 2004 "...I don't [want] the Lawyer's Committee litigating in our service area on these issues without our participation."

According to the CS, though CRLA did not have a client with an interest in the case, a statement of facts from a client, a retainer agreement with a client or a co-counsel agreement with LCCR and/or Heller Ehrman, the CS stated that DLATs Jacobs and Rice and several members of the Modesto Office staff, including the CS, spent a significant amount of time performing work in furtherance of the litigation. Also during the pre-filing phase the CS informed DLATs Jacobs and Rice several times that working on the CCC v. Modesto case was consuming a great deal of her time, taking away from her ability to attend to her significant number of "services cases," that she did not want to continue working on the case, and that she did not think involvement in the case was consistent with the LSC regulations.[17]

The CS described CRLA's pre-filing work performed in furtherance of the CCC v. Modesto case including that of DLAT Rice, DLAT Jacobs and staff in the Modesto Office, the majority of which occurred from the Spring of 2004 through the filing of the case in August 2004. According to the CS, DLATs Rice and Jacobs participated in strategy and planning conference calls and emails with LCCR and Heller Ehrman, performed research and, in the case of DLAT Rice, attained CRLA's status as co-counsel in the litigation though CRLA did not have

---

[17] The CS provided two examples of how time spent on impact work affects the critical needs of individual clients. First, the CS told of a Greek client who lost her house due to fraud and malfeasance by a title company. This client, finding no one to assist her, had filed her own suit. She came to CRLA in what the CS described as desperate circumstances, not even having working bathroom facilities in her home. Next, the CS described the circumstances of a second client, also requesting assistance in keeping her home. According to the CS, this client was being wrongfully evicted from a mobile home she had paid for in full. When she came into the CRLA office wearing a swastika on a necklace some CRLA staff, repulsed by this, did not want to assist her; she was given cursory assistance and was left to represent herself (pro se) at trial. The CS describes meeting this client when she returned to CRLA after losing her home, now requesting assistance with an affirmative action against the mobile home park owner. Although needing extended service (or full representation) from CRLA, the press of the CCC v. Modesto case and other impact work allowed the CS to provide only limited assistance to these clients proceeding pro se.

a vested client. The CS and six others in the Modesto Office spent time "investigat[ing] and research[ing]; review[ing] past CRLA annexation work, dating back to 1989; perform[ing] time-intensive fact checking of the assertions contained in draft(s) of the complaint; perform[ing] legal research; assist[ing] LCCR in identifying community groups to meet with on case related issues and attend[ing] meetings to discuss with those groups possible involvement in the litigation; and tr[ying] to find a client for CRLA to represent in the case." According the the CS, CRLA essentially served as local counsel in the case but, with the exception of the search for a client, the Modesto staff performed this work on behalf of plaintiffs already represented by other counsel in the case.

The CS explained that CRLA procedures require attorneys to file Litigation Action Plans (LAP), to be approved by CRLA's DLATs and Deputy Director Luis Jamarillo,[18] prior to filing a case. At the direction of DLAT Rice the CS prepared an LAP for a former CRLA client who had already been rejected as a plaintiff by LCCR and Heller Ehrman, and later that same day the DLATs approved the LAP. The CS estimated that from the time that CRLA received a copy of a draft complaint on July 14, 2004, until the complaint was filed on August 18, 2004, she alone spent five hours a day working on the case.[19] This does not account for the time spent before July 14, 2004, or for time spent by other CRLA staff or the DLATs.

The CS stated that due to pressure from CRLA management the Modesto Office staff expended a significant amount of time and energy trying to locate an appropriate and eligible client for CRLA to represent in the litigation. According to the CS, in an effort to locate such a client, she and other Modesto Office staff "attempted to contact former CRLA clients represented in the old CRLA annexation work, [ ] discussed with counsel in the litigation (e.g., LCCR; Heller Ehrman) whether they could refer someone to [CRLA], and [ ] contacted individuals then represented by other counsel in the case (with counsel's permission)." The CS describes the search for a client as follows:

> In June 2004, we thought we had identified a client appropriate for the litigation but LCCR did not want this person as a plaintiff (the person may have lived in the wrong neighborhood or LCCR may already have had a representative from that neighborhood as a client in the litigation). We later thought we had identified another appropriate client but this client was rejected because we discovered that he did not live in the correct neighborhood; he was

---

[18] Mr. Jaramillo was recently on a leave of absence from CRLA and working at LSC headquarters as Special Counsel to the LSC President. He was on a three-month contract, starting in November 2005, which during the OIG investigation, was extended through May 8, 2006. LSC management indicated that Mr. Jaramillo was "walled off" from the CRLA matter and did not have any involvement in discussions concerning the OIG investigation during his tenure as Special Counsel to the LSC President.

[19] Five hours per business day between July 14 and August 18 amounts to approximately 130 attorney hours, or more than three full work weeks.

merely a representative of a group of neighborhood residents. In August 2004, on the eve of litigation, it appeared that only one of the individuals already slated to be plaintiffs in the litigation (and already represented by other pro-bono counsel) would qualify for CRLA services. [A Community Worker] went to the client's house for the purpose of completing the intake but returned without complete information and reported that she did not believe the client was being truthful. [ ] I subsequently went to this person's house for the purpose of completing the intake and at that time we became aware of information which indicated this person was unlikely to be financially eligible. When I brought this to the attention of DLATs Rice and Jacobs and questioned the prospective client's credibility, I was chastised for engaging in further inquiry as to eligibility and told that I should base the eligibility determination solely on the information provided by the client. This individual therefore remained our client for the itigation at that time. Ultimately, we found another client eligible for CRLA representation. Again there were problems as I was informed this client was about to experience a material change of circumstances. I expressed to DLATs Jacobs and Rice and Executive Director Jose Padilla that the client would not qualify in the future without an eligibility waiver. I further expressed that it appeared an eligibility waiver would not be appropriate under LSC regulation 45 CFR Part 1611 and CRLA's case handling manual guidelines because other counsel was available to this client at no cost. I am informed and believe a waiver request was submitted to Mr. Padilla and was granted.

The CS stated that during the search for an eligible client for CRLA to represent in the litigation she recorded the time she spent working on the case in different client files. She also stated that prior to having a client, she charged the time she spent working on the CCC v. Modesto case to a former CRLA client transferred to her from another staff attorney in 2002; this client's case was left open for the purpose of charging miscellaneous work related to housing issues and for which advocates did not have a specific client (all purpose housing client). According to the CS, she never met with the client and had only limited contact with the client by telephone and letter. She stated that she charged time to a new file opened on behalf of a separate former CRLA client to whom CRLA had earlier provided brief services regarding the disparate provision of municipal services. The CS stated that client was later rejected as a plaintiff in the litigation. The CS further stated that she charged time to another client who already had an open file with CRLA for an unrelated issue.

The OIG substantiated the CS's allegations that CRLA undertook work in connection with the case, CCC v. Modesto, without having a client involved in the case. The OIG also substantiated that CRLA staff expended significant time and

energy trying to find a client for CRLA to represent in connection with the case, including soliciting former CRLA clients and individuals who were already represented by other counsel, in violation of the LSC restriction prohibiting solicitation of clients.[20]    Finally, the OIG confirmed that CRLA senior management was aware of, and at times, directed this activity.

b. The McBride Case Provides an Example of CRLA's Participation in Impact Litigation Originating in a Branch Office Other Than Modesto.

