IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

and

KIRT WEST,
INSPECTOR GENERAL OF THE
LEGAL SERVICES CORPORATION,
3333 K STREET, NW, 3RD FLOOR,
WASHINGTON, D.C. 20007
Petitioners,
v.
CALIFORNIA RURAL LEGAL
ASSISTANCE, INC.,
631 HOWARD ST., #300
SAN FRANCISCO, CA  94105

Respondent.

Misc. No. 1:07-MC-00123

**DECLARATION OF WILLIAM G. HOERGER IN REPLY TO PETITIONER'S OPPOSITION TO MOTIONS TO INTERVENE**

MARTIN R. GLICK (CA State Bar No. 40187)
BERNARD A. BURK (CA State Bar No. 118083)
bburk@howardrice.com
Howard Rice Nemerovski Canady Falk & Rabkin
A Professional Corporation
Three Embarcadero Center, 7th Floor
San Francisco, California  94111-4024
Telephone: 415/434-1600
Facsimile:  415/217-5910

CHONG S. PARK #463050
cpark@kirkland.com
ALEXANDER T.H. NGUYEN #499678
anguyen@kirkland.com
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:   202/879-5000
Facsimile:    202/879-5200

*Attorneys for Respondent*

I, WILLIAM G. HOERGER, declare as follows:

1. I am a member in good standing of the State Bar of California, and have so been since my admission in 1973. Except where otherwise indicated, I have personal knowledge of the facts stated in this declaration, and as to any facts of which I lack personal knowledge I am informed and believe they are true. If called upon as a witness I could and would competently testify to the facts stated herein.

2. ***Summary of this Declaration.*** I offer this declaration in reply to the Legal Service Corporation's Office of Inspector General's ("OIG's") oppositions to the two pending motions to intervene in this proceeding, in order to clarify some factual misimpressions the oppositions may create. Specifically, (1) while the OIG states in its oppositions that its request for client names and other client-identifying information is limited to a period of slightly less than three years, and some requests in the subpoena duces tecum at issue do refer to this time period, the principal request in the subpoena seeking client-identifying information (Request No. 1) literally contains no limitation as to time. *See* paragraphs 4-7. CRLA objected to that omission in its written response to the subpoena over six months ago, and whatever its intentions may be the OIG has yet to clarify or limit its demand. *See* paragraphs 8-9. (2) OIG also states in its oppositions that the attorney and client intervenors need not worry about disclosure of confidential information to third parties. Yet in prior discussions between the parties concerning this dispute, OIG categorically refused to provide this assurance when CRLA requested it. In response to CRLA's request, OIG refused to undertake not to disclose confidential information it received from CRLA to third parties, in particular to members of Congress. This is of serious concern, as it is members of California's congressional delegation who have instigated multiple investigations of

-1-

CRLA over the last several years at the instance of their agribusiness constituents and contributors against whom CRLA regularly litigates all over California. Disclosure of confidential client information to those acting at the behest of CRLA's litigation adversaries would obviously be a very serious matter. *See* paragraphs 10-12.

3.  ***My background***. I am currently employed by California Rural Legal Assistance, Inc. ("CRLA") as one of four Directors of Litigation, Advocacy and Training ("DLAT"), a supervisorial position that reports directly to CRLA's Executive Director. I have been employed as a DLAT since CRLA created the position in 1996, and have been employed by CRLA since May 1982. Among my duties, I am generally involved in reviewing questions or issues of professional responsibility that arise within CRLA With respect to the OIG's current investigation of CRLA that was announced in December 2005, I am one of the managers overseeing CRLA's substantive and procedural responses. I am familiar with the records and communications arising from or generated by this investigation, the administrative requests OIG made in March 2006 for data and documents, the ensuing subpoena duces tecum issued to CRLA in October 2006 (the "OIG Subpoena"), and the instant petition for enforcement of that Subpoena.

4.  ***The scope of the information literally encompassed by the OIG Subpoena***. Request No. 1 in Appendix A of the OIG Subpoena refers to "KEMPS data fields that reside in the CLIENTSW table." "KEMPS" is a proprietary case-management system that has been used by CRLA and many other legal-services programs nationwide. CRLA used KEMPS for a number of years, but began implementing a different proprietary system, called "Legal Server," in an effort to overcome the numerous problems we had encountered in attempting to implement and operate KEMPS throughout the 23-office network that comprises our firm. CRLA's conversion

from KEMPS to "Legal Server" was largely completed in or about 2005. Many of the data fields in the former KEMPS system were merged or converted into "Legal Server" data fields. With respect to the OIG's requests for information at issue in this litigation, CRLA has generally treated the OIG's references to "KEMPS" as equally applicable to the corresponding data fields and information that were transferred and/or recorded and maintained within our current "Legal Server" case management system rather than forcing OIG to re-propound its requests.

5. CRLA opens a record in our KEMPS/Legal Server case-management system for eligible clients to whom we agree to provide legal assistance. CRLA also opens records for some, but not all, applicants for legal assistance whom we decline to serve on various grounds, including lack of eligibility as defined in the federal Legal Services Corporation Act, other federal statutes and their respective implementing regulations.

