# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

and

KIRT WEST,
INSPECTOR GENERAL OF THE
LEGAL SERVICES CORPORATION
3333 K STREET, NW, 3RD FLOOR
WASHINGTON, DC 20007,

                    Petitioners,

     v.

CALIFORNIA RURAL LEGAL
ASSISTANCE, INC.
631 HOWARD STREET, #300
SAN FRANCISCO, CA 94105,

                    Respondent.

No. 1:07-mc-00123-EGS

**ATTORNEY-INTERVENERS'
OPPOSITION TO PETITION FOR
SUMMARY ENFORCEMENT OF
ADMINISTRATIVE SUBPOENA
DUCES TECUM**

Before:  The Honorable Emmet G. Sullivan

JACK W. LONDEN (CA SBN 85776)
JLonden@mofo.com
*Admitted pro hac vice*
WENDY M. GARBERS (CA SBN 213208)
WGarbers@mofo.com
*Admitted pro hac vice*
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Tel.: (415) 268-7000

Attorneys for Interveners JEANNIE BARRETT, ALEGRIA DE
LA CRUZ, VANESSA FRANK GARCIA, PHYLLIS KATZ,
TERI SCARLETT, ARTURO RODRIGUEZ, and KIRK AH-
TYE

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................iii

INTRODUCTION .................................................................................................................. 1

RELEVANT BACKGROUND .............................................................................................. 2

I.      ATTORNEY-INTERVENERS AND THEIR CLIENTS. ......................................... 2

        A.      Attorney-Interveners. ................................................................................... 2

        B.      CRLA's and Attorney-Interveners' Clients. ................................................ 2

        C.      Importance of Confidentiality to CRLA's and Attorney-Interveners'
                Clients. ......................................................................................................... 3

        D.      CRLA's Collection and Storage of Client Information. ............................... 5

II.     THE SUBPOENA AT ISSUE. ................................................................................. 7

III.    OVERVIEW OF THE STATUTORY FRAMEWORK. ........................................... 9

ARGUMENT ....................................................................................................................... 10

I.      ENFORCEMENT OF THE SUBPOENA WOULD VIOLATE THE
        PRIVILEGE RIGHTS OF CRLA'S CLIENTS. .................................................... 10

        A.      CRLA's Clients Have Attorney-Client Privilege Rights Under Both
                Federal and California Law. ....................................................................... 10

        B.      Information Sought by the Subpoena Is Protected by CRLA's
                Clients' Privilege Rights. ........................................................................... 13

II.     ENFORCEMENT OF THE SUBPOENA WOULD VIOLATE THE
        PRIVACY RIGHTS OF CRLA'S CLIENTS. ....................................................... 16

        A.      CRLA's Clients Have a Constitutional Right to Privacy. ........................... 16

        B.      Information Sought by the Subpoena Is Protected by CRLA's
                Clients' Constitutional Privacy Rights. ...................................................... 17

III.    ENFORCEMENT OF THE SUBPOENA WOULD VIOLATE THE
        CONFIDENTIALITY RIGHTS OF CRLA'S CLIENTS. ...................................... 18

        A.      Attorney-Interveners' Duty of Confidentiality. ......................................... 18

        B.      Information Sought by the Subpoena Is Encompassed by the Duty of
                Confidentiality. .......................................................................................... 20

        C.      Production of the Information Sought by the Subpoena Would Cause
                Attorney-Interveners to Breach Their Duty of Confidentiality. ................. 21

IV.    CRLA AND ATTORNEY-INTERVENERS HAVE MET THEIR
       BURDEN OF PROOF IN INVOKING CRLA'S CLIENTS'
       PRIVILEGE, PRIVACY, AND CONFIDENTIALITY RIGHTS. ............................ 23

V.     OIG DOES NOT HAVE AUTHORITY TO INTERFERE WITH
       ATTORNEY-INTERVENERS' CALIFORNIA ETHICAL
       OBLIGATIONS OR INVADE ATTORNEY-CLIENT
       PRIVILEGE. ................................................................................................. 24

       A.    OIG Is Not Authorized To Seek Information on Potential Clients. .................... 24

       B.    OIG Is Not Authorized To Seek Information Protected by the
             Attorney-Client Privilege. ................................................................................. 24

       C.    OIG Is Not Entitled to Information Protected by CRLA's Clients'
             Privacy Rights and/or Attorney-Interveners' Duty of Confidentiality ................ 25

VI.    THE *LSNYC* AND *BRONX LEGAL SERVICES* CASES DO NOT
       ALLOW OIG TO OBTAIN THE PRIVILEGED, PRIVATE, AND
       CONFIDENTIAL INFORMATION IT SEEKS. .......................................................... 27

VII.   IF OIG'S SUBPOENA WERE ENFORCED, CRLA'S CLIENTS
       WOULD BE HARMED. ............................................................................................. 29

VIII.  THE COURT CAN MODIFY OIG'S SUBPOENA TO PROTECT
       THE CONFIDENTIALITY OF CRLA'S CLIENTS. ................................................... 30

CONCLUSION ..................................................................................................................... 31

# TABLE OF AUTHORITIES

## CASES

*Adair v. Rose Law Firm*,
  867 F. Supp. 1111 (D.D.C. 1994) ............................................................................ 30, 31

*Baird v. Koerner*,
  279 F.2d 623 (9th Cir. 1960) ............................................................................ 11 & fn.2, 12

*Barton v. United States District Court*,
  410 F.3d 1104 (9th Cir. 2005) ............................................................................ 11 fn.3

*Bauman v. Jacobs*,
  136 F.R.D. 460 (N.D. Ill. 1990) ............................................................................ 11 fn.3

*Branch v. Smith*,
  538 U.S. 254 (2003) ............................................................................ 25

*Bronx Legal Servs. v. LSC*,
  64 Fed. Appx. 310 (2d Cir. 2003) ............................................................................ 22, 27, 28, 29

*Cobell v. Norton*,
  213 F.R.D. 69 (D.D.C. 2003) ............................................................................ 23

*Cobell v. Norton*,
  428 F.3d 1070 (D.C. Cir. 2005) ............................................................................ 25, 26

*Dixon v. State Bar*,
  653 P.2d 321 (Cal. 1982) ............................................................................ 19, 22

*Doe v. Attorney Gen.*,
  941 F.2d 780 (9th Cir. 1991) ............................................................................ 26

*Dole v. Milonas*,
  889 F.2d 885 (9th Cir. 1989) ............................................................................ 13

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg & Const. Trades Council*,
  485 U.S. 568 (1988) ............................................................................ 26

*Egelhoff v. Egelhoff*,
  532 U.S. 141 (2001) ............................................................................ 26

*Fisher v. United States*,
  425 U.S. 391 (1976) ............................................................................ 10, 11, 30

*Goldfarb v. Virginia State Bar*,
  421 U.S. 773 (1975) ............................................................................ 26

*Goldstein v. Lees*,
  120 Cal. Rptr. 253 (Ct. App. 1975) ............................................................................ 19

*In re Grand Jury Proceedings (Pavlick)*,
  680 F.2d 1026 (5th Cir. 1982) ................................................................. 12

*In re Grand Jury Proceedings Under Seal*,
  947 F.2d 1188 (4th Cir. 1991) ................................................................. 11

*In re Grand Jury Subpoenas (Anderson)*,
  906 F.2d 1485 (10th Cir. 1990) ............................................................... 12

*In re Grand Jury Subpoena for DeGeurin*,
  926 F.2d 1423 (5th Cir.  1991) ..................................................... 11, 12, 13

*In re Grand Jury Subpoena for Osterhoudt*,
  722 F.2d 591 (9th Cir. 1983) ................................................... 4, 12 & fn.4

*Hays v. Wood*,
  603 P.2d 19 (Cal. 1979) .......................................................................... 12

*Hill v. Nat'l Collegiate Athletic Ass'n*,
  856 P.2d 633 (Cal. 1994) ........................................................................ 17

*Hooser v. Superior Court*,
  101 Cal. Rptr. 2d 341 (Ct. App. 2000) .............................................. 17, 26

*In re Johnson*,
  4 Cal. State Bar Ct. Rptr. 179 (2000) ................................................ 19, 22

*Montgomery v. Leftwich*,
  161 F.R.D. 224 (D.D.C. 1995) ................................................................ 11

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
  127 S. Ct. 2518 (June 25, 2007) .............................................................. 25

*People v. Kor*,
  277 P.2d 94 (Cal. Ct. App. 1954) ........................................................... 22

*People v. Singh*,
  11 P. 2d 73 (Cal Ct. App. 1932) ........................................................ 18, 19

*Rosso, Johnson, Rosso & Ebersold v. Superior Court*,
  237 Cal. Rptr. 242 (Ct. App. 1987) ................................................ 11, 12, 13

*In re Sealed Case*,
  877 F.2d 976 (D.C. Cir. 1989) ................................................................ 22

*In re Subpoenaed Grand Jury Witness v. United States*,
  171 F.3d 511 (7th Cir. 1999) ............................................................ 11, 13

*United States v. Legal Servs. for New York City*,
  100 F. Supp. 2d 42 (D.D.C. 2000) ....................................................... 2, 27

*United States v. Legal Servs. for New York City*,
  249 F.3d 1077 (D.C. Cir.  2001) ....................................................... *passim*

*United States v. Liebman*,
   742 F.2d 807 (3d Cir. 1984) .................................................................. 11, 12, 13

*Whalen v. Roe*,
   429 U.S. 589 (1976) ................................................................................. 26

## CONSTITUTION

Cal. Const., art. I.
   § 1 ............................................................................................................ 16, 17

## STATUTES

5 U.S.C.
   § 552 *et seq.* ............................................................................................... 5

5 U.S.C. App. 3
   § 2 ............................................................................................................... 9
   § 6(a)(4) ...................................................................................................... 9

20 U.S.C.
   § 1232g ....................................................................................................... 5

42 U.S.C.
   § 2996 ......................................................................................................... 9
   § 2996e .................................................................................................... 9, 25

24 C.F.R.
   § 966.56(b)(3) ............................................................................................. 5

34 C.F.R.
   § 99.30 ......................................................................................................... 5

45 C.F.R.
   § 1600 *et seq.* ............................................................................................... 9

Cal. Bus. & Prof. Code
   § 6068 ............................................................................................... 18, 21, 27
   § 6078 ......................................................................................................... 22

Cal. Educ. Code
   § 49076 ........................................................................................................ 5

Cal. Evid. Code
   § 951 .......................................................................................................... 11
   § 954 .......................................................................................................... 10
   § 955 .......................................................................................................... 10

Cal. Unemp. Ins. Code
   § 1094 ........................................................................................................... 5

Cal. Welf. & Inst. Code
§ 827 .......................................................................................................................... 5
§ 11325.93(h) ............................................................................................................ 5

Omnibus Consolidated Rescissions and Appropriations Act of 1996,
Pub. L. No. 104-134, § 509(h),110 Stat. 1321, 1358-59 (1996) ............................... *passim*

Violence Against Women and Dep't of Justice Reauthorization Act of 2005,
Pub. L. 109-162, § 104, 119 Stat. 2960, 2978-79 (2006).................................................. 16

## OTHER AUTHORITIES

ABA Model Rules of Prof'l Conduct R.
1.6.......................................................................................................................... 22

Cal. Rules of Prof'l Conduct
R. 3-100 ................................................................18, 19, 21 & fn. 7, 22 & fn.8

Cal. State Bar. Standing Comm. on Prof'l Responsibility and Conduct,
Form. Op. 1981-58 ......................................................................................... 22, 23
Form. Op. 1984-84 .............................................................................................. 20
Form. Op. 1993-133 ............................................................................................ 19
Form. Op. 2003-161 ...................................................................................... 19, 20

Attorney-Interveners respectfully submit this memorandum in opposition to the petition for summary enforcement of subpoena of the Office of the Inspector General of the Legal Services Corporation ("OIG").

## INTRODUCTION

OIG seeks to compel California Rural Legal Assistance ("CRLA") to turn over copious amounts of individualized and private information about all persons who have sought legal assistance from CRLA. OIG demands each such person's name, address, legal problem, and immigration status, among many other things. OIG has not put into place any ethical walls that would prevent a person's name from being linked up with his or her legal problem or other information, nor will OIG commit to keeping this sensitive information confidential.

Generally speaking, the legal services clients whose personal information is at issue do not know it is being sought. OIG has not notified them, and they are not before the Court. Many of these clients have the legal right to prevent any disclosure of their information to OIG, and Attorney-Interveners have the duty to assert these rights. Confidentiality is not a matter of mere abstract right to many of CRLA's clients, who have well-founded fears of harm if the information they provided to CRLA attorneys were to become known. For example, mistreated workers fear loss of their livelihoods, abused women fear escalating abuse, tenants fear evictions, and illegal aliens who contact CRLA (and who are entitled to confidentiality even though CRLA must almost always decline to represent them) fear deportation. Unless CRLA's lawyers can promise to keep the fact of the consultation confidential, people in these and other categories simply will not seek legal help.

Much of the information at issue is protected from disclosure by the attorney-client privilege, the client's constitutional right of privacy, and Attorney-Interveners' ethical duty of confidentiality. OIG is not entitled to information protected by these privileges and rights. The point is not that *all* of the client-specific information OIG demands is privileged, but rather that *some* of it is. Unlike Legal Services for New York City, against which OIG enforced a subpoena in this Court, *United States v. Legal Servs. for New York City*, 249 F.3d 1077, 1082-83 (D.C. Cir.

2001) ("*LSNYC II*"), *aff'g United States v. Legal Servs. for New York City*, 100 F. Supp. 2d 42 (D.D.C. 2000) ("*LSNYC I*"), CRLA and Attorney-Interveners *can* establish entitlement to these legal protections, and OIG has *not* agreed to prophylactic steps to avoid disclosure of privileged information. But how these things are to be done is crucial. As CRLA demonstrates in its opposition, a crippling burden would be imposed by an overly mechanical procedure for invoking and protecting the privileged and confidential information here. Accordingly, OIG's request for an unconditional order summarily requiring compliance with its subpoena, without any provision for Attorney-Interveners' and CRLA's individual clients' confidentiality concerns, is inappropriate and should be denied.

