## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>and<br><br>KIRT WEST,<br>INSPECTOR GENERAL OF THE<br>LEGAL SERVICES CORPORATION,<br>3333 K STREET, NW, 3RD FLOOR,<br>WASHINGTON, D.C. 20007<br><br>                Petitioners,<br><br>   v.<br><br>CALIFORNIA RURAL LEGAL<br>ASSISTANCE, INC.,<br>631 HOWARD ST., #300<br>SAN FRANCISCO, CA  94105<br><br><br>                Respondent. | Misc. No. 1:07-MC-00123-EGS |

MARTIN R. GLICK (CA State Bar No. 40187)
BERNARD A. BURK (CA State Bar No. 118083)
bburk@howardrice.com
Howard Rice Nemerovski Canady Falk & Rabkin
A Professional Corporation
Three Embarcadero Center, 7th Floor
San Francisco, California  94111-4024
Telephone:  415/434-1600
Facsimile:  415/217-5910

CHONG S. PARK #463050
cpark@kirkland.com
EDWARD H. MEYERS #973799
emeyers@kirkland.com
SAVERIA B. HARRIS #979410
sharris@kirkland.com
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  202/879-5000
Facsimile:  202/879-5200

## ERRATA TO DECLARATION OF WILLIAM G. HOERGER IN SUPPORT OF OPPOSITION TO PETITION FOR SUMMARY ENFORCEMENT OF ADMINISTRATIVE SUBPOENA DUCES TECUM

PLEASE TAKE NOTICE THAT Respondent California Rural Legal Assistance, Inc's ("CRLA") Opposition To Petition For Summary Enforcement Of Administrative Subpoena Duces Tecum, contains the following inadvertent error:

2) A portion of Exhibit LL to the Declaration of William G. Hoerger In Support of Opposition To Petition For Summary Enforcement Of Administrative Subpoena Duces Tecum, filed with the Court on September 14, 2007, was inadvertently not filed.   The exhibit should contain three parts, LL-1, LL-2 and LL-3.  Only parts LL-1 and LL-2 were filed; part LL-3 was inadvertently not filed.  A true and correct copy of the missing pages of Exhibit LL (i.e. part LL-3) is attached  hereto as Exhibit LL-3.

Dated:  September 17, 2007.

MARTIN R. GLICK (Cal. State Bar No. 40187)
BERNARD A. BURK (Cal. State Bar No. 118083)
HOWARD RICE NEMEROVSKI CANADY FALK &
    RABKIN, A Professional Corporation

By:      /s/ *Bernard A. Burk*
               BERNARD A. BURK

Three Embarcadero Center, 7th Floor
San Francisco, California 94111-4024
Telephone:     415/434-1600
Facsimile:      415/217-5910
Email:         bburk@howardrice.com

CHONG S. PARK #463050
EDWARD H. MEYERS #973799
SAVERIA B. HARRIS #979410
KIRKLAND & ELLIS LLP

By:      /s/ *Chong S. Park*
               CHONG S. PARK

655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:     202/879-5000
Facsimile:      202/879-5200
E-mail: cpark@kirkland.com

*Attorneys For Respondent*

# Exhibit LL-3

    c.    **CRLA Has Not Claimed, Collected Or Retained Attorneys Fees In The *CCCI* Case And Did Not Intend To Allow The Impression That It Requested Attorney Fees; CRLA Has Acted To Correct Any Implication To The Contrary**

It is clear that neither CRLA nor any co-counsel, nor any CRLA clients, either intended or believed that fees were being claimed, collected or retained by or for CRLA, and that CRLA took early and frequent steps to attempt to ensure that the attorneys fees restriction was appropriately and explicitly observed.

Internal correspondence between July 14, 2004 and August 25, 2004 demonstrates that CRLA sought to ensure compliance:

- The exchange commenced on May 3rd & 5th when CRLA DLAT Ilene Jacobs asked about the co-counsel agreement and the draft complaint (OCE letter of 10/19/06, p.4.) CRLA DLAT Cynthia Rice advised the litigation team on July 14th that CRLA had "some boiler plate required by our internal policies and LSC regulations that will need to be included. . . . and sent on July 15th the CRLA standard fees provisions from its form co-counseling agreements.

- Jacobs emailed the team on August 6 notifying them that the new version of the agreement did not yet include CRLA's required language, and inquired again on August 16th about the status of CRLA's language.

- Jacobs was advised on August 19 that the CRLA language was inserted in the agreement and a few changes to accommodate it were made as well.

- All counsel accepted the language on August 20th, and the final version was circulated on August 25th. CRLA immediately executed the co-counseling agreement on August 25, 2004.

The final co-counseling agreement among CRLA, LCCR, Heller Ehrman, Coblentz and Covington & Burling incorporated the several provisions of the CRLA's standard form (above):

- ¶4 of CRLA's standard form is incorporated as the third sentence in paragraph 5 of the agreement.

- ¶5 of CRLA's standard form (*see* above) appears (with non-substantive stylistic edits) as paragraph 12 of the agreement and, indeed, is prefaced by a more informative title, *LSC Limitation on Preparation of Fees Motion.*

The Litigation Assessment Plan submitted for approval on August 16, 2004 similarly confirms that attorneys' fees would not be claimed by CRLA.

The *CCCI* complaint was filed August 18, 2002. It was prepared by pro bono counsel Heller Ehrman, and inadvertently omitted the agreed CRLA qualifying language (*see* above), praying simply in ¶108(v): "Grant the plaintiffs attorneys' fees, costs, and prejudgment interest pursuant to . * * * . and other applicable provisions of law . . ."

EXHIBIT LL-3
Page 60 of 76

We observe that since every *CCCI* plaintiff either formerly or currently represented by CRLA was also represented by LCCR and pro bono co-counsel, all plaintiffs were and are entitled to claim, collect and retain any fees that become available for the work of their non-CRLA counsel.[62]

As noted above, CRLA first became aware of the inadvertent omission of its standard language when the OIG released its interim report, and CRLA has taken appropriate steps to clarify the *CCCI* complaint.  OIG never discussed the issue with CRLA prior to releasing its public Report.

Plaintiffs' Motion For Leave to File Third Amended Complaint was filed October 27, 2006; the accompanying proposed complaint has modified this prayer as follows:

> An award of Plaintiffs' costs and prejudgment interest to all plaintiffs' counsel and an award of plaintiffs' attorneys' fees to Heller Ehrman LLP; Lawyers Committee for Civil Rights; Covington & Burling LLP; and Coblentz, Patch, Duffy & Bass LLP, pursuant to California Gov. Code §§1021.5 and 12989.2, 42 U.S.C. §§1988 and 3613(c)(2) and other applicable provisions of law . . . .  (*The Committee Concerning Community Improvement et al., v. City of Modesto, et al.*, (E.D. Cal., Case No. F-04-6121 AWI DLB, [proposed] Third Amended Complaint (lodged with Plaintiffs' Motion For Leave . . . etc.) (filed Oct. 27, 2006), p.27, & X(v), at p.27.)

### 3.    CRLA Did Not Solicit Clients In *CCCI*.

CRLA's involvement in the Modesto Services case was proper and commendable.  CRLA management acted on behalf of its clients' interests and in accordance with LSC regulations.  The subject matter of the Modesto Services case fits squarely within CRLA's program priorities.  During the preparation of the Modesto Services case, CRLA had eligible clients with interests in the case.  Furthermore, all CRLA's named plaintiffs were eligible for CRLA services and were either properly referred to CRLA, or independently sought our services.

The Modesto Services case concerns what happens in too many jurisdictions in California and throughout the nation:  municipal services are denied or provided unequally to vulnerable families because of their race or national origin.  Pockets of poverty, often unincorporated and annexed around, in which lower income and marginalized neighborhoods are excluded from the provision of basic services such as sewers and proper sanitation, adequate storm drainage, street lights, sidewalks, and sufficient police protection, and left to suffer the consequent health and safety hazards and assault on their dignity.  This does not happen by accident, and its adverse effects are far reaching.  Families trying to make better lives for their children are challenging the deprivation of rights that keeps them in these unseemly conditions, unacceptable in this time and place.

---

[62]Nevertheless, we agree that the prayer could and should more explicitly have provided that fees were not being sought by or for CRLA, as is CRLA's practice and is described in OLA External Opinion # EX-2002-1008.

EXHIBIT LL-3
Page 61 of 76

a.    **From The Beginning, CRLA's Interest In The Modesto Services Case Was Appropriate.**

CRLA's Board, consistent with LSC requirements, adopted priority recommendations for 2003 that included developing a "special project" addressing "*colonia*" poverty.[63]    CRLA therefore undertook a special project, "unequal services/*colonia* poverty," which concluded that communities sharing the characteristics of *colonias* were developing throughout the State and that CRLA's approach to the legal problems confronting *colonia* residents should be expanded beyond the border region.    In authorizing the "unequal services" project, CRLA's Board was complying with the Act's requirement that recipients ". . . adopt procedures for determining . . . priorities for the provision of . . . assistance, taking into account the relative needs of eligible clients . . . including particularly the needs for service on the part of significant segments of the population of eligible clients . . . ." (42 U.S.C. §2996f(a)(2)(c).)    The Board was also complying with its duty to identify pressing legal needs by identifying developments affecting distinct and significant segments of the eligible population (LSC Performance Criteria (April 2006) at p. 10.)    This effort was also appropriate under CRLA's California Equal Access funding to provide services to "marginalized communities."

The *colonia* priority identified by the Board and ratified by a CRLA statewide conference was immediately applicable to the Modesto area.    Earlier that same year, community member and CRLA Board Member Miguel Donoso brought the issue of deprivation of public services to Modesto-area, unincorporated Latino neighborhoods to the attention of CRLA staff.    In mid-2003 Mr. Donoso also sought other counsel and was ultimately referred to Lawyers Committee for Civil Rights of the San Francisco Bay Area ("LCCR") who began fact-finding efforts.    In December 2003, CRLA was approached by LCCR to join efforts regarding the issue of public services for Modesto's poorest communities.    LCCR considered CRLA's involvement important because CRLA's longstanding presence in the community brought local credibility to the project; CRLA was also able to bring Spanish-speaking attorneys and local outreach to the case.    Similarly, CRLA was interested in cooperating with LCCR's efforts because it would undoubtedly impact CRLA clients.    From a resource perspective, it is common—and efficient— for organizations to cooperate in large pieces of litigation.    In addition, collaborating and co-counseling with non-LSC funded counsel, of course, complies with CRLA's obligation to expend 12.5% of our LSC Basic grant in the involvement of private counsel in the provision of legal services. (45 C.F.R. §1614.1(a).)

At an LCCR/CRLA meeting in mid-December 2003, CRLA Modesto Staff Attorney Catherine Hallinan reported to a CRLA DLAT and to LCCR counsel that she was very interested in the Robertson Road issues, which were critical and had been too long ignored.    Hallinan described Robertson Road and another unincorporated area as mostly minority and low-income, and opined that local political powers perceived that annexation services would be drained by the

---

[63]"Colonias" are defined by HUD as "housing settlements that lack potable water supply, adequate sewage systems or decent and sanitary housing" in the U.S.- Mexico border region, defined by HUD as the area within 150 miles of the border.    (*See, e.g.,* U.S. Dept. of Housing and Urban Development, "Colonias Quick Facts," http://www.hud.gov/offices/cpd/community development/programs/colonias/index.cfm.)

EXHIBIT LL-3
Page 62 of 76

needs of those populations. Hallinan also opined that as these areas increased in poverty and minority "diversity," the likelihood that they would receive services would lessen.

On December 15, 2003, Pastor Fernando Cordova, an LSC-eligible client, approached CRLA concerning problems in "No Man's Land," one of Modesto's unincorporated neighborhoods in which his church was located. CRLA, through then-Law Clerk Maria Jaime,[64] assisted Pastor Cordova in drafting a *pro se* letter on behalf of the church's "Community Committee" to Stanislaus County Supervisor Paul Caruso. The letter described problems with street lighting, vandalism, criminal activity, lack of law enforcement in the local park, and sewage and drainage problems. The letter requested advice from Supervisor Caruso, and was "cc'd" to a congressman, a state senator and CRLA.

> **b.** **CRLA's Work Throughout the Modesto Services Case Has Been Entirely Proper Under Both LSC Policies and Professional Standards.**

As previously discussed, Pastor Cordova's concerns were very similar to those expressed, also in December, by Staff Attorney Hallinan with regard to the Robertson Road area, and mirrored those that Miguel Donoso had still earlier expressed about several Modesto neighborhoods, and ultimately brought to LCCR's attention.

Hallinan continued to express her interest in becoming involved, and assured management that there were eligible community members that were interested in being clients. On March 11, 2004, Hallinan repeated to DLAT Jacobs:

> "*I am very interested in working on what is locally referred to as the Robertson Road problem.* Robertson Road is our West side. . . . The primary concern of the residents is that they are not hooked up to the city sewer and have every manner of outdated septic systems, some as rudimentary as 40 gallon drums. Certainly these inadequate septic systems must be leaching into the river which is just a few yards away. During the floods of 1997 these households were severely affected. Among the resulting problems was an abundance of free-cruising raw sewage." (emphasis added) (03/11/04 1:30pm)

Later that same day, Ms. Hallinan added: "Miguel Donoso . . . he is the President of the Community Committee. If he is going to be the LCCR client, does it matter that he is not income eligible for our services? *We have other folks who are interested in being clients if we proceed with this project who do qualify.*" *Id.* at 2:33pm (emphasis added).)

Four weeks later, Hallinan reported that she "was asked by Robertson Rd. folks to become involved . . . this arose out of our attending the community meeting re the housing element . . ." (04/05/04 6:31pm). Given these representations, there was no reason for management to suspect that CRLA did not have eligible clients on this case.

---

[64]Ms. Jaime subsequently became a CRLA Staff Attorney following her admission to the Bar in June 2004.

EXHIBIT LL-3
Page 65 of 76

Regrettably, tensions were already growing between Ms. Hallinan, CRLA's attorney assigned to this project, and LCCR and its pro-bono co-counsel.

### c.     The OIG's Email Evidence Is Innocuous When Placed In Context.

The IG alleges that DLAT Rice's response, regarding wanting to *remain* involved" in the case, is improper. To the contrary, DLAT Rice's email displays a commitment to CRLA clients and routine management of an employee conflict. First, Ms. Rice's comment must be viewed in the context of CRLA's mandated priorities, discussed above. The unincorporated areas in the Modesto Services case exemplified CRLA's *colonia* poverty focus. This was the first *colonia*-related case being investigated and pursued in CRLA's service regions. Moreover, LCCR had reached out to bring CRLA into its project which coincided with CRLA's priority. DLAT Rice's statement that she did not want LCCR "litigating in our service area *on these issues* without our participation" was nothing more than recognition that the CRLA's Board expected CRLA to address *this very issue,* and an attempt to emphasize the importance of this priority over what then appeared to be personal conflicts between CRLA employee Hallinan and LCCR. As noted, Ms. Hallinan had by this time reported twice that she was acting for Robertson Road clients.

On April 14, Catherine Hallinan e-mailed CRLA DLATs Ilene Jacobs and Cynthia Rice concerning conflicts with LCCR. Ms. Hallinan's e-mail was apparently precipitated by an earlier call she received from a member of the co-counseling team advising her that her complaint to a community member that LCCR was not inviting CRLA to community meetings would undermine the work of LCCR. (04/14/04 9:27 am) Ms. Hallinan reacts, "[T]he more I think about all this angrier I get. We haven't even started working on the project yet and there is *already* bs. If this is any indication of what is to come, I frankly am not interested in participating in their project. Unless you instruct me otherwise, I am done with it."

It appeared to Ms. Rice that Ms. Hallinan wanted to discontinue the project because she was personally upset,[65] and not because the case was not in the best interest of CRLA clients. Considering CRLA's priorities and the community interests, Ms. Rice felt it was her duty to guide Ms. Hallinan toward staying on the case. (04/14/04 10:11am) In fact, Ms. Hallinan immediately replied, "Deep breath . . . of course you are right." (04/14/04 10:24 am)[66]

CRLA senior management continued to assume from Ms. Hallinan's communications regarding her contact with the Robertson Road community and the interests of its residents that work on *CCCI* was supported by open intakes for eligible clients. The record reflects Ms. Hallinan first reported to management that she did not have a client in her May 4, 2004 email to DLAT Ilene Jacobs. (05/04/04 4:57 pm) This was of course surprising, since

---

[65]Only later has the nature of Ms. Hallinan's antagonism to this *litigation,* seemingly arising in part from significant personal relationships with individuals associated with the potential defendants—and perhaps amounting to potential conflicts of interest—become apparent.

[66]Ms. Hallinan is almost certainly the person referred to by the Inspector General as the "Confidential Source" or "CS." However, since she has not been officially identified as such, we will distinguish in this report between an account of her role in the *CCCI* and other matters on the one hand and statements attributed to the "CS" on the other. CRLA has not attempted to contact Ms. Hallinan as it does not want any possibility of a claim of interference or harassment to be even remotely conceivable.

EXHIBIT U-3
Page 64 of 76

Ms. Hallinan had to this point repeatedly reported that she had several Robertson Road clients. Upon receiving this information, Ms. Jacobs suggested that Ms. Hallinan look into existing housing element clients. (05/05/04 10:53 am) Two important points must be borne in mind:

*First:* Ms. Jacobs' response was entirely appropriate under LSC's solicitation regulation which defines:

> Unsolicited advice means advice to obtain counsel or take legal action given by a recipient or its employee to an individual who did not seek the advice and *with whom the recipient does not have an attorney-client relationship.* (45 C.F.R. §1638.2(b) (emphasis added))

Contacting an existing client about an issue, particularly one that falls within the client's general area of concern (i.e., adequate housing), is not "unsolicited advice" and does not violate any LSC prohibition. Moreover, California judicial decisions and rules of professional conduct affirmatively obligate an attorney to "keep a client reasonably informed about significant developments relating to the employment or representation . . . ." (Cal. R. Prof. Cond. 3-500; *see also Nichols v. Keller*, 15 Cal. App. 4th 1672 (1993) (an attorney has the duty to alert clients to legal problems and issues that the client might reasonably expect to be advised about); Los Angeles County Bar Association Formal Opinion, Opinion No. 502 (Nov. 4, 1999). Thus, it was not only CRLA's right, but arguably its duty to advise its Modesto clients about the potential Modesto Services litigation to the extent that it might affect them.

*Second*, the work being done in investigating the issue of lack of equal services to housing in Robertson Road and the other unincorporated areas of Modesto and related educational activity was specifically authorized, indeed a required deliverable, under CRLA's HUD Fair Housing grant, and Ms. Jacobs charged her time to that activity and later reminded Ms. Hallinan that the portion of her time spent that related to the housing issues should also be charged to the grant.[67]

Ms. Hallinan replied, stating she had spoken to CRLA/Modesto Community Worker Luis Rivera and "he thinks he might have someone." (5/05/04 10:53am) Unbeknownst to CRLA management, however, Ms. Hallinan apparently had asked Luis to "get a client."[68] As a result, CRLA opened a new file for a client, Rafael Castillo,[69] who, although eligible, had been "solicited" within the meaning of the regulation.[70] Management was unaware of the

---

[67]It is also true that CRLA's pre-filing work (in investigating the Modesto services issues, in providing outreach and community education to the areas under review by both LCCR and CRLA) qualified as a permissible "project" within LSC's framework of legal assistance activities. "Projects" do not require that work be undertaken on behalf of clients. And, as is described in more detail above, identification and assessment of pressing legal needs, outreach and community education, and preparation and capacity-building in anticipation of client arrival are all perfectly permissible activities; indeed, marks of high-quality programs.

[68]Luis Rivera has reported this information during the course of CRLA's internal investigation.

[69]Mr. Castillo, although never named as a plaintiff in the complaint or other public documents, has authorized CRLA to reveal his name.

[70]Indeed, Mr. Castillo had been a former CRLA client on a matter unrelated to housing conditions or other

(continued . . .)

EXHIBIT LL-3
Page 65 of 76

inappropriate solicitation of Mr. Castillo.   Unequivocally, Ms. Hallinan was not directed by CRLA management to improperly solicit this or any other client. On June 9, 2006, Ms. Hallinan wrote to Ms. Jacobs informing her of the name and number of the client. Ms. Hallinan "billed" 30.75 hours between June 9, 2004 and August 5, 2006, to this client.[71]  Most of this relatively small number of hours (22.5) was billed to work on the FHIP grant, an entirely proper allocation, and only 8.25 to LSC. As already noted, Ms. Jacobs reported all her time properly to work under the HUD grant.

Ms. Hallinan's interest in representing the Robertson Road community apparently led her to examine whether a CRLA client lived in the Robertson Road area that might be affected by the Modesto Services case. She wrote to Ms. Jacobs, "we in Modesto are trying to identify *a client in our pool* who will meet our needs and the needs of the litigation. . . . We have clients who meet the qualifications but live in pockets other than Robertson Rd." (emphasis added). (07/16/04 3:51)[72]  Ms. Jacobs reasonably understood that Ms. Hallinan was again referring to existing clients "in our pool" who lived in Robertson Road, as Ms. Hallinan had twice before reported she had.

During August 2004, several CRLA-eligible individuals interested in the Municipal Services case contacted CRLA.   On August 2nd Pastor Cordova reported that his church committee supported his participation in the litigation.[73]  (08/02/04 8:45pm.) On August 5th, Hallinan directed CRLA support staff Cecilia Flores to complete an intake for Florinda Laureano, an LCCR client who was financially eligible to also be represented under LSC guidelines. No hours were ever logged to work for Ms. Laureano, however, and although she did complete an intake with CRLA she did not sign a retainer. Her case was closed on September 1, 2004.[74]

On August 6, CRLA employee Cecilia Flores prepared an intake for Alfonso Rivera, and advised Hallinan that Mr. Rivera was eligible and interested in the case: "He states on his intake that he is interested in getting the area of Robertson Rd. fixed, wants sidewalks and lights and

---

( . . . continued)
issues pertinent to *CCCI*, whose file had been closed for some time.

[71] Ms. Hallinan later closed Mr. Castillo's file prior to the *CCCI* litigation's being filed. She says she did so because litigation counsel determined based on litigation strategy that he was not appropriate as a plaintiff. That would not be a reason to discontinue representation to him but her case notes say she nevertheless called the client to tell him his file was closed. At the time Ms. Hallinan closed Mr. Castillo's file, management was still unaware of the inappropriate solicitation. And on August 3, Ms. Hallinan sent an email stating again that "we do not now have a client" but we are doing a "workup" for the Reverend (who was existing client Pastor Cordova).

[72] Ms. Hallinan's expressed interest in the Robertson Road situation, however, turned out to not be consistent with her involvement in litigation against the defendant City. Unbeknown to senior management, Hallinan was then characterizing the LCCR efforts to prepare litigation to Modesto staff as "too controversial" and "too in your face."

[73] On July 15th, Maria Jaime had brought former CRLA client Pastor Cordova's interest in the Modesto services issues and his eligibility to Hallinan's attention—and Hallinan contacted him. (07/15/04 6:24pm) His file had already been opened several months earlier.

[74] Ms. Laureano was identified to CRLA as a "client" for "joint retention" by a private bar member and she was interviewed in CRLA's offices by that bar member and a CRLA community worker/interpreter on August 5, 2005. This, of course, is not solicitation.

more police patrol in the area. . . . This gentleman qualifies for our services and is a current client." (08/06/04 5:21pm) Mr. Rivera had overheard a general discussion about what became the *CCCI* case at a family dinner, and decided he wanted to be involved in it. He went to CRLA's offices seeking, on his own, to be represented. He was not solicited in any way.

On August 12, 2006, Ena Lopez was referred to CRLA by Pastor Cordova and became the *fourth* unsolicited eligible CRLA client interested in the Modesto Services case.

At this point CRLA management was fully satisfied that CRLA client interests were being properly represented in the Modesto Services case.[75] Then at about 9:00 p.m. on August 16, two days prior to the anticipated filing date, Ms. Hallinan sent an email to Ms. Jacobs and Ms. Rice, stating, "At this point only ONE of the plaintiffs is qualified for our services . . . Florinda Laureano." That was, to say the least, unexpected news. Indeed, Ms. Jacobs had, on August 10th, briefed another CRLA DLAT on the matter, stating that "Cathy has good plaintiffs who have worked in the community, or lived in the underserved areas and are affected enough I think to satisfy article III injury" (referencing federal standing requirements). (08/10/04 6:10pm) In response, Ms. Jacobs wrote on August 17th, "I am concerned that we did not learn about this problem until the last moment and that the client statements and retainers were not done." (8/17/04 4:57pm)

Ms. Hallinan's unexpected warning about the client-eligible plaintiff situation was erroneous. Ms. Hallinan had also decided to review Mr. Rivera's eligibility, and thus she was apparently discounting him.[76] But Ms. Hallinan somehow completely overlooked the other client, Ena Lopez. Emails flew back and forth at that point as both Ms. Jacobs and Ms. Rice are (1) incredulous that this critical last minute analysis of clients previously reported as eligible is going on, (2) deeply concerned that all rules are met, and (3) not trusting the accuracy of reports sent by Ms. Hallinan whose antipathy to the case is by this time very pronounced.

It appeared that Ms. Hallinan's resistance to the Modesto Services case may have, at least in part, stemmed from a personal conflict. Through the course of the litigation, Ms. Hallinan gradually distanced herself from the case and focused on other matters. After the earlier falling out between Ms. Hallinan and LCCR, co-counsel reported that they increasingly found Ms. Hallinan to be less attentive or responsive to the case. More importantly, Ms. Hallinan let it be known that she was being pressured by others not to pursue the case. On several occasions Ms. Hallinan told co-counsel and CRLA management that she knew the city officials who would be accused of discrimination and considered them good people; that she believed the city officials would never intentionally deprive these communities of services; and she was not satisfied with the realities of de facto segregation.

The morning of the day preceding filing, Ms. Hallinan reportedly called a city counsel member and advised him that the litigation would be filed the next day and that she had "had

---

[75]That, however, did not mean that every CRLA *client* interested in the litigation would be a named *plaintiff* in the case. For strategic reasons, ultimately only clients that represented certain demographics were chosen to be named plaintiffs.

[76]On the eve of filing, Hallinan concluded that Rivera was in fact eligible for CRLA services.

EXHIBIT LL-3
Page 61 of 76

nothing to do with it." If this indeed happened, it would be a breach of her professional duties of confidentiality and loyalty.

Perhaps Ms. Hallinan should have removed herself from the case earlier. Her last minute emails regarding clients were entirely inaccurate. In addition to Pastor Cordova (who ultimately was rejected as a plaintiff for reasons of standing),[77] there were two other eligible CRLA clients who were proper plaintiffs—Alfonso Rivera and Ena Lopez. The August 6, 2004, intake showed Mr. Rivera's reported income within eligibility parameters.[78] (08/17/04 8:11pm) In addition, her announcement to CRLA management about the lack of eligible client-plaintiffs completely overlooked the other CRLA client, plaintiff Ena Lopez.

Ms. Hallinan's dislike for the Modesto Services case ultimately drove her to demand that she be taken off the case. On August 23, 2004, Michelle Morrow, then the Modesto office's Directing Attorney, wrote to DLAT Jacobs informing her that Ms. Hallinan planned to quit CRLA if she had to be named counsel in the newly filed Municipal Services case. Morrow explained, "many of us feel locally that case has a bad flavor and the remedies should have been sought administratively before a complaint was filed." (08/23/04 3:18pm). CRLA then took Ms. Hallinan off the Municipal Services case.

Plaintiffs represented by CRLA as of September 2004[79] were all eligible clients and were either properly referred or independently sought assistance. First, Alfonso Rivera came to CRLA's office on August 6, 2004 and was determined to be eligible. (It was Mr. Rivera whose home Ms. Hallinan visited on the evening of August 17, 2004, and confirmed that he was eligible at that time. (08/17/04 8:11pm)) Mr. Rivera was not solicited. Second, Ena Lopez came to CRLA on August 12, 2004, after referral by Pastor Cordova. She qualified for CRLA services and she was not solicited. Ms. Lopez stated in her retainer that she sought to improve her neighborhood; she also commented that she had spent nearly her entire life living, and raising her children, in a neighborhood "regarded as 'no man's land.'" CRLA acted in accordance with all rules and regulations except as to the unauthorized solicitation by Ms. Hallinan of Rafael Castillo reported above.

---

[77]While Pastor Cordova's church was in one of the impacted areas, his personal residence was not. Although Ms. Hallinan appeared to believe that his church location provided him standing, there was a general consensus among co-counsel that he did not have standing to be a named plaintiff.

[78]As noted above, Hallinan's redetermination concluded that Rivera was in fact eligible for services. It should be noted that it is highly unusual for attorneys to re-interview clients regarding income after receiving a completed intake form. It is of course proper if there is reason to doubt the information provided, but of course this is to be pursued before the last moment.

[79]Due to an administrative oversight, the original complaint did not show CRLA as representing Ena Lopez and Alfonso Rivera. However, both plaintiffs were in fact CRLA clients before the complaint was filed on August 18, 2004. In September 2004, the plaintiffs filed a Request for Judicial Notice in Support of Opposition to Defendants' Motion to Dismiss and those pleadings and all subsequent ones show that CRLA appears for Ms. Lopez and Mr. Rivera.

**B.    CRLA Did Not Solicit Clients In The *McBride* Case Or Work Inappropriately In The Case Without A Client.**

CRLA represented Belia Leal, through and by her mother and guardian ad litem Elicia Leal (the "Leals"), in a case styled *McBride v. Modesto City Schools* filed on June 8, 2005. As set forth below, there was no solicitation of the Leals to participate in the case.

The Board of Education of the Modesto City Schools adopted as policy a mandated "Constitution Test" that students had to pass to participate in graduation ceremonies from the 8th grade in schools in the District. The test, which was unique to the District and corresponded to no State or Federal education requirement, allowed no accommodation for learning-disabled or other handicapped students to complete the test even though they were afforded that time on all other course work in the curriculum. This was true even for students who had demonstrated their civics proficiency by receiving A's and B's in social studies classes. Because of the policy, a large group of special education program and limited-English speaking children who had met all criteria to advance to the ninth grade (and indeed were promoted to that grade by the Modesto school system) were not going to be allowed to graduate, *i.e.*, participate with their classmates and parents in graduation ceremonies or receive their Certificate of Completion (*i.e.*, diploma). A group of the parents had petitioned the school board to reconsider and a meeting of the Board was held on May 31, 2005. The Board voted to maintain its policy.

At that point the affected children and parents sought legal help. A Modesto attorney in private practice, contacted by a member or members of the group, was familiar with and referred the member or members to the Oakland office of an organization called Protection and Advocacy, Inc. ("P&A"), a nonprofit disability rights advocacy group. P&A had no office in Modesto and indeed the firm typically secures relief for its target group by co-counseling with legal services organizations in the affected area. The same private attorney, also familiar with CRLA by having previously worked there, referred the Leals to CRLA. An attorney for P&A named Steven Rosenbaum contacted CRLA attorney Jack Daniel, who was the head of CRLA's statewide Education Task Force, asking for assistance. The contact by Mr. Rosenbaum appears to have occurred on Thursday, June 2, 2005. The Leals followed up on their separate referral to CRLA and, on June 6, 2005, they were interviewed by CRLA community worker Ignacio Musino who completed the appropriate forms and opened the case. Belia Leal was an eighth grader at the Hanshaw Middle School receiving special education services under the Individuals with Disabilities Education act and Section 504 of the Rehabilitation Act of 1973. She wanted and needed the extra time she was usually given to take and complete the test, and most certainly wanted to graduate with her class and receive her diploma. Her mother also sought that relief.[80]

The case faced severe time constraints, as the graduation was to go forward without the plaintiffs on June 10 and without an order from a court it would be too late thereafter to do anything for those excluded from the event. Mr. Daniel worked to get the required co-counseling agreement in place and to submit the required approvals to CRLA management to get approval to file the case on the assumption that the Leals would indeed qualify for the

---

[80]Apparently on June 3 a list of names was sent by Mr. Rosenbaum to Mr. Daniel, but the Leal family was not on that list and none of the individuals on that list became CRLA clients.

EXHIBIT LL-3
Page 69 of 76

services they sought. According to the intake, Mr. Leal was a part-time construction worker who had an over income month at the time of his interview but would be qualified based on his annual income. Such applicants may be qualified for legal services if the program director issues a waiver based on such circumstances. That waiver was requested, the appropriate justification was provided, and it was granted. Consequently Ms. Elicia Leal (the student's mother and guardian ad litem) executed a completed intake form on Tuesday, June 7.

The hearing on the request for a restraining order was held on June 8. The Judge declined to give the relief sought, and the children were not permitted to graduate. The only time logged to the Elicia Leal file was 22.25 hours spent by Modesto attorneys Michelle Gomez and Rick Cardozo from June 6 to June 10. All of that work was proper and appropriate.[81]

Regrettably, however, there is more to this story that CRLA continues to investigate. On March 8, 2006 a representative of the OIG interviewed staff in Modesto and indicated that OIG was looking into the case against the Modesto School Board. In response, on March 10 CRLA management requested from the field copies of the case file, including intakes, pleadings, and other relevant forms and information.[82] On the 13th of March, CRLA received from a CRLA employee certain information and documents, including what appeared to be a client intake form for Belia Leal dated May 16, 2005 that employee had completed. Later, in response to a document request from the OIG, CRLA provided both the Belia Leal intake form just described and the above-referenced intake form for Elicia Leal, maintained as appropriate at the Modesto office, as well as time records that showed some 44 hours worked on the case during May.

On October 19, 2006, CRLA received from LSC's Office of Compliance and Enforcement a letter asking questions about the *McBride* case and including various evidence provided to LSC by OIG. Based on that information, CRLA management has reviewed the relevant documents and has found no evidence that anyone at CRLA had heard of or worked on the case before June 1, 2005. We have also discovered that the document that purports to be Belia Leal's May 16, 2005 intake was not entered into CRLA's electronic records system until a few hours after the request for records on March 10, 2006, and that all of the hours recorded on the Belia Leal file were entered into the time system on or after that date. Based on these findings, CRLA placed a call to Ms. Leal to request an interview. She firmly declined, stating that the graduation had come and gone, that they did not get to participate, that it was behind them, and that they would have nothing more to say about it.

Thereafter, CRLA informed the employee who had supplied the Belia Leal records of the right to obtain counsel, and that there were questions management wished to ask regarding these events. The employee has obtained counsel and did consent to an interview, which was conducted by CRLA Executive Director Jose Padilla and CRLA Board Member Jack Revvill on Sunday, November 5. At this time CRLA questions whether the previously submitted intake

---

[81]*See also* the discussion above concerning co-counseling and private attorney involvement ("PAI") requirements.

[82]The case was erroneously referred to as *Gomez v. Modesto Schools* instead of *McBride v. Modesto City Schools*.

EXHIBIT LL-3
Page 70 of 76

form under the name Belia Leal and the related recorded hours are genuine. That is disputed. A separate sealed report of the personnel matter is being provided to LSC, with a copy to OIG.

## VI.   THE OIG REPORT CONTAINS ADDITIONAL ALLEGATIONS THAT NOT ONLY LACK MERIT, BUT REFLECT THE OIG'S OWN POLITICAL AGENDA.

In addition to the claims outlined above, the OIG report contains miscellaneous other accusations against CRLA and its staff. These allegations are based on scattered web postings, anecdotal accounts and unidentified "witnesses." One thing binds them together, however: they are all devoid of merit. Indeed, the inaccuracies of these allegations, and the OIG's willingness to accept them at face value without any deeper scrutiny, reveals the extent to which the Inspector General appears bent on dismantling CRLA. And it underlines the reason for his steadfast refusal to provide CRLA with the allegations against it and afford it an opportunity to rebut them *before* disseminating his blunderbuss attack to Congress and the national and California media. The IG didn't want to ask because learning the truth might force him to drastically reduce or abandon the attack he had already decided to make.

CRLA does not take lightly its conclusion that the LSC OIG has formed and is executing an agenda at odds with its purposes. OIG fills a very important role in our government, and it appropriately has oversight responsibilities over the Legal Services Corporation and its grantees. The public and those the IG regulates have every reason to expect that OIG's mission will be handled in a scrupulously fair and open manner. Reliance on reports from a disgruntled former employee who has improperly taken confidential attorney work product and selected emails from her former employer should have been reviewed with great caution. And basic and elemental justice demands that the accused, CRLA in this case, and the Corporation itself in other recent OIG campaigns, be given the right to knowledge of the charges and opportunity to respond *before* conclusions are reached.

But the Inspector General has decided to adopt the Queen of Hearts' decree of "sentence first—verdict afterwards" and appears bent on making a political and media splash, not on the neutral fact-finding that is his proper role. It is this that accounts for his unprecedented and, we submit, indefensible decision to issue an official report to Congress (and to the media) *prior* to taking the trouble even to inform CRLA of the nature of his investigation, let alone afford notice of the charges he was advancing or an opportunity to be heard. This is just what it seems: biased and untrustworthy.

### A.   As Noted By LSC's Office Of Compliance And Enforcement, The Allegations Of Improper Political Activities By CRLA Staff-Members Are Unfounded.

Anyone seeking proof that the OIG is politically motivated in its criticisms of CRLA need look no further than that section entitled "CRLA Officials Associate The Grantee With Political Activities." (OIG Report at p.20.) There, the OIG report claims to have found "two instances in which CRLA senior staff appears [sic] to be engaged in prohibited political activities." (*Id.*) The

EXHIBIT LL-3
Page 71 of 76

Report asserts that in both instances, CRLA staff-members had "intentionally identif[ied]" CRLA with a partisan campaign in violation of 45 C.F.R. §1608.4(a).[83]

In one instance, the OIG accuses CRLA Executive Director Jose Padilla of improperly endorsing a website called "World Can't Wait: Drive Out the Bush Regime." (OIG Report at p.20.) Mr. Padilla's name appears on that website (along with hundreds of other people) in the following form: "Jose Padilla, exec. Dir., CA Rural Legal Assistance*." The asterisk refers to a notation on the bottom of the webpage which states: "*Affiliation for identification purposes only."

In the other instance, the OIG accuses CRLA DLAT Ilene Jacobs of improperly co-hosting a fundraiser for 2004 Presidential Candidate John Kerry. The report contends that DLAT Jacobs "inappropriately identified" herself as a CRLA employee. That assertion is apparently based on a webpage which referred to "Ilene Jacobs, of CRLA, [a] California fair housing lawyer[]."[84] Nowhere on that webpage does it spell out what "CRLA" refers to.

The Director of the LSC's Office of Compliance and Enforcement flatly dismissed both of these allegations in his October 19, 2006, letter ("the OCE letter").[85] The OCE letter noted that the term "intentionally identify" as used in 45 C.F.R. §1608.4(a) does not include "'the listing of title and affiliation of current employment on campaign literature for informational purposes.'" (*See* OCE Letter at 14 (quoting from the Office of Legal Affairs Opinion IN-2002-2001).) In both instances, the OCE letter found that the identification of CRLA staff members with CRLA itself was for informational purposes only. Indeed, with respect to Mr. Padilla's endorsement, the OCE letter points out what should have been apparent to the OIG, namely, that the website specifically cautioned that the reference to CRLA was an "[a]ffiliation for identification purposes only." The OCE letter concluded with the following sentence: "*Therefore, while we concur with the OIG that the evidence is what it says it is, we believe it [the OIG] has not applied the law correctly.*" (OCE Letter at 14 (emphasis added).)

**B.    The Trip To Mexico To Conduct Training At The Invitation And Expense Of The Michoacan State Government Was Completely Proper.**

The OIG Report contains a number of other allegations, most of which are based on statements made by its Confidential Source. One such allegation, referenced on page two of the OIG report, is that CRLA staff violated LSC restrictions by, among other things, "travel[ing] to Mexico for the purpose of providing training." The implication, of course, is that CRLA staff went out of its way to assist Mexican workers or, worse yet, improperly used LSC funds to undertake this travel to assist foreign residents.

---

[83] *See* 45 C.F.R. §1608.4(a) ("No employee shall intentionally identify the Corporation or a recipient with any partisan [sic] or nonpartisan political activity, or with the campaign of any candidate for public or party office").

[84] For a complete image of this webpage, please refer to the OCE's October 19, 2006, letter to Jose Padilla. (*See* Letter from Danilo A. Cardona, Direct, Office of Compliance and Enforcement, to Jose Padilla, Executive Director of CRLA (Oct. 19, 2006) at p.14.)

[85] *See* Letter from Danilo A. Cardona, Direct, Office of Compliance and Enforcement, to Jose Padilla, Executive Director of CRLA (Oct. 19, 2006) at 12-14.

EXHIBIT LL-3
Page 72 of 76



Nothing could be further from the truth. In 2003, representatives of the Michoacan state government requested CRLA to provide, *at the expense of the Michoacan state government*, training to their staff regarding employment, housing, health laws applicable to immigrants within the United States. CRLA staff provided that training in March 2005, in Morelia, the capital city. The State of Michoacan paid CRLA travel, lodging and meal expenses. *No staff time* was charged to LSC.

As with so many other groundless and unnecessary charges in the OIG's Report, this one could have been resolved with a single simple telephone call to CRLA.

C.    **There is No Basis For The OIG's Claims That The Modesto Office Of CRLA Has Ignored Service Work Because of Concentration On Cases With Broader Impact.**

The OIG Report contains numerous anecdotes that are intended to illustrate how CRLA is engaging in "impact work"—especially impact work on behalf of Latinos—that distracts it from other needs. All of these instances are based on statements made by OIG's Confidential Source or one other unidentified witness.

Had the IG bothered to look or inquire, even a cursory review of relevant records would have revealed that the Modesto office closes *more* service cases than any other CRLA office. According to CRLA data for the period of January 1, 2003 through October 31, 2005,[86] the Modesto office had 8,919 client records open during that period. Of these, 6,262 were "cases" that were closed during that same period.[87] Of the 6,262 cases closed, 4,543 files were closed following consultation and advice, and 1,154 files were closed after brief service other than consultation and advice; this amounts to over 90% of the files closed in that period.[88] Of necessity, these are all service cases. The allegation that basic services work in the Modesto office suffers due to time spent on impact work is simply inaccurate. The Modesto office is extraordinarily busy and focuses on service cases. Moreover, each year the Modesto office advances its goals by providing direct services to thousands of clients.

Staff feedback and local advisory committee reports, made prior to the OIG investigation and unmotivated by any accusations or defenses, show that the Modesto office is replete with service cases. A Priorities Meeting summary in January 2005 states, *"because of our volume of intakes in Modesto, clerical tasks and support often fall behind . . ."* (Priorities Meeting Summary, Modesto Office, January 26, 2005, preface (emphasis added).) In addition, the Modesto office has been described as *"a small staff overburdened with service cases."* *Id.*

---

[86] This is the period for which the IG has requested the records of 39,000 CRLA cases.

[87] The number of files closed during a period is the most indicative of how many clients were directly served. Of the client records that were not closed during this period, 1,163 cases remained open, and 1,458 were coded as "matters" rather than "cases."

[88] In addition, 371 cases were closed upon clients' withdrawing; 99 after external referral; 26 following negotiated settlements without litigation; 24 following negotiated settlement with litigation; 18 following court decisions; 13 following administrative agency decisions; 8 based on insufficient merit; and, 6 based on a change in eligibility.

66

EXHIBIT LL-3
Page 73 of 76

In short, contrary to the Confidential Source's allegation, the Modesto office focuses on service cases. CRLA's Case Handling Manuel reports that Modesto works in "all areas of education, but with a *service focus . . .*"; Modesto handles "*significant labor service cases involving wage claims, wrongful terminations, job discrimination, field sanitation and other work condition problems*"; Modesto provides landlord tenant defense and weekly tenant education clinics; and Modesto provides legal assistance to Seniors through an Area Agency on Aging grant which requires that the office directly serve 800 seniors annually and expend 2000 hours of service to that community. (Case Handling Manual, Exhibit IV.B.(1), at pp.3-15.)

The OIG's Confidential Source also made claims about two or three specific clients allegedly not served and, once again without checking, the OIG seems to have adopted the allegations wholesale. The specific claims are as off the mark as the overall conclusion the OIG is trying to support.

1.    The "Greek Woman."

In a lengthy footnote, the OIG report makes reference to an case involving "a Greek client" that it contends shows "how time spent on impact work affects the critical needs of individual clients." (OIG Report at p.9, n.17.) According to the CS, this client came to the Modesto office to seek help for a housing situation and found no one there to assist her. She had to file her own suit. (*See* OIG Report at p. 9, n.17.)

This narrative has no basis in fact. The truth of the matter is that the Catherine Hallinan was the person responsible for this client and that she did in fact open a case for her. Ms. Hallinan signed a "brief-service agreement" that would enable her to prepare documents for the client's upcoming civil trial. The case was eventually discussed during office case review. Upon closing, CRLA determined that the client had failed to provide a copy of her alien documentation, and the file was closed as a "matter." Staff members in the Modesto staff don't recall any restriction placed on level of services arising from either pressure to do impact work or the client's ethnicity. The accusation is simply wrong, and undermines the credibility of the source.

2.    The Client With The Swastika.

The OIG report contains other allegations of how the press of "impact work" allegedly caused CRLA to lose focus. According to the OIG's Confidential Source, on one occasion a woman "wearing a swastika" around her neck came into the Modesto office seeking help in fighting a wrongful eviction case. (*See* OIG Report at p.9 n.17.) According to the CS, some of CRLA staff were "repulsed" by the woman's necklace and refused to assist her. She was eventually given "cursory assistance" and had to represent herself at trial. The CS claims that, after losing her home, this client returned to CRLA to again obtain assistance but, due to the press of "impact work," the office was unable to offer any real assistance. (*See* OIG Report at p.9 n.17.)

Again, the OIG has misreported what actually took place. According to the CRLA file, this client was not denied any services, but rather the case handler originally assigned to the case decided not to make a formal appearance for her. Staff in the Modesto office don't recall placing

EXHIBIT 4-3
Page 14 of 16

any restrictions on the level of services because of pressure to do impact work or the client's political beliefs.

The client did return later with a separate but related issue. She was re-screened, found to be eligible and *provided extensive service*, including court appearances and settlement negotiations (by a highly experienced attorney). The CS's accusation is again simply wrong and further undermines the credibility of the source.

### 3.    The Ceres Police Sweeps.

The OIG report makes reference to another "illustrative case" involving the Ceres Police Department that supposedly demonstrates how CRLA's focus on "impact work" has caused it to run afoul of LSC regulations. (*See* OIG Report at pp.7-8, n.15.) The facts of this case are far different than the OIG reports.

Following the police raid, LSC-qualified residents of the Ceres farm labor housing complex sought assistance concerning individual incidents of harassment by police as well as what manifested itself as a campaign of harassment directed at residents in general. CRLA staff members then provided advice and counsel and other brief services.

Immediately following the initial police sweep of the complex, residents also contacted a staff attorney in Modesto, who initially provided assistance and referrals on her own personal, non-CRLA time. Following consultation with the CRLA attorney in charge of CRLA's Civil Rights Task Force about the appropriate extent of CRLA services, a resident was then screened and determined to be LSC-eligible on January 31, 2005. (File No. 38041740.) CRLA subsequently opened files for two CRLA employees, Ignacio Musino and Cecilia Flores, and their respective spouses, all of whom were screened and determined to be LSC-eligible. (Though the OIG report criticizes the representation of these persons, there is no LSC rule that restricts representation of otherwise-eligible employees, and the OIG does not contend otherwise.) Following CRLA's initial investigation, which included attending community meetings called by the complex residents, CRLA, consistent with its professional responsibilities to its clients, prepared tort claims pursuant to California Government Code Sections 905 *et seq.*, and referred the case to private counsel and the American Civil Liberties Union, who have both the expertise and the resources to handle the multiple claims. CRLA did not provide extended representation to any of the individuals that filed claims. Again, nothing inappropriate occurred.

### 4.    The Mobile Home Park.

In another lengthy footnote, the OIG report recites an instance involving substandard mobile home parks in Modesto. (*See* OIG Report at p8 n.15.) According to an unidentified "knowledgeable witness," CRLA management, including DLAT Cynthia Rice, were not interested in taking cases on behalf of senior citizens who lived in certain mobile home parks until they learned that one such park was predominantly Hispanic. According to the informant, the case was kept open at the direction of DLAT Rice using the name of one of the senior citizens so that CRLA could find Hispanic clients. The source went on to allege that a staff attorney was looking for co-counsel to represent plaintiffs who were ineligible for CRLA services.

EXHIBIT LL-3
Page 75 of 76

CRLA has been unable to identify a case or client that fits the description provided by this "knowledgeable witness." DLAT Rice unequivocally denies directing anyone on the Modesto staff to keep a case open in order to find Hispanic clients.

CRLA is required to carefully scrutinize clients in housing cases. The housing grant that CRLA receives from the Dept. of Housing and Urban Development mandates that additional screening be undertaken whenever issues of housing discrimination on the basis of race, ethnicity, gender, religion or other protected status appear. Additionally, there can be many legitimate reasons for keeping a file open under the name of one plaintiff. Under CRLA's master file system, time and activities for multiple clients involved in a single matter may be reported under one "master" file. During the course of the normal, periodic case review undertaken by a DLAT with local staff, a question could have been raised about how to report time on a multiple-client case resulting in a direction to staff to "charge" or report the time under the file of the primary client in the case. Finally, there is absolutely nothing wrong with referring clients who may be ineligible for CRLA services to other attorneys. (*See* 45 C.F.R. §1626.3 ("legal assistance does not include normal intake and referral services").)

## CONCLUSION

CRLA regrets the necessity of having had to answer the OIG's charges at this length, but whatever savings in time and accuracy might otherwise have been achieved were lost in the Inspector General's unprecedented insistence on total secrecy during his investigation, and his abandonment of the Office's longstanding custom of providing an accused grantee the opportunity to review and comment on any concerns the OIG might be entertaining. We remain available to the Subcommittee, the Office of Compliance and Enforcement, and the Office of the Inspector General to address any of these issues further if necessary.

Dated:     November 8, 2006.                    Respectfully submitted,

CALIFORNIA RURAL LEGAL ASSISTANCE, INC.

By _____

Jose R. Padilla,
Executive Director

EXHIBIT LL-3
Page 76 of 76