IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

and

KIRT WEST,
INSPECTOR GENERAL OF THE
LEGAL SERVICES CORPORATION
3333 K STREET, NW., 3RD FLOOR
WASHINGTON, D.C.  20007

                Petitioners,

v.

CALIFORNIA  RURAL LEGAL
ASSISTANCE, INC.
631 HOWARD STREET, #300
SAN FRANCISCO, CA  91405

                Respondent.

Misc. No. 1:07-MC-00123-EGS

**MOTION OF THE NATIONAL
LEGAL AID AND DEFENDER ASSOCIATION
FOR LEAVE TO FILE BRIEF AMICUS CURIAE
IN SUPPORT OF RESPONDENT CALIFORNIA
RURAL LEGAL ASSISTANCE, INC. AND
ATTORNEY-INTERVENERS**

Before:  The Honorable Emmet G. Sullivan

LINDA E. PERLE (DC Bar No. 180752)
ALAN W. HOUSEMAN (DC Bar No. 264382)
CENTER FOR LAW AND SOCIAL POLICY
1015 15TH Street, NW, Suite 400
Washington, DC  20005
Tel.: 202-906-8001

*Attorneys for Amicus*

JAN M CALL, Esquire
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA  19104

DARREN MAREINISS, Esquire
Dechert LLP
300 West 6th Street
Suite 1850
Austin, TX  78701

*Of Counsel*

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Pursuant to the Minute Order of September 15, 2007, the National Legal Aid and Defender Association respectfully moves this Court for leave to file a brief *amicus curiae* in support of respondent California Rural Legal Assistance, Inc. and Attorney-Interveners in the above-captioned case.  Respondent CRLA and the Attorney-Interveners have consented to the filing of the brief.  Counsel for the Petitioner has declined to provide consent.   However, Counsel did indicate that Petitioner would consider consenting to the filing of an amicus brief if NLADA had submitted the brief to the Department of Justice in advance of the filing deadline.  Because of the short time frame in which the amicus brief had to be prepared, amicus is unable to do so.  In support of this motion, amicus NLADA states as follows:

1.      National Legal Aid and Defender Association ("NLADA"), a non-profit organization incorporated in the District of Columbia, is the largest national organization dedicated to ensuring access to justice for the poor through the nation's civil and criminal legal aid system. Among NLADA's 2000 plus members are those legal aid programs funded by the Legal Services Corporation ("LSC" or "the Corporation"), including Respondent California Rural Legal Assistance, Inc. ("CRLA").  NLADA also has individual members who include low-income clients, LSC program staff attorneys, like the Attorney-Interveners ("Interveners"), and other case handlers.

2.      NLADA has had extensive experience providing technical assistance to recipients of LSC funds that are subject to monitoring for compliance with LSC restrictions and requirements by LSC Management and to audits and investigations by the LSC Office of Inspector General ("OIG") dealing with compliance with LSC restrictions and requirements as well as with

allegations of fraud and abuse.  Since the OIG was established at LSC, NLADA has tracked OIG audits and investigations and has provided assistance to LSC recipients on many issues that have arisen as a result of these and other actions taken by the OIG.

3.      This case raises issues having a profound and direct impact on NLADA and its program and individual client and attorney members.  Those issues are:

a.      The need to protect from disclosure personal and confidential client information.  Enforcement of the OIG's subpoena will undermine the legitimate concerns of NLADA's  client members regarding confidentiality and will substantially undercut the ability of its LSC funded legal aid program members around the country to provide legal representation to vulnerable members of the client community.  Without  assurance that the information they have provided to their attorneys regarding their legal problems as well as their personal lives will be held in confidence and protected from inappropriate disclosure, applicants for service and clients may choose not to divulge information that is critical to the attorney's ability to provide appropriate legal assistance, or they may forego seeking legal assistance altogether.  Disclosure of confidential information may put clients at risk of severe embarrassment, harassment, discrimination, retaliation or even physical harm, and the possibility that these outcomes may possibly transpire is likely to even further deter clients from seeking needed legal assistance.

b.      The need to protect from disclosure attorney work-product information.  The disclosure of the attorney work-product information requested by the OIG will damage the ability of LSC-funded programs to engage in internal strategic discussions and to collaborate with specialized support programs in an effort to provide the highest quality legal services to its clients.

c.      Cost of complying with the OIG subpoena.  The huge costs that appropriate compliance by NLADA member CRLA with the OIG subpoena will entail will waste substantial scarce resources that should be available to provide legal assistance to eligible clients that LSC has funded CRLA to serve and will set a dangerous precedent for requiring such costs of other severely underfunded LSC funded programs around the country.

d.      The inappropriate scope of the OIG investigation.  The OIG is seeking to investigate whether CRLA is engaged in "impact work" and is disproportionately serving Latinos and farm workers.    Impact work is specifically encouraged by LSC and nothing in the LSC Act, appropriation riders or LSC regulations prohibits impact work or systemic advocacy.    There is no objective evidence that CRLA was serving a disproportionate number of Latino and farm worker clients compared to their percentage in the low-income population. Even if it were true that CRLA was serving a disproportionate number of Latino and farm worker clients compared to their percentage in the low-income population, there is no LSC requirement that clients must be served in proportion to their numbers in the overall poor population, and LSC has made it clear that programs should make efforts to serve clients with limited English proficiency and special problems of access.

4.      The *amicus curiae* brief is intended to apprise this Court of the importance of the issues involved in this case apart from the specific interest of the parties and interveners and to provide relevant information and a broader perspective regarding the issues raised in this case. Because of its broad membership and experience, NLADA is able to view the issues in this case with a national perspective and to comment on the impact that the OIG's action with regard to CRLA will potentially have on the LSC-funded legal aid community across the country. Thus, the

*amicus curiae* brief should serve as a useful supplement to the submissions presented by the

parties.

WHEREFORE, the National Legal Aid and Defender Association respectfully requests this

Court to grant its motion for leave to file the attached brief as *amicus curiae.*

Respectfully submitted,


LINDA E. PERLE (DC Bar No. 180752)
Senior Staff Attorney

ALAN  W. HOUSEMAN (DC Bar No. 264382)
Executive Director

*Of Counsel:*

JAN M CALL, Esquire
Dechert LLP                                          By:  /s/ *Linda E. Perle*
Cira Centre                                              ————————————
2929 Arch Street
Philadelphia, PA  19104                      CENTER FOR LAW & SOCIAL POLICY
                                                           1015 15TH Street, NW, Suite 400
DARREN MAREINISS, Esquire            Washington, DC  20011
Dechert LLP                                          Telephone:  202-906-8001
300 West 6th Street                            Facsimile:  202-842-2410
Suite 1850                                              Email:  lperle@clasp.org
Austin, TX  78701
                                                           *Attorneys for Amicus Curiae National Legal Aid*
                                                           *and Defender Association*


Dated:  September 21, 2007

# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

and

KIRT WEST,
INSPECTOR GENERAL OF THE
LEGAL SERVICES CORPORATION
3333 K STREET, NW., 3RD FLOOR
WASHINGTON, D.C.  20007

                         Petitioners,

v.

CALIFORNIA  RURAL LEGAL
ASSISTANCE, INC.
631 HOWARD STREET, #300
SAN FRANCISCO, CA   91405

                        Respondent.

Misc. No. 1:07-MC-00123-EGS

**BRIEF OF AMICI CURIAE NATIONAL LEGAL AID AND DEFENDER ASSOCIATION IN SUPPORT OF RESPONDENT CALIFORNIA RURAL LEGAL ASSISTANCE, INC. AND ATTORNEY INTERVENORS**

Before:  The Honorable Emmet G. Sullivan

LINDA E. PERLE (DC Bar No. 180752)
ALAN W. HOUSEMAN (DC Bar No. 264382)
CENTER FOR LAW AND SOCIAL POLICY
1015 15TH Street, NW, Suite 400
Washington, DC  20005
Tel.: 202-906-8001

*Attorneys for Amicus*

JAN M CALL, Esquire
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA  19104

DARREN MAREINISS, Esquire
Dechert LLP
300 West 6th Street
Suite 1850
Austin, TX  78701

*Of Counsel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………..ii

INTEREST OF THE AMICUS AND SUMMARY OF ARGUMENT……………….....1

ARGUMENT………………………………………………………………………..4

I.    ENFORCEMENT OF THE SUBPOENA HAS THE POTENTIAL TO HARM CLIENTS AND DETER THEM FROM SEEKING LEGAL ASSISTANCE, IMPROPERLY IMPLICATES PRIVACY CONCERNS OF CLIENTS, AND IS CONTRARY TO THE PURPOSES OF THE LSC ACT………………………..4

    A.  Forced Disclosures of Clients' Names, Associated With Problem Codes and Personal Information Has the Potential to Harm Clients and Deter Them From Seeking Legal Counsel…………………………………………………..4

    B.  Disclosure of the Information the OIG Seeks Intrudes Upon the Privacy Rights of Clients…………..………………………………………………9

    C.  Disclosure of the Information the IG Seeks Is Contrary to the Purposes of the LSC Act …………………………………………………………………11

II.    THE SUBPOENA IMPROPERLY SEEKS DOCUMENTS GENERATED BY LSC RECIPIENTS THAT ARE PROTECTED BY FEDERAL AND STATE WORK-PRODUCT DOCTRINES ……………………………………………………13

III.   THE COSTS OF COMPLIANCE WITH THE OIG SUBPOENA ARE UNREASONABLE AND UNDULY BURDENSOME …………………………..17

IV.   THE OIG DOES NOT HAVE STATUTORY AUTHORITY TO INVESTIGATE WHETHER CRLA IS FOCUSING RESOURCES ON IMPACT WORK OR IS SERVING DISPROPORTIONATE NUMBERS OF LATINO OR FARM WORKER CLIENTS………………………………………………………………………23

    A.  The OIG Does Not Have Statutory Authority to Investigate Whether CLRA Is Focusing Resources on "Impact Work" …………………………………..23

        1.  No Part of the LSC Act Prohibits "Impact Work"…………………...24

        2.  Not Only Does the LSC Act Fail to Prohibit "Impact Work," But LSC Actually Encourages Such Work …………………………………26

    B.  The OIG Does Not Have Statutory Authority to Investigate Alleged Overrepresentation of Latinos and Farmworkers…………………………...28

CONCLUSION……………………………………………………………………32

i

# TABLE OF AUTHORITIES

## CASES

*Appeal of FTC Line of Business Report Litigation,*
595 F. 2d 685 (D.C. Cir. 1978)………………………………………….…………19

*Burlington Northern R.R. Co. v. OIG, Railroad Retirement Bd.,*
983 F. 2d 631 (5th Cir. 1993)…………….……………………………..…....17, 23, 24, 26

*Commodity Futures Trading Comm'n v. McGraw-Hill Cos., Inc.,*
___F. Supp. 2d___, 2007 WL 2416109 (D.D.C. Aug. 27, 2007)……………..………18

*Equal Employment Opportunity Comm'n v. A.E. Staley Mfg. Co,*
711 F. 2d 780 (7th Cir. 1983)……………………………………………….…..19 fn. 11

*Equal Employment Opportunity Comm'n v. Citicorp Diners Club,*
985 F. 2d 1036 (10th Cir. 1983)…………………………………………….…..19 fn. 11

*Equal Employment Opportunity Comm'n v. Maryland Cup Corp.,*
785 F. 2d 471 (4th Circ. 1986)…………………………………………….…...18, 19 fn. 11

*Equal Employment Opportunity Comm'n v. Morgan Stanley & Co., Inc.,*
132 F. Supp.2d 146 (S.D.N.Y 2000)………………………………………………..18, 19

*FDIC v. Wentz*, 55 F. 3d 905 (3d Cir. 1995)……………………………………………10

*Federal Trade Comm'n v. Shaffner*, 626 F. 2d 32 (7th Cir. 1980)……………18, 19 fn. 11

*Federal Trade Comm'n v. Texaco*, 555 F. 2d 862 (D.C. Cir. 1977)……………………....18

*United States v. Firestone Tire & Rubber Co.,* 455 F. Supp 1072 (D.D.C 1978)……....18

*United States v. Hunton & Williams*, 952 F. Supp. 842 (D.D.C. 1997)….…..10, 17, 23, 26

*United States v. Legal Services for New York City,* 249 F. 3d 1077 (D.C. Cir. 2001)….16

*United States v. Montgomery County Crisis Center*, 676 F. Supp 98 (D. MD 1987)…..26

*United States v. Morton Salt Co.,* 338 U.S. 632 (1950)………………………………...10

*United States v. Westinghouse Elec. Corp.*, 638 F. 2d 570 (3rd Cir. 1980)…..9, 10, 23, 26

*Whalen v. Roe*, 429 U.S. 589 (1977)……………………………………………………10

# CONSTITUTION

U.S. Const, Am. 4…………………………...…………………………………………9

# STATUTES

Inspector General Act of 1978, 5 U.S.C. App. §§2, 3…………………………………..12

Legal Services Corporation Act, 42 U.S.C §2996 *et seq*…………………………..*passim*

Omnibus Consolidated Rescissions & Appropriations Act of 1996,
    Pub. L. No. 104-134, §509(h), 110 Stat. 1321(1996)………………4 fn. 2, 12 fn. 8, 17

# REGULATIONS

45 CFR §1620…………………………………………………………………………...29

# OTHER AUTHORITIES

ABA Standards for Providers of Civil Legal Services to the Poor (1986)………………5

ABA Standards for the Provision of Civil Legal Aid (2006)………………………*passim*

ABA Model Rules of Professional Conduct…………………………………………..2

*Delivery Systems Study: A Policy Report to Congress and the President
    Of the United States*, Legal Services Corporation (June 1980)………………………28

*Documenting the Justice Gap in America – The Current Unmet Civil Legal Needs of
Low-Income American*, Legal Services Corporation (Sept. 2005)……… 20, 21, 22 fn. 23

H.R Rep. 93-247, 1974 U.S.C.C.A.N. 3872, 3882 (June 4, 1973)………………25 fn. 24

*Legal Needs and Civil Justice, A Survey of Americans, Major Findings
    From the Comprehensive Legal Needs Study*, American Bar
    Association (1994)…………………………………………………...21 fn. 15, 21 fn. 17

Legal Services Corporation Case Service Reporting Handbook (2001),
    Section X: Legal Problem Categories and Codes……………………………………4, 7

Legal Services Corporation Performance Criteria (2007)…………………………*passim*

LSC OIG Website, www.oig.lsc.gov/org/overview.htm...................................................13

LSC Program Letter 04-2 (December 6, 2004)……………………………………………30

*Restrictions by Funders and the Ethical Practice of Law,* Alan W. Houseman,
67 Fordham L. Rev. 2187 (1999)……………………………………………27 fn. 25

*Securing Equal Justice for All: A Brief History of Civil Legal Assistance
in the United States,* Houseman and Perle, Center for Law & Social Policy,
(January 2007)…………………………………………………….………15, fn. 10

*Special Legal Problems and Problems of Access to Legal Services of Veterans,
Migrant and Seasonal Farm Workers, Native Americans, People With Limited
English-Speaking Abilities and Individuals in Sparsely Populated Areas:
A Report to Congress Required by Section 1007(h) of the Legal Services
Corporation Act as Amended,* Legal Services Corporation (1981)……………...29 fn. 27

## INTEREST OF THE AMICUS AND SUMMARY OF ARGUMENT

*Amicus* National Legal Aid and Defender Association ("NLADA"), a non-profit

organization incorporated in the District of Columbia, is the largest national organization

dedicated to ensuring access to justice for the poor through the nation's civil and criminal

legal aid system. Among NLADA's 2000 plus members are those legal aid programs

funded by the Legal Services Corporation ("LSC" or "the Corporation"), including

Respondent California Rural Legal Assistance, Inc. ("CRLA"). NLADA also has

individual members who include low-income clients, LSC program staff attorneys, like

the Attorney Interveners ("Interveners") and other case handlers.

NLADA has had extensive experience providing technical assistance to recipients

of LSC funds that are subject to monitoring for compliance with LSC restrictions and

requirements by LSC Management and to audits and investigations by the LSC Office of

Inspector General ("OIG") dealing with compliance with LSC restrictions and

requirements as well as with allegations of fraud and abuse. Since the OIG was

established at LSC, NLADA has tracked OIG audits and investigations and has provided

assistance to LSC recipients on many issues that have arisen as a result of these and other

actions taken by the OIG.[1]

Working with members of the LSC Board, NLADA helped develop a protocol on

Access to Records that was adopted by LSC Management, although the OIG made it

clear that it would not be subject to the provisions of the protocol. NLADA has also

participated extensively with the American Bar Association (ABA) in the 2006 revision

---

[1] Counsel for NLADA, Linda E. Perle and Alan W. Houseman, have advised NLADA member CRLA on numerous occasions regarding the OIG's investigations of CRLA, but do not represent CRLA in the action by the Department of Justice to enforce the OIG's subopoena.

1

of the Standards for the Provision of Civil Legal Aid, ("the ABA Standards" or "the

Standards") and the most recent revisions to the Model Rules of Professional Conduct

(Ethics 2000), and with the LSC staff and others in the initial development in

1992 and the 2007 revision of the LSC Performance Criteria.

Because of its broad membership and experience, NLADA is able to view the

issues in this case with a national perspective and to comment on the impact that the

OIG's action with regard to CRLA will potentially have on the LSC-funded legal aid

community across the country.

NLADA files this brief *amicus curiae* to support CRLA and the Interveners in

their arguments regarding the need to protect from disclosure attorney work-product

information and personal and confidential client information.  NLADA opposes the

OIG's subpoena on the ground that disclosure of the requested information will damage

the ability of LSC-funded programs to engage in internal strategic discussions and to

collaborate with specialized support programs in an effort to provide the highest quality

legal services to its clients.  In addition, enforcement of the OIG's subpoena will

undermine the legitimate concerns of its client members regarding confidentiality and

will substantially undercut the ability of its LSC funded legal aid program members

around the country to provide legal representation to vulnerable members of the client

community.

NLADA recognizes that the relationship between attorney and client is grounded

in a necessary expectation of confidentiality.  Without  assurance that the information

they have provided to their attorneys regarding their legal problems as well as their

personal lives will be held in confidence and protected from inappropriate disclosure,

clients may choose not to disclose information that is critical to the attorney's ability to

provide appropriate legal assistance, or they may forego seeking legal assistance altogether.  Disclosure of confidential information may put clients at risk of severe embarrassment, harassment, discrimination, retaliation or even physical harm, and the possibility that these outcomes may possibly transpire is likely to even further deter clients from seeking needed legal assistance.

In addition, NLADA urges the court to deny the OIG's petition because the huge costs that appropriate compliance by NLADA member CRLA with the OIG subpoena will entail are unreasonable and unduly burdensome.  These costs will waste substantial resources that should be available to provide legal assistance to eligible clients that LSC has funded CRLA to serve.

NLADA is also concerned that the OIG is seeking to investigate whether CRLA is engaged in "impact" work and is disproportionately serving Latinos and farmworkers. In our view, such an investigation is outside of the scope of the OIG authority.  Impact work is specifically encouraged by LSC and nothing in the LSC Act, appropriation riders or LSC regulations prohibits impact or systemic advocacy.   Even if it were true that CRLA was serving a disproportionate number of Latino and farmworker clients compared to their percentage in the low-income population, there is no LSC requirement that clients must be served in proportion to their numbers in the overall poor population, and LSC has made it clear that programs should make efforts to serve clients with limited English proficiency and special problems of access.

## ARGUMENT

I. **ENFORCEMENT OF THE SUBPOENA HAS THE POTENTIAL TOHARM CLIENTSAND DETER THEM FROM SEEKING LEGAL ASSISTANCE, IMPROPERLY IMPLICATES PRIVACY CONCERNS OF CLIENTS, AND IS CONTRARY TO THE PURPOSES OF THE LSC ACT**

### A. Forced Disclosures of Clients' Names, Associated With Problem Codes and Personal Information, Has the Potential to Harm Clients and Deter Them From Seeking Legal Counsel.

Among other things, the OIG seeks from CRLA the names[2], addresses, telephone numbers and identifying information concerning spouses for every client and applicant who has sought legal assistance from during a three year period. *(See* Declaration of Karen Smith in Support of CRLA's Opposition to Petition for Summary Enforcement of Administrative Subpoena Duces Tecum (Smith Decl.), ¶18). CRLA estimates that this constitutes more than 39,000 records.[3] *(See* Declaration of Karen Smith in Support of CRLA's Opposition to Petition for Summary Enforcement of Administrative Subpoena Duces Tecum (Smith Decl.), ¶16). In addition, the OIG has sought and CRLA has provided, problem codes that identify the subject about which the client sought assistance for each case reported under the LSC Case Service Reporting system[4], as well as

---

[2] Section 509(h) of the LSC Appropriations Act (Omnibus Consolidated Rescissions & Appropriations  Act of 1996, Pub. L. 104-134 (H.R. 3019)), (Apr. 26, 1996).  provides that notwithstanding the rules of professional responsibility, providers are required to make available to LSC and the OIG, as well as certain other monitors and auditors, certain eligibility information and client names, in addition to other kinds of information not at issue here, as long as the information is not protected by the attorney-client privilege.

[3] Although the original document request sought information for a three year period, the Subpoena does not actually indicate the time period for which the information is sought.. According to "The Declaration of William G. Hoerger in Opposition to Petition for Summary Enforcement of Administrative Subpoena Decus Tecum" p. 17 fn 12, this could require information for over 110,000 records.

[4] See LSC CSR Handbook (2001 Edition), Section IX: Legal Problem Categories and Codes, pp 12-16, *available at* http://www.lsc.gov/pdfs/LSCPerformanceCriteria.pdf.

financial and alien eligibility information[5] and numerous other categories of information, which, if associated with the particular client names could reveal confidential and sensitive personal information about the client. (Smith Decl. ¶20)

At the outset, it is important to understand the fundamental importance of confidentiality in civil legal aid practice. The Standards for the Provision of Civil Legal Aid were adopted by the American Bar Association at its 2006 Annual Meeting. The Standards replaced the 1986 version of Standards for Providers of Civil Legal Services to the Poor which had, in turn, replaced several earlier versions that were first adopted in 1961, long before the passage of the LSC Act in 1974. The current version of the Standards as well as earlier versions[6] affirm the crucial values that underline effective legal aid practice and provide guidance to legal aid providers in the work that they do every day on behalf of low-income clients.

The Standards emphasize that both programs and practitioners must protect the information provided by clients from unauthorized disclosure and must abide by the ethical obligations to protect client confidences. Standard 4.3 on Protecting Client Confidences by civil legal aid programs provides that "[c]onsistent with its ethical and legal responsibilities, a provider must protect information relating to representation of a client from unauthorized disclosure." The Commentary to Standard 4.3 makes it clear that:

> The attorney-client relationship depends upon the free and candid flow of information between client and practitioner. This will occur only if clients are certain that the information they provide will be protected from unauthorized disclosure.

---

[5] *Supra*, n. 1.

[6] For example, Standard 1.3 of the 1986 version of the "Standards for Providers of Civil Legal Services to the Poor" provided that "Consistent with ethical and legal responsibilities, a legal services provider and practitioner must preserve information relating to the representation of a client from unauthorized disclosure." The 1986 Commentary to Standard 1.3 contains discussion of these concerns.

While acknowledging that "[t]here can be a tension between the legitimate interests of a funding source to account for the proper expenditures of its funds and the need for providers to protect the confidences and secrets of their clients…[,]" the Commentary makes it clear that providers have an obligation to protect sensitive client information in a manner consistent with the applicable rules of professional responsibility and state and federal law.

Similarly, Standard 7.3 on The Practitioner's Responsibilities to Protect Client Confidences provides that: "A practitioner must not disclose information related to representation of a client except as authorized by the client or by pertinent ethical rules and laws." The Commentary to Standard 7.3 emphasizes that:

> The duty to protect client confidences lies at the heart of effective representation that depends on a high level of trust between practitioner and client. Furthermore, a practitioner cannot effectively represent a client without full knowledge of the facts relevant to the matter, including those that may be detrimental or embarrassing to the client. Candid communication between the practitioner and client about such facts depends on the client being certain that the communication will be kept confidential in keeping with the practitioner's professional responsibilities.

Disclosure of sensitive client information to the OIG will impair the ability of legal services lawyers to provide service of the highest quality as demanded by the LSC Act and the ABA Standards by limiting the information that clients are willing to share with their attorneys for fear that this information will fall into the hands of Congress, other politicians, adverse parties or the media. Even if the OIG were to promise that it would limit access of third parties to client information that it acquires, which the OIG has not proposed to do in this case, neither the OIG nor his employees are subject to the lawyers' ethical obligations of confidentiality to their clients. Also, court ordered

disclosure may undermine future reliance on the promise of confidentiality by legal services clients.

In addition to client names and financial eligibility information, the OIG subpoena asks for a wide variety of personal information about the applicants for service, clients and their families. The OIG also asked for and received in the CRLA response problem codes that are part of the LSC Case Service Reporting (CSR) System and that describe in general terms the legal problem for which the client has sought assistance. In many instances, revealing that a client has sought legal assistance with respect to a particular type of problem will reveal confidential and highly sensitive personal information that can be, at the very least, embarrassing to the client and in more serious situations can be harmful to the client's interests, or can even threaten a client's or his or her family's physical safety.

The OIG's focus on obtaining client names that will be linked to the problem codes for those clients will invade the privacy of many clients and will set a dangerous precedent for clients served nationally by LSC-funded programs. Many of the CSR problem codes are specific enough that revealing the names associated with them will also reveal the clients' motives for seeking legal help. For example, disclosure of the codes for "spouse abuse," "paternity," "divorce/separation/annulment," "neglected/abused/dependent," "mental health" and "job discrimination" will, in each instance, reveal clients' particular motivations for seeking legal assistance and could put the client in a sensitive and often difficult situation. If this Court compels CRLA to disclose the names of clients who have sought help, together with their problem codes, those clients' motivations for seeking legal assistance will be revealed to the OIG and potentially to third parties. Revealing that applicants and clients have sought legal

assistance for legal needs identified by particular problem codes can put their lifes in danger, subject them to harassment, discrimination or retaliation, or cause him or her intense embarrassment, and serves as a disincentive to applicants and clients to share sensitive but important information with their legal aid lawyers or even to seek assistance from legal aid providers in the first instance.  Without frank communication between lawyer and client, legal aid lawyers will be significantly less effective in advancing their clients' interests.

The declarations that accompany the Respondent's and the Interveners' Briefs provide detailed and often chillingly graphic descriptions of the kinds of situations where applicants for service and clients run the risk, at the very least, of severe embarrassment and in more serious situations serious harm to the applicant or client's interests, or even threats to the applicant or client's physical safety or that of his or her family if personal or confidential information that is provided to a legal aid lawyer is disclosed to the OIG. *See* Hoerger Decl ¶¶ 19-32 (farmworker, employment, immigrants, landlord-tenant); Declaration of Teri Scarlett In Support of Attorney-Interveners' Opposition to Petition for Summary Enforcement of Administrative Subpoena, ¶¶ 6-9 (domestic violence); Declaration of Jeannie Barrett In Support of Attorney-Interveners' Opposition to Petition for Summary Enforcement of Administrative Subpoena, ¶¶ 9-17 (employment, disability, juvenile, delinquency, public assistance);  Declaration of Phyllis Katz In Support of Attorney-Interveners' Opposition to Petition for Summary Enforcement of Administrative Subpoena, ¶¶ 7-13 (landlord/tenant, employment,  federal public housing).

While these examples are all taken from CRLA's intake and case records, they represent situations that exist in the experiences of every LSC funded program.

Applicants for service and clients of every legal services program have the same fears of embarrassment, retaliation, harassment, eviction or threats to their or their family's physical safety if sensitive personal and confidential information regarding their legal problems is inappropriately or precipitously disclosed and are often loathe to share this information if they cannot be sure that this information will not be kept confidential.

### B. Disclosure of the information the OIG Seeks Intrude Upon The Privacy Rights of Clients

As the instant case dramatically illustrates, the attempt by an administrative agency to subpoena information concerning private citizens can have serious consequences for those individuals.  As a result, the subpoena power of administrative agencies is limited by both the Fourth Amendment and the other constitutional privacy interests of the people or entities whose information is targeted by the subpoena. Resolution Trust Corp. v. Walde, 18 F.3d 943, 948 (D.C. Cir. 1994); United States v. Westinghouse Elec. Corp., 638 F.2d 570, 576 (3d Cir. 1980).

Both the Respondents and the Interveners address the privacy concerns of applicants for service and clients under California law.  *See* Memorandum of Points and Authorities in Opposition to Petition for Summary Enforcement of Administrative Petition Duces Tecum ("Respondent's Brief") pp. 36-37, and Attorney-Interveners Opposition to Petition for Summary Enforcement of Administrative Subpoena Duces Tecum ("Interveners' Brief"), pp. 16-18.  We incorporate those arguments by reference.

As the OIG concedes, it is to protect privacy interests that the federal courts have held that an administrative subpoena is enforceable only when: "'(1) the subpoena was issued for a lawful purpose within the statutory authority of the agency that issued it; (2) the documents requested are relevant to that purpose; and (3) the subpoena demand is reasonable and not unduly burdensome.'"  Inspector General's Memorandum of Points

and Authorities in Support of Petition for Summary Enforcement of Administrative

Subpoena Duces Tecum ("IG's Brief") at pp. 2 and 8 (quoting United States v. Hunton &

Williams, 952 F. Supp. 842, 848 (D.D.C. 1997)).  These criteria must be met whether the

subpoena was directed against a private individual or against a corporate entity.   United

States v. Morton Salt Co., 338 U.S. 632, 652 (1950).

However, when targeted information concerns a private individual who is not

suspected of any wrongdoing and who has not in any way waived his privacy rights,

special considerations come into play.  Walde, 18 F.3d at 948 ("The Supreme Court

reminds us that 'corporations can claim no equality with individuals in the enjoyment of a

right to privacy.'") (quoting Morton Salt Co., 338 U.S. at 652 ); FDIC v. Wentz, 55 F.3d

905 (3d Cir. 1995) ("When personal documents of individuals, as contrasted with

business records of corporations, are the subject of an administrative subpoena, privacy

concerns must be considered.").  Moreover, in addition to Fourth Amendment privacy

protections, individuals have a constitutionally protected "'interest in avoiding disclosure

of personal matters.'"  Westinghouse Elec. Corp., 638 F.2d at 576 (quoting Whalen v.

Roe, 429 U.S. 589, 599-600 (1977), applying that case to the enforceability of an

administrative subpoena directed to an employer for employee information); FDIC v.

Wentz, 55 F.3d 905 (3d Cir. 1995) (following Westinghouse Elec. Corp.).

Because individuals have a heightened privacy interest, when an agency seeks

personal information, a court must ensure not only that the three criteria identified by the

OIG are met, but also that the subpoena satisfies additional privacy criteria.  Heightened

privacy protection – and the application of the additional criteria to the OIG's subpoena –

are appropriate in this situation because the OIG seeks highly sensitive personal

information about private individuals and their spouses who are not suspected of any

wrongdoing.  Regardless of whether or not the OIG intends to share the information with other third parties or the public, it is the governmental intrusion into individuals' privacy that raises constitutional concerns.  *See* Walde, 18 F.3d at 948 (discussing individuals' privacy concerns in case in which the Resolution Trust Corporation subpoenaed information for its own use during an investigation, without any prospect that the agency would publish that information to the public).

### C.  Disclosure of the Information the OIG Seeks Is Contrary to the Purposes of the LSC Act.

By seeking to compel disclosure of intimate personal client information and disrupting the ability of legal aid attorneys to counsel their clients, the OIG's actions undermine the core values of the Legal Services Corporation Act ("LSC Act")[7], which encourages the provision of legal services to eligible clients by requiring lawyers to adhere to the highest standards of loyalty and confidentiality when providing legal assistance to clients.  By requiring legal aid attorneys to subordinate their duty to their clients to its investigatory interests, the OIG's request for disclosure runs flatly contrary to the principles of the LSC Act.

The LSC Act maps out a framework designed to encourage indigent persons to seek out legal services lawyers to resolve disputes pursuant to the rule of law.  The LSC Act, which became law in the summer of 1974, not long after urban riots had shaken the nation, makes this point explicitly in its "Statement of Findings and Declaration of Purpose," which declares that "for many of our citizens, the availability of legal services has reaffirmed faith in our government of laws."  42 U.S.C. §2996(4). The LSC Act also requires that LSC, which includes the OIG, *see* Inspector General Act of 1978, 5 U.S.C. App. §§ 2, 3, "shall insure the maintenance of the highest quality of service and

---

[7] 42 U.S.C §2996 *et seq.*

professional standards [and] the preservation of the attorney-client relationship." 42 U.S.C. § 2996f(a)(1).

Thus, LSC supported-attorneys "must…have…full freedom to protect the best interest of their clients in keeping with the Code of Professional Responsibility, the Canons of Ethics and the high standards of the legal profession." (*Id*. §2996(6). "The Corporation shall not . . . interfere with any attorney in carrying out his professional responsibilities to his client . . . or abrogate . . . the authority of a state or other jurisdiction to enforce the standards of professional responsibility generally applicable to attorneys in such jurisdiction. The Corporation shall ensure that activities under this subchapter are carried out in a manner consistent with attorneys' professional responsibilities." (*Id*. § 2996(b)(3)).[8] And in a separate section entitled "Attorney-client privilege," the LSC Act states: "Neither the Corporation nor the Comptroller General shall have access to any reports or records subject to the attorney-client privilege." (*Id*. §2996h(d)).

Many of the areas of law in which legal aid attorneys practice are extremely complex and cannot be navigated well by unrepresented litigants, especially those in the low-income community who may be uneducated or have limited English proficiency. This makes it particularly important for legal aid clients to be able to rely on the loyalty of their lawyers. If indigent litigants are unable to turn to LSC-funded attorneys for fear that the attorneys will reveal their personal information and their confidences, they will be left without the tools necessary to exercise their legal rights in these areas.

---

[8] The FY1996 appropriations act stated that, notwithstanding this language, LSC recipients could be required to turn over certain specific types of information to auditors. The specified information included client names but did not include other personal information sought by the OIG including addresses and spouses' names as well as problem codes. This provision of the act also specifically stated that information covered by the attorney-client privilege need not be disclosed. Omnibus Consolidated Rescissions & Appropriations Act of 1996, Pub. L. 104-134 (H.R. 3019), § 509(h) (Apr. 26, 1996). These provisions have been repeated in subsequent appropriations bills.

Amicus NLADA urges the Court to recognize that the attempt of the OIG to require the disclosure of personal client information imperils the ability of LSC to perform one of its most basic and most important functions -- to assure clients and potential clients of the loyalty of their legal aid lawyers.  Part of the OIG's mission is to "to promote efficiency and effectiveness in the activities and operations of LSC and its grantees" See OIG Website, www.oig.lsc.gov/org/overview.htm.  The OIG's efforts should be designed to further, and not impede, the individual client's trust in lawyers. Any effort by the OIG that abandons this goal will discourage individuals from seeking the aid of legal services lawyers, undercut the goals of the LSC Act, and ultimately threaten the primacy of the rule of law.

## II.    THE SUBPOENA IMPROPERLY SEEKS DOCUMENTS GENERATED BY LSC RECIPIENTS THAT ARE PROTECTED BY FEDERAL AND STATE WORK-PRODUCT DOCTRINES

As part of its subpoena, the OIG seeks several categories of documents including: (1)  work plans prepared by CRLA staff in the Modesto office; (2)  training, power point and other written reports, minutes and documents prepared by one of four CRLA internal task forces (Civil Rights, Education, Labor and Housing) that are comprised of CRLA attorneys and community workers who practice in these areas; and (3) case summaries from retainers and engagement letters with the California Affordable Housing Law Project, a legal services project that CRLA co-counsels and consults with in developing housing litigation and pre-litigation advocacy.    Hoerger Decl. ¶¶61-72.  These documents contain information about both litigation and non-litigation strategies.  Similar documents are common in civil legal aid practice throughout the country.

Both large and small legal aid programs often require attorney employees to prepare individual reports for each client or group of clients, laying out the objectives of

the advocacy, information about the case or project, the procedural history of the particular case and the specific actions that the employees will take to further the client's legal rights and interests. Such reports often contain information on litigation and non-litigation strategies that is protected by federal or state work-product law. Written staff reports on ongoing cases and strategies being used or contemplated is a common method by which managers and supervisory staff review the representation provided to clients in order to comply with ABA Standard 6.4 which requires providers to "review representation provided to clients to assure that they receive high quality assistance" and with Criterion 1 of Performance Area Three of the LSC Performance Criteria[9] which requires "(s)ystems for ongoing evaluation of the effectiveness of legal work" and "[e]ffective supervision of legal work, which includes regular and detailed supervisory review of cases."

In addition, many programs maintain internal working groups, practice concentrations or task forces of professional employees who come from different office locations, often with differing levels of experience, to discuss how to effectively address legal problems of the clients served by the program. These discussions may include existing legal strategies and tactics, new developments that may affect such strategies and tactics, and ideas for new strategies that the program plans to undertake in the future. The discussions focus on litigation, representation of clients before administrative agencies, permissible policy advocacy before administrative agencies and legislative bodies and other areas of program advocacy. This is a common approach used to develop

---

[9] In 2007, the Legal Services Corporation completed a review and issued a new version of the Legal Services Corporation Performance Criteria (LSC Performance Criteria). These criteria are used to "guide LSC's assessments of program performance generally and in the competitive grants process. Available at http://www.lsc.gov/pdfs/LSCPerformanceCriteriaReferencingABAStandards.pdf .

the most appropriate methods and strategies to effectively represent clients, as is called for by Criterion 2 of Performance Area One of the LSC Performance Criteria.

Finally, many civil legal aid programs work closely with state or national support programs that focus on specific areas of law, such as the California Affordable Housing Law Project.  Often the general service program, like CRLA, and the support program co-counsel on key cases.  More often the general service program seeks strategic advice and assistance from the support center to help in its ongoing representation of its clients.  Often documents exchanged between a general program and a specialized program contain information on litigation and non-litigation strategy that is protected by federal and state work-product law.

Such state and national support programs have been a critical component of the civil legal aid system in the United States since the program's inception, and have ensured that general service programs have access to highly specialized experts knowledgeable about specific areas of the law and familiar with the wide variety of strategies and tactics that have been successfully pursued to effectively represent low-income clients.[10]  Participation and co-counseling with entities like the California Affordable Housing Law project are specifically encouraged by ABA Standard 2.3 which requires providers to "participate in regional and statewide delivery systems" and by the LSC Performance Criteria in Criterion 9 of Performance Area Four which requires the program to "participate in … statewide … legal assistance delivery systems.  Moreover, under the ABA's Standard 6.5, providers "should provide access to ongoing and comprehensive training" including "co-counseling and other work with more experienced practitioners."  Similarly, LSC Performance Criteria, Performance Area Three of

---

[10] See *Securing Equal Justice for All: A Brief History of Civil Legal Assistance in the United States* by Alan W. Houseman and Linda E. Perle , Center for Law and Social Policy (January 2007), p. 9, *available at*

Criterion 1, (b) requires that programs utilize "available outside resources, expertise and other support" and ensure "effective training" or its staff.

Amicus NLADA does not believe the OIG has statutory authority to obtain access to work-product information under the circumstance of the CRLA investigation. Under the LSC Act, the "Corporation shall not . . . interfere with any attorney in carrying out his professional responsibilities to his client . . . or abrogate . . . the authority of a state or other jurisdiction to enforce the standards of professional responsibility generally applicable to attorneys in such jurisdiction. The Corporation shall ensure that activities under this subchapter are carried out in a manner consistent with attorneys' professional responsibilities." (42 U.S.C. § 2996e (b)(3)). In addition, the "Corporation shall insure the maintenance of the highest quality of service and professional standards [and] the preservation of the attorney-client relationships . . . ." (*Id.* § 2996f (a)(1)). Sections 1006(b)(3) and 1007(a)(1) apply to and impose obligations on the OIG with regard to protection of privileged information, including work-product information. *See* United States v. Legal Services For New York City, 249 F.3d 1077, 1082-83 (D.C. Cir. 2001).

Nothing in section 509(h) of the Appropriation provision suggests that the OIG has the authority to get access to work-product information, and the OIG has demonstrated no "substantial need" for the work product information in the documents, or portions of documents that have been redacted, that relates to any ongoing investigate purpose. CRLA and the Interveners have ably briefed these issues and we will not repeat their arguments here.

For the reasons outlined above, Amicus NLADA opposes the summary enforcement of the subpoena *duces tecum* regarding documents, records and case summaries from engagement letters that provide information protected by Federal and

---

http://www.clasp.org/publications/legal_aid_history_2007.pdf.

state work product doctrines.  Not only do we believe that there is no justification in this

case for access to such records, but we are concerned about the precedent such access

would provide to other OIG investigations and the negative impact that a decision to

grant the subpoena would have on civil legal programs and lawyers across the country.

Granting access to program employee work plans and similar documents in this case

would require many programs to rethink, if not totally abandon the use of employee work

plans and similar management requirements that programs use to ensure high quality,

effective and efficient representation.   Similarly, granting access to minutes, training and

other reports and records resulting from internal program task forces and related

structures that programs employ, would substantially deter if not totally eviscerate the use

of these mechanisms that promote strategic thinking within legal aid programs. Finally, if

the Court grants enforcement of the subpoena and the OIG obtains work product

information resulting from the CRLA work with the California Housing Law Project, this

precedent would call into question the use of co-counseling and effective interaction

between specialized state and national programs and LSC-funded general services

program staff around the country and substantially limit the ability of LSC-funded

programs to provide high quality legal assistance.

### III.  THE COSTS OF COMPLIANCE WITH THE OIG SUBPOENA ARE UNREASONABLE AND UNDULY BURDENSOME

In order to comply with an administrative subpoena issued by the OIG, "the

subpoena demand [must be] reasonable and not unduly burdensome."  United States v.

Hunton & Williams, 952 F. Supp. 842, 848 (D.D.C. 1997)); *see* Burlington Northern R.R.

Co. v. OIG, Railroad Retirement Bd., 983 F.2d 631, 638 (5th Cir. 1993)(enforced only if

"the demand is not unreasonably broad or burdensome").  When confronted with

burdensome demands, "a court may take steps to modify investigative subpoenas when

they threaten to seriously impair or unduly disrupt the normal operations of the business."
Federal Trade Comm'n v. Shaffner,  626 F.2d 32, 38-39 (7th Cir. 1980) (citing Federal
Trade Comm'n v. Texaco, 555 F.2d 862, 881 (D.C. Cir. 1977)). *See also* Commodity
Futures Trading Comm'n v. McGraw-Hill Cos., Inc., ___ F. Supp. 2d ____, 2007 WL
2416109 (D.D.C.  Aug. 27, 2007)  ("A party may be excused from compliance with a
subpoena that imposes an undue burden when the subpoena is so broad that compliance
will severely disrupt its normal business operations.")

When evaluating the impact of compliance on a party's business, a court must
consider whether the cost of providing the demanded information is unduly burdensome
in light of the responding party's normal operating costs.   Equal Employment
Opportunity Comm'n v. Morgan Stanley & Co., Inc., 132 F. Supp. 2d 146, 161 (S.D.N.Y.
2000) (*quoting* Equal Employment Opportunity Comm'n v. Maryland Cup Corp., 785
F.2d 471, 479 (4th Cir. 1986)).  *Cf.* Appeal of FTC Line of Business Report Litigation,
595 F.2d 685, 703 (D.C. Cir. 1978) (upholding district court's decision to enforce the
subpoena where, "even assuming the accuracy of the estimated costs, compliance costs
were *de minimis* relative to the overall corporate operating budgets").  When CRLA's
budget, financing sources and amounts, and normal business operations are taken into
account, as they must be, the unreasonable and unduly burdensome nature of the
subpoena is clear.  Accordingly, OIG's reliance on thirty-year-old decision of this Court
upholding a subpoena, despite an alleged two million dollar cost of compliance, because
it was directed to a then-Fortune 500 company, does not begin to resolve the question
whether this subpoena, directed to a non-profit legal aid entity, is unduly burdensome.
*See* United States v. Firestone Tire & Rubber Co., 455 F. Supp. 1072 (D.D.C. 1978).

As reflected in its opposition brief and accompanying affidavits (and exhibits), CRLA has clearly established the burdensome nature of the subpoena and has outlined in detail the effect compliance would have on its normal business operations, both in terms of costs of compliance and the impact compliance would have on its ability to serve its clients.[11]  In September of 2006, at the request of LSC Vice President Karen Sarjeant, CRLA conducted a survey which sampled the estimated 39,000 client files involved in the OIG subpoena demand for client identities protected by the federal attorney-client privilege  (and by California client confidentiality law.)   The survey was intended to assess the CRLA time and resources that would be required to review all of the files included within the OIG's subpoena to determine whether, for each file, the information sought by the OIG was protected by the privilege.  The survey concluded in relevant part as follows:

> It would require 3200 hours of experienced attorney time, as well as between 4,800 and 7,800 hours more of non-attorney time. It would take about a year and a half to complete…. During that time, the procedure would substantially interfere with the ability of numerous CRLA offices to provide basic legal services to the poor for extended periods as limited and overburdened staff are forced to review old client files for privilege rather than service current clients' pressing needs. Even at the modest legal aid salaries paid to legal aid staff, it would cost in excess of $270,000 and as much as $356,000; at the rate for the services in question that would be charged by outside contractors in the private sector, the cost could easily approach or exceed $1 million.[12]

---

[11] The evidence offered by CRLA to support its position distinguishes this case from those where courts have upheld a subpoena in the face of a claim of undue burden.  *See, e.g.*, Equal Employment Opportunity Comm'n v. Citicorp Diners Club, 985 F.2d 1036, 1040 (10th Cir. 1993) ( Diners Club neither offered "any specific estimate of cost involved nor shown how compliance would impact [its] normal operations"); Equal Employment Opportunity Comm'n v. Maryland Cup Corp., 785 F.2d 471, 477 (4th Cir. 1986) ("conclusory allegation that [Maryland Cup] needs constant access to all" of the requested documents did not show compliance would "seriously disrupt its normal business operations"); Equal Employment Opportunity Comm'n v. A.E. Staley Mfg. Co., 711 F.2d 780, 788 (7th Cir. 1983) (respondent made "no showing" that subpoena enforcement would threaten normal business operations); Federal Trade Comm'n v. Shaffner, 626 F.2d 32,38-39 (7th Cir. 1980) (burden not met when failing to show number of files involved, estimated work hours required to effect compliance, nor estimated cost of compliance).

[12] See October 2, 2006 Memorandum from William Hoerger (CRLA) to Karen Sarjeant, Vice President for Programs and Compliance (LSC) and Mark Freedman, Assistant General Counsel (LSC).  See also Affidavit of William Hoerger, ¶¶90-104, and exhibits referenced therein.

CRLA has proposed alternative approaches[13] that should fully meet the OIG's needs and yet result in far less cost and disruption than will otherwise be required, but the OIG has steadfastly refused to discuss them, stating simply that, in essence, the OIG has the power to make the demands and is not required to give any reason or justification and, hence, will not consider any accommodation.

If CRLA had funding adequate to meet the demand for its services, perhaps one could argue that some greater degree of disruption could be justified, even though the OIG has never given any reason why the information it seeks is relevant to its investigation or why it needs so much sensitive personal information about so many people. But CRLA, like civil legal aid programs generally, cannot come close to meeting the demand for its services with its current resources, and it is completely unreasonable to require that CRLA divert such an enormous portion of its limited resources to meet the OIG's demands for confidential client information in a manner consistent with the attorney-client privilege.

In 2005, LSC completed a study, *Documenting the Justice Gap in America – The Current Unmet Civil Legal Needs of Low-Income Americans*,[14] that used three different methodologies to examine whether LSC recipients had adequate funding to meet the legal needs of the low-income population that they served. First, LSC asked its grantees to document over a two-month period, from March 14, 2005 to May 13, 2005, the potential eligible clients who came to their offices whom the programs could not serve due to lack of resources. The LSC "unable to serve" study established that for every client who

---

[13] See Respondents Brief, pp 43-44, Nos. 2,3,4,5,7 and 9.

[14] Legal Services Corporation, *Documenting the Justice Gap in America – The Current Unmet Civil Legal Needs of Low-Income Americans* (Sept. 2005), available at: http://www.lsc.gov/JusticeGap.pdf [hereinafter "*Justice Gap*"].

receives legal services from a LSC grantee, one eligible applicant was turned away, indicating that 50 percent of the potential eligible clients actually requesting assistance from an LSC grantee were turned away due to lack of program resources.

Second, the LSC *Justice Gap* study carefully analyzed nine legal needs studies, undertaken over the last five years by individual states, of the civil legal problems faced by the states' low-income residents. It examined them for nationally applicable conclusions, and it compared their results to the 1994 ABA's Comprehensive Legal Needs Study.[15] These states included Illinois and Montana (2005), Oregon (2000), Vermont (2001), New Jersey (2002), Connecticut (2003), Massachusetts (2003), Washington (2003), and Tennessee (2004).[16] All nine of these state studies were based on the methodology of the ABA study, which remains the most recent *national* study of the legal needs of low-income Americans.[17] The nine state studies validated the findings of the ABA study, demonstrating that less than 20 percent of the legal needs of low-income Americans were being met.[18] Eight of the nine studies found an unmet legal need that was greater than the 80 percent figure determined by the ABA.[19]

---

[15] ABA Consortium on Legal Services and the Public, *Legal Needs and Civil Justice, A Survey of Americans, Major Findings from the Comprehensive Legal Needs Study* (1994), *available at* http://www.abanet.org/legalservices/downloads/sclaid/legalneedstudy.pdf.

[16] *Justice Gap*, *supra* note 35, at 9-12.

[17] *Justice Gap*, *supra* note 35, at 2. The ABA study was based on roughly 1,800 random telephone interviews with low-income Americans, conducted during spring and summer of 1993. Respondents were asked about a set of circumstances that their household might have experienced during the preceding year. A panel of attorneys ensured the situations described to the respondents contained a legal issue and met a threshold of seriousness. When respondents reported such circumstances, follow-up questions asked what the household did (or did not do) about the situation and what contacts, if any, it had with the civil justice system. ABA Consortium on Legal Services and the Public, *supra* note 37, at 7-8. The nine state studies all used a survey questionnaire based on the ABA study questionnaire. Although each state modified the questionnaire somewhat to reflect local circumstances and concerns, the general approach used and the majority of the questions asked were the same as in the ABA study. *Justice Gap*, *supra* note 35, at 11.

[18] *Id.* at 13.

[19] *Id.* at 9.

Finally, the LSC *Justice Gap* study totaled the number of legal aid lawyers in both LSC and non-LSC funded programs that were providing legal aid to the low-income population and compared this to the total number of attorneys providing civil legal assistance to the general population in this country.[20] LSC determined that there is, at best, one legal aid attorney for every 6,861 low-income persons.[21]  In contrast, the ratio of attorneys delivering civil legal assistance to the *general* population is approximately one for every 525 persons.  Thus, there are thirteen times as many lawyers serving the civil legal needs of the general population than there are civil legal aid attorneys.[22]

The study concluded: "It is clear from this research that at least 80 percent of the civil legal needs of low-income Americans are not being met. Moreover, 50 percent of the eligible people seeking assistance from LSC-funded programs in areas in which the programs provide service are being turned away for lack of program resources."[23]

The reason that this justice gap exists and programs like CRLA cannot meet the demand for client services is in major part a result of inadequate funding for civil legal aid.  A primary cause of inadequate funding is the decline in funding from LSC for its recipients like CRLA. CRLA receives over 60 per cent of its funding from LSC.  But appropriations that provide funding for LSC grantees has been substantially reduced since 1980 when LSC reached a funding goal of "minimum access," i.e., to provide funding that would support two civil legal aid lawyers for every 10,000 persons below

---

[20]  *Id.* at 15.

[21]  *Id.*

[22]  *Id.*

[23]  See the Executive Summary of the *Justice Gap* study for a description of the conclusions of the study. *Documenting the Justice Gap in America – The Current Unmet Civil Legal Needs of Low-Income Americans – Overview*, at 2 (Sept. 2005), *available at* http://www.lsc.gov/press/documents/JusticeGapReportOverview120105.pdf.

the poverty line.  In 1980 minimum access funding was $300 million.  Since that time

Congress has imposed two major cuts on LSC funding, 25% in 1982 and 30% in 1996.

For many other years, funding remained static or declined while inflation further reduced

the buying power of LSC dollars.  Even after a $22 million increase in 2007, LSC

funding is still 52.5% less than it was in 1980, adjusted for inflation.

It is unreasonable and unduly burdensome to enforce the issuance of a subpoena

that will result in the expenditures of hundreds of thousands of dollar, take huge amounts

of attorneys' time, and divert these scarce resources in a way that will result in the denial

of legal services to thousands of low-income clients.  This is particularly true when there

is a huge "justice gap" in CRLA's services area that will be exacerbated by the diversion

of resources required to meet the OIG's demands and there are other alternatives

available to meet the OIG's information needs.

## IV.    THE OIG DOES NOT HAVE STATUTORY AUTHORITY TO INVESTIGATE WHETHER CRLA IS FOCUSING RESOURCES ON IMPACT WORK OR IS SERVING DISPROPORTIONATE NUMBERS OF LATINO OR FARM WORKERS CLIENTS

### A. The OIG Does Not Have Statutory Authority To Investigate Whether CRLA Is Focusing Resources On "Impact Work"

Courts will enforce an administrative subpoena only if it was "issued for a lawful

purpose within the statutory authority of the agency that issued it." United States v.

Hunton & Williams, 952 F. Supp. 843, 848 (D.D.C. 1997).  Accordingly, the OIG's

subpoena power is limited to requiring production of only that information necessary to

the performance of the functions assigned to the OIG by statute.  See United States v.

Westinghouse Electric Corp., 788 F.2d 164, 166 (3rd Cir. 1986); see also Burlington

Northern Railroad Co. v. OIG, Railroad Retirement Brd., 983 F.2d 631, 638 (5th Cir.

1993). The Inspector General's subpoena powers, while broad, "are not … without

limits." <u>Burlington Northern</u>, 983 F.2d at 641.  Courts will not enforce a subpoena if it

exceeds the statutory authority or is issued for an improper purpose.  *Id.* at 638.

The Court's role in assessing the validity of such subpoenas is "neither minor nor

ministerial." <u>Resolution Trust Corp. v. Thorton</u>, 41 F.3d. 1539, 1544 (D.C. Cir. 1994).

Determination of whether a subpoena is within statutory authority requires an

examination of the nature and purpose of the underlying investigation.  *Id.*  Here, the OIG

claims that it is investigating CRLA principally due to a confidential source's allegation

that it "impermissibly" focused its resources on "impact work" to the detriment of other

work, and admits to issuing the subpoena for the express purpose of advancing this

particular investigatory goal.  <u>See</u> Petition for Summary Enforcement of Administrative

Subpoena Duces Tecum at 5 ¶ 11; <u>see</u> Memorandum of Points and Authorities in Support

of Petition for Summary Enforcement of Administrative Subpoena Duces Tecum, pg. 4,

11.

Such a subpoena is beyond the OIG's statutory authority and therefore

unenforceable.  Nothing in the LSC Act, appropriation riders or LSC regulations gives

the OIG specific authority to subpoena information regarding "impact work."  There is

nothing impermissible about the CRLA engaging in the conduct alleged regarding

"impact work," and, indeed, such work is actually encouraged by the LSC.

### 1.  No Part of the LSC Act Prohibits "Impact Work"

Although the OIG refers to allegedly impermissible "impact work" several times

in its petition, there is no such prohibition in the LSC Act.  *See* Petition for Summary

Enforcement of Administrative Subpoena Duces Tecum at 5 ¶11, 6 ¶13.  In fact, the only

statutory reference that the OIG makes that even remotely relates to "impact work" is in

the LSC Act, §1007(b)(5), 42 USC §2996f(b)(5).  That provision prohibits LSC from

funding a "private law firm" that expends the majority of its resources litigating issues in

the public interest.  42 USC §2996f(b)(5).  The OIG does not cite any similar provision

regarding service providers that are *not* private law firms.  Indeed, the OIG's brief

misleadingly paraphrases the statutory provision, using the term "corporation" instead of

"private law firm."  *See* Memorandum of Points and Authorities in Support of Summary

Enforcement of Administrative Subpoena Duces Tecum, pp. 2-3 (LSC must ensure "that

no grants are awarded to *corporations* expending 50 percent or more of their resources or

time litigating issues in the broad interest of a majority of the public."  *Id.* (emphasis

added)).

CRLA is not a private law firm under any reasonable definition[24] of the term, and

it certainly does not receive a majority of its revenues from retainers or fees from private

clients.  Declaration of Laurie Tarantowicz at 3 (stating that the majority of CRLA's

revenue is derived from federal LSA grants).  In fact, CRLA takes no fees or retainers

from its clients and derives the lion's share of its resources from grants from LSC and

other governmental entities.  *Id.*

Accordingly, this statutory provision, relating as it does to private law firms, does

not give the OIG the authority to investigate the nature of CRLA's work.  CRLA's

"impact work," assuming it existed, is not prohibited by the LSC Act, and a subpoena

---

[24] While the term is not defined in the LSC Act, the legislative history of section 1007(b)(5) of the Act clarifies what is meant by a private law firm: "a private law firm is one which receives a majority of its revenue from retainers or fees of private clients, and, therefore, no current recipient should be harmfully affected by this provision.  Since the back-up centers and legal services law reform groups are not private law firms, they are not affected by this provision…" H.R. Rep. 93-247, 1974 U.S.C.C.A.N. 3872, 3882 (June 4, 1973). A similar distinction is made in the only other part of the Act which refers to private law firms. The Act speaks to "contracting or making other arrangements with private attorneys, private law firms, or other State or local entities of attorneys, or with legal aid societies having separate public defender programs, for the provision of legal assistance to eligible clients under this subchapter. 42 U.S.C. §2996i(c). By using the term "private law firms" as an alternative to "other State or local entities of attorneys" and also as an alternative to "legal aid societies," this provision makes clear that the term "private law firms" means something more limited than all recipients, and does not include legal aid societies like CRLA.

directed to "impact work" information cannot be based on any lawful purpose within the statutory authority of the Act.  It should not be enforced.  <u>Hunton & Williams</u>, 952 F. Supp. at 848; <u>Westinghouse Electric Corp.</u>, 788 F.2d at 166; <u>Burlington Northern Railroad Co.</u>, 983 F.2d at 638; <u>United States v.</u> <u>Montgomery County Crisis Center</u>, 676 F. Supp. 98, at 99 (D.MD 1987).

While there are, for example, prohibitions on grant recipients initiating or participating in class actions, seeking or claiming attorney's fees, representing prisoners in certain cases, and engaging in some types of legislative and administrative advocacy, no statutory provision and no LSC regulation suggests or implies that programs like CRLA should not be engaged in any "impact work."[25]

### 2. Not Only Does the LSC Act Fail To Prohibit "Impact Work," But LSC Actually Encourages Such Work

Moreover, LSC explicitly encourages "impact work."  The recently revised LSC Performance Criteria, the standards used to "guide LSC assessments of program performance generally and in the competitive grants process," specifically require that "the program maximizes the use of its resources and achieves in its representation and work the greatest possible benefits and systemic solutions for other low-income people who may face similar legal problems, and for the client eligible population as a whole. " *See* LSC Performance Criteria, Performance Area Three, Criterion 1, Part C at pg. 20.  In addition, Criterion 2 of Performance Area One, which requires LSC programs to set goals and objectives, provides that "these objectives should be expressed in terms of desired outcomes for both individual clients and the *low-income population as a whole* or any of its major segments, as may be applicable."  *Id.* at pg. 7. (emphasis added).

---

[25] <u>See</u> Alan W. Houseman, *Restrictions by Funders and the Ethical Practice of Law*, 67 Fordham L. Rev. 2187 (1999) (reviewing the limitations and prohibition on funding under the LSC Act).

LSC has long permitted, indeed encouraged, "impact work," beginning from the moment the LSC took over the legal services program from the Community Services Administration in 1976 until today.  In fact, LSC used the criterion of "impact on the client community" as one of four criteria in the 1976-1980 Delivery System Study mandated by Section 1007(g) of the LSC Act. See 42 USC §2996f(g).  The other three criteria were cost of services, client satisfaction and quality of legal work.  In that seminal study, the term "impact" was defined as the "results of those legal activities/strategies that are likely to lead to improvement or avoidance of deterioration in the rights and living conditions of significant segments of the poor population." See "The Delivery Systems Study: A Policy Report to the Congress and the President of the United States," Legal Services Corporation, June 1980 at pg. 130.

So called "impact" work lies at the heart of the civil legal aid program in the United States and has since the inception of federal funding for civil legal aid in 1966. Such work has enjoyed widespread support from the organized bar and the judiciary. Perhaps the best example of this is found in the ABA Standards which are replete with references to impact work.  Standard 2.6 specifically provides that "[a] provider should strive to achieve both clients' objectives and lasting results that responds to the low income communities' most compelling legal needs." The Commentary Standard 2.6 further describes what a legal aid provider should do, including various forms of systemic advocacy to "accomplish systemic change" by identifying "laws, policies and practices that have a detrimental effect on low income persons."  The Standards also delineate strategies such as "systemic impact in individual cases," "affirmative litigation" to challenge laws, policies and practices "detrimental to the interests of low-income persons."

In short, to the extent that the OIG is seeking attorney-work product documents and client names and other identifying information in order to determine whether CRLA is engaging in impact work, the Court should refuse to enforce the subpoena as outside of the scope of an appropriate area of inquiry.

### B.  The OIG Does Not Have Statutory Authority to Investigate Alleged Overrepresentation of Latinos and Farmworkers

The OIG also indicates that it needs the documents described in the subpoena in order to investigate whether CRLA is devoting a disproportionate amount of its resources to the representation of Latino and farmworker clients.  In addition to CRLA, LSC funded programs across the country devote resources to the representation of these and other groups, including those with limited English proficiency, that present special problems of access to legal services and that often make it difficult for programs to serve them.

We do not question the OIG's authority to investigate whether CRLA has used an appropriate process to set priorities for the use of its resources to meet the most critical legal needs of the client population in its service area under Part 1620 of the LSC regulations, *See* 45 CFR §1620, and CRLA has provided the OIG with enormous amounts of the documentation that it has sought related to the processes that CRLA has used to establish its priorities.   However, even if it were true that CRLA were serving a larger percentage of Latinos and farmworkers than their percentage in the overall low-income population in its service areas, there is clearly no proportionality requirement in the LSC Act, riders or regulations, and, in fact, the LSC Act, numerous LSC policies and reports, and specialized LSC funding for migrant farmworkers have emphasize the importance of serving these groups.

Indeed, the LSC Act requires LSC to ensure that programs take "into account the relative needs of eligible clients" for legal assistance, "including particularly the need for services on the part of significant segments of the population of eligible clients with special difficulties of access to legal services or special legal problems…." *See* 42 U.S.C. §2996f(a)(2)(C).[26] Congress also required LSC to "…conduct a study on whether eligible clients who are…migrants or seasonal farmworkers...[and] persons with limited English-speaking abilities…have special difficulties of access to legal services or special legal problems which are not being met." *See* 42 U.S.C. §2996f(h).[27]

The LSC Performance Criteria specifically encourage programs to take account of and devote resources to "problems or issues that uniquely or disproportionately affect distinct and significant segments of the eligible population such as…farmworkers, ethnic and racial groups…, immigrants …, and people who are not able to communicate well in English." *See* LSC Performance Criteria, Performance Area One, Criterion 1, Indicators, p.8. LSC has made it clear to its recipients that it should consider and adjust its delivery system "to respond to the special legal needs" of "eligible individuals in their service

---

[26] In acknowledging the importance of serving persons with limited English proficiency, Congress also required of LSC that "[i]n areas where significant numbers of eligible clients speak a language other than English as their principal language, the Corporation shall, to the extent feasible, provide that their principal language is used in the provision of legal assistance to such clients…." *See* 42 U.S.C. §29963(b)(6). The ABA Standards recognize the difficulty of serving persons in the low-income community with limited English proficiency and devoted an entire Standard to "Communication in the Primary Language of Persons Served," stating that "[a] provider should assure that all language groups within its low income communities have access to its services and should assist persons using its services in their primary language." *See* Standards for the Provision of Civil Legal Aid, American Bar Association, Standing Committee on Legal Aid and Indigent Defendants, August 2006, Standard 4.6.

[27] The study, undertaken between 1977 and 1981, specifically found that migrant farm workers and people with limited English-speaking faced significant difficulties of access and special legal problems. The study called for increased funding for migrant farm workers, increased recruitment efforts to induce bilingual staff into legal aid programs and an increase in support, training, research and material development on migrant farm workers, immigrants and non-citizens. *See* "Special Legal Problems and Problems of Access to Legal Services of Veterans, Migrant and Seasonal Farm Workers, Native Americans, People with Limited English-Speaking Abilities and Individuals in Sparsely Populated Areas: A Report to Congress Required by Section 1007(h) of the Legal Services Corporation Act as Amended".

areas who are persons with limited English proficiency (LEP)." *See* LSC Program Letter 04-2 (December 6, 2004) *available at* http://www.lsc.gov/program/pl/pl2004-2.pdf.

Many Latinos, particularly those living in rural areas, including farmworkers, and those with limited English proficiency, have special difficulties of access to legal services, and CRLA would be perfectly justified in focusing their work on these populations. The ABA Standards urge providers—

> to be attentive to the access needs of specific populations for which there are particular barriers to seeking and to utilizing services that are offered. Some persons encounter geographic barriers, particularly in sparsely populated rural areas.…Migrant farm-workers housed in farm labor camps may not be able to reach or easily communicate with legal aid providers and legal aid providers may not easily access labor camps.…Some low-income persons…maybe impeded by limited proficiency in English. *See* Standards for the Provision of Civil Legal Aid, American Bar Association, Standing Committee on Legal Aid and Indigent Defendants, August 2006, commentary to Standard 4.5, p.161

From 2000-2005, the Latino population of CRLA's services area represented 47.99% of the total poverty population and 48.5% of the rural poor. At the same time, 48.7% of the LSC eligible cases that it closed were for Latino clients. Rather than suggesting that CRLA overrepresented Latinos, these numbers showed that Latino representation was in parity with their numbers in the population. During that same period, whites made up 41.95% of the overall poverty population and 31.85% of the rural poor, but 41.5% of the CRLA cases, so that whites were slightly overrepresented by CRLA. African-Americans were 6.2% of the poverty population, 3.8% of the rural poor and 6.64% of CRLA's clients, again a modest overrepresentation. The only group that seems to have been underrepresented was the rural Asian-Pacific Island population, which represented only 1.5% of the overall poverty population, but 7% of the rural poor. Only 1.59% of the CRLA cases during that period were for Asian-Pacific Island clients.

It should be noted that CRLA receives a large portion of its LSC funding specifically to serve migrant farmworkers. In 2006, almost one third of its LSC funding was intended to be devoted to service to migrant farmworkers. Total 2006 LSC funding for CRLA was $6,700,745, of which $4,327,720 was for basic field services and $2,373,025 was specifically set aside for service to migrant farmworkers throughout the state of California. While sixty per cent of its funding comes from LSC, including its migrant grant, the remaining forty percent comes from other sources, and significant portions of those resources, including three of CRLA's other major funders, is specifically required to be devoted to services to farmworkers and non-English speaking Latino clients.

In short, to the extent that the OIG is seeking client names and other identifying information in order to determine whether CRLA is engaging in impact work or the disproportionate representation of Latino and farmworker clients, the Court should refuse to enforce the subpoena as outside of the scope of an appropriate area of inquiry.

## <u>CONCLUSION</u>

For the reasons set forth herein, *amicus* NLADA respectfully urges this Court to

deny the OIG's motion to enforce the OIG's subpoena *duces tecum* against CRLA.

Dated: September 20, 2007


LINDA E. PERLE (DC Bar No. 180752
Senior Staff Attorney

ALAN  W. HOUSEMAN (DC Bar No. 264382
Executive Director

*Of Counsel:*

JAN M CALL, Esquire
Dechert LLP                                By:     /s/ *Linda E. Perle*
Cira Centre
2929 Arch Street
Philadelphia, PA  19104                    CENTER FOR LAW & SOCIAL POLICY
                                           1015 15TH Street, NW, Suite 400
DARREN MAREINISS, Esquire                  Washington, DC  20011
Dechert LLP                                Telephone:  202-906-8001
300 West 6th Street                        Facsimile:  202-842-2410
Suite 1850                                 Email:  lperle@clasp.org
Austin, TX  78701

                                           *Attorneys for Amicus Curiae National Legal Aid*
                                           *and Defendant Association*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of September, 2007, I served a copy of the within Motion of the National Legal Aid and Defender Association for Leave to File Brief *Amicus Curiae* In Support of Respondent California Rural Legal Assistance, Inc. and Attorney-Interveners via first-class United States Mail, postage prepaid, upon the following persons:

Arthur R. Goldberg
Helen H. Hong
U.S. Department of Justice
Civil Division
20 Massachusetts Ave., N.W.
Room 7104
Washington, D.C. 20530
E-mail helen.hong@usdoj.gov

Martin R. Glick
Bernard A. Burk
Howard Rice Nemerovski Canady Falk &
Rabkin
Three Embarcadero Center, 7th Floor
San Francisco, California 94111-4024
Email bburk@howardrice.com
Attorneys for Respondent CRLA

Chong S. Park
Edward H. Meyers
Saveria B. Harris
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Email emeyers@kirkland.com
Attorneys for Respondent CRLA

Laurie Tarantowicz
LSC-Office of Inspector General
3333 K. Street, NW, 3rd Floor
Washington, D.C. 20007
Email LT@oig.lsc.gov
Of Counsel

Jack W. Londen
Wendy Garbers
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
Email WGarbers@mofo.com
Attorneys for Attorney-Interveners

*/s/ Linda E. Perle*

Linda E. Perle

Counsel for Amicus Curiae
National Legal Aid
and Defender Association