A separate witness confirmed the CS's allegation that CRLA management pressures staff to take impact cases, affecting the amount of individual client representation (service cases) CRLA attorneys can provide.  The witness also stated that it is not unusual for CRLA to solicit clients for cases in which CRLA wants to be involved but in which an eligible client had not sought assistance from CRLA. The witness described the general practice of solicitation she witnessed.  She stated that CRLA management sometimes learned of an issue in which management wanted CRLA to become involved when individuals ineligible for service contacted CRLA for service.  In order for CRLA to become involved, CRLA management would direct the office to send staff out to find an eligible client for CRLA to represent in the matter.  Management also would themselves, or would direct staff, shop the case around to try to find other counsel to represent the ineligible persons (and to act as co-counsel once CRLA found a client).  According to this witness, similar steps would be taken when CRLA simply learned of an issue it wanted to litigate, though no client had requested service.[21]

When asked to provide an example of this practice, the witness described a case implicating the same concerns raised by CRLA's involvement in the CCC v. Modesto case, the McBride case.  McBride is an education discrimination case filed against the Modesto City Schools.  CRLA sent a demand letter to the schools insisting that the schools allow a group of eighth graders to graduate despite not passing a mandatory test on the Constitution given only in English.  When the schools did not give in to the demand letter, CRLA filed for a Temporary Restraining Order (TRO) that would affect all similarly situated students within the Modesto School District and within the jurisdiction of the presiding court.  The OIG was unable to obtain details as extensive as those obtained for the CCC v. Modesto case; however, the McBride case illustrates the

---

[20] The OIG thus far has been unable to ascertain how much time was spent.  Although CRLA states otherwise, the time records associated with the case that CRLA provided appear to be incomplete based on information obtained from the CS.  This may be due to the practices CRLA is alleged to use when working without a client, such as charging time to an all-purpose client or charging time to a matter rather than a client's case.  See discussion supra Part .
[21] See discussion of CRLA's involvement in the Ceres case supra note 15.

same working without a client and solicitation practices by CRLA as does the former case.[22]

CRLA's Modesto Office first learned of the matter that later became the McBride case when a private attorney contacted CRLA to take the education case. Clients sought assistance from the private attorney, but they could not pay her. Though she was unsure whether the clients were eligible for LSC services, the private attorney sent the clients to CRLA and told CRLA that they should be involved in the case.

A Modesto Office attorney sent DLAT Rice an email about the matter who, in turn, contacted former DLAT Jack Daniel, currently the Directing Attorney of CRLA's Fresno Office and head of CRLA's Education Task Force. Rice learned that Daniel was already co-counseling the case in Fresno with Protection And Advocacy Inc. (P&A), apparently without a client.

Daniel and P&A performed substantial work on the case prior Daniel's acquisition of a client in the case. An internal communication indicates that before June 6, 2005 Daniel and P&A sent the demand letter and performed the research and writing necessary to file a complaint in court and request a TRO. Drafted documents appear to include declarations, *guardian ad litems*, a civil cover sheet, summons and acknowledgements, the TRO cover sheet, the complaint, and the proposed order.

On June 6, 2005, two days before the complaint was filed, Daniel asked employees in the Modesto Office to help him find a client on whose behalf he could file the complaint. Ignacio Musina, the basic field Community Worker in the Modesto Office agreed to assist Daniel. Daniel instructed Musina to go out and find a client(s) for the litigation. Daniel explained the case the to the Modesto Office staff, described the ideal plaintiff and then requested assistance in soliciting a "clean" client. An internal communication from Daniel requests that "...someone from Modesto call folks on this list and see if 1. they want to be plaintiffs 2. if so, find out the following: is student barred from graduating[,] why?[,] that is was it slowly [sic] because they flunked the constitution test or were there other things going on[,] is student proficient in English?" The internal communication also says, "I know [t]his is last minute and apology – of [sic] you can't help, I understand – just let me know and we will get folks from Fresno to do this. I appreciate any help I can get."

---

[22] A press release obtained by the OIG appears to indicate that CRLA's involvement in the McBride case is similar to, if not in conjunction with, a more high profile effort to change the administration of exams by California schools in English. The press release indicates that CRLA represented parents and students intervening in a "Landmark Lawsuit Regarding Unfair Testing of English Learners in California Public Schools." Statement of California Rural Legal Assistance, "Landmark Lawsuit Regarding Unfair Testing of English Learners in California Public Schools," June 7, 2005.

Internal communications indicate that Musina interviewed all clients already represented in the case by P&A. Of the P&A clients contacted, the one client the Modesto Office determined to be eligible required an income eligibility waiver from CRLA Executive Director Padilla. During a DLAT meeting (at which Deputy Director Jaramillo also was present) Padilla approved the income eligibility waiver for the attorney working the case over the telephone.

The OIG substantiated the witness's account of CRLA's involvement in the McBride case. The OIG obtained supporting internal communications from Daniel to the Modesto Office. Musina confirmed that he worked on the case with an attorney from P&A.[23] He stated that he got a list of names of clients with phone numbers to follow-up on.[24] Documents the OIG received from CRLA also support this recount of how CRLA came to be involved in this case.

### c. CRLA's Desire to Participate in Impact Litigation Causes CRLA to Violate LSC Restrictions.

Again, litigating a case that may impact a large segment of the population is not automatically problematic. However, with a grantee so focused on attacking issues, and not on providing services to clients seeking assistance, an institutional climate may arise in which the grantee expends its resources on issues in which it does not have an interested client, and must, therefore solicit appropriate clients for representation in the case and become involved in restricted cases.

### i. CRLA Performs Work Without a Client.

It may be somewhat surprising that the question of whether CRLA may perform work on a case prior to it having a client in the case does not present a simple answer. Although on its face such efforts appear inconsistent with the premise on which funding is supplied, that it will be used to provide legal assistance to eligible clients, LSC provides no explicit requirement that litigation work be performed only when a grantee has an identifiable client.[25]

---

[23] Memorandum of Interview with Ignacio Musina, Community Worker, CRLA Modesto (December 21, 2005).

[24] Id.

[25] In addition to the overall purpose of establishing LSC, several restrictions and requirements touch on the notion. See LSC Act, supra note 4, § 2996b(a) (discussing overall purpose: LSC established "for the purpose of providing financial support for legal assistance in noncriminal proceedings or matters to persons financially unable to afford legal assistance); see also id. at § 2996 (discussing congressional findings and declaration of purpose). See LSC Act, supra note 4, § 2996f(a)(2), LSC Regulations, supra note 6, Part 1611 (discussing *financial eligibility*: before providing legal assistance, grantees must determine that an individual is financially eligible for services); 1996 Appropriations Act, supra note 5, § 504(a)(9), LSC Act, supra note 4, § 2996f(a)(2)(C)(1), and LSC's Regulations, supra note 6, Part 1620 (discussing *priorities*: grantees may devote time and resources only to those cases or matters the grantee has determined to be within its priorities after appraising the needs of its eligible client population); 1996 Appropriations Act, supra note 5, § 504(a)(10)(A) and LSC Regulations, supra note 6, Part 1635 (discussing

Leaving aside the question of whether CRLA should have performed work without a client, in doing so CRLA's performance of work on behalf of those *already represented by other counsel* certainly appears problematic. In the CCC v. Modesto case, these individuals were likely not eligible for LSC funded service, given the apparent difficulty CRLA had in attempting to find one to qualify for service. The work could be viewed as subsidizing the activities of other organizations in violation of Part 1610 of LSC Regulations; and the work raises concerns regarding the efficient and effective use of the scarce resources available to provide services to clients.

CRLA undertook work in connection with the CCC v. Modesto case, although it did not have a client in the litigation. In addition to the CS's own statement to this effect, the CS provided documentation in the form of email communications supporting the efforts CRLA performed in furtherance of the litigation. These emails support the CS account of CRLA's efforts in relation to the litigation. From personal knowledge, a second witness, though admittedly ignorant about much of CRLA's earliest efforts, corroborated later portions of the CS's account. Finally, records received from CRLA are consistent with the CS's statement of events.

The emails further demonstrate that most of the CCC v. Modesto work was done with the full knowledge of CRLA senior management. Two of CRLA's DLATs actively participated in researching issues and drafting the complaint. Later versions of the complaint were also copied to the Executive Director and Deputy Executive Director. The DLATs asked for and received updates on the status of the case including that CRLA staff was assisting in locating community organizations for co-counsel to represent; that CRLA staff was interviewing persons represented by other counsel in the case for factual investigation on behalf of other counsel; that CRLA staff was organizing and participating in meetings with co-counsel and community groups. The emails show that DLATs instructed the CS to continue supporting the other firms working on the case despite not having a client and to draft an LAP for the case using a former client, which CRLA's DLATs and Deputy Executive Director approved only hours after

---

*timekeeping*: grantees must maintain records of time spent on each case, matter or supporting activity in which the grantee is engaged); 1996 Appropriations Act, <u>supra</u> note 5, § 504(a)(8) and LSC Regulations, <u>supra</u> note 6, Part 1636 (discussing *client identity and statement of facts*: grantee must identify its client in complaints filed or in pre-complaint negotiations and must maintain a statement of facts forming the basis for the complaint); LSC Regulations, <u>supra</u> note 6, Part 1611 (discussing *retainer agreement*: grantees must execute retainer agreements with clients in extended service cases, although not where only brief service or only advice is given); 1996 Appropriations Act, <u>supra</u> note 5, § 504(a)(1)-(6) and LSC Regulations, <u>supra</u> note 6, Part 1612 (discussing *lobbying prohibited*); LSC Act, <u>supra</u> note 4, §§ 2996f(a)(6), (b)(4), (b)(6), & (b)(7) and LSC Regulations, <u>supra</u> note 6, Parts 1608 & 1612 (discussing political activity, organizing activity and demonstrations limited).

receiving it. Finally, the emails show the request for and receipt of an income eligibility waiver from CRLA's Executive Director Jose Padilla.

With regard to the McBride case, internal communications indicate that Fresno Directing Attorney Daniel had already performed all of the necessary pre-filing work when he contacted the Modesto Office for assistance in finding a client on whose behalf to file the case. Interestingly, CRLA timekeeping records for the case indicate that Daniel spent 64.4 hours working under client file number 05-0199427 and charged against LSC funds. The Modesto client's intake appears to be dated May 16, 2005, well before Daniel contacted the Modesto Office for assistance in soliciting a client. If Daniel already had a client, why did he need the Modesto Office to find a client for him? If Daniel could not file the case under the name of client number 05-0199427, why did Daniel charge his time to this client?[26] CRLA filed the claim two days following Daniel's initial contact with the Modesto Office for assistance. Daniel's timekeeping indicates he that he did not spend any time on the case on June 6th or 7th, though the email traffic indicates otherwise. According to Daniel's timekeeping records he spent only six hours on the case after contacting the Modesto Office, all of which occurred on June 8th, 2005, 4.5 of which he spent traveling to the hearing and 1.5 of which he spent at the hearing. Two attorneys within the Modesto office spent a total of 22.25 hours on the case, all of which occurred after Daniel contacted the Modesto Office. CRLA provided no timekeeping for Musina, the Modesto Office Community Worker who clearly spent time searching for a client.

The performance of the pre-filing work in conjunction with other counsel in CCC v. Modesto and again in McBride, in the absence of a client raises concerns as to the potential subsidization of another organization that engages in restricted activities and represents potentially ineligible clients. [27] Additionally, absent a client, the work raises concerns regarding the efficient and effective use of the scarce resources available to provide services to clients. Finally, the timekeeping questions raise issues as to the accuracy of CRLA's timekeeping practices and, therefore, the integrity of a basic accountability tool.

---

[26] See discussion of LSC's timekeeping requirements in the introductory Note of this report, supra pp. iii-iv. Also of interest, the client number under which Daniel kept his time does not appear in the database provided by CRLA containing all CRLA client numbers for clients from January 1, 2003 to October 31, 2005.

[27] Other counsel, including P&A and LCCR, engage in work that LSC grantees are prohibited from undertaking, such as class action cases and legislative advocacy. LSC grantees may associate with other organizations that engage in such prohibited activities, but may not use LSC funds to subsidize such organizations. See LSC Regulations, supra note 6, § 1610.8(a)(2). For example, Daniel timekeeping records indicate that he used LSC funds to support his work on the McBride case when CRLA did not have an interested client. This appears to violate the prohibition on subsidizing an organization engaging in restricted activities; Id.

ii. <u>CRLA Solicits Clients.</u>

CRLA's activity in furtherance of finding a client for CRLA to represent in connection with CCC v. Modesto and McBride clearly violates the restriction in LSC's 1996 appropriations act prohibiting grantee attorneys from "accept[ing] employment resulting from in-person unsolicited advice to a nonattorney that such nonattorney should obtain counsel or take legal action."[28]

The McBride case presents an obvious instance of solicitation. In addition to a witness' recount of how CRLA became involved in McBride, email communications clearly show a Directing Attorney instructing Modesto staff members to solicit clients for a case in which he had already performed the necessary pre-litigation work. Internal communications indicate that a Modesto Community Worker did, in fact, solicit a client for CRLA to represent in the litigation. This instance also indicates that this practice is not isolated within the Modesto Office.

The OIG substantiated that CRLA staff expended significant time and energy trying to find a client for CRLA to represent in connection with the CCC v. Modesto case. Information received from other staff and copies of email communications support the CS's statement to this effect. These sources support the following solicitation activities: CRLA contacted former CRLA clients or current clients being represented on other matters to determine whether they would be interested in pursuing the litigation; CRLA discussed with other counsel in the litigation whether they could refer one of their clients to CRLA; and CRLA contacted individuals then represented by other counsel in the case (with counsel's permission).

CRLA expended significant time trying to qualify these individuals as eligible for CRLA-service and was only able to qualify a single client on the eve of case filing. Staff spent time pursuing one prospective client who was not eager to speak with CRLA because the individual was already represented by counsel and had been advised by that counsel not to sign anything from anyone else. CRLA requested that the counsel contact the client and assure the client that the client could speak to CRLA. CRLA staff expended time attempting to verify the income of this prospective client, whose credibility was questioned due to the fact that information provided had proved inaccurate. The client CRLA ultimately obtained originally appeared to be ineligible. CRLA staff spent time tracking down this person to gain additional information that might allow the person to qualify for CRLA services. On the evening before the case was filed, CRLA concluded that this person was eligible for services with an eligibility waiver, as his income was scheduled to change in approximately two weeks time.

---

[28] Pub. L. 104-134, § 504(18), <u>see also</u> LSC Regulations, <u>supra</u> note 6, Part 1638.

Internal communications further demonstrate that most of this work was done with the full knowledge of, and at times under the direction of CRLA senior management, as does the statement of a second witness.   The emails substantiate that one of the DLATs involved in the case knew on July 16, 2004 that CRLA staff was actively seeking a client to represent in connection with the case.  On August 3, 2004, CRLA staff asked for guidance in light of the lack of a client and the DLAT asked the staff member if there was not some "housing element comment client" available to support factual investigation of the case.[29] Internal communications show a flurry of activity in the days leading up to filing, with CRLA attempting to find a client among the plaintiffs already represented by other counsel.  A DLAT directed staff to review the other plaintiffs in the case (persons already represented by co-counsel) and to try to qualify them as CRLA clients, that is, conduct an intake and obtain a statement of facts and retainer agreement from them.  When the CS informed a DLAT of the questionable credibility of the above referenced prospective client's eligibility information, the DLAT asked the CS whether the client qualified based on the information previously provided and told her that CRLA should take their clients at face value and that inquiries attempting to verify eligibility are not justified absent hard evidence.  When a client finally was signed, on the eve of filing the case, the CS advised a DLAT that this client would become ineligible for service two weeks hence; the DLAT directed the CS to submit an income eligibility waiver to the CRLA Executive Director so that CRLA could continue the representation.

These two cases illustrate CRLA's propensity for involvement in certain cases regardless of whether or not CRLA has an interested client.   In fact, one knowledgeable witness stated that CRLA becomes involved in cases without a client and, therefore, must solicit a client(s), most commonly because CRLA becomes interested in an issue and chooses to pursue involvement in the issue via lawsuit despite not having an interested client and less because outside counsel contacts CRLA to become involved, like the Modesto and McBride cases.  The two cases also illustrate that this practice of desiring to be involved in a case, working in furtherance of the case despite the lack of a client and then soliciting an appropriate client for the litigation is neither a simple anomaly, attributable to one rogue attorney or rogue branch office, nor an occurrence of which CRLA's upper management was ignorant.

### iii.  CRLA Inappropriately Worked a Fee Generating Case.

The CCC v. Modesto case is a fee generating case for LSC purposes, to which none of the enumerated exceptions making participation permissible apply. CRLA's involvement in the case, therefore, violates LSC Regulations.

---

[29] This supports the CS's assertion that CRLA maintains "all-purpose" clients in various issue areas in order to charge time worked on cases in which CRLA has no client. See supra p. 11.

Part 1609 of the LSC Regulations implements Section 1007(b) (1) of the LSC Act and generally prohibits grantees from providing legal assistance in fee generating cases. LSC's stated purpose for the restriction is "[t]o ensure that recipients do not use scarce legal services resources when private attorneys are available to provide effective representation."[30] Fee generating cases are defined as "any case or matter, which, if undertaken on behalf of an eligible client by an attorney in private practice, reasonably may be expected to result in a fee for legal services from an award to a client, from public funds or from the opposing party."[31] Section 1609.3 provides exceptions limited to cases in which no private attorney or lawyer referral service will accept the case or emergency cases in which time does not permit referral.[32]

An internal communication from DLAT Rice indicates that "from CRLA's perspective … this is a non-fee generating case as [the co-counsels] are eliminating all requests for monetary relief and it is injunctive relief only…" The CCC v. Modesto co-counsel agreement between the myriad of private and not-for-profit law firms indicates that CRLA will not request attorneys' fees in the case.

Neither of CRLA's attempts to separate itself from the attorneys' fees that the CCC v. Modesto case could reasonably be expected to generate is relevant to the determination of whether the case is fee generating for LSC purposes. That CRLA's co-counsel is opting not to request monetary relief, hence will not collect a contingency fee from the plaintiffs, does not render the case one in which monetary relief is not possible and from which an attorney in private practice reasonably may be expected to collect a fee. In fact, CRLA's statement "[the co-counsels] are eliminating all requests for monetary relief" suggests that monetary relief may have been available in this case. Similarly, a request for attorneys' fees would not be included in a prayer for relief unless the requesting party had a basis for asserting that the party was entitled to such fees upon a successful outcome in the case. The complaint filed on August 18, 2004 includes a claim for attorneys' fees by the other firms working the case,[33] which signifies that this case is, indeed, a fee generating case. Finally, as evidenced by the fact all clients were previously represented by other counsel, including private law firms, long before CRLA became involved in the case, neither exception can reasonably apply to this case. For LSC purposes, the CCC v. Modesto case is a fee generating case and CRLA's involvement in the case violates Part 1609 of LSC Regulations.

---

[30] LSC Regulations, supra note 6, § 1609.1.
[31] LSC Regulations, supra note 6, § 1609.2 (a).
[32] LSC Regulations, supra note 6, § 1609.3.
[33] See CCC v. Modesto, supra, note 16.

#### iv. CRLA Inappropriately Requested Attorneys Fees.

Part 1642 of the LSC Regulations prohibits grantees from "claim[ing], or collect[ing] and retain[ing of] attorneys' fees"[34] and provides no exceptions. As indicated in the previous section, the prayer for relief in CCC v. Modesto includes a claim for attorneys' fees. Again, CLRA's attempt to disassociate itself from the request for attorneys' fees by co-counsel, via the co-counsel agreement is irrelevant. The claim in the CCC v. Modesto case indicates neither that CRLA is not requesting any attorneys' fees, nor that no fees collected will go to CRLA. CCC v. Modesto includes a simple request for attorneys' fees and CRLA is counsel of record in the case. CRLA's claim for attorneys' fees is a clear violation of the restriction.

### B.    CRLA Officials Associate the Grantee with Political Activities.

Unrelated to the CCC v. Modesto or McBride cases, as a result of independent research, the OIG found two instances in which CRLA senior staff appears to be engaged in prohibited political activities. LSC Regulation 1608.4 (a) clearly states "[n]o employee shall intentionally identify the Corporation or a recipient with any partisan or nonpartisan political activity, or with the campaign of any candidate for public or party office."[35] Specifically, CRLA's Executive Director, Jose Padilla, is listed as an endorser of "The World Can't Wait: Drive Out the Bush Regime." Likewise, DLAT Ilene Jacobs co-hosted a fundraiser for 2004 Presidential Candidate John Kerry via "Fair Housing Advocates for Kerry. Certainly both Padilla and Jacobs are free to express their own private political beliefs on their personal time. However, in both instances the CRLA employees appear to have inappropriately identified themselves as "of CRLA," thereby identifying CRLA with such political activities in violation of Section 1608.4 (a) of LSC's regulations.

---

[34] LSC Regulations, supra note 6, Part 1642.
[35] LSC Regulations, supra note 6, § 1608.4 (a).

III. **Areas of Continuing Concern**

For other allegations and issues arising from our investigation, the OIG requires additional information in order to conclude whether the evidence supports a finding of noncompliance. These issues are sufficiently developed to raise the serious concerns discussed herein.

A. CRLA Engages in Other Activities That Tend to Support the Claim that CRLA Prioritizes Impact Work Over Service Work.

Other common practices at CRLA illustrate the grantee's propensity for impact type work. Some activities include lobbying, monitoring, filing amicus briefs and filing cases on behalf of the "general public" under California's Unfair Competition Law. Though many of these activities raise serious concerns, the OIG has not yet developed sufficient evidence to support definitive findings regarding CRLA's possible violation of federal law as a result of engaging in the following activities.

1. CRLA Engages in Activities that May Violate Restrictions Prohibiting Lobbying.

The OIG found possible prohibited lobbying activities, including legislative and rulemaking activities in violation of LSC Regulations Part 1612 and Section 504(a)(1)-(6)) of the 1996 Appropriation Act (1996 Appropriation), incorporated by reference in LSC's current appropriation. LSC's 1996 Appropriation prohibits grantees from "attempt[ing] to influence the issuance, amendment, or revocation of any executive order, regulation, or other statement of general applicability and future effect by any Federal, State, or local agency"[36] and "attempt[ing] to influence the passage or defeat of any legislation, constitutional amendment, referendum, initiative or any similar procedure,"[37] at the Federal, State or Local level. LSC implemented this prohibition in Part 1612 of its regulations. Part 1612 generally prohibits lobbying contact with legislative or administrative bodies but, in accordance with the 1996 Appropriations Act, allows limited contact with legislative and administrative bodies at the federal, state and local level in response to an unsolicited written request for comment and public rulemakings and using non-LSC funds.[38]

As stated, the CRLA activities reviewed in this section may violate LSC's lobbying restrictions. In applying LSC's implementing regulation, Part 1612, to CRLA's activities we find the regulation provides less functional guidance than may be needed; additional guidance to grantees may be worth considering.

---

[36] 1996 Appropriations Act, supra note 5, § 504 (a) (2).
[37] Id. at § 504 (a) (4).
[38] Id. at § 504 (e), LSC Regulations, supra note 6, § 1612.6, also referred to as the Cohen-Bumpers Amendment. LSC also requires grantees to "maintain separate records documenting the expenditure of non-LSC funds for legislative an rulemaking activities permitted by § 1612.6." LSC Regulations, supra note 6, § 1612.10 (b). This separate timekeeping is often referred to as "Cohen-Bumpers" time.

a. CRLA's Comments on the Housing Elements May Be Considered
   Lobbying.

The CS described a CRLA wide project called the Housing Elements as an
example of CRLA management's desire for staff to engage in "impact work." The
CS explained that Housing Elements refers to the housing needs portion of a
state mandate that all cities and counties adopt a comprehensive long-term
physical development plan for all economic segments of the community within
their respective jurisdictions.  The CS stated that CRLA management required all
CRLA offices to participate in the revision of the Housing Element in their
respective service areas.  According to the CS, all CRLA offices were instructed
to comment on proposed revisions, evaluate each jurisdiction's compliance with
the law and assess the litigation prospects in each jurisdiction.

The CS stated that DLAT Jacobs, the DLAT responsible for housing issues,
oversaw this project CRLA wide.  The CS agreed to take the project in the
Modesto Office.  According to the CS she attended many community meetings,
planning commission hearings, commented on housing element revisions and
gave an oral presentation at a planning commission meeting.  The CS stated that
at least four other advocates from the Modesto Office participated in the Housing
Elements project and that she supervised two interns who worked almost
exclusively on the project. According to the CS, she presented comments to the
planning commission as a representative of CRLA and not on behalf of any
client.  The CS stated that she charged her time spent working on Housing
Elements to the same "all purpose" housing client to whom she charged her
clientless time while working on the CCC v. Modesto case. According to the CS,
this was the common practice for all CRLA offices.

The OIG substantiated that CRLA staff participated in the revision of the Housing
Elements.  The CS provided specific times and dates of some of her Housing
Elements activities.    Internal communications indicate that, indeed, the CS
submitted written and oral comments to the Housing Elements planning
commission in Modesto and support the CS's statement as to interns working on
the project.  Language in the communications indicates that the planning
commission changed language in a draft of the Housing Element as a result of
her comments.   DLAT Jacobs commended the CS for the work in a separate
documented communication.

Additionally, the aforementioned Housing Elements Priorities Memo[39] states
"CRLA housing advocates in all field offices continue to analyze housing
development proposals for consistency with local housing elements and general
plans, responding to written requests for comment upon development
proposals..."  A Summer 2003 AWHP[40] Farmworker Housing Survey Report,

---

[39] See supra note 12.
[40] Agricultural Worker Health Project.

also presented at CRLA's 2003 Asilomar Priorities Setting Conference also refers to CRLA's evaluation of general Housing Elements plans.[41]  The May 2003 Six Month Work Plans for the Modesto Office employees indicate the "[t]he Modesto office has made a commitment to become familiarized with Housing Elements law with a goal of long-term monitoring and enforcement" and that multiple Modesto Office employees engaged in Housing Elements work.  CRLA's 2004 application for LSC funding also states that it intends to "comment on housing elements, consolidated plans and analysis of impediments to fair housing."[42]

In an effort to determine the permissibility of CRLA's Housing Elements work, the OIG evaluated CRLA's activities, obtained from CRLA documents necessary to determine whether CRLA used LSC funds to undertake the activity and whether the comments were provided in response to a request for comment as allowed by the Cohen-Bumpers amendment.[43]  Clearly the activities of the CS fall within the realm of activities covered by Part 1612 of LSC Regulations.  Not only did the CS "attempt to influence the issuance, amendment, or revocation of …[a] statement of general applicability and future effect by [a] local agency;" her actions succeeded in causing the planning commission to change language in a draft of the Housing Elements.  The CS's activities do not appear to be exclusive to her or the Modesto Office and CRLA management appears to coordinate and support such activities.

In response to the OIG's request for documents regarding the Housing Elements work, CRLA responded that it does "not consider comments on housing elements to be legislative advocacy nor [ ] responses to notice and rulemaking."  CRLA considers the commenting to be "FHIP work"[44] and requires neither time to be kept as Cohen Bumpers IOLTA[45] nor a written invitation from a legislative or administrative official.   In at least two instances, though, CRLA reported commenting to state and local officials regarding Housing Elements to LSC pursuant to Section 1612.10 (c) of LSC Regulations,[46] which requires grantees to submit semi-annual reports describing their Cohen-Bumpers activities.[47]

CRLA sets forth three reasons for not considering commenting on Housing Elements as activity covered by Part 1612, but considering them to be "in the nature of exhaustion of administrative remedies."  First, CRLA asserts that a writ

---

[41] AWHP Farmworker Housing Survey Report, Summer 2003, pp. 6-7.

[42] CRLA Proposal Narrative for 2004 Grants Competition, p. 8.

[43]  Under limited circumstances, section 504(e) permits grantees to use non-LSC funds to "respond to a written request for information or testimony from a Federal, State or local agency, legislative body or committee;" 1996 Appropriations Act, supra note 5.

[44] Fair Housing Initiatives Program is a U.S. Dept. of Housing and Urban Development program that promotes fair housing laws and equal housing opportunity awareness.

[45] See explanation of "Cohen-Bumpers" supra note 38.

[46] LSC Regulations, supra note 6, § 1611.10 (c).

[47] CRLA Semi-Annual Report on Legislative and Rulemaking Activities Conducted Pursuant to 45 C.F.R. § 1612.10 (c), for January 1, 2004 to June 30, 2004, p. 6, and July 4, 2004 to December 31, 2004, p. 4.  Additional entries may also be related to the Housing Elements but do not refer to the activities as such.

petition cannot be sustained unless comments were previously submitted. Second, CRLA explains that "unlike legislative acts, a governing jurisdiction cannot legally adopt a housing element without first submitting a draft to the Department of Housing and Community Development for compliance review." Third, according to CRLA "the governing statute requires each jurisdiction to take public comment in order to be in compliance with state law." Assuming that CRLA's first assertion is true, the argument seems irrelevant because grantees are not permitted to "attempt to influence" regarding a statement of general applicability for any reason. As to CRLA's second claim, when and under what conditions the governing jurisdiction can adopt a Housing Element is irrelevant to the determination of whether or not CRLA "attempt[ed] to influence" that governing body. Finally, CRLA's third assertion appears to be arguing that commenting on the Housing Elements may be "permissible under Section 1612.6 (e), "a public rule making proceeding." Although CRLA does not consider it as such, it is unclear whether such activity constitutes a "public rulemaking" for LSC purposes. The OIG requires additional information as to the public comment requirement. Regardless, CRLA's use of LSC funds to engage in these activities appears impermissible. CRLA failed to provide any information relating to the Housing Elements work of the Modesto Office, however the timekeeping documents for twenty other jurisdictions provided by CRLA indicate that LSC funds were used to support Housing Elements work, despite CRLA's claim to the contrary.[48]

> ### b. CRLA Attempts to Influence Other State and Local Officials Regarding Legislation and Executive Branch Statements of General Applicability and Future Effect.

Information on CRLA's lobbying activities is widespread and widely available. CRLA's activities are easily discoverable via internet search, in CRLA's internal documents and by admission from the grantee itself.

> ### i. Information Regarding CRLA's Lobbying Activities is Readily Available on the Internet.

A simple Internet search reveals CRLA's involvement in other questionable activities that may be violative of LSC's prohibition on lobbying. The following five items provide a smattering of samples of seemingly impermissible activities in which CRLA engaged:

---

[48] In addition to commenting on revisions to the Housing Elements, some Housing Elements work appears to be litigation related and on behalf of a particular client. This work could allowably be charged against LSC funds. However, a significant amount of activity charged against LSC funds appears to be general review and comment work. It is unclear whether that work is on behalf of a particular client. The AWHP Farmworker Housing Survey Report, supra note 41, also indicates that Housing Elements work has a litigation component.

- Drafting of California Assembly Bill 712, introduced on February 17, 2005, regarding residential land use densities. The bill indicates that CRLA is the bills "Source" (drafter). CRLA maintains that they have no record of any involvement in the bill.

- Opposing California Assembly Bill 2399. Governor's Office Press Release – Wilson Admonishes Organized Labor and CRLA for Death of Bill Requiring Continuing Education for Farm Labor Contractors, April 22, 1998. The Governor's Office issued the press release following the defeat of A.B. 2399 (Poochigian). The press release states "Governor Pete Wilson today expressed exasperation with ...California Rural Legal Assistance for their opposition to A.B. 2399 (Poochigian), a bill to require continuing education for California farm labor contractors."

- Commenting on the Parajo Valley Unified School District Board's decision whether to contract with AdvancePath, which according to its website is a provider of alternative education for out-of-school youth or those at risk of dropping out. A CRLA attorney is represented as having "pulled his support for Advance Path..." and sending letters to officials addressing what happens with students when they leave their education. CRLA records indicate that the attorney spent 115.5 hours working on the comments, all of which was charged against LSC. At the time the OIG requested CRLA's Report on Legislative and Rulemaking Activities Conducted Pursuant to 45 C.F.R. § 1612.10 (c), the report for the second half of 2005 had not yet been filed. The OIG will request such documentation to determine whether CRLA received a request for comment from the school district.

- An Analysis of the Labor Provisions of McCain/Kennedy. DLAT Rice coauthored an analysis of the immigration reform bill, "prepared to share [ ] perspectives with labor, immigrant advocacy organizations and other allies in the comprehensive immigration reform movement." The paper was intended to "state clearly the shortcomings of this legislation so that it can be improved, if possible, and if compromise is necessary and desirable, the trade-offs are clearly understood by policy-makers, and above all, by ourselves." The paper goes on to analyze provisions of the bill "of serious concern" and suggest alternatives. In response to the OIG's request for documents, DLAT Hoerger claimed that his work on this project was on personal time and DLAT Rice charged 3.75 hours against LSC funds on the project and that CRLA was not representing a client in this work. DLAT Hoerger also stated that "[i]n [his] opinion, this activity is clearly LSC-appropriate." In light of the stated goal of the analysis of the McCain/Kennedy immigration reform act, and its intended audience, e.g., "policymakers," publishing of the analysis is likely a violation of the LSC restriction against lobbying.

ii. CRLA Describes Potentially Impermissible Contact with State and Local Regulatory Agencies.

On June 14, 2006 CRLA sent a letter attempting to explain to LSC Management why the grantee should not be required to comply with the OIG's "breath-

taking"[49] request for CRLA employee time keeping records regarding "'*comment(s)* or testimony on California Department of Industrial Relations current or proposed regulations *or other policies,*'"[50] and other documents and data. In the letter CRLA describes some of the communications and activities its employees undertake in relation to state and local agency officials but that CRLA does not consider to be covered by LSC's prohibition on lobby activities. The relevant portion of letter reads:

> *Third example:* OIG is requiring CRLA to produce, again on a program-wide basis, all records for a period exceeding three years concerning, '*comment(s)* or testimony on California Department of Industrial Relations current or proposed regulations or *other policies.*' (Emphasis added.)...California's Department of Industrial Relations encompasses a number of state agencies including, *e.g.* the Division of Labor Standards Enforcement; the Occupational Safety and Health Administration; the Industrial Welfare Commission, the Employment Development Department, the Unemployment Insurance Appeals Board - - large, state-wide agencies that function in and/or have jurisdiction over – and often local offices – every one of our service areas. While CRLA advocacy concerning regulatory rule-making can be tracked through Cohen-Bumpers reporting requirements, the vast majority of activities undertaken by our advocates that fall within the scope of this request is incalculable. On a daily basis, CRLA staff may be discussing with, *e.g.*, a local Deputy Labor Commissioner, or the Counsel whether a particular existing regulation is being properly applied to calculate penalties on unpaid wages; or CRLA staff may be discussing with a locally-based Cal-OSHA Compliance Officer or a state-wide industry enforcement coordinator or Cal-OSHA's General Counsel whether a regulation addressing use of the driverless-tractors has been appropriately applied to use of remote engine-"kill" switches, or whether an agency should be encouraging its staff to spend greater time in "field monitoring" and "investigations" instead of desk-analysis, and/or whether and when an agency should investigate a complaint from a laborer concerning employer non-compliance on a work-force-wide basis rather than individually. Every one of these activities falls within the OIG document demand for 'comments' on 'current regulations' and/or 'other policies'. And individual employee time-records (reporting under 'cases' or 'matters') will reflect these activities. But none of the activities falls within Cohen-Bumpers record-keeping requirements, nor under any other LSC statutory or regulatory

---

[49] Letter from Jose Padilla, Executive Director, CRLA, to Karen Sarjeant, Vice President for Programs and Compliance, LSC, June 14, 2006, p. 3.
[50] Id. (quoting Data and Document Request from Kirt West, LSC OIG, to Jose Padilla, Executive Director, March 16, 2006) (emphasis in CRLA letter not in original OIG Request).

requirement for tracking. Thus, while records may 'exist', there is no way of locating them except by a hand-review of every individual time-record for every single CRLA advocate...for the entirely of their working hours over a 3+-year period...[51]

Furthermore, a Memorandum submitted at CRLA's 2003 Priorities Setting Conference from Ellen Braff-Guajardo, CRLA Project Director, to Jose Padilla states "as a result of ongoing negotiations with Cal/OSHA, we now are much closer to a statewide protocol for the acceptance of CRLA-initiated, rather than worker-initiated, administrative complaints."[52]

CRLA staffs' discussions with CalOSHA regarding how the agency should spend its resources to ensure compliance with the laws, i.e. how to investigate a complaint, and negotiations with the agency to change the way complaints may be filed and seem to be "attempt[s] to influence...[a] statement of general applicability and future effect by any Federal, State, or local agency," in violation of LSC's 1996 Appropriations language. Just as the promulgation of a regulation itself is a statement of general applicability and future effect, so is a governing agency's application of its regulations, often captured in documents such as operations, policies and procedures manuals and guidance letters, and otherwise captured informally by agency practice. Likewise, advising an agency how it should spend its limited resources is in effect telling the agency how it should generally carry out its mandate, what it should prioritize. How an agency applies its regulations and carries out its mandate affects all those who come before it, and not just the particular rights, benefits or interests of an individual client. Thus, negotiations affecting a change in the manner in which a complaint may be filed with or is investigated by an agency, including whether to investigate a particular individual's complaint or to use an individual complaint as a reason to investigate the entire workforce results in a practice of general applicability and future effect. All of these activities are an attempt to influence agency decisions, formal or informal, resulting in statements of general applicability and future effect. Influencing such agency decisions appears to be the precise type of activity Congress sought to prohibit LSC grantees ability to engage.

## 2. CRLA Engages in Various Types of Monitoring Activities.

According to the CS, Community Workers from the Modesto Office "spent time going into fields to monitor...sanitation conditions." Additionally, CRLA's applications for LSC funding, CRLA Annual Reports, statements made to the OIG by CRLA Community Workers and various statements by CRLA to the press

---

[51] Id., pp. 3-4. The OIG and CRLA have discussed this request and have agreed on a starting point for CRLA's review and gathering of information for response. The OIG is awaiting CRLA's substantive response pursuant to this clarification.

[52] The referenced protocol would appear to facilitate CRLA's filing of complaints without a client. Memorandum to Jose Padilla, Luis Jaramillo, CRLA Board of Directors, CRLA Staff from Ellen Braff-Guajardo, CRLA Project Director, Agricultural Work Health Project, re: Agricultural Work Health and Safety Report for the November 2003 Priorities' Conference, October 14, 2003, p. 5.

indicate CRLA engages in a number of monitoring activities typically relating to farmworker and Latino issues and often absent a specific client. Although not necessarily in violation of the laws and regulations governing the use of LSC funds, CRLA's monitoring of issues for possible CRLA involvement in impact work, creates the conditions for instances of noncompliance with federal laws, see discussion supra Part III.A.3, and diverts resources away from the provision of services to clients who seek assistance. Below are but a few instances of CRLA monitoring activities:

- Labor -- Monitoring activities include extensive field monitoring to assess compliance with applicable laws by agricultural employers. CRLA's Proposal Narrative for the LSC 2004 Grants Competition states that six of its field offices have "in recent years focused on efforts…to monitor and promote compliance with field sanitation and safety requirements."[53] "Field Sanitation in Venture County: When Cal-OSHA Fails Its Job," recounts CRLA's monitoring of Ventura County fields for noncompliance by employers beginning in 1989 and continuing, at least, through 1998.[54] CRLA's 2002 Annual Report reports CRLA's close monitoring of H-2A applications submitted by agricultural employers. According to its own Annual Report, CRLA community workers began to investigate an Oceanside tomato grower, apparently without a client, when the Department of Labor approved the employer's H-2A application. The story also indicates that the aggrieved plaintiffs learned of their claim against the grower only after CRLA investigated.[55] Luis Rivera, a Community Worker for the Stockton Migrant Unit but based in the Modesto Office, stated that he spends 70% of his time on community education and outreach work that consisted of field monitoring and observing farmworkers at their worksite.[56] May 2003 Six Month Work Plans for Modesto Office employees indicates that Community Workers spend up to 80 % of their time monitoring agricultural workers on the job and attorneys either participating in or coordinating monitoring of agricultural workers, including coordination with other CRLA offices.

- Education -- CRLA monitored California's monitoring of public school system for compliance with court orders and federal and state laws particularly regarding Limited English Proficiency students, namely Hispanic students. In the Comite de Padres case,[57] concerning the compliance of the California

---

[53] CRLA Proposal Narrative for 2004 Grants Competition, p. 51. The 2004 Grants Competition is the most recent competition for which CRLA was awarded a three year grant. CRLA has since provided Grant Renewal Applications that do not deviate from the Narrative set out in the 2004 Grants Competition.

[54] CRLA 1998 Annual Report, p. 4.

[55] CRLA 2002 Annual Report. p. 5.

[56] Memorandum of Interview with Luis Rivera, Community Worker, CRLA Modesto (December 21, 2005).

[57] Comite de Padres de Familia v. O'Connell, No. CV281824 (Cal. Super. Ct. filed May 25, 1979), termination of consent decree aff'd, CO42166, 2004 Cal. App. LEXIS 1027 (Cal. Ct. App. Jan. 30, 2004).

State Board of Education with requirements that it ensure that students with limited English proficiency and non-English speaking students receive instruction in a language they understand and which resulted in a settlement agreement requiring the State to monitor the implementation of bilingual education programs," the CS monitored the State's monitoring of the programs with DLAT Rice, then DLAT Daniel and two attorneys from Multicultural Education, Training, and Advocacy (META). The CS stated that CRLA was not representing a client in conjunction with the monitoring activities, though she charged her time to a client named in the Comite case. The CS also stated that this client later became CRLA's all-purpose client[58] for education issues, particularly issues regarding English as a Second Language (ESL) students.

- Public Benefits – CRLA's Proposal Narrative for the LSC 2004 Grants Competition states that CRLA intends to "monitor state and county implementation of benefits programs through problem-solving meetings with state and county officials."[59]

Although monitoring of a case settlement on behalf of a client or monitoring the activity of an adversary may be entirely appropriate advocacy for an LSC grantee to undertake, apparently CRLA often engages in monitoring activities that are not on behalf of an interested client. CRLA's monitoring of issues in which CRLA wishes to be involved, which appears to be in search of instances in which CRLA can engage in impact work, creates the conditions for instances of noncompliance with federal laws. CRLA's monitoring activities often raises the issues addressed in Part III.A.3.c, regarding work performed without a client. Time spent monitoring any given situation without a client, be it the activities of private parties or state actions, draws limited precious resources away from their intended purpose, for CRLA to provide legal aid to clients who seek assistance.

### 3. CRLA Filed Cases Under California's Unfair Competition Law on Behalf of the General Public and Who Are Otherwise Not Named Plaintiffs.

Until portions of California's Unfair Competition law (UCL), CA Business and Professions Code §17200, were reformed in 2005, CRLA used the UCL to seek redress from employers for more than just clients represented by CRLA. Under the title "Making an Impact," CRLA's 2002 Annual Report explains how CRLA uses the UCL "to file lawsuits that will result in payment of back wages to all workers affected by the illegal practices workers [sic]."[60] Many of the workers on

---

[58] According to the CS all-purpose clients are client files that CRLA keeps open, regardless of whether the actual service to the client has concluded. CRLA advocates record time in all-purpose client files when advocates perform work on a case or matter but are not actually representing any client in the case or matter because no client has sought assistance regarding the case or matter. CRLA's all-purpose clients are effectively straw man clients.

[59] CRLA Proposal Narrative for 2004 Grants Competition, p. 13.

[60] CRLA 2002 Annual Report, p. 7.

whose behalf CRLA filed litigation, under the name of "the general public" may not have been eligible for LSC funded services.  Nonetheless, CRLA filed litigation on their behalf and sometimes recovered damages on their behalf and administered a fluid recovery on their behalf.  CRLA's Annual Report goes on to say that "[f]iling strong court actions has resulted in bringing the employer to the settlement table."[61]  Similarly, the same Annual Report states that CRLA used the UCL tool in the H-2A monitoring cases also.

In 2004 California voters passed amendments to the UCL.  One of the most significant changes eliminated private lawsuits brought on behalf of the general public.  Now, a UCL plaintiff who seeks to represent individuals other than himself must abide by the rules and procedures governing class actions.[62]

> 4.  CRLA Files Amicus Briefs.

In a five-year period ending in 2005, CRLA filed at least 10 amicus briefs in federal and California appellate level courts.[63]  CRLA did not file all of the amicus briefs on behalf of clients[64] and kept questionable time keeping records on those filed on behalf of clients.  The filing of amicus briefs in CRLA's institutional capacity rather than serving individual clients appears consistent with the allegation that the grantee desires to be involved in cases that the grantee deems will have an "impact."

> a.  CRLA Files Amicus Briefs in Its Institutional Capacity and Not on Behalf of Any Client.

CRLA filed three of the identified briefs in its "institutional" capacity.  A copy of the minutes of an April 29, 2000 telephonic meeting indicates that the Executive Committee of CRLA's Board of Directors discussed changing CRLA's policy of filing amicus briefs on behalf of a client "so that CRLA is not limited to only representing individual clients but to represent CRLA itself of this kind of amicus argument."  One board member commented that "in these political times, the policy of having a client to represent is well founded...[but] we need to adapt to changing times and we need to participate in that forum as amicus with a stronger position."  The Board passed a motion to allow CRLA "to represent

---

[61] Id.

[62] The OIG recently learned that CRLA is currently attempting to the employ the UCL tool to file a representative action without first following the required class action procedures.  Though the OIG has not undertaken a comprehensive evaluation of California's reformed UCL, a cursory review begs the question of whether a representative action filed under the UCL is tantamount to filing a class action.  If filing a representative action under the UCL is, in effect, the same as filing a class action lawsuit, CRLA may be in violation of Part 1617 of LSC Regulations, which prohibits any grantee from *participating* in a class action lawsuit.

[63] The OIG has not conducted a comprehensive search for CRLA amicus filings.

[64] CRLA's filing of amicus briefs on behalf of clients is not inappropriate so long as the filings do not otherwise violate LSC restrictions.

clients or CRLA [in the filing of amicus litigation] when appropriate and at the discretion of the Executive Director." CRLA filed these three briefs not on behalf of a client, but in its "institutional" capacity. A DLAT working on one of the cases charged all of his time to an existing CRLA client with similar issues as those on appeal. Other DLAT time spent working on amicus litigation without a client is categorized as an "activity." Again, CRLA's filing of amicus briefs in its "institutional" capacity seems inconsistent with the premise on which funding is supplied, to provide legal assistance to eligible clients.

Many of the briefs appear to be joined by a number of other private attorneys and civil rights and poverty organizations, indicating the availability of other counsel to perform this work. These briefs include those filed on behalf of particular clients and those filed by CRLA in its "institutional" capacity. The multitude of other attorneys and organizations available to represent the interests of the poor community via the filing of amicus briefs raises concerns regarding CRLA's use of resources. Although CRLA certainly can use its non LSC funds to file amicus briefs representing itself rather than an eligible client,[65] as indicated supra note 9, LSC grantees are reportedly turning away half of the clients who seek services due to lack of funding.

It is not for the OIG to judge the wisdom of using non-LSC resources to file amicus briefs rather than for representation of individual clients. The filing of amicus briefs in CRLA's institutional capacity rather than serving individual eligible clients, however, appears consistent with the allegation that the grantee desires to be involved in cases that the grantee deems will have an "impact."

### b. Even When CLRA Files Amicus Briefs on Behalf of Clients The Quality of Timekeeping Records Is Questionable.

The timekeeping and intake documents for several of the cases raises questions of accurate timekeeping; such as: a retainer agreement requesting CRLA service pertaining the filing the amicus brief dating more than one year after the date of the initial intake documents, and in which the intake documents indicate one attorney sent a letter on behalf of the client one year prior to a separate attorney keeping time under the client's file. The client's file appears to still be open in CRLA's database. Also puzzling is attorney time charged to clients other than the client on whose behalf CRLA filed the amicus; the filing of amicus briefs on behalf of and time charged to clients whose cases are not affected by the filing, i.e. the clients' cases have already been resolved favorably for the client; time being kept as an "activity" or a "matter" more than one month before the client intake sheet indicates the CRLA acquired the client and not affiliated with the client CRLA purports have filed on behalf of but who is not listed in the filing, rather CRLA appears to have filed on behalf of the defendant-appellant. Such timekeeping irregularities raise doubt as to the accuracy of CRLA's timekeeping records and the integrity of a basic accountability tool.

---

[65] The OIG has not yet determined the source of funding supporting these activities.

D.   CRLA's Timekeeping and Case Management Practices Create Conditions in Which Advocates Can Serve Undocumented Persons Without Detection.

The CS and a second witness stated that employees are expected to serve undocumented persons and those employees who do not provide services to undocumented persons are looked down upon by the organization.  The CS stated, "I personally provided legal services to undocumented aliens on CRLA time and using CRLA resources and I am aware that other CRLA Modesto staff did as well."  The CS also stated, "[b]eyond the parameters of what I was willing to do, there was a clear feeling among certain CRLA staff that anyone unwilling to serve undocumented persons is a bad person."  The CS stated that time spent serving undocumented persons was charged as a "matter."[66]  The CS stated that the former Directing Attorney "directed that if an undocumented individual was provided assistance there was to be no paperwork attached to the intake.  The directive was that any paperwork which had been generated should be destroyed."  The CS and other attorneys did not destroy the paperwork and attached it to the case file despite the Directing Attorney's mandate.  The CS also stated that undocumented persons who were served were not given a case number nor entered into the case management system, as is typical for all other clients CRLA sees.  Rather, the former Directing Legal Secretary kept a separate binder for the advocates to access in order to determine if and what kind of the services CRLA had previously provided the client.

The second witness corroborated that undocumented persons were served and that a separate binder containing their information was kept while the former Directing Attorney was there.   The witness also stated that she served undocumented persons, or at least provided the client with an informational packet or referral, permissible under LSC regulations.  The witness also stated that after the Directing Attorney left, the Acting Directing Attorney ordered that all clients, undocumented or not, unserved or not, were to be entered into the case management system and given an case number.   The witness stated that Community Workers who gained and assisted clients while out in the field did not always enter their clients, some of whom are undocumented.

Based on the OIG's understanding of how clients are served and entered into CRLA's case management system, the OIG determined that the CS's account of how the Modesto Office was able to serve and not document service to undocumented workers appears entirely plausible.  The OIG interviewed the Modesto Office staff regarding how clients are processed through intake.  The OIG understands that the receptionist hands walk-in clients an intake form to be filled out.  The receptionist tries to assign the client an intake number before the client sees an advocate, but sometimes the receptionist is not able to enter the

---

[66] LSC's timekeeping regulation requires time be kept for all cases, matters, and supporting activities.  See LSC Regulations, supra note 6, Part 1635.

client into the case management system before the client sees the advocate. When the client sees an advocate before being entered into the case management system, the advocate returns the intake form to her at the end of the day for her to assign the client a number. Advocates close all of the cases and assign the closing codes; however, if the client cannot be provided service, the client's case is closed as a "matter."

Under CRLA's intake system, CRLA advocates could easily provide services to undocumented persons and no record of that service would ever exist. Employee six month work plans for the Modesto Office advocates indicate that persons seeking assistance from CRLA are not processed in the ideal manner described above. As a result, an undocumented person may receive services from a CRLA advocate but no record of the service may ever be created by the intake personnel. Based on the CS and witness statements, former management of the Modesto Office directed such activity. Furthermore, CRLA Community Workers may easily provide services to undocumented persons while monitoring agricultural work sites and no record may ever be created. Internal communications and timekeeping documents indicate that CRLA Management was aware of the lack of accountability for Community Workers' time. The OIG intends to develop additional evidence concerning the CS's allegations.

E.    CRLA Allegedly Focuses Its Resources on Latino Work.

The CS and another knowledgeable witness both stated that in their respective views CRLA focuses on issues benefiting California's farmworker and Latino community. According to both, CRLA believes that other advocacy groups focus on issues such as domestic violence, public benefits, etc... and that the farmworker and Latino issues are "[CRLA's] thing." The CS and the witness believe that CRLA's focus on the provision of services to the Latino community, particularly through impact work, results in the provision of inadequate service to other segments of the poor population within CRLA's service area, including other ethnic groups and those living in urban areas. Specifically, the CS stated:

> I also believe that CRLA's work demonstrates a bias toward serving farmworkers and Latinos. While I support legal assistance in those areas, CRLA is often the sole recipient of legal services monies in increasingly urbanized areas. Further, the service areas are broadly diverse. Yet in Modesto, for example, the Community Committee (which is supposed to be reflective of the service area population) does not include any African Americans, Southeast Asians, etc. In addition, little – if any – outreach/information service is provided to non-Latino community groups.

The CS also recounted two instances in which non-Latino persons required extended services from CRLA's Modesto Office, as it is the only legal aid provider in the area, but could not find anyone to help them. The CS stated that

she attempted to assist each as much as possible but "the demands of ongoing impact work [ ] prevented me from accepting their cases for full representation."

The CS and the witness believe the following CRLA management behaviors support this assertion: CRLA's Modesto Office expected staff to serve undocumented persons, and they believe this practice is not specific to Modesto; CRLA interjects itself into high profile cases involving Latino issues, such as the CCC v. Modesto case, the McBride Case, and the Ceres Case, see discussion supra Parts III.A.2.a. & b. and note 15.; CRLA Management is disinterested in impact cases unless the case involves a Latino or farmworker issue, such as the mobile home case also described supra note 15; CRLA favors employees who work on Latino issues; and CRLA Management and staff inappropriately travel to Mexico.

The OIG has begun developing facts surrounding this assertion. The OIG is reviewing specific information provided by the CS. The OIG is also reviewing other evidence that tend to bolster or weaken this allegation, including: CRLA's internal procedures, policies and practices; CRLA publications and representations to the public; CRLA communications with LSC and other evidence developed by the OIG.

The OIG notes that though each of the behaviors alleged by the CS in support of the assertion may, indeed, be true, a determination of whether CRLA truly expends its resources in a manner that disproportionately favors services to Latinos and farmworkers may not be possible due to the lack of accountability in LSC timekeeping requirements.[67]

---

[67] See introductory Note of this report, supra pp. iii-iv.

## <u>Conclusion</u>

The OIG substantiated the general assertion that CRLA is focused on impact work and developed substantial evidence to support several particular findings of noncompliance by CRLA. At this time the OIG is unable to conclude on the permissibility of several other potentially problematic activities in which CRLA engages. The OIG intends to further investigate the unresolved issues as soon as the access issues with CRLA are remedied.

*Kirt West*

Kirt West
Inspector General

September 13, 2006