6. Each record opened for a CRLA client or applicant that is entered into KEMPS/Legal Server includes information about the client or applicant entered into a series of data fields that are collectively referred to as the CLIENTSW table. Much of the identifying information about the client or applicant is collected in fields contained in the CLIENTSW table. The CLIENTSW table consists of numerous separate data fields. In response to the OIG's March 2006 administrative data request and later subpoena duces tecum seeking an even broader range of materials, CRLA produced to OIG data in many of these fields, but objected to producing data in a number of the CLIENTSW fields that we considered to be specifically client-identifying and thus, in the many cases in which clients and applicants consult CRLA in confidence, confidential and privileged. By way of example, some of these fields include: CLNAME (client last name); CFNAME (client first name); CMI (client middle initial); CADDRESS (client's street address); CPHONE (client's phone number); RACardNum (client's

Resident Alien Card, or "green card," number, a unique identifier similar to a social security number); SLNAME (spouse last name); and SFNAME (spouse first name).

7. Throughout the OIG's oppositions to the pending motions to intervene, the OIG refers to the scope of its subpoena as calling for CRLA records that were open at any time between January 1, 2003 and October 31, 2005. That alone encompasses in excess of 39,000 files. But while *some* of the categories of documents and information requested in the OIG Subpoena are subject to this time limitation, others extend as far back as 1998, and Request No. 1—the Request referred to above that calls for client-identifying information from the CLIENTSW table—has no time limitation in it at all. CRLA objected to this apparent lack of any time constraint on that request in the written response to the Subpoena CRLA served in November 2006. OIG has not to date limited or clarified this request, so if its intentions are different from those stated in the Subpoena they are currently unknown.

8. During this investigation (as well as in earlier OIG demands for client information) CRLA has repeatedly attempted to seek accommodations with the OIG that would enable CRLA to provide more limited information that OIG genuinely needs for any specific investigative purposes while maintaining CRLA's legal and professional responsibilities, and to develop means of limiting the burden on CRLA of responding to the OIG's requests while preserving the confidential and privileged status of the materials requested. The OIG has refused CRLA's requests to limit the number of clients or the amount or type of identifying information sought, or to discuss the development of protocols to streamline, limit or simplify the manner or extent to which such information could be reviewed, produced or confirmed while preserving its confidential and/or privileged character.

9. CRLA continues to hope the OIG will reconsider and participate in such discussions.

The threat of LSC funding sanctions for noncompliance with OIG's demands, and the burdens of OIG's demands themselves both potentially threaten CRLA's viability as an ongoing program able to provide legal aid to eligible clients. CRLA thus hopes representatives of OIG will reconsider and entertain possible accommodations that will make it feasible for CRLA to comply with all of the conflicting demands it currently faces.

10. ***OIG's refusal to guarantee the confidentiality of any information it obtains from CRLA.*** CRLA has also attempted to seek assurances during this investigation that the OIG would maintain the confidentiality of information it obtains. In a telephone conference in which I participated during the summer of 2006 concerning the administrative requests that preceded the OIG Subpoena, we asked what assurances OIG could give CRLA that the information it obtained from CRLA would be kept confidential. Assistant Inspector General Laurie Tarantowicz, who we are informed oversees the current investigation for the OIG, categorically refused to assure CRLA that OIG would not turn over client names to third parties, in particular to members of Congress.

11. This is of grave concern to CRLA and its clients for any number of reasons, not the least of which is that representatives of industries with which CRLA regularly litigates on behalf of its clients have acted through members of Congress to instigate multiple LSC and OIG investigations of CRLA. For example, the current investigation is the third investigation of CRLA in the last 7 years prompted by members of Congress from California's Central Valley on behalf of the California dairy industry, a regular litigation adversary of CRLA's clients all over California. CRLA has assisted dairy workers who, upon being observed by their employers talking to CRLA staff (or with on-site California wage-and-hour or California occupational-safety agents), have suffered employer retaliation from certain employers in that industry,

including but not limited to immediate termination; immediate lock-out of workers and their families (including minor children) from employer-supplied housing; lockouts and physical destruction of family furnishings; physical assaults (beatings) requiring emergency medical treatment; and assaults upon workers and their minor children with high-pressure liquid-manure hoses.

12.    Nor is this kind of retaliation limited to certain employers in the dairy industry. Employer retaliation is feared by low-wage workers in many industries. These workers fear not only direct retaliation from current employers, but the difficulties they may face finding other work once they have been identified as "trouble-makers." As an example of this phenomenon, in the 1990s, at a time when then-existent LSC regulations did not prohibit LSC-funded recipients from engaging in legislative advocacy, I attended a hearing before a Committee of the California Legislature considering a bill to strengthen wage protections and wage enforcement for California farm workers. A group of key witnesses, who were experienced harvest workers from the southern Salinas Valley (often referred to as the "salad bowl" of America) testified that contractors employing them for harvesting chiles routinely withheld the first ten days of wages, justifying this practice as a "learning period." These witnesses entered the state Capitol and testified wearing ski masks and using fictitious names. They requested leave to do so based upon their fears that if their identities were to be learned, they would be "black-balled" from agricultural work throughout the entire Salinas Valley. The threat of disclosure of the identity of individuals who ultimately decided not to come forward in matters on which they had sought legal advice from CRLA thus would be deeply serious to CRLA and its clients.

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct, and that this Declaration was executed at San Francisco, California on June 11, 2007.

_____
WILLIAM G. HOERGER