## RELEVANT BACKGROUND

### I.     ATTORNEY-INTERVENERS AND THEIR CLIENTS.

#### A.     Attorney-Interveners.

Attorney-Interveners—Jeannie Barrett, Alegria De La Cruz, Vanessa Frank Garcia, Phyllis Katz, Teri Scarlett, Arturo Rodriguez, and Kirk Ah-Tye—are all attorneys, licensed by the State of California and employed by CRLA. They each have clients whose information is called for by OIG's subpoena. They have intervened in this proceeding to assert their clients' attorney-client privilege, privacy, and confidentiality rights, which are threatened by OIG.

#### B.     CRLA's and Attorney-Interveners' Clients.

CRLA's mission is to provide free legal services to low-income Californians, with a focus on the rural poor and farm workers, many of whom are immigrants and/or migrant laborers. CRLA's and Attorney-Interveners' clients are therefore from a particularly vulnerable segment of the population: not only are they poor, but they also often do not speak English and frequently lack any formal education. Many who seek CRLA's help are also not citizens; if they are undocumented, though CRLA must (with rare exceptions) decline to represent them, CRLA and Attorney-Interveners are still obliged to protect their confidential information. CRLA's clients tend not to know their legal rights and have limited means of enforcing them. They are thus highly susceptible to mistreatment, legal and otherwise, by their employers, their landlords,

and others.  (Declarations of Jeannie Barrett ¶ 9 ("Barrett Dec.") and Phyllis Katz ¶ 2 ("Katz Dec."), filed Sept. 14, 2007.)

Fear of retaliation for seeking to enforce their legal rights is pervasive among CRLA's and Attorney-Interveners' clients, with good reason.  Attorney-Interveners are sadly aware that sometimes the legal assistance their clients seek can result in retribution:  employees can be fired, tenants can be evicted, and abused woman can be further abused.  Retaliation is not always limited to the person seeking legal help.  Attorney-Interveners are also aware of retaliation against others, such as a relative of a complaining employee or a child of an abused woman. Because the economic circumstances of CRLA's and Attorney-Interveners' clients are already precarious, the consequences of retaliation—loss of a job or a home, for example—can be devastating.  As a result, many of the individuals who come to CRLA for help choose not to pursue the protection of their legal rights.  (Barrett Dec. ¶¶ 10-14; Katz Dec. ¶¶ 7-10; Declaration of Teri Scarlett ¶¶ 6-9 ("Scarlett Dec."), filed Sept. 14, 2007; Declaration of William G. Hoerger ¶¶ 19-28 ("Hoerger Dec."), filed Sept. 14, 2007.)

### C.    Importance of Confidentiality to CRLA's and Attorney-Interveners' Clients.

Given their precarious circumstances and their fear of retaliation, confidentiality is critical to CRLA's and Attorney-Interveners' clients.  Attorney-Interveners are acutely aware of the importance of confidentiality to their clients—they are repeatedly asked to assure their clients, as well as potential clients, that the information the clients provide will remain confidential.  Attorney-Intervener Teri Scarlett, a family-law lawyer with a specialty in domestic abuse, for example, must promise the abused women she represents that, if they decide not to go ahead with seeking a restraining order, she will keep their request for help confidential.  (Scarlett Dec. ¶ 9.)  Throughout her career as a CRLA lawyer, Attorney-Intervener Jeannie Barrett, as another example, has represented a multitude of clients for whom the confidentiality of the representation was paramount—ranging from mistreated agricultural workers to disabled students.  (Barrett Dec. ¶¶ 10-17.)  The same is true of Attorney-Intervener Phyllis Katz.  (Katz

Dec. ¶¶ 7-13.)  Simply put, many of CRLA's and Attorney-Interveners' clients would never seek legal assistance in the first place, if they could not do so on a confidential basis.

Contrary to a more typical legal practice, in which client names are inevitably revealed in the course of an attorney's work on behalf of the client, a significant percentage of CRLA's and Attorney-Interveners' clients expect that the information they provide their attorneys, including their identities, will remain confidential.  These clients can be roughly categorized as follows:

*Potential Clients.*  Many individuals who walk in the door at CRLA do not become clients.  Not all persons qualify for the free representation CRLA provides.  An individual's income may exceed CRLA's threshold, the individual may be seeking legal assistance with a type of problem that CRLA does not handle (such as most criminal matters), or the individual may not have proper immigration documentation (CRLA is not permitted, except in rare circumstances, to represent undocumented aliens).  Nonetheless, CRLA generally takes information from all potential clients to assess whether it can help them.  (Barrett Dec. ¶¶ 2-5; Katz Dec. ¶ 3; Declaration of Karen Smith ¶¶ 5-13 ("Smith Dec."), submitted September 14, 2007.)  By law, CRLA and Attorney-Interveners must keep confidential all the information provided by those who CRLA declines to represent.

*Counseling Clients*.  A substantial percentage of the people who seek the help of CRLA do so solely on a counseling basis.  (Barrett Dec. ¶ 7; Katz Dec. ¶ 6.)  These individuals become clients of CRLA.  Other than providing them with legal advice, however, CRLA attorneys do not take any action on their behalf.  Sometimes this is because the clients have refused to allow their attorneys to take any action that would jeopardize their anonymity.  (Again, fear of retaliation is the predominant reason that clients refuse to take legal action.)  Such clients include employment law clients, who fear retaliation from their employers; domestic violence clients, who fear retaliation from their abusers; and landlord-tenant clients, who fear retaliation from their landlords, among others.  (Barrett Dec. ¶¶ 9-14; Katz Dec. ¶¶ 7-11.)  By law, CRLA and Attorney-Interveners must keep confidential all the information provided by those for whom CRLA does nothing that is disclosed to anyone but the client.

***Clients in Confidential Proceedings.***  Even in cases where CRLA acts on the clients'

behalf, some clients, due to the nature of their legal problems, reasonably expect that the legal

actions CRLA undertakes will remain confidential.  For example:

- <u>*Disabled Student-Clients*</u>.  CRLA represents clients in matters related to educational services and accommodations for students with disabilities.  These clients have a right to confidentiality in these matters under the Individuals with Disabilities Education Act and the Family Educational Rights and Privacy Act, among other laws. *See* 20 U.S.C. § 1232g(b); 34 C.F.R. § 99.30.

- <u>*Juvenile Clients*</u>.  CRLA represents juvenile clients in proceedings that are closed to maintain confidentiality.  The records from school expulsion hearings, for instance, are not in the public record.  Cal. Educ. Code § 49076.  Juvenile court proceedings are also closed to the public.  Cal. Welf. & Inst. Code § 827 (case file may only be inspected by limited persons).

- <u>*Public Housing Clients*</u>.  CRLA represents public housing tenants faced with the possibility of eviction.  Applicable federal regulations guarantee these clients the right to a private hearing, unless the client consents to a public hearing, which they typically do not.  *See* 24 C.F.R. § 966.56(b)(3).

- <u>*Public Assistance Clients*</u>.  CRLA represents clients in matters involving public assistance programs in front of administrative agencies in which the clients are entitled to keep their applications for or participation in the public assistance programs confidential.  *See, e.g.*, Privacy Act, 5 U.S.C. § 552 *et seq*. (certain federal agency records, including Social Security Administration records, to be kept confidential); Cal. Welf. & Inst. Code § 11325.93(h) (application for and participation in CalWorks and the Food Stamps program to be kept confidential).

- <u>*Unemployment Benefits Clients*</u>.  CRLA represents clients in administrative proceedings concerning applications for unemployment benefits.  Under the California Unemployment Insurance Code, information from these proceedings must be kept confidential.  *See* Cal. Unemp. Ins. Code § 1094.

(Barrett Dec. ¶¶ 15-17; Katz Dec. ¶¶ 11-13.)

## D.  CRLA's Collection and Storage of Client Information.

When a potential client contacts CRLA—either upon walking into a branch office or by

calling a branch office—the client is asked to fill out, or a secretary fills out, an "intake" form.

This form captures numerous, specific pieces of information about the potential client, including

that person's name, address, telephone number, date of birth, social security number, income and

assets (in great detail), gender, race, alien status and other immigration-related information,

language, disability status, spouse's name, a description of the legal problem, and the identity of

any adverse party or parties.  This last piece of information is essential, as CRLA uses it to run a conflicts check on the potential client.  (Barrett Dec. ¶¶ 2-4; Katz Dec. ¶ 3; Smith Dec. ¶¶ 5-6.)

Once the intake form has been filled out, the information in it is input into CRLA's database.  The description of the client's legal problem is input into the database as one of approximately 100 legal "problem codes," which include:  "Job Discrimination," "Wage Claims," "Spouse Abuse," "Medicaid," "Federally Subsidized Housing Rights," "Landlord/Tenant (Other than Public Housing)," "Food Stamps," "SSI" (Social Security Insurance), "Unemployment Compensation," "Worker's Compensation," and "Immigration/Naturalization."  Even if a potential client never becomes an actual client of CRLA, and even if a client declines to pursue a legal claim with CRLA, the information from that person's intake form is recorded in CRLA's database, including a legal problem code.  (Barrett Dec. ¶ 5 & Ex. A; Smith Dec. ¶¶ 8-11.)

CRLA then makes a determination of the potential client's eligibility, and, if the potential client is eligible, the type of service CRLA will provide the client.  Clients who are deemed ineligible are rejected as clients and classified as such in the database.  Clients who are deemed eligible are classified as "advice/counsel, brief service, or referral" or "extended service" in the database.  The reason why a potential client's or client's case was closed is also captured in the database in the form of a "closing code."  The "closing codes" include:  "Advice and Counsel," "Referred," "Insufficient Merit," and "Client Withdrew."  Again, this information is recorded regardless of whether the person ever becomes an actual client of CRLA or pursues a legal claim with CRLA.  (Barrett Dec. ¶¶ 5-8 & Ex. B; Katz Dec. ¶¶ 11-13; Smith Dec. ¶¶ 7-12.)

Clients who simply receive a referral from CRLA or advice/counsel do not sign retainer agreements.  A client only signs a retainer agreement if CRLA agrees to take some action on the client's behalf:  if the action is limited, such as a letter or telephone call or short proceeding, the client is supposed to sign a brief service retainer agreement; if CRLA agrees to take on an entire case for a client, the client must sign an extended service retainer agreement.  (Barrett Dec. ¶¶ 7-8; Katz Dec. ¶ 6; Smith Dec. ¶ 8.)

The subpoena at issue purports to require production of most of the client information in CRLA's database.

## II.    THE SUBPOENA AT ISSUE.

OIG began its current investigation of CRLA in December 2005.  (Hoerger Dec. ¶ 40.) Although OIG initially refused to disclose the purpose of its investigation (*id.*), OIG now claims that the investigation is based on anonymous complaints from Congress that CRLA is unlawfully "soliciting clients; working a fee generating case; requesting attorney fees; and associating [] with political activities."  (Petition for Summary Enforcement of Administrative Subpoena *Duces Tecum*, filed Mar. 23, 2007 ("Petition")).  The members of Congress, to whom OIG refers, are from California's Central Valley.  (Hoerger Dec. ¶ 33.)  They called for the investigation at the behest of California's dairy industry, against which CRLA frequently prosecutes cases on behalf of mistreated workers.  (Hoerger Dec. ¶¶ 37-39.)

By letter dated March 16, 2006, OIG sought numerous categories of documents and data. (Petition, Ex. A, Appendix B.)  Of relevance here, OIG asked for ***all*** the client data in CRLA's database, except social security numbers and the "summary" (or case memo).  *(Id.)*  Starting in April 2006, CRLA responded to the letter, producing thousands of documents and much of the data requested by OIG.  (Hoerger Dec. ¶ 44-45, 56-60; Smith Dec. ¶¶ 19-20.)  CRLA objected, however, to disclosing client names and client-specific information, among other objections. (Hoerger Dec. ¶¶ 29-32, 45; Smith Dec. ¶ 19.)

On October 17, 2006, OIG served CRLA with a subpoena *duces tecum*, seeking the same information it had sought seven months earlier.  (Petition, Ex. A.)  Beginning in November 2006, and through to the present, CRLA has produced documents and data in response to the subpoena. (Hoerger Dec. ¶¶ 111-112.)  With respect to the client-specific information, CRLA has now produced everything except the following client-identifying information:  client names, spouse names, client addresses, phone numbers, and some alien status information.  (Smith Dec. ¶ 20.) Were CRLA to produce this client-identifying information, the information could be linked—via the unique identifying numbers attached to all the client data in CRLA's database—to the client-

specific information that CRLA has already produced.  (Smith Dec. ¶¶ 14-21.)  CRLA has

objected to producing the client-identifying information on grounds of confidentiality and the

attorney-client privilege.  (Hoerger Dec. ¶¶ 29-32, 45; Smith Dec. ¶ 19.)[1]

      CRLA has repeatedly requested that OIG assure CRLA that it will protect the

confidentiality of any client-identifying information that CRLA produces, but OIG has refused to

provide such assurance.  (Hoerger Dec. ¶ 84.)  OIG's refusal to address confidentiality concerns

is surprising, given that other authorities have weighed in, asking it to.  For example, in

July 2006, the President of the American Bar Association sent a letter to OIG expressing

concern, based on the work of a Presidential Task Force on Attorney-Client Privilege, about

OIG's request for confidential client names and information.  (Hoerger Dec. ¶ 85.)  The letter

urged OIG to use well-established protocols that involve unique identifiers to avoid the problem

of disclosing confidential information.  (*Id.*)  OIG has ignored the American Bar Association's

entreaties.  (*Id.*)

      Instead, on March 23, 2007, OIG filed a petition for summary enforcement of its

subpoena with this Court, initiating this proceeding.  On May 18, 2007, Attorney-Interveners

petitioned the Court to intervene.  The Court granted the petition on August 6, 2007, concluding

that Attorney-Interveners have standing "because they have an interest in asserting their clients'

attorney-client privilege and privacy rights, and their low-income clients are hindered in

protecting their own rights due to their lack of means, ability, and knowledge of this matter."

(Order, Aug. 6, 2007, at 2-3.)  At the same time, the Court denied the petition of a group of

unnamed CRLA clients to intervene, concluding that "the client-interveners' interests will be

adequately protected by CRLA and the attorney-interveners.  In particular, the attorney-

interveners' sole interest is to protect their clients' rights, and their position will allow them to do

so in a fully informed fashion."  (*Id.*)

---

[1] CRLA also objected to the subpoena on burden and other grounds, topics which CRLA addresses in its opposition to the subpoena.

### III.    OVERVIEW OF THE STATUTORY FRAMEWORK.

CRLA receives funding from the Legal Services Corporation ("LSC"), a federal entity created in 1974 to promote equal access to justice and to provide high-quality civil legal assistance to low-income Americans.  42 U.S.C. § 2996.  LSC is governed by its authorizing statute, 42 U.S.C. § 2996 *et seq.* (the Legal Services Corporation Act or "LSCA").  The Office of the Inspector General was established at the LSC, like other inspector general offices, for the purpose of preventing and detecting fraud and abuse.  5 U.S.C. App. 3 §§ 2, 6(a)(4).  It is pursuant to this statute, the Inspector General Act of 1978, as amended, that petitioner OIG claims authority to audit, monitor, and subpoena CRLA.

As a grant recipient of LSC, CRLA is subject to the restrictions imposed by LSC's authorizing statute, as well as regulations promulgated by LSC.  45 C.F.R. § 1600 *et seq*. Under the terms of its authorizing statute, however, LSC is forbidden from interfering with the client obligations of attorneys who work for its grant recipients, such as CRLA, and LSC is also forbidden from interfering with those attorneys' ethical obligations.  That statute provides:

> [LSC] ***shall not***, under any provision of this title, ***interfere with any attorney in carrying out his professional responsibilities to his client*** as established in the Canons of Ethics and the Code of Professional Responsibility of the American Bar Association . . . or abrogate as to attorneys in programs assisted under this title the authority of a State or other jurisdiction to enforce the ***standards of professional responsibility generally applicable to attorneys in such jurisdiction***.  [LSC] shall ensure that activities under this title are carried out in a manner consistent with attorneys' professional responsibilities.

42 U.S.C. § 2996e(b)(3) (emphasis added).  These limitations apply not only to LSC, but also to OIG's auditing and monitoring of grant recipients.  *LSNYC II*, 249 F.3d at 1082-83 (reading "§ 2996e(b)(3) to impose obligations on the Inspector General with regard to both privileged and secret materials").

In addition to the LSCA, Section 509(h) of the Omnibus Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 ("Section 509(h)") and subsequent provisions re-enacting the same language in federal appropriations legislation, address the information that "shall be made available" to those auditing or monitoring the activities of LSC grant recipients.  Section

509(h) provides, "[n]otwithstanding Section 1006(b)(3) of the [LSCA], financial records, time records, retainer agreements, client trust fund and eligibility records, and client names" shall be made available, "*except for reports or records subject to the attorney-client privilege*."  Pub. L. No. 104-134, § 509(h), 110 Stat. 1321, 1359 (emphasis added).  Like the LSC, OIG is bound by section 509(h).  *See LSNYC II*, 249 F.3d at 1082-83.

## ARGUMENT

Through its petition, OIG seeks far more information than it is statutorily authorized to seek.  OIG's subpoena is overreaching.  It calls for almost all client-identifying information, which, in many cases, is protected from disclosure by the attorney-client privilege, as well as the clients' rights of privacy and confidentiality.  While OIG is entitled to audit CRLA, it is not entitled to this information.  Moreover, production of this information could have devastating consequences for CRLA's clients.  The facts and governing confidentiality law in this case differ in several, crucial respects from *LSNYC II*, 249 F.3d at 1082-83.  Enforcing the subpoena here would be contrary to law and would do unnecessary injury to the ability of Attorney-Interveners and CRLA to comply with their professional duties and represent their clients.

## I.      ENFORCEMENT OF THE SUBPOENA WOULD VIOLATE THE PRIVILEGE RIGHTS OF CRLA'S CLIENTS.

### A.      CRLA's Clients Have Attorney-Client Privilege Rights Under Both Federal and California Law.

A client of a California attorney has, under California law, "a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer."  Cal. Evid. Code § 954.  An attorney "shall claim the privilege" when it is applicable and when he or she knows the information is sought.  Cal. Evid. Code § 955.  Under federal common law, the attorney-client privilege protects confidential communications between attorneys and their clients.  *See, e.g.*, *Fisher v. United States*, 425 U.S. 391, 403 (1976) ("Confidential disclosures by a client to an attorney made in order to obtain legal assistance are

privileged."). And "it is universally accepted that the attorney-client privilege may be raised by the attorney." *Id.* at 402, n.8.[2]

The purpose of the attorney-client privilege "is to encourage clients to make full disclosures to their attorneys." *Fisher*, 425 U.S. at 403; *see also Baird v. Koerner*, 279 F.2d 623 (9th Cir. 1960) (applying California law). A "client," under California and federal law, includes persons who simply consult a lawyer, but do not retain him or her. *See* Cal. Evid. Code § 951 (defining "client" as "a person who, directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in a professional capacity"); *In re Grand Jury Proceedings Under Seal*, 947 F.2d 1188, 1190 (4th Cir. 1991) (extending attorney-client privilege to statements made while consulting an attorney for legal advice, even though the attorney has not yet been employed); *see also Montgomery v. Leftwich*, 161 F.R.D. 224 (D.D.C. 1995) (same).[3]

Although a client's identity is not generally protected by the attorney-client privilege, a client's identity may be privileged if its disclosure is tantamount to a disclosure of a confidential communication. *See, e.g.*, *In re Subpoenaed Grand Jury Witness v. United States*, 171 F.3d 511, 514 (7th Cir. 1999); *In re Grand Jury Subpoena for DeGeurin*, 926 F.2d 1423, 1430-31 (5th Cir.

---

[2] Federal Rule of Evidence 501 provides that privileges in federal court are generally determined by federal common law, "[e]xcept as otherwise required by the Constitution of the United States or provided by Act of Congress . . . ." However, the statute preventing OIG from seeking "client names . . . subject to the attorney-client privilege" does not specify whether federal or state privilege law applies (Pub. L. No. 104-134 § 509(h), 110 Stat. 1321, 1359), and as discussed below, Attorney-Interveners are required to keep confidential any information that is protected by California's attorney-client privilege under the California duty of confidentiality. In any event, for the purpose of this analysis, federal law and state law on attorney-client privilege are substantially the same: the case cited by many federal courts for the principle that a client's identity may be privileged is a case interpreting California law. *See Baird v. Koerner*, 279 F.2d 623 (9th Cir. 1960).

[3] Courts have extended the protection of the attorney-client privilege even to individuals who simply fill out law firm questionnaires. *See, e.g.*, *Bauman v. Jacobs*, 136 F.R.D. 460, 461-62 (N.D. Ill. 1990); *Barton v. United States District Court*, 410 F.3d 1104, 1111 (9th Cir. 2005) (applying California law). The California attorney-client privilege has been extended to such individuals even where the questionnaire included an acknowledgement that the individual was *not* entering into an attorney-client relationship. *Barton*, 410 F.3d at 1111.

1991); *United States v. Liebman*, 742 F.2d 807, 809 (3d Cir. 1984); *In re Grand Jury Subpoena for Osterhoudt*, 722 F.2d 591, 593 (9th Cir. 1983); *Rosso, Johnson, Rosso & Ebersold v. Superior Court*, 237 Cal. Rptr. 242, 244 (Ct. App. 1987).

Courts have often found this circumstance to arise in the criminal context, where disclosure of the client's identity could incriminate the client. *See*, *e.g.*, *Liebman*, 742 F.2d at 809 (where it had been previously disclosed that all clients were advised by attorneys that a certain fee was deductible for income tax purposes, the client identities were privileged because, if disclosed, "the IRS would automatically identify those who were told that they could make the questionable deductions"); *see also Baird v. Koerner*, 279 F.2d at 623 (applying California law and concluding the same with respect to the identities of a tax attorney's clients). Some courts have also independently found a client's identity privileged if disclosure of the identity would implicate the client in the very criminal activity for which the legal advice was sought. *See*, *e.g.*, *In re Grand Jury Subpoenas (Anderson)*, 906 F.2d 1485, 1491 (10th Cir. 1990) (collecting federal cases); *Hays v. Wood*, 603 P.2d 19, 25 (Cal. 1979). Other courts have found a client's identity privileged if the identity would provide a "last link" in a chain of evidence that could be used to indict or prosecute the client. *See*, *e.g.*, *In re Grand Jury Proceedings (Pavlick)*, 680 F.2d 1026, 1027 (5th Cir. 1982).

In the civil context, the question of whether a client's identity is privileged does not turn on what could happen to the client, but on what the client communicated to his or her attorney.[4] Thus, if disclosure of a client's identity would constitute disclosure of the client's motive in seeking legal advice, the client's identity is privileged. As the Fifth Circuit has explained:

---

[4] At least one circuit, the Ninth Circuit, has concluded that the question of whether a client's identity is privileged never turns on the narrower question of what could happen to the client, but only on the broader question of what the client communicated to his attorney. *See Osterhoudt*, 722 F.2d at 593 ("[t]he principle of *Baird* was not that the privilege applied because the identity of the client was incriminating, but because in the circumstances of the case disclosure of the identity of the client was in substance a disclosure of the confidential communication in the professional relationship between the client and the attorney").

> Clients often consult with attorneys concerning matter that they wish to keep confidential. The matter may or may not involve misconduct, and if it does involve misconduct, the client may or may not be implicated. For example, a client may wish to consult an attorney concerning adopting a child but not wish the matter to be made public. Such an individual normally will reveal the nature of his problems as well as his identity, and reasonably expects both to remain confidential. If the disclosure of the client's identity will also reveal the confidential purpose for which he consulted an attorney, we protect both the confidential communication and the client's identity as privileged.

*DeGeurin*, 926 F.2d at 1430; *see also In re:  Subpoenaed Grand Jury Witness*, 171 F.3d at 514

("A client's motive for seeking legal advice is undeniably a confidential communication.

Accordingly, the privilege protects an unknown client's identity where its disclosure would

reveal a client's motive for seeking legal advice.") (citation omitted). This analysis applies

equally to other information communicated by clients in confidence. *See, e.g.*, *Dole v. Milonas*,

889 F.2d 885, 889 n.7 (9th Cir. 1989) (where disclosure of client identities would constitute

disclosure that clients were undocumented aliens, client identities could be privileged); *Rosso*,

237 Cal. Rptr. at 244 (where disclosure of client identities would constitute disclosure that clients

had experienced problems with a particular medical device, client identities were privileged).

Disclosure of a client's identity by an attorney may, on its own, reveal a confidential

attorney-client communication, such as where the attorney is a tax attorney. Alternatively,

disclosure of a client's identity may reveal a confidential communication "where so much of the

actual attorney-client communication has already been disclosed that identifying the client

amounts to full disclosure of the communication." *Liebman*, 742 F.2d at 809.

### B.    Information Sought by the Subpoena Is Protected by CRLA's Clients' Privilege Rights.

Much of the client-identifying information sought by the subpoena is privileged under

both California and federal law. By virtue of who they are and the extent of their confidentiality

concerns, CRLA's clients are far more likely than clients in ordinary civil practice to want to

keep their contact with CRLA, as well as their motive for contacting CRLA, confidential.

Requiring production of the client-identifying information would, on its own, be

tantamount, in many cases, to requiring production of a privileged attorney-client

communication, as the disclosure would reveal the fact that the clients had ***contacted*** CRLA.  As set forth in the accompanying declarations of Jeannie Barrett, Phyllis Katz, and Teri Scarlett, many of the individuals whose identifying information is stored in CRLA's database have never consented, and would never consent, to having the fact that they contacted CRLA disclosed. These clients fall into two categories:

- ***Potential clients***.  Extensive information about potential clients is stored in the CRLA database, even though such individuals never become actual clients of CRLA and no action, public or otherwise, is taken on their behalf.

- ***Counseling clients***.  While these clients are actual clients of CRLA, no public action is taken on their behalf.  They too may desire to keep their identities confidential, which is often why their representation is limited to counseling in the first place.

An example of the type of client who would not want the fact of his or her ***contact*** with CRLA disclosed is a domestic violence victim.  As Attorney-Intervener Scarlett, a family law attorney who represents many victims of domestic violence, attests, domestic violence victims often go to great lengths to ensure that their abusers do not know they are seeking legal help, and for good reason: if the abuser discovers that the victim has sought legal help, she and possibly her children are at risk of further physical harm.  (Scarlett Dec. ¶¶ 7-9.)  Domestic violence victims are far from the only clients of CRLA, however, who would want the fact of their contact with CRLA kept confidential.  As Attorney-Intervener Barrett and Attorney-Intervener Katz also attest, CRLA's clients are often concerned that their visit to CRLA remain confidential.  (Barrett Dec. ¶¶ 9-17; Katz Dec. ¶¶ 7-13; *see also* Hoerger Dec. ¶¶ 19-28.)  Attorney-Intervener Barrett testifies that at CRLA community education events, more than half of people who wish to attend the events refuse to sign an attendance sheet once they learn that the list of names must be provided to LSC.  (Barrett Dec. ¶ 10.)

Requiring production of the client-identifying information in conjunction with the previously produced "problem codes," as requested by the subpoena, would compound the deleterious effect of the disclosure of client-identifying information alone, as the "problem

codes" reveal the clients' *motive* in contacting CRLA. The problem codes describe the client's type of legal problem, and therefore the reason he or she is seeking legal advice. While some of the codes are relatively broad, others leave nothing to the imagination. Thus, disclosing a client's identifying information along with the following problem codes would reveal the exact reason the client contacted CRLA: 21 (Job Discrimination), 22 (Wage Claims), 37 (Spouse Abuse), 51 (Medicaid), 61 (Federally Subsidized Housing Rights), 63 (Landlord/Tenant (Other than Public Housing)), 73 (Food Stamps), 75 (SSI), 76 (Unemployment Compensation), 78 (Worker's Compensation), and 81 (Immigration/Naturalization). (Barrett Dec., Ex. B (list of problem codes).)

Finally, requiring production of the client-identifying information in conjunction with the "problem codes" *and* the rest of the client-specific information that has previously been produced would be tantamount to disclosing any number of other privileged attorney-client communications. In fact, the combination of the client-identifying information sought and the other client-specific information already produced would provide OIG with a complete picture of CRLA's clients, even if everything about the client is privileged. For example:

- In the case of a farm worker who sought legal advice about his working conditions or wages but chose not to take any action out of fear of retaliation, the identity of the farm worker, as well as information about him and his claim, is privileged. Yet the production of client-identifying information would reveal: the farm worker's identity, date of birth, and contact information; his motive in seeking legal assistance, problem code 21 (Job Discrimination) or wages problem code 22 (Wage Claims); the date his case was opened; the date his case was closed; and the name of his employer, who he would have identified as the adverse party.

- In the case of the victim of domestic violence who decides not to pursue a temporary restraining order out of fear of retaliation, the identity of the victim, as well as information about her and her claim, is privileged. Yet the production of client-identifying information would reveal: the victim's identity, date of birth, and contact information; her motive in seeking legal assistance, problem code 37 (Spouse Abuse); the date her case was opened; the date her case was closed; and the name of her abuser, who she would have identified as the adverse party.

- In the case of the tenant who called a CRLA hotline for brief legal advice but could not afford to lose his apartment so did not have any intention of taking legal action out of fear of retaliation, the identity of the tenant, as well as information about him and his claim, is privileged. Yet the production of client-identifying information would reveal: the tenant's identity, date of birth, and contact information; his motive in seeking legal assistance, problem code 63 (Landlord/Tenant (Other than Public

Housing)); the date his case was opened; the date his case was closed; and the name of his landlord, whom he would have identified as the adverse party.

- In the case of a disabled client who went to CRLA for assistance with social security disability insurance but chose not to file the necessary forms because she was not willing to admit in writing that she was disabled, the identity of the client, as well as information about her and her claim, is privileged. Yet the production of client-identifying information would reveal: the client's identity, date of birth, and contact information; her motive in seeking legal assistance, problem code 75 (SSI); the date her case was opened; and the date her case was closed.

(Barrett Dec., Ex. B (list of problem codes and close codes); Smith Dec. ¶¶ 17-20.)[5]

The production of the client-identifying information, linked to information already produced, could also implicate clients in criminal activities or provide a link in a chain of evidence connecting clients to criminal activity. For example, release of a client's identifying information in connection with problem code 98 (Criminal Referrals) could implicate the client in criminal activity for which he sought advice. Similarly, release of the client-identifying information linked with particular immigration-related information already provided could also provide a link in a chain of evidence exposing potential clients, and some few clients,[6] to enforcement proceedings.

## II.    ENFORCEMENT OF THE SUBPOENA WOULD VIOLATE THE PRIVACY RIGHTS OF CRLA'S CLIENTS.

### A.    CRLA's Clients Have a Constitutional Right to Privacy.

Article I, Section 1, of California's Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety,

---

[5] Other examples of the information that would be disclosed regarding CRLA clients are listed in a September 21, 2006 Memo from Lee Pliscou, pp. 9-11. (Hoerger Dec., Ex. II.)

[6] As is noted in Attorney-Intervener Scarlett's declaration (Scarlett Dec. ¶ 3), the Violence Against Women and Dep't of Justice Reauthorization Act of 2005 allows CRLA to take on victims of domestic violence as clients even if they are undocumented. Pub. L. No. 109-162, § 104, 119 Stat. 2960, 2978-79 (2006) (funds appropriated to LSC may be used to provide assistance to "an alien who has been battered or subjected to extreme cruelty or a victim of sexual assault or trafficking . . ." or "an alien whose child, without the active participation of the alien, has been battered or subjected to extreme cruelty or a victim of sexual assault or trafficking . . .").

happiness, and *privacy*."  Cal. Const., art. I., § 1 (emphasis added); *see also Hill v. Nat'l Collegiate Athletic Ass'n*, 856 P.2d 633, 645 (Cal. 1994) (holding privacy right enforceable against both government and private entities).  California courts have construed this privacy right to function like a privilege:  "Information that is not protected by statutory privilege may nonetheless be shielded from discovery, despite its relevance, where its disclosure would invade an individual's right of privacy."  *Hooser v. Superior Court*, 101 Cal. Rptr. 2d 341, 346 (Ct. App. 2000) (citing *Valley Bank of Nevada v. Superior Court*, 15 Cal. 3d 652, 656 (1975)).

In *Hooser*, the California Court of Appeal addressed the very question of whether an attorney should be required to produce a list of his clients pursuant to a subpoena.  101 Cal. Rptr. 2d. at 341.  The case involved an attorney who was ordered to appear for a judgment debtor's examination, and a subpoena for a list of clients was issued in conjunction with the order.  *Id.* at 344.  The *Hooser* court determined that, although "the attorney-client privilege does not apply to prevent the disclosure of the identities of Hooser's clients, we conclude that the identity of an attorney's clients is sensitive personal information that implicates the clients' rights of privacy." *Id.* at 347 (quoting *Willis v. Superior Court*, 112 Cal. App. 3d 277, 293 (1980) ("[E]very person [has the right] to freely confer with and confide in his attorney in an atmosphere of trust and serenity . . . .")).  As such, unless a public disclosure of the attorney-client relationship occurs, a "client's identity is itself a matter of privacy, subject to the protection against involuntary disclosure through compelled discovery against the attorney."  *Id.* at 348.

### B.    Information Sought by the Subpoena Is Protected by CRLA's Clients' Constitutional Privacy Rights.

The requested production of all client-identifying information would invade CRLA's clients' California constitutional right to privacy.  In addition to the identities of clients are protected by the attorney-client privilege, the identities of other CRLA clients are protected by the California constitutional privacy right.

The *Hooser* court described the following scenarios as ones in which clients have a privacy right:  a spouse who consults a divorce attorney; an employee who is concerned about

conduct in his workplace; an entrepreneur planning a new business endeavor; and a family member who desires to rewrite a will. 101 Cal. Rptr. 2d at 347. In other words, consulting clients—even those whose representation is not covered by the attorney-client privilege—have a protectable privacy interest in their identity.

Further, the identities of clients in confidential proceedings are also protected by the constitutional privacy right. According to the *Hooser* court, "public disclosure" of the attorney-client relationship takes place "through the filing of a lawsuit, [or] the *open representation* of the client in dealing with third parties in some other manner." 101 Cal. Rptr. 2d at 347 (emphasis added). The confidential-proceeding clients are clients for whom CRLA's attorneys take legal action in a confidential forum: disabled students in matters related to educational issues; juveniles in school expulsion hearings and juvenile court proceedings; public housing tenants in eviction hearings; and public assistance and unemployment benefit recipients in administrative benefits proceedings. These clients also have a protectable privacy interest in their identities.

## III.  ENFORCEMENT OF THE SUBPOENA WOULD VIOLATE THE CONFIDENTIALITY RIGHTS OF CRLA'S CLIENTS.

### A.  Attorney-Interveners' Duty of Confidentiality.

California is unique in the strength of its protection of attorney-client confidentiality. Attorney-Interveners are required by statute, as well as the California Rules of Professional Conduct, to "maintain inviolate the confidence, and *at every peril to himself or herself* to preserve the secrets, of his or her client." Cal. Bus. & Prof. Code § 6068(e)(1) (emphasis added); *accord* Cal. Rules of Prof'l Conduct R. 3-100(A) (2006). The duty to "preserve the confidentiality of client information involves public policies of paramount importance." Cal. Rules of Prof'l Conduct R. 3-100, discussion at [1] (citing *In re Jordan*, 12 Cal. 3d 575, 580 (1974)). This has been consistently reaffirmed in California cases. *See*, *e.g.*, *People v. Singh*, 11 P. 2d 73, 75-76 (Cal Ct. App. 1932) (referencing California's statute, and then opining, "[t]he statement of a client to his attorney is much in the nature of a confession to a clergyman. The very nature of the transaction clothes it with a high degree of sanctity").

Client "confidence" and "secrets" are broader in scope than confidential communications protected by the attorney-client privilege: "The principle of client-lawyer confidentiality applies to information relating to the representation, whatever its source, and encompasses matters communicated in confidence by the client, and therefore protected by the attorney-client privilege, matters protected by the work product doctrine, and matters protected under ethical standards of confidentiality, all as established in law, rule, or policy." Cal. Rules of Prof'l Conduct R. 3-100, discussion at [2]; *see also Goldstein v. Lees*, 120 Cal. Rptr. 253, 257 n.5 (Ct. App. 1975) ("The attorney-client privilege is more limited than the ethical obligation of a lawyer to guard the confidences and secrets of his client."); *In re Johnson*, 4 Cal. State Bar Ct. Rptr. 179 (2000) (same).

The California State Bar interprets "client secrets" to mean "any information obtained by the lawyer during the professional relationship, or relating to the representation, which the client has requested to be inviolate or the disclosure of which might be embarrassing or likely detrimental to the client." *See, e.g.*, Cal. State Bar. Standing Comm. on Prof'l Responsibility and Conduct, Form. Op. 1993-133. A client's request that information be kept confidential prohibits an attorney from revealing that information, *even if the information is already public. See In re Johnson*, 4 Cal. State Bar Ct. Rptr. 179 (2000) (disciplining attorney for breach of client confidence where attorney disclosed that client was a convicted felon). Which client secrets are "embarrassing" is also particular to the client. *See id.*; *see also Dixon v. State Bar*, 653 P.2d 321 (Cal. 1982) (disciplining attorney for breach of client confidence where attorney disclosed that client had had an extramarital affair).

As with the attorney-client privilege, the protection of the duty of confidentiality extends not only to persons who ultimately engage the attorney they consulted. The protection also extends to persons who reasonably believe they have entered into a confidential attorney-client communication as a result of the attorney's words or actions. Cal. State Bar. Standing Comm. on Prof'l Responsibility and Conduct, Form. Op. 2003-161; *see also* Cal. State Bar. Standing Comm. on Prof'l Responsibility and Conduct, Form. Op. 1984-84.

Thus, under California statutory law, as well as the California Rules of Professional Conduct, Attorney-Interveners have a duty of confidentiality with respect to any information (1) that potential clients or clients told them they did not want disclosed, (2) the release of which might embarrass the potential clients or clients, and (3) the release of which might be detrimental to the potential clients or clients.

### B.    Information Sought by the Subpoena Is Encompassed by the Duty of Confidentiality.

All the information sought by the subpoena that is protected by CRLA's clients' attorney-client privilege or the constitutional privacy right is also confidential for the purpose of Attorney-Interveners' duty of confidentiality.  As discussed above, this is a significant percentage of the client-identifying information sought in relation to potential clients, consulting clients, and confidential-proceeding clients.

Additionally, however, any information listed in categories (1), (2), and (3), above, is confidential for the purpose of Attorney-Interveners' duty of confidentiality.  As such, its production would constitute a violation of Attorney-Interveners' professional responsibilities and of the clients' right to confidentiality.  An even more significant percentage of the client information in the CRLA database falls into categories (1), (2), and (3).  Production of this information linked to client names is thus inappropriate.

*Designated confidential information*.  Attorney-Interveners' clients frequently ask them to keep some or all of the extensive and personal information collected on them confidential, including information at issue in confidential proceedings.  (Barrett Dec. ¶¶ 15-17; Katz Dec. ¶¶ 11-13.)  Such information is protected from disclosure by the duty of confidentiality, even if it is otherwise public.

*Embarrassing information*.  Various pieces of the information provided to CRLA and Attorney-Interveners and input into the CRLA database may be viewed by the clients as embarrassing.  Such information includes the individual's income and assets (or lack thereof), status as a recipient of some form of public assistance, disability status, immigration status, the

very fact that the individual consulted CRLA, or the individual's legal problem. (Barrett Dec. ¶¶ 15-17; Katz Dec. ¶ 12.) Under the professional codes of conduct in California, it is Attorney-Interveners' duty to keep any information that could embarrass their clients confidential, even if the clients do not explicitly ask for such treatment.

*Potentially detrimental information*. As set forth above, release of all the client-specific information OIG seeks could have potentially detrimental consequences for some individuals. Some individuals could be implicated in criminal activity, including being prosecuted as illegal aliens. The release of a client's age, disability status, or legal problems could have negative consequences vis-à-vis the client's employment and social relationships. Employees could be subject to retaliation; abused women could be put in further jeopardy; and the perception by clients that they are exposed to such risks will certainly cause them further harm because it will surely deter them from obtaining legal help. (Barrett Dec. ¶¶ 10-14; Katz Dec. ¶¶ 7-10; Scarlett Dec. ¶¶ 6-9; Hoerger Dec. ¶¶ 19-28.)

### C. Production of the Information Sought by the Subpoena Would Cause Attorney-Interveners to Breach Their Duty of Confidentiality.

There is only *one* exception to Attorney-Interveners' duty of confidentiality: "an attorney may, but is not required to, reveal confidential information relating to the representation of a client to the extent that the attorney reasonably believes the disclosure is necessary to prevent a criminal act that the attorney reasonably believes is likely to result in the death of, or substantial bodily harm to, an individual." Cal. Bus. & Prof. Code § 6068(e)(2); *accord* Cal. Rules of Prof'l Conduct R. 3-100(B); *see also* Cal. Rules of Prof'l Conduct R. 3-100(A), which provides: "A member shall not reveal information protected from disclosure by Business and Professions Code section 6068, subdivision (e)(1) without the informed consent of the client." [7] As opposed

---

[7] Even that exception is qualified. *See* Cal. Rules of Prof'l Conduct R. 3-100, discussion at [6] (exception is "a last resort, when no other available action is reasonably likely to prevent the criminal act," and attorneys are instructed to "make a good faith effort to persuade the client to take steps to avoid the criminal act or threatened harm"); *see also id.* (among factors "to be considered in determining whether to disclose confidential information" is "the extent of adverse effect to the client's . . . privacy rights under Article 1 of the Constitution of the State of California that may result from disclosure contemplated by the member").

to the American Bar Association's Model Rule of Professional Conduct 1.6, which has been adopted by most states, there is no exception in section 6068 or the corollary professional rule for compliance with a court order.  ABA Model Rules of Prof'l Conduct R. 1.6(6); *compare LSNYC II*, 249 F.3d 1077, *and Bronx Legal Servs. v. LSC*, 64 Fed. Appx. 310 (2d Cir. 2003).[8]

Failure to meet their statutory and ethical obligations could result in serious consequences for Attorney-Interveners:  They could be suspended, disbarred, or otherwise subject to discipline. Cal. Bus. & Prof. Code § 6078; *accord* Cal. Rules of Prof'l Conduct R. 1-100.  Not long ago, the Review Department of the State Bar Court recommended a five-year suspension for an attorney who violated statutory obligations, including a violation of the confidentiality requirement in California Business and Professions Code section 6068(e).  *In re Johnson*, 4 Cal. State Bar Ct. Rptr. 179 (2000); *see also Dixon,* 653 P.2d at 329 (imposing five-year suspension on attorney who violated section 6068(e)).

That the State Bar or a court may later condone a release of client information an attorney had deemed confidential is of little comfort.  At least one California judge has opined that, if confronted with a choice between the disclosure of a client confidence and being held in contempt, an attorney "should have chosen to go to jail and take his chances of release by a higher court."  *People v. Kor*, 277 P.2d 94, 101 (Cal. Ct. App. 1954) (Concurring Opinion); *see also* Cal. State Bar. Standing Comm. on Prof'l Responsibility and Conduct, Form. Op. 1981-58 (even if attorneys do not have "safe harbor" from liability to third parties, their duty is to safeguard the client's confidentiality "regardless of the risk to themselves").

_____

[8] OIG argues that California *does* provide an "otherwise required by law" exception to an attorney's duty to maintain client confidences.  (Petition at n.7.)  As evidence, OIG cites one of the comments to California Rule of Professional Responsibility 3-100, which notes:  "a member may not reveal [confidential client information] except with the consent of the client or as authorized or required by the State Bar Act, these rules, or other law."  Cal. Rules of Prof'l Conduct R. 3-100, of discussion at [2].  Characterizing this as an exception to the attorney's duty of confidentiality is misleading at best: it is neither an exception to the California statutory duty of confidentiality, Cal. Bus. & Prof. Code § 6068, nor is it an exception to Rule of Professional Responsibility 3-100 itself, which, in any event, cannot modify the statutory duty.  Cal. Rules of Prof'l Conduct, R. 1-100(A) ("[n]othing in these rules shall be deemed to create, augment, diminish, or eliminate any substantive legal duty of lawyers").

IV.    **CRLA AND ATTORNEY-INTERVENERS HAVE MET THEIR BURDEN OF PROOF IN INVOKING CRLA'S CLIENTS' PRIVILEGE, PRIVACY, AND CONFIDENTIALITY RIGHTS.**

Attorney-Interveners have offered sufficient evidence here to meet their burden of proof that information sought by OIG is privileged, private, and confidential.

OIG argues that CRLA's privilege objections are inadequate because they are "blanket," "generic," "speculative," "dubious," and "conclusory."  (Petition at 18-20.)  Attorney-Interveners' descriptions of specific clients, and specific categories of clients, are none of the above.  Attorney-Interveners have put in evidence demonstrating that many categories of client information OIG seeks are privileged and confidential.  Indeed, Attorney-Interveners could not voluntarily provide more specific information without waiving the very privilege, privacy, and confidentiality rights they are invoking.  *See In re Sealed Case*, 877 F.2d 976, 980 (D.C. Cir. 1989) ("[s]hort of court-compelled disclosure, or other equally extraordinary circumstances, we will not distinguish between varying degrees of 'voluntariness' in waivers of the attorney-client privilege")(internal citation omitted.); *Cobell v. Norton*, 213 F.R.D. 69, 74 (D.D.C. 2003) (same).  Thus to require such production as proof of privilege would create an untenable "catch-22": to invoke the privilege properly, the privilege must be waived.

Nor would it be reasonable to insist that CRLA and Attorney-Interveners invoke privilege on a client-by-client basis, as OIG will likely demand.  Isolating the privileged client information from the non-privileged would require enormous amounts of time and resources, such that the burden of responding to the subpoena would interfere with CRLA's provision of the legal services Congress funds it to provide.  To require a client-by-client showing at this juncture, therefore, not only would be impractical, but also would force CRLA to waive its otherwise meritorious burden argument.  Instead, the Court should approach the evidentiary burden as such burdens are approached in the representative action context: evidence produced by a typical class member is sufficient to demonstrate the claims of all the class members.  This approach would also avoid jeopardizing CRLA's clients' due process rights.

The evidence offered by Attorney-Interveners and CRLA is sufficient for the Court to refuse to enforce OIG's subpoena summarily. Should the Court decide that it needs additional evidence, however, Attorney-Interveners each make an offer of proof: If ordered by the Court to do so, each Attorney-Intervener would be able to produce evidence, *in camera*, that certain of their clients' identifying information is protected by the attorney-client privilege, the California constitutional right of privacy, and the California duty of confidentiality. (*See*, *e.g.*, Barrett Dec. ¶¶ 18-22; Katz Dec. ¶¶ 14-16; Scarlett Dec. ¶ 10.)

**V.    OIG DOES NOT HAVE AUTHORITY TO INTERFERE WITH ATTORNEY-INTERVENERS' CALIFORNIA ETHICAL OBLIGATIONS OR INVADE ATTORNEY-CLIENT PRIVILEGE.**

As set forth above, much of the client-identifying information sought by OIG's subpoena is privileged, private, and/or protected by Attorney-Interveners' ethical duty of confidentiality. Because LSC and OIG are not authorized to obtain this information, CRLA's objection to producing it should be upheld.

**A.    OIG Is Not Authorized to Seek Information on Potential Clients.**

There is absolutely no basis for OIG to seek the names of potential clients, as it purports to do. Section 509(h) only entitles OIG to non-privileged "*client* names," not the names of potential clients. The Court should therefore uphold CRLA's objection to producing any potential client names. Pub. L. No. 104-134, § 509(h), 110 Stat. 1321, 1359 (emphasis added).

**B.    OIG Is Not Authorized To Seek Information Protected by the Attorney-Client Privilege.**

Attorney-Interveners would be able to identity particular situations in which CRLA's clients' names are themselves privileged and/or the clients' names linked to other client-specific information are privileged. (*See*, *e.g.*, Barrett Dec. ¶¶ 18-22; Katz Dec. ¶¶ 14-16; Scarlett Dec. ¶ 10.) Even under a broad reading of Section 509(h), OIG is clearly not entitled to privileged information. Pub. L. No. 104-134, § 509(h), 110 Stat. 1321, 1359 (excepting "attorney-client privilege[d]" information from the information that OIG may seek).

C.    **OIG Is Not Entitled to Information Protected by CRLA's Clients' Privacy Rights and/or Attorney-Interveners' Duty of Confidentiality.**

LSC's authorizing statute, which binds OIG, prohibits it from interfering with the ethical obligations of attorneys employed by its grant recipients.  42 U.S.C. § 2996e(b)(3); *LSNYC II*, 249 F.3d at 1082-83 ("§ 2996e delineated ethical obligations binding on the entire corporation"). This prohibition on interference with the attorney-client relationship is tempered only by Section 509(h), which permits OIG to obtain "financial records, time records, retainer agreements, client trust fund and eligibility records, and client names" from LSC's grant recipients, "except for reports or records subject to the attorney-client privilege."  Pub. L. No. 104-134, § 509(h), 110 Stat. 1321, 1359.

To the extent that Section 509(h) creates an exception to the general prohibition against interference with the attorney-client relationship set forth in 42 U.S.C. § 2996e(b)(3), that exception must be narrowly construed.  Section 2996e(b)(3) establishes a policy of respect for attorneys' state ethical obligations, which is echoed in the attorney-client privilege carve-out from Section 509(h).  "While a later enacted statute . . . can sometimes operate to amend or even repeal an earlier statutory provision . . . , repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal is clear and manifest."  *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2532 (June 25, 2007).  A court should not infer a statutory repeal "unless the later statute expressly contradicts the original act or unless such construction is absolutely necessary in order that the words of the later statute shall have any meaning at all."  *Id.* (quoting *Traynor v. Turnage*, 485 U.S. 535, 548 (1988)); *see also Branch v. Smith*, 538 U.S. 254, 273 (2003) ("An implied repeal will only be found where provisions in two statutes are in 'irreconcilable conflict,' or where the latter Act covers the whole subject of the earlier one and is 'clearly intended as a substitute.'") (citation omitted.).  This is particularly true where the later statute is an appropriations bill.  *See, e.g.*, *Cobell v. Norton*, 428 F.3d 1070, 1075 (D.C. Cir. 2005) ("The significance of appropriations bills is of course limited, and the associated legislative history is even more so.").

There is nothing in Section 509(h) that "clearly and manifestly" indicates that Congress wanted to *repeal* LSC's authorizing statute. Nor is it "absolutely necessary" to read Section 509(h) to be in conflict with the authorizing statute. Section 509(h) can be read coherently and consistently with LSC's authorizing statute to mean that OIG is authorized to obtain client names from grant recipients of LSC *if* the release of those names would not interfere with the grant recipient attorney's state ethical duties or invade the sanctity of the attorney-client relationship.

There are additional reasons to construe Section 509(h) narrowly here. "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988). Requiring the production of confidential and private information about CRLA's clients would implicate serious constitutional concerns. *See Hooser*, 101 Cal. Rptr. 2d at 341 (California constitutional privacy right); *see also Whalen v. Roe*, 429 U.S. 589 (1976) (identifying federal substantive due process informational privacy right); *Doe v. Attorney Gen.*, 941 F.2d 780, 796 (9th Cir. 1991) (informational privacy right in medical data). Further, there is a presumption against preemption in areas of traditional state regulation, unless Congress has made its desire for preemption clear. *See*, *e.g.*, *Egelhoff v. Egelhoff*, 532 U.S. 141, 151 (2001). Regulation of the legal profession has traditionally been left to the states. *See Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975) ("The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary government function of administering justice, and have historically been 'officers of the courts.'") (citations omitted.)

Pursuant to these canons of statutory construction, Section 509(h) must be construed to be harmonious with LSC's authorizing statute, and in a manner that will not do violence to CRLA's clients' rights of privacy and confidentiality. In other words, the statute should be construed to protect CRLA's clients' rights to privacy and confidentiality to comply with Section 2996e; and because the contrary is not "absolutely necessary" under the language of

Section 509(h). So construed, Section 509(h) does not entitle OIG to information protected by the California constitutional right to privacy or Attorney-Interveners' duty of confidentiality.

### VI. THE *LSNYC* AND *BRONX LEGAL SERVICES* CASES DO NOT ALLOW OIG TO OBTAIN THE PRIVILEGED, PRIVATE, AND CONFIDENTIAL INFORMATION IT SEEKS.

Two court of appeals decisions have addressed OIG's ability to obtain information from the grantees of LSC: *LSNYC II*, 249 F.3d 1077, and *Bronx Legal Servs.*, 64 Fed. Appx. 310. While the factual circumstances of this situation are different than those present in either the *LSNYC* cases or *Bronx Legal Servs.*, those cases are necessarily instructive.

In *LSNYC II*, the Court of Appeals for the District of Columbia affirmed a decision requiring Legal Services for New York City ("LSNYC") to produce client names to OIG. *LSNYC II*, 249 F.3d at 1084. The OIG subpoena at issue sought both client names in "closed cases" and legal problem codes. In contrast to this case, however, there OIG had "created a screening procedure designed to assure that nobody within LSC OIG could or would link a client name with its associated legal problem code." *LSNYC I*, 100 F. Supp. 2d at 44 (described by that court as a "Chinese Wall"). Despite this assurance, which CRLA has asked for but not received, LSNYC raised objections, both based on privilege and under New York's professional ethics rules, to producing client names.

The *LSNYC II* court rejected the objections on the grounds that (1) LSNYC had raised an insufficiently particularized claim of privilege, and (2) New York state ethical obligations did not prevent OIG from "compelling production of client names associated with problem codes." 249 F.3d at 1080-83. Significantly, the *LSNYC II* court noted that the applicable ethics rules explicitly permitted the disclosure of confidential client information in response to a court order. *Id.* at 1083. This is in contrast to California's ethics rules, which do not. *See* Cal. Bus. & Prof. Code § 6068(e)(2). The *LSNYC II* court also noted that Section 509(h) contemplated the production of retainer agreements, which would capture much the same information as the names and problem codes. *Id.* Even if that is true, that same logic does not entitle OIG to all the client names and associated problem codes here. Although OIG purports to seek the names and

associated codes for all individuals in CRLA's database, a significant percentage of these individuals never entered into retainer agreements with CRLA. For example, neither potential clients nor counseling clients execute retainer agreements. (Barrett Dec. ¶¶ 7-8; Katz Dec. ¶ 6; Smith Dec. ¶ 8.) Thus, the fact that Section 509(h) may entitle OIG to some retainer agreements does not entitle it to all the names and associated problem codes it seeks.

The Second Circuit's reasoning in *Bronx Legal Services* is largely the same as the *LSNYC II* court's. Although the Second Circuit did not sustain the legal service groups' objection that producing the requested information would cause its attorneys to violate their New York professional ethical obligations, the court noted that New York's ethics rules *permitted* disclosure in response to a court order. *Bronx Legal Servs*, 64 Fed. Appx. at 311 (the legal services groups did not raise attorney-client privilege as an objection). The Second Circuit also reiterated the *LSNYC II* court's point about retainer agreements. *Id.* Importantly, the Second Circuit also noted that "it is possible" that their decision would have been different if "the requested disclosure of client names would violate a disciplinary rule," as the disclosure of California clients' names would here. *Id.* at 311.

The situation at issue here thus differs in a number of key respects from that presented in *LSNYC II* or *Bronx Legal Services*.

- OIG has not agreed to erect an ethical wall ensuring that the client names cannot be matched up with information about why they consulted CRLA;

- California's statutory duty of confidentiality and its rules of professional conduct do not contain an exception for court-ordered disclosure;

- Attorney-Interveners have made, and would be able to expand on, a particularized showing that some of the subpoenaed names (the names of potential clients, for example) are privileged; and

- Retainer agreements do not exist for a good percentage of the clients whose names OIG seeks.

These differences are critical.  There is no reason to assume that, if they had been present in *LSNYC II* and *Bronx Legal Services*, those cases would have been decided as they were.

### VII.    IF OIG'S SUBPOENA WERE ENFORCED, CRLA'S CLIENTS WOULD BE HARMED.

Enforcement of the subpoena in this case could have serious consequences for CRLA's clients—for many, disclosure of their confidential information would expose them to the risk of great harm.

Despite the best efforts of CRLA, OIG has refused to provide any assurance that the information it seeks will not be further disclosed.  (Hoerger Dec. ¶ 84.)  Disclosure of CRLA's clients' confidential information beyond OIG could result in any number of harmful consequences, the total number of which is impossible to predict.  One possible harm, for example, is that employers could learn the names of the employees who had sought legal advice regarding employment against them, and fire or blackball all such employees.  Another possible harm is that immigration officials could learn the identity of the potential clients who are undocumented and who could then be deported.

Should anyone choose to contact one of the clients on the list—to ascertain, for instance, whether the client had been solicited for impact litigation (the subject matter of OIG's investigation of CRLA)—the harm could be even worse:  though the clients are not as numerous, the harm risked by calling or writing to the house of a victim of domestic abuse and identifying her as a client of CRLA could be catastrophic.  (Scarlett Dec. ¶ 8.)  With respect to individual clients, production of their identifying information would also potentially nullify any later argument that the information was privileged.  For example, if a client who had previously received only advice from CRLA later decided to pursue a legal claim, that client might not be able to refuse to produce the information provided to CRLA in his or her earlier visit on privilege grounds.

Most troubling, the production of the client-identifying information will act as a deterrent to future clients of CRLA.  When CRLA attorneys cannot assure their clients that their visit to

CRLA, and the purpose of that visit, will be kept confidential, significant numbers of CRLA clients will choose not to seek legal help. If 50% of the people who wish to attend CRLA community events refuse to sign the attendance sheet because CRLA discloses that the sheet will be sent to LSC (Barrett Dec. ¶ 10), it is likely that substantial numbers of eligible prospective clients will not pursue CRLA's legal help if CRLA must say that the client's name, the nature of the client's legal problem, and the identity of the adverse party, will be disclosed to LSC. *See Fisher*, 425 U.S. at 403 ("if the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure, the client would be reluctant to confide in his lawyer and it would difficult to obtain fully informed legal advice"). This deterrent effect would have drastic consequences for CRLA's ability to provide the very services LSC is authorized to support.

### VIII.   THE COURT CAN MODIFY OIG'S SUBPOENA TO PROTECT THE CONFIDENTIALITY OF CRLA'S CLIENTS.

Should the Court decide to enforce some portion of OIG's subpoena, it should still modify the subpoena to protect the confidentiality of CRLA's clients. This Court has held that "[i]t is a legitimate exercise of the court's authority to modify the terms of an agency subpoena by providing additional confidentiality protections for a person or entity to whom the subpoena is directed, and *particularly for innocent third parties about whom the respondent that is the subject of subpoena may possess information*." *Adair v. Rose Law Firm*, 867 F. Supp. 1111, 1119 (D.D.C. 1994) (emphasis added).

In *Adair*, an inspector general ("IG") had issued a subpoena to a law firm, seeking information on the firm's clients. *Id.* at 1114. The law firm opposed the subpoena, and it also moved for a protective order limiting the IG's disclosure of the client information. *Id.* at 1118. The court expressed its concern "about the privacy interests of Rose's clients who have no relationship to this investigation," and it declared its authority to modify the subpoena based on these concerns. *Id.* at 1118-19. The court concluded, however, that it need not modify the terms the subpoena because the IG had agreed to provide "significant" confidentiality protections, such

that the court "[could not] devise any greater protections for those unimplicated clients of the Rose law firm . . . than those the IG himself has offered." *Id.* at 1121.

The Court should engage in the same analysis here. Attorney-Interveners' and CRLA's clients are not before this Court. They likely do not even know that the government is seeking private information about them, nor are they able to protect their privileged and confidential information held by CRLA. Accordingly, they must rely on this Court to protect such information. If the Court chooses to enforce some or all of OIG's subpoena, the Court should modify the terms to protect the confidentiality of Attorney-Interveners' and CRLA's clients.

## CONCLUSION

The accompanying declarations demonstrate that a significant portion of the information sought by OIG's subpoena is privileged, private, and/or encompassed by the ethical duty of confidentiality in place in California. Production of this information would violate Attorney-Interveners' and CRLA's clients' rights. Attorney-Interveners respectfully request that the Court decline to authorize violation of such rights and deny OIG's request for summary enforcement of its subpoena.

Dated: September 14, 2007                    Respectfully submitted,


                                             By:  /s/ Wendy M. Garbers
                                                 Wendy M. Garbers

                                                 MORRISON & FOERSTER LLP
                                                 425 Market Street
                                                 San Francisco, CA 94105-2482
                                                 Tel.: (415) 268-7000

                                                 Attorneys for Interveners JEANNIE
                                                 BARRETT, ALEGRIA DE LA CRUZ,
                                                 VANESSA FRANK GARCIA, PHYLLIS
                                                 KATZ, TERI SCARLET, ARTURO
                                                 RODRIGUEZ, and KIRK AH-TYE

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

and

KIRT WEST,
INSPECTOR GENERAL OF THE
LEGAL SERVICES CORPORATION
3333 K STREET, NW, 3^(RD) FLOOR
WASHINGTON, DC 20007,

                 Petitioners,

    v.

CALIFORNIA RURAL LEGAL
ASSISTANCE, INC.
631 HOWARD STREET, #300
SAN FRANCISCO, CA 94105,

                 Respondent.

No. 1:07-mc-00123-EGS

**DECLARATION OF JEANNIE
BARRETT IN SUPPORT OF
ATTORNEY-INTERVENERS'
OPPOSITION TO PETITION FOR
SUMMARY ENFORCEMENT OF
ADMINISTRATIVE SUBPOENA**

Before:  The Honorable Emmet G. Sullivan

JACK W. LONDEN (CA SBN 85776)
JLonden@mofo.com
*Admitted pro hac vice*
WENDY M. GARBERS (CA SBN 213208)
WGarbers@mofo.com
*Admitted pro hac vice*
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Tel.: (415) 268-7000

Attorneys for Interveners JEANNIE BARRETT, ALEGRIA DE
LA CRUZ, VANESSA FRANK GARCIA, PHYLLIS KATZ,
TERI SCARLET, ARTURO RODRIGUEZ, and KIRK AH-
TYE

I, Jeannie Barrett, declare:

      1.    I am an attorney licensed to practice in the State of California, and I have been a member in good standing of the California State Bar since 1977.  Between 1997 and the present, I have been employed as an attorney by California Rural Legal Assistance, Inc. ("CRLA"), respondent in this action, and I am currently the directing attorney of the Santa Maria office.  I am submitting this declaration in support of the Attorney-Interveners' Opposition to the Office of the Inspector General's ("OIG") Petition for Summary Enforcement of Administrative Subpoena.  I make this declaration on personal knowledge, except as otherwise expressly stated.  If called as a witness, I could and would testify competently to the matters stated in this declaration.

### CRLA's Client Intake Procedures

      2.    Most potential clients who contact CRLA—either by walking into a CRLA branch office or by calling a branch office—are asked to complete an intake form.  Sometimes the potential client fills the form in by himself or herself; sometimes a secretary fills in the form (a number of our clients are illiterate, for example).  A true and correct copy of the version of this form that was in effect between 2003 and 2005 is attached hereto as Exhibit A.

      3.    In addition to the potential client's name, address, and telephone number, the intake form asks for extensive personal information, including date of birth, social security number, detailed information regarding income and assets, gender, race, alien status and other immigration-related information, language, handicapped status, spouse's name, a description of the legal problem, and any adverse parties.  The inclusion of the identity of adverse parties on the intake form is essential, as CRLA uses it to run a conflicts check on the potential client.

      4.    On the back of the intake form there is a section for "CRLA Staff Use."  This section contains several boxes that can be checked, including "Client is eligible and accepted for advice/counsel, brief service, or referral," "Client is eligible and accepted for extended service," and "Ineligible."  CRLA does not take individuals for whom the box "Ineligible" is checked on as clients.  A person may be deemed "Ineligible" for a variety of reasons:  they may have

improper immigration documentation, or they may have a legal problem, such as a criminal legal problem, that CRLA, by law, cannot help them address.  In my experience, attorneys make the decision as to which of these boxes is checked with respect to particular individuals.

5.    Once the intake form has been filled out, the information from it is input into CRLA's computer database.  Intake information is input into the computer database even if the potential client has been determined to be "Ineligible" for CRLA's legal services.  One of the pieces of information stored about clients in the CRLA database is a "problem code," which is a code that captures the client's description of his or her legal problem.  Another piece of information stored about clients in the CRLA database is the "close code," which describes how the client's matter was resolved.  A true and correct list of CRLA's "problem codes" and "close codes" is attached hereto as Exhibit B.

6.    If a potential client is eligible, there are no conflicts, and he or she is accepted as a client, that person is assigned to a CRLA staff attorney.  Following the assignment, the attorney can access the information on the client in CRLA database's.  He or she can also add information to the database, such as case notes and time records.

7.    Eligible clients fall into the following categories:  referral clients, advice/counsel clients, brief services clients, and extended service clients.  Referral and advice/counsel clients are clients for whom CRLA attorneys do not take any public action—including sending letters or making telephone calls.  Generally, referral and advice/counsel clients do not enter into written retainer agreements with CRLA.  In my practice, approximately 80% of my clients are referral or advice/counsel clients, and I believe my practice to be typical of attorneys at CRLA.

8.    Brief service clients are clients for whom CRLA takes limited action—writing a letter, making a telephone call—and these clients enter into brief service retainer agreements with CRLA.  Extended service clients are clients for whom CRLA fully takes on representation, and these clients enter into full form retainer agreements.

## CRLA's Clients' Fear of Retaliation

9.    CRLA's mission is to provide free legal services to the poor throughout California, particularly farm workers.  Many of these people are immigrants.  In addition to being poor, many of CRLA's clients have little, if any, formal education and speak little, if any, English.  Many of CRLA's clients do not know their legal rights, or even that they have legal rights.  In my experience, my clients' poverty and lack of knowledge has made them very vulnerable to exploitation by employers, landlords, and others.

10.    CRLA's clients are frequently afraid that, if their visit to CRLA were known, they would be retaliated against—or their coworkers or family would be retaliated against.  The retaliation they fear most often is that they will be fired, but they also fear eviction, or loss of public services, or even physical violence.  This fear is so strong that at community education events, which CRLA holds on a regular basis, at least 50% of the attendees will not even sign the attendance sheet when they learn that the attendance sheet must be shared with the Legal Services Corporation.

11.    The fear of retaliation is unfortunately very real.  I have heard of many instances of retaliation, but I recall several in particular.  In one instance, a woman who had attended one of our community education events on sexual harassment learned about a coworker who was being sexually harassed.  The woman told the foreman (based on information she had received at our event) that what he was doing was illegal.  Both the woman and her coworker were then fired.  In 2003, we offered to bring a claim on behalf of the woman, but she decided not to pursue it: having already lost her job for simply stating her coworker's rights, she was afraid that she would be blacklisted if she actually made an official legal claim.

12.    In another instance, a farm worker came in to seek help regarding a disability.  The worker had contracted carpel tunnel syndrome due to the farm's pruning practices, and we referred her out (i.e., referred her to another attorney) to make a worker's compensation claim.  We subsequently heard that as soon as she requested a worker's compensation form from the farm, she was fired.

13.    In a third instance, in 2004, a pesticide applicator was fired for pointing out the lack of proper safety procedures on the farm on which he worked.  He came to us to file a claim for wrongful firing.  We agreed, and in connection with the claim, we tried to get declarations from his coworkers about the farm's safety procedures.  Most of the coworkers declined to give us declarations, however, as they were too afraid of being fired themselves.

14.    Out of fear of retaliation, people who contact CRLA are often reluctant to fill out the intake form.  CRLA assures these people, however, that the information they give CRLA in filling out the form will remain confidential.  In fact, the intake form itself states that any information clients give CRLA will remain confidential.  The maintenance of their confidence is of great importance to CRLA's clients.  Even where a client does agree to fill out an intake form, or to seek advice from a CRLA attorney, the client often decides not to pursue any action that could link him or her—such as a letter or a telephone call—to a visit to CRLA.

## CRLA's Clients' Other Confidentiality Concerns

15.    Aside from fear of retaliation, there are other reasons that clients of CRLA are very interested in protecting their confidentiality.  A number of the matters that CRLA attorneys are asked by clients for help on—relating to disability, juvenile delinquency, and various forms of public assistance—are sensitive and potentially embarrassing, and the clients often tell their attorneys that they want to keep those matters confidential.  Because many of these matters are resolved in administrative or other forums in which the records are kept confidential, I have assured clients, and I am informed and believe that other CRLA attorneys assure their clients, that the matters will be kept confidential.

16.    For example, in one education case my office worked on, we pursued a claim on behalf of students who had been sent by a juvenile court to a particular school for juvenile delinquents as probation.  As conditions of their probation, the students were required to get certain grades in their classes, but the school had no resources for the students who were learning disabled.  We represented the students in both juvenile court and in school administrative proceedings, the records of both of which are confidential by law.  Because the students were

described in our representation as being both juvenile delinquents and special needs, neither the students nor the parents would have been willing to pursue the claim publicly. We told the students and parents, however, that our representation of the students would remain confidential.

17.     My office also has many clients who are qualified to receive social security disability payments. Getting the clients to describe their condition in writing (which is necessary to receive the payments) is often difficult, as the clients are embarrassed of their condition and do not want to be labeled as "disabled." This is especially true if the disability is not visible, such as a mental health disability. In a number of cases, I have had clients turn down money they need because they are too ashamed to admit that they are disabled, and this is despite the fact that we tell them that social security disability records are confidential by law.

### Individual Cases in which CRLA's Clients' Identities Are Confidential

18.     I would be able to provide the Court, *in camera*, with numerous, specific examples, drawn from my own practice, of individual clients whose information is privileged and confidential, yet sought by OIG. Concerns about waiving the very privilege and confidentiality concerns at issue prevent me from providing such detail, except *in camera*, and under circumstances in which there would be no waiver of privilege.

19.     That said, there are numerous clients, from my own practice, whose information is called for by OIG's subpoena, who have forgone prosecution of meritorious claims because they feared retaliation and desired to keep our consultation confidential, including clients with valid employment claims against local agricultural employers, and valid landlord/tenant claims against local landlords.

20.     Similarly, there are clients, from my own practice, whose information is called for by OIG's subpoena, who would not have authorized me to take any legal action on their behalf if I could not have assured them that such action could be taken confidentially. Such clients include, for example, juveniles with education-related disability claims.

21.    In the years that I have worked for CRLA, I have seen at least one case a week in which, as in the cases described above, the client wants to keep their interaction with a CRLA attorney confidential.

22.    The details of these individual's circumstances and desire for confidentiality are compelling and would assist the Court in understanding, in human terms, what is at stake. I thus respectfully request that, if the Court determines a more individualized showing of privilege is needed, that it direct me to provide more detail concerning clients from my practice *in camera*, without thereby waiving the attorney-client privilege.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of September 2007, at Santa Maria, California.


          /s/ Jeannie Barrett
                   Jeannie Barrett

# EXHIBIT A

# CALIFORNIA RURAL LEGAL ASSISTANCE
## CONFIDENTIAL QUESTIONNAIRE

CALIFORNIA RURAL LEGAL ASSISTANCE

**IMPORTANT -- PLEASE READ**
The following questions will help us determine if you are eligible for our assistance and help us to advise you about your legal problem. Any information you give us is strictly confidential. After we discuss your problem with you, we will tell you whether we can assist you in any way, refer you to other agencies for help, or represent you as your lawyers.

Case Number: _____
□ TELEPHONE    □ FIELD    □ OFFICE
Date opened: _____
Screener: _____ Case Handler: _____
Problem Code: _____
Funding: LSC IOLTA PAI
Grant: _____ Addendum □
Indigenous language _____
Eng/Spn/Mix/Hmong _____ Interp □
Closed: _____ Time Dollar □

| Date of Birth | Social Security Number |
|---|---|

NAME: _____

SPOUSE/PARTNER: _____

STREET OR MAILING ADDRESS: _____  City: _____  Zip: _____
(If you move frequently, please list a permanent contact address on page 2 of this form.)

PHONE: _____  MESSAGE PHONE: _____  NUMBER OF ADULTS IN HOME ___  NUMBER OF CHILDREN ___
(under 18)

ETHNICITY:  □ Caucasian  □ Black/African American  □ Hispanic/Latino  □ Asian/Pacific Islander  □ Native American

□ U.S. CITIZEN    □ Other (not U.S. Citizen or Permanent Resident Alien)
□ PERMANENT RESIDENT ALIEN

title of document        number and client's name (if different from above)        expiration date

| Gross Monthly Household Income | YOU | OTHERS |
|---|---|---|
| 1. Wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ | | $ |
| 2. TANF/CalWORKs . . . . . . . . . . . . . . . . . . $ | | $ |
| 3. SSI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ | | $ |
| 4. Social Security . . . . . . . . . . . . . . . . . . . . . $ | | $ |
| 5. Child or Spousal Support . . . . . . . . . . . . . . $ | | $ |
| 6. Unemployment or State Disability . . . . . . . $ | | $ |
| 7. Workers' Comp . . . . . . . . . . . . . . . . . . . . . $ | | $ |
| 8. Pension . . . . . . . . . . . . . . . . . . . . . . . . . . $ | | $ |
| 9. Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ | | $ |

Total Gross Monthly Income:  . . . . . . . . . . . . . . . . . $ _____
□ I receive General Assistance/Relief  (amount, if cash $ _____ )
□ I receive Food Stamps      (amount, if cash $ _____ )
(If your household income has changed recently, or if you think it will change in the near future, please explain on page 2 of this form.)    **LSC = $**

Please turn to page 2 and complete the shaded ASSET area. Then mark one of the boxes below.
**Do you have assets worth more than $5,000?** □ No  □ Yes

Have you been to CRLA before?
□ No  □ Yes. When? _____

Who referred you to CRLA? _____

Are you a farmworker? □ Yes  □ No

Describe your problem. _____
_____
_____
_____
_____

intake eng 083199

I attest that the information I have given above is true.
Date: _____  Your Signature: _____

EMPLOYER Name: _____  Address: _____  Phone: _____

## ASSETS    After completing the shaded portion, please turn to page 1 and check Yes or No for assets.

**Household Assets**            Enter zero or value on every line.

| | |
|---|---|
| Bank Accounts . . . . . . . . . . . . . . . . . . . . . . $_____ | |
| **(Include checking and savings)** | |
| Real Estate (including land) . . . . . . . . . . . . . $_____ | |
| (Do not include the value of the home where you now live.) | |
| Personal Property . . . . . . . . . . . . . . . . . . . . . $_____ | |
| Cars/Trucks . . . . . . . . . . . . . . . . . . . . . $_____ | |
| (Do not include the value of your vehicles used primarily for employment or medical transportation or handicapped.) | |
| Other Liquid Assets . . . . . . . . . . . . . . . . . . $_____ | |
| Stocks, bonds, investments, pensions . . . . $_____ | |
| Total Household Assets: . . . . . . . . . . . . . . . $_____ | |

**Monthly Household Debts***

Bank/Credit Cards . . . . . . . . . . . . . . . . . . . . . $_____
Rent or Mortgage Payments . . . . . . . . . . . . $_____
Amount owing on Cars/Trucks . . . . . . . . . . . . $_____
Medical Expenses . . . . . . . . . . . . . . . . . . . . . . $_____
Employment Expenses (including child care) . . . . . . $_____
Other household Debts: . . . . . . . . . . . . . . . . . . $_____

**Total Household Debts:** . . . . . . . . . . . . . $_____
*Medical and employment expenses are possible B-1 factors. See 45 CFR 1611 and the *CRLA  Case Handling Manual*.

### OTHER FACTORS:
☐ I will lose welfare or public benefits if legal assistance is denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Amount $_____
☐ I will lose money or income if legal assistance is denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Amount $_____
☐ Other harm that I will suffer if legal assistance is denied:  (Please describe.)

---

**CRLA Staff Use - DO NOT WRITE IN THIS BOX.**

☐ Client is eligible and accepted for advice/counsel, brief service, or referral. * _____  _____
☐ Client is eligible and accepted for extended service. * _____
☐ Income was between 125% and 187% and was adjusted to 125% or below.  Supplemental Intake is attached.
☐ Ineligible.                                                                                                    *DA's or DA's delegate's initials and date.
☐ Waiver will be requested from the Executive Director by the Directing Attorney.  Supplemental intake is attached.

---

**CLOSING THE CASE**
1) **Confirm funding and problem codes.**
2) **Choose major reason case was closed.**
☐ A)  Counsel and Advice
☐ B)  Brief service (letter, call to 3rd party)
☐ C)  Referred after legal assessment.
☐ D)  Insufficient merit to proceed
☐ E)  Client withdrew and unable to contact
☐ F)  Negotiated settlement without lit
☐ G)  Negotiated settlement with lit
☐ H)  Administrative agency decision
☐ I)  Court decision
☐ J)  Change in eligibility

**SAVINGS**
Damages $_____ for _____
Wages/benefits $____ for __ mos
Value of property won/saved
_____

Other savings to client
_____
_____
_____

Other relief won
_____
_____
_____

**COMMENTS**

intake eng 083199

# EXHIBIT B



For 25 Years, America's
Partner For Equal Justice

# CSR Handbook

## 2001 Edition

**TABLE OF CONTENTS**

## Section VIII:    Case Definitions & Closure Categories

This section includes definitions of common types of case services which programs provide to eligible clients during the course of a case, as well as categories of circumstances which lead to case closure prior to the resolution of a client's legal problem, such as a change in client eligibility, the withdrawal of a client, or a determination that a case lacks sufficient merit to warrant further representation.

All legal assistance recorded and reported to LSC as a case must:

(a)    qualify as a case, as defined by Section 2.1 of this Handbook and 45 CFR Section 1635.2(a);[12]

(b)    be provided to an eligible client, as defined by Section 2.2 of this Handbook, and

(c)    be documented as required by Section V of this Handbook.

### CSR Category A -- Counsel and Advice

A case closed as the result of the provision of advice to an eligible client in a case, e.g., the review of relevant information and the counseling of the client on action(s) to take to address a legal problem.

### CSR Category B -- Brief Services (Other than Counsel and Advice)

A case closed as a result of an action taken at or within a few days or weeks of intake on behalf of an eligible client, e.g., the preparing of a short letter, the making of a telephone call, or the preparation of a routine legal document such as a simple will.

### CSR Category C -- Referred After Legal Assessment

A case closed in the course of providing assistance to an eligible client because the client is referred outside the program (e.g., to a social service agency or a non-LSC provider) because information in the case indicates that the program should not handle the case, or that the client would be better served by a referral outside the program.[13]

### CSR Category D -- Insufficient Merit to Proceed

A case closed after an applicant has been accepted as a client because new facts or circumstances arise or become apparent leading to the conclusion that there is an insufficient basis, in law or in fact, to pursue the case.

### CSR Category E -- Client Withdrew or Did Not Return

A case closed because the client failed to return to the program during the course of representation and could not be contacted. This category also includes case closures where the client decides not to proceed with the case, e.g., a client in an eviction case decides to move out instead of proceeding with legal action.[14]

### CSR Category F -- Negotiated Settlement Without Litigation

A case closed through negotiation prior to initiation of court or administrative action.

### CSR Category G -- Negotiated Settlement With Litigation

A case closed through negotiation during a court or administrative action, e.g., the resolution of a dispute

after an action has been filed.

### CSR Category H -- Administrative Agency Decision

A case closed as a result of an action taken by an administrative agency or body, e.g., a welfare department.

### CSR Category I -- Court Decision

A case closed as a result of an action by a court.

### CSR Category J -- Change in Eligibility Status

A case closed through discontinuance of representation of a client because the client no longer meets financial or other eligibility requirements due to new circumstances, e.g., a change in employment status or family income, incarceration, or a change in immigration status.

### CSR Category K -- Other

A closed case that does not fit any of the preceding ten CSR case closure categories. Cases in which there is no opposing party, but in which the services provided are too extensive to fit the brief service category, such as the preparation of a complex contract or a complex medical power of attorney, may be closed in this category. Cases which fit two or more CSR categories may not be closed in this category, but should be closed in the category which best reflects the level of service provided.

### Section IX:    Legal Problem Categories And Codes

This section lists common types of legal problems experienced by clients. Each closed case is assigned a numeric Legal Problem Code ranging from 1 to 99 describing the type of legal problem. These Legal Problem Codes are grouped in ten broad Legal Problem Categories. The Legal Problem Codes are set out below by Legal Problem Category:

## CONSUMER/FINANCE

01 – Bankruptcy/Debtor Relief

02 – Collection (Including Repossession/Deficiency/Garnishment)

03 – Contracts/Warranties

04 – Credit Access

05 – Energy (Other than Public Utilities)

06 – Loans/Installment Purchase (Other than Collection)

07 – Public Utilities

08 – Unfair Sales Practices

09 – Other Consumer/Finance

## EDUCATION

11 – Education

# EMPLOYMENT

21 – Job Discrimination

22 – Wage Claims

29 – Other Employment

# FAMILY

30 – Adoption

31 – Custody/Visitation

32 – Divorce/Separation/Annulment

33 – Guardian/Conservatorship

34 – Name Change

35 – Parental Rights Termination

36 – Paternity

37 – Spouse Abuse

38 – Support

39 – Other Family

# JUVENILE

41 – Delinquent

42 – Neglected/Abused/Dependent

49 – Other Juvenile

# HEALTH

51 – Medicaid

52 – Medicare

59 – Other Health

# HOUSING

61 – Federally Subsidized Housing Rights

62 – Homeownership/Real Property

63 – Landlord/Tenant (Other than Public Housing)

64 – Other Public Housing

69 – Other Housing

## INCOME MAINTENANCE

71 – TANF/Other Welfare

72 – Black Lung

73 – Food Stamps

74 – Social Security

75 – SSI

76 – Unemployment Compensation

77 – Veterans Benefits

78 – Workers Compensation

79 – Other Income Maintenance

## INDIVIDUAL RIGHTS

81 – Immigration/Naturalization

82 – Mental Health

84 – Disability Rights

89 – Other Individual Rights

## MISCELLANEOUS

91 – Incorporation/Dissolution

92 – Indian/Tribal Law

93 – License (Auto & Others)

94 – Torts

95 – Wills/Estates

99 – Other Miscellaneous

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

and

KIRT WEST,
INSPECTOR GENERAL OF THE
LEGAL SERVICES CORPORATION
3333 K STREET, NW, 3RD FLOOR
WASHINGTON, DC 20007,

                    Petitioners,

        v.

CALIFORNIA RURAL LEGAL
ASSISTANCE, INC.
631 HOWARD STREET, #300
SAN FRANCISCO, CA 94105,

                    Respondent.

No. 1:07-mc-00123-EGS

**DECLARATION OF PHYLLIS
KATZ IN SUPPORT OF
ATTORNEY-INTERVENERS'
OPPOSITION TO PETITION FOR
SUMMARY ENFORCEMENT OF
ADMINISTRATIVE SUBPOENA**

Before:  The Honorable Emmet G. Sullivan

JACK W. LONDEN (CA SBN 85776)
JLonden@mofo.com
*Admitted pro hac vice*
WENDY M. GARBERS (CA SBN 213208)
WGarbers@mofo.com
*Admitted pro hac vice*
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Tel.: (415) 268-7000

Attorneys for Interveners JEANNIE BARRETT, ALEGRIA DE
LA CRUZ, VANESSA FRANK GARCIA, PHYLLIS KATZ,
TERI SCARLET, ARTURO RODRIGUEZ, and KIRK AH-
TYE

I, Phyllis Katz, declare:

1.     I am an attorney licensed to practice in the State of California, and I have been a member in good standing of the California State Bar since 1988.  Between 2000 and the present, I have been employed as an attorney in the Monterey, Gilroy and now Watsonville office of California Rural Legal Assistance, Inc. ("CRLA"), respondent in this action.  I am submitting this declaration in support of the Attorney-Interveners' Opposition to the Office of the Inspector General's Petition for Summary Enforcement of Administrative Subpoena.  I make this declaration on personal knowledge, except as otherwise expressly stated.  If called as a witness, I could and would testify competently to the matters stated in this declaration.

### CRLA's Clients

2.     CRLA provides free legal services to low-income Californians.  Originally, CRLA focused on rural Californians, specifically farm workers, but as California's cities have expanded, CRLA's work for low-income, urban residents has expanded as well.  California is now demographically significantly comprised of various immigrant populations, and many of CRLA's clients are non-native English speakers.

3.     When potential clients first contact CRLA, they give CRLA a lot of personal information, which is recorded on an intake form.  The information on this form is then input into CRLA's database.  The information is input into the database whether or not the potential client eventually becomes a client.

4.     There are a number of reasons that a potential client may not become a client.  For example, the person may not qualify for income-related reasons, or the person may simply decide not to pursue a legal claim.  One reason that a potential client may not become a client of CRLA is if that person does not have the proper immigration documentation.  Aside from specific, recognized, and exceptional circumstances, CRLA may only take on as clients immigrants who are properly documented.  Potential clients who contact CRLA but who do not have the proper documentation are deemed ineligible and rejected as clients, which may be recorded in the database as "insufficient merit," "referred after legal assessment," or "change in

eligibility," depending on the circumstances.  The database also contains information on the type of documentation, or lack thereof, that these individuals have.

5.    Once a potential client has been determined to be eligible and is accepted as a client by CRLA, CRLA may perform different kinds of work for that client.  A high percentage of the work CRLA does for clients is "advice" work, informing the client of his or her legal rights and advising them on what action to take.  This kind of work can take less than half an hour of an attorney's time, and can be accomplished completely over the phone, as when, for example, clients call into my office's housing hotline.

6.    CRLA also refers many clients, if the kind of legal assistance they need is not the kind CRLA provides, such as most criminal law matters, or if CRLA simply does not have time to take the case, and these clients are known as "referral" clients.  If CRLA is providing more than a referral or advice, it has clients sign a retainer agreement.  There are two types of retainer agreements, one for "brief services," usually a limited action on the part of an attorney such as writing a letter, and one for "extended services."  The majority of my clients and the majority of the clients of other CRLA basic unit attorneys (as opposed to migrant unit attorneys whose statistics I am not familiar with), are referral, advice, or brief services clients.

### CRLA's Clients' Confidentiality Concerns

7.    My clients, and the clients of other CRLA attorneys, often put a premium on confidentiality.  By this I mean that clients explicitly tell their CRLA attorney that they want the fact that they have contacted the attorney to stay confidential.  There are many reasons for this, including that the clients are afraid of retaliation.

8.    I work on many landlord/tenant cases, and clients are frequently concerned that they will be evicted if they complain to the landlord, or assert their legal rights in some other way.  I believe these concerns to be legitimate, as I have had clients who have received notices to terminate their tenancy for telling a landlord that the landlord is violating the tenant's legal rights.  Also, eviction for many of my clients means that they will be homeless, since they lack

either a security deposit, funds to move, or both, and homelessness is something they often know well and will do almost anything to avoid.

9.    Most of the labor clients I advise are also concerned about retaliation.  Our clients often report that a friend or co-worker asserted their legal rights and was fired.  Having seen what happens when others assert their rights, many of the labor clients I advise do not want me to take action, revealing their identity to their employer.  Even if a client has already been fired, and could take legal action against the employer, he or she may not want me to take such action out of hope that a new foreman or crew boss may not be aware of the situation and may hire them back.  Losing a job, for my clients, can quickly mean losing everything else too—their home, their hopes for their children's success in school, and even their next meal.  If you have no savings, one missed paycheck can have very serious consequences.

10.    Out of fear of retaliation, some of my clients decide not to bring legal claims against their landlord or against their employer.  Some other of my clients learn that they do not have any legal claims (they may believe they are being treated unfairly, but the treatment is not illegal), in which case they may decide just to cope with their housing or employment situations. In both these situations, and for obvious reasons, the clients always want me to keep their visit to CRLA confidential.

11.    Still others of my clients never really wanted to bring a claim; they just wanted to know their legal rights.  This may seem surprising in this Internet era, but my clients are often very isolated, and even the more urban clients do not necessarily have Internet access.  For these clients, my legal advice can be empowering: once they understand what their landlord or employer can and cannot do, they feel that they do not need to bring a claim, or even have me write a letter or make a telephone call.  Nonetheless, these clients often want me to keep their visit to CRLA confidential.

12.    Even some of my clients who do decide to bring claims are concerned about protecting their confidentiality.  For example, I have worked on several education cases, trying to get special educational services for disabled student clients or their parents.  These clients,

especially the teenagers, do not want anyone at their school to know that they are trying to get special services because they do not want to be labeled "special ed." Because education disability proceedings are confidential, I have assured these clients that I will maintain their confidentiality.

13.     Also, clients who are involved in federal public housing proceedings are entitled to private eviction hearings. Most of these clients choose to keep these hearings private—out of embarrassment over the fact that they receive public housing benefits, or other reasons—and I assure them that I will keep this information confidential.

### Specific Cases in which CRLA's Clients' Identities Are Confidential

14.     The subpoena issued by LSC's Office of the Inspector General ("OIG") seeks information that I know to be privileged and confidential. If the Court so directed me, I would be able to provide to the Court *in camera* specific examples of individual clients of mine whose privileged and confidential information is sought by OIG's subpoena. I have not provided such detail in this declaration, and I would not provide such detail unless directed to do so by the Court *in camera*, out of concern about waiving the very privilege and confidentiality rights I am trying to protect.

15.     The clients whose information is privileged and confidential include tenants who chose not to pursue claims against their landlords; employees who chose not to pursue claims against their employers; and other clients, such as disabled students, who wanted some aspect of their legal consultation kept confidential. I assured all of these clients that I would not disclose the information they asked me to keep confidential.

16.     I believe my clients' circumstances are compelling, and that reviewing their individual claims of privilege and/or confidentiality may be useful to the Court. If the Court determines a more individualized showing of privilege and/or confidentiality is needed, I therefore respectfully request that it direct me to provide more detail concerning clients from my practice *in camera*, without thereby waiving the attorney-client privilege.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of September 2007, at Watsonville, California.


_____/s/ Phyllis Katz_____
Phyllis Katz

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

and

KIRT WEST,
INSPECTOR GENERAL OF THE
LEGAL SERVICES CORPORATION
3333 K STREET, NW, 3RD FLOOR
WASHINGTON, DC 20007,

                    Petitioners,

    v.

CALIFORNIA RURAL LEGAL
ASSISTANCE, INC.
631 HOWARD STREET, #300
SAN FRANCISCO, CA 94105,

                    Respondent.

No. 1:07-mc-00123-EGS

**DECLARATION OF TERI
SCARLETT IN SUPPORT OF
ATTORNEY-INTERVENERS'
OPPOSITION TO PETITION FOR
SUMMARY ENFORCEMENT OF
ADMINISTRATIVE SUBPOENA**

Before:  The Honorable Emmet G. Sullivan

JACK W. LONDEN (CA SBN 85776)
JLonden@mofo.com
*Admitted pro hac vice*
WENDY M. GARBERS (CA SBN 213208)
WGarbers@mofo.com
*Admitted pro hac vice*
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Tel.: (415) 268-7000

Attorneys for Interveners JEANNIE BARRETT, ALEGRIA DE
LA CRUZ, VANESSA FRANK GARCIA, PHYLLIS KATZ,
TERI SCARLET, ARTURO RODRIGUEZ, and KIRK AH-
TYE

I, Teri Scarlett, declare:

1.    I am an attorney licensed to practice in the State of California, and I have been a member in good standing of the California State Bar since 1987.  I am the Directing Attorney for the Monterey, Gilroy, and Salinas Basic offices of California Rural Legal Assistance, Inc. ("CRLA"), respondent in this action.  I am submitting this declaration in support of the Attorney-Interveners' Opposition to the Office of the Inspector General's Petition for Summary Enforcement of Administrative Subpoena.  I make this declaration on personal knowledge, except as otherwise expressly stated.  If called as a witness, I could and would testify competently to the matters stated in this declaration.

2.    I have worked in legal services for over 20 years, and at CRLA from 2000 to the present.  A large part of my practice is devoted to family law, with a focus on domestic violence cases.  I have worked with literally thousands of women who are victims of domestic violence.  Between 2003 and 2005, I estimate that 40% of my clients were victims of domestic violence.

### Intake and Processing of Domestic Violence Clients

3.    Typically, my clients are referred to CRLA by someone—the police, the courts, or a friend.  When they call or come into the office, they fill out our intake form.  This intake form is then used to determine whether they are eligible for our services.  Most domestic violence victims who contact us are eligible for our services, meaning that they meet our threshold income requirements.  In addition, even though CLRA by law does not provide legal services to individuals who are undocumented from an immigration standpoint, the Violence Against Women Act contains an amendment to the eligibility criteria imposed on CRLA by the Legal Services Corporation that allows us to represent women and children who are victims of domestic violence, even if they are undocumented.

4.    After I or a paralegal has reviewed the intake form and the client has been screened for eligibility, I contact the client for an interview.  This interview can take place in our offices or over the phone, and during it I collect additional and standard information about the client.  My clients are often extremely traumatized, and the initial interview is very difficult for them.  If the

client decides to pursue a restraining order, the client then comes into the office, reviews the paperwork I have prepared based on the interview, and signs a retainer agreement.

5.    On the same day the client reviews the paperwork, I can usually get a temporary restraining order.  The proceedings are *ex parte*, though of course they are not confidential.  If the temporary restraining order is granted, a hearing is set within the next few weeks, at which I seek a three-year restraining order.

### Confidentiality Concerns of Domestic Violence Clients

6.    I seek restraining orders on behalf of many of my clients, but many other of my clients decide not to pursue restraining orders.  The reasons that clients choose not to pursue restraining orders vary, but a common reason is fear of their abuser.

7.    My clients live in real fear of physical abuse, against both themselves and against their children.  When my clients place their initial call to CRLA, they are often on the phone— terrified that they will be overheard—and they often hang up in the middle of the call if someone comes in the room.  Because abusers have been known to dial *69 when they see their girlfriend or wife on the phone, CRLA has had its numbers blocked from caller identification.

8.    We at CRLA try not to underestimate the real danger our domestic violence clients are in.  When I do seek restraining orders, I strongly urge my clients to go to a shelter or a friend's house, somewhere where their abuser cannot easily find them.  The first few days a restraining order is in effect are usually the most dangerous for my clients, but many of my clients are never entirely free of danger.  Sadly, I know first-hand the serious threat that seeking legal recourse can be to my clients.  I have had two cases in which my clients were killed by their abusers after I obtained restraining orders against them.  I also know of a case in which a CRLA attorney sent a client a form she had requested in the mail, and when her abuser saw the form, he beat her severely.

9.    Because I understand the danger they are in, I understand when clients tell me that they do not think they can go through with getting a restraining order.  For this same reason, I tell all my clients that if they decide not to go to court their visit to me will be kept completely

confidential.  Making this promise is absolutely essential:  otherwise, my clients would never seek legal help at all.

### Specific Cases in which CRLA's Clients' Identities Are Confidential

10.    The subpoena issued by LSC's Office of the Inspector General ("OIG") seeks information that I know to be privileged and confidential.  If the Court so directed me, I would be able to provide to the Court *in camera* specific examples of individual, domestic violence clients of mine whose privileged and confidential information is sought by OIG's subpoena.  I have not provided such detail in this declaration, and I would not provide such detail unless directed to do so by the Court *in camera*, out of concern about waiving the very privilege and confidentiality rights I am trying to protect.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of September 2007, at Monterey, California.


_____/s/ Teri Scarlett_____
                    Teri Scarlett