# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

and

KIRT WEST,
INSPECTOR GENERAL OF THE LEGAL
SERVICES CORPORATION
3333 K STREET, NW 3RD FLOOR,
WASHINGTON, D.C. 20007

          Petitioners,

v.

CALIFORNIA RURAL LEGAL ASSISTANCE, INC.,
631 HOWARD ST., #300
SAN FRANCISCO, CA 94105

          Respondent.

Civil Action No. 1:07-MC-123 EGS

**BRIEF OF *AMICUS CURIAE* LEGAL AID ASSOCIATION OF CALIFORNIA IN SUPPORT OF RESPONDENT CALIFORNIA RURAL LEGAL ASSISTANCE, INC.**

BEFORE THE HONORABLE EMMET G. SULLIVAN

DARYL S. LANDY (CA State Bar No. 136288)
Morgan, Lewis & Bockius, LLP
2 Palo Alto Square
3000 El Camino Real, Suite 700
Palo Alto, California 94307
Telephone: 650.843.7561
Facsimile: 650.843.4001

CARL P. BRETSCHER
(DC Bar No. 463,985)
Morgan, Lewis & Bockius, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: 202.739.5953
Facsimile: 202.739.3001

ARCHANA OJHA (CA State Bar No. 213008)
TUAN NGUYEN (CA State Bar No. 246214)
Morgan, Lewis & Bockius, LLP
One Market,
Spear Street Tower
San Francisco, California 94105
Telephone: 415-442-1000
Facsimile: 415-442-1177

1-SF/7605653.4

## TABLE OF CONTENTS

Page

I. INTRODUCTION ....................................................................................................... 1

II. MEMBER ORGANIZATIONS OTHER THAN THE CRLA ARE AT RISK OF BEING FORCED TO DISCLOSE CONFIDENTIAL CLIENT INFORMATION .......... 2

    A. Legal Services the LSC-Funded LAAC Member Organizations Provide .............. 3

    B. LSC Resources Are Vital To The Operation Of The Member Organizations That Receive LSC Grants ................................................................ 8

        1. California Suffers From An Overwhelming "Justice Gap" Between The Needs Of Its Low-Income Residents And The Legal Assistance They Receive ................................................................................. 8

    C. In Many Rural Areas LSC-Funded LAAC Organizations Are The Only Organizations Serving The Poor ............................................................................. 9

    D. In Many Instances LSC Grant Assurances Conflict With Grant Assurances From Other Funding Sources ............................................................... 12

III. NON-LSC FUNDED PROGRAMS COULD BE SIMILARLY AFFECTED ............... 14

IV. CONCLUSION ........................................................................................................... 15

## I.   INTRODUCTION

Former U.S. Supreme Court Justice Lewis Powell, Jr. once noted, "Equal justice under law is not merely a caption on the facade of the Supreme Court building, it is perhaps the most inspiring ideal of our society. It is one of the ends for which our entire legal system exists ... that justice should be the same, in substance and availability, without regard to economic status." True access to justice requires that every community have access to a continuum of legal services. Legal services programs efficiently serve millions of poor clients, and promote an ordered society and the peaceful resolution of disputes. Equally important, legal services programs promote low-income persons' belief that our system of laws can work for them. A court order requiring CRLA to disclose personal client information will undermine these objectives, and therefore would be contrary to the public's interest.

LAAC is a nonpartisan, nonprofit public benefit corporation. Its primary charitable purpose is to ensure the efficient and coordinated delivery of legal services to disadvantaged persons throughout California. Declaration of Julia Wilson in Support of the Brief of *Amicus Curiae* Legal Aid Association of California in Support of California Rural Legal Assistance, Inc. (hereinafter "Wilson Dec."), ¶4. As a membership organization, it also seeks to provide a unified voice for its various member groups on issues of concern to the statewide legal aid community. *Id.*

Since its inception, the LAAC has remained focused on achieving its founding objectives of advocating for increased funding for legal services, training attorneys and staff engaged in offering legal services, coordinating the efforts of legal aid organizations for the effective and efficient use of limited resources, and developing the leadership skills of legal services providers. Wilson Dec., ¶4. LAAC has a strong, demonstrated interest in ensuring that conditions for its member organizations are most conducive to providing basic, fundamental legal services to its

1-SF/7605653.4

most important stakeholders: the residents of California's low-income communities.

Many LAAC members are legal aid organizations that receive funding from both private and public sources. Wilson Dec. ¶7. Of the seventy-four LAAC member organizations, at least eleven (including CRLA) currently receive funding from the Legal Services Corporation ("LSC"). *Id.* Each of these organizations could be the target of an Office of Inspector General ("OIG") subpoena similar to the one that was served on the CRLA. The OIG subpoena far exceeds the authority of the Inspector General in investigating an LSC grantee and jeopardizes the members of the very communities that the LSC Act purports to serve. Consequently, the LAAC respectfully requests that the Court quash the OIG's administrative subpoena *duces tecum*.

The briefs of California Rural Legal Assistance, Inc. and the attorney-interveners describe the dispute and provide a detailed analysis of the consequences to CRLA's clients of disclosing personal information, especially without assurances that the personal information will not be further disseminated. In addition, the brief of *amicus curiae* Los Angeles County Bar Association clarifies and expands upon the history, scope and importance of California's protection of the attorney-client privilege. This brief of a*micus curiae* Legal Aid Association of California describes the important potential impact of the Court's ruling on other LSC and non-LSC funded programs.

## II. MEMBER ORGANIZATIONS OTHER THAN THE CRLA ARE AT RISK OF BEING FORCED TO DISCLOSE CONFIDENTIAL CLIENT INFORMATION

In addition to the CRLA, ten other LAAC member organizations receive funding from the LSC. Wilson Dec. ¶7. Each of these organizations sign grant assurances substantially similar to the grant assurances signed by the CRLA. *Id.* Each of these ten organizations face the risk of being forced to disclose confidential client information as part of an investigation by

1-SF/7605653.4

the OIG. If the OIG seeks to enforce such an overboard subpoena against the CRLA, it is distinctly possible that the OIG will serve similarly overboard subpoenas on other LSC-funded organizations. This court should send a message to deter the OIG from further engaging in such conduct.

### A.    Legal Services the LSC-Funded LAAC Member Organizations Provide

The ten LSC-funded LAAC member organizations other than the CRLA provide legal assistance on a broad array of substantive issues, ranging from general poverty law to civil rights to immigration and serve a wide range of low-income, disadvantaged, and vulnerable populations including low-income seniors, persons with disabilities, victims of domestic violence and migrant farmworkers. Wilson Dec. ¶¶10-24. These LSC-funded LAAC member organizations provide services over an expansive geographic area serving a significant portion of California:

- **Bay Area Legal Aid**

    Bay Area Legal Aid ("BayLegal") is the largest provider of free civil legal services to the poor in the San Francisco Bay Area. Wilson Dec. ¶10, Ex. A at 2. BayLegal's services cover seven highly-populated Bay Area counties consisting of Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo and Santa Clara. *Id.* BayLegal provides legal assistance in the areas of housing, domestic violence, public benefits, and health care access, among other areas. *Id.* For low-income people with time-sensitive issues, BayLegal provides immediate assistance via its Legal Advice Line, which is the only area-wide legal advice hotline for the more than 1.2 million low-income Bay Area residents. Wilson Dec. ¶11, Ex. B at 8. In 2006, BayLegal received 41% of its funds from LSC. Wilson Dec. ¶10, Ex. A at 19, 23. Thus, a loss of LSC funds likely would result in substantially fewer residents being served.

- **California Indian Legal Services**

    California Indian Legal Services ("CILS") provides legal services exclusively to the cause of Native American rights, serving indigent Indians, Indian tribes, and Indian organizations throughout the entire state of California. Wilson Dec. ¶12, Ex. C at 2, 36; Wilson Dec. ¶13, Ex. D at 1. As a group, Native Americans are the poorest population group in California but receive disproportionately fewer

services from non-Indian legal service providers compared to other low-income populations. Wilson Dec. ¶12, Ex. C at 3. To the best of staff's knowledge, no other organization provides the services that CILS offers. *Id.* at 4. CILS receives 31% of its funding from LSC. *Id.* at 25, 29.

- **Central California Legal Services**

Central California Legal Services ("CCLS") has provided 40 years of service to the residents of Merced, Tuolumne, Mariposa, Fresno, Kings and Tulare counties located in the rural Central Valley. Wilson Dec. ¶14, Ex. E at 2. This area this past winter suffered greatly when a freeze devastated its citrus industry in particular. *Id.* As a result, thousands of farm workers and low-wage employees have been affected. *Id.* Fresno reportedly has among the highest concentration of residents in extreme poverty of major U.S. cities, and three of the six aforementioned counties have the highest poverty levels of all California counties. *Id.* CCLS's priority areas are domestic violence and elder abuse prevention, tenant/landlord matters, healthcare access, education/youth law, consumer law, public benefits access, community economic development, employee rights and taxpayer assistance. *Id.* CCLS receives 53% of its funding from LSC. *Id.* at 16, 20.

- **Greater Bakersfield Legal Assistance, Inc.**

Greater Bakersfield Legal Assistance ("GBLA") offers free legal services to low-income and elderly persons residing within Kern County, which is among the fifteen poorest regions in the nation. Wilson Dec. ¶15, Ex. F at 2. GBLA assists clients in preventing homelessness, accessing healthcare, securing financial resources, and ensuring economic and family stability, physical security and access to high quality education. *Id.* LSC provides approximately 38% of GBLA's funding. *Id.* at 16, 19.

- **Inland Counties Legal Services**

Inland Counties Legal Services ("ICLS") provides legal services to low-income residents in Riverside and San Bernardino Counties. Wilson Dec. ¶16, Ex. G at 3. The poverty population in these two counties totaled 477,496 as of the 2000 Census. *Id.* Various programs and projects include the free Housing Hotline (handling 2,200 cases annually), the Tenant and Landlord Assistance Project, the Banning and Indio Court Access Partnership Project, and the I-CAN! Earned Income Tax Credit Project. *Id.* ICLS is a partner with the Riverside County Family Justice Center project, the Rape Crisis and Sexual Assault Center, Alternatives to Domestic Violence and the Public Service Law Corporation of the Riverside County Bar Association. *Id.* ICLS case priorities are in the areas of housing, family, public benefits, consumer and elder law. *Id.* Approximately

73% of ICLS's funds originate from LSC. *Id.* at 14, 18.

- **Legal Aid Foundation of Los Angeles**

Legal Aid Foundation of Los Angeles ("LAFLA") is the largest provider of general civil legal services in California. Wilson Dec. ¶17, Ex. H at 2. LAFLA serves Los Angeles County, where 17.9% residents are below the federal poverty line. *Id.* LAFLA operates through low-income neighborhood offices in South Central Los Angeles, East Los Angeles, Pico-Union, Crenshaw, Santa Monica and Long Beach. *Id.* LAFLA provides legal assistance that supports the integrity of the family, preserves housing, maintains economic stability, addresses safety and health, addresses the needs of those with special vulnerabilities and vindicates civil rights. *Id.* LSC grants provide approximately 54% of LAFLA's funding. *Id.* at 15, 19.

- **Legal Aid Society of Orange County**

Legal Aid Society of Orange County ("LASOC") services Orange County as well as the southeast area of Los Angeles County. Wilson Dec. ¶18, Ex. I at 3. LASOC's service area includes approximately 459,000 residents with incomes below 125% of the federal poverty level. *Id.* LASOC's service priorities include support for the family, preservation of the home, maintenance of economic stability and health, and support for populations with special vulnerabilities. *Id.* LASOC provides services through four domestic violence victim legal service centers serving Los Angeles County, including satellite centers in Los Angeles County courthouses in Norwalk and Compton. *Id.* LSC provides 59% of LASOC's funding. *Id.* at 12, 20.

- **Legal Aid Society of San Diego**

Legal Aid Society of San Diego ("LASSD") provides legal services to the indigent residents of San Diego County. Wilson Dec. ¶19, Ex. J at 2. Since LASSD's service area borders Mexico, much of the served population is Hispanic, but LASSD also serves large groups of immigrants and refugees from Africa, the Middle East and South East Asia. *Id.* LASSD's priorities are housing and community development, health and welfare, Supplemental Security Income, aliens' rights, consumer law and family and juvenile law. *Id.* LASSD delivers its services both at its offices and also at the East County, South County and downtown courthouses, where a Private Attorney Involvement team provides facilitator services concerning civil TROs, unlawful detainers, guardianships, conservatorships, domestic violence restraining orders and other family law issues. *Id.* LASSD also supports the Consumer Center for Health Education and Advocacy, which works with health consumers day-to-day in identifying health

access issues and negotiating quality resolutions. *Id.* LSC provides 46% of LASSD's funds. *Id.* at 14, 17.

- **Legal Services of Northern California**

Legal Services of Northern California ("LSNC") serves the northernmost counties of California. Wilson Dec. ¶20, Ex. K at 3. LSNC services for these counties include support for families, enhancement of economic stability, civil rights, safety, stability, healthcare and support for populations with special vulnerabilities. *Id.* at 4. Services LSNC provides include an Ombudsman program for long-term care residents, which has permitted expanded services to the institutionalized elderly and poor; a Client Assistance Program for persons with disabilities seeking state rehabilitative services; a Senior Legal Hotline; and a Health Rights Hotline addressing problems with managed health care. *Id.* LSNC also provides assistance on Medicare and health insurance issues to seniors and those with disabilities through its Health Insurance Counseling and Advocacy Program. *Id.* LSNC receives 39% of its funding from LSC. *Id.* at 15, 19.

- **Neighborhood Legal Services of Los Angeles**

Neighborhood Legal Services of Los Angeles County ("NLSLA") provides legal services to low-income communities in Los Angeles County. Wilson Dec. ¶21, Ex. L at 2. NLSLA operates through field offices, courthouse-based satellite offices and intake centers, and serves a 100-mile area that spans the rural Santa Clarita and Antelope Valleys, through the San Fernando Valley, the cities of Pasadena, Burbank and Glendale, and San Gabriel and Pomona Valleys. *Id.* NLSLA is the only full-service legal service program serving Northern and Eastern portions of Los Angeles County that engages in all forms of advocacy. *Id.* Special NLSLA projects include the Health Consumer Center of Los Angeles, the Asian Language Legal Intake Project, the VIDA Health Project and Ventanilla de Salud. *Id.* In accordance with its priorities, NLSLA provides legal assistance in areas such as housing, government benefits, health, family, employment, job development, community development, immigration, consumer, education and the environment. *Id.* NLSLA receives 44% of its funding from LSC. *Id.* at 35, 39.

Housing Services. In the 2007-2008 grant cycle, Legal Services of Northern California served 7,756 clients (33% of the clients served) with housing-related legal matters. Wilson Dec. ¶20, Ex. K at Section VII. Additionally, Legal Aid Foundation of Los Angeles assisted 7,754 clients (54%) while Inland Counties Legal Services served 3,308 (41%) with housing-related

legal matters. Wilson Dec. ¶16, Ex. H at Section VII and Ex. G at Section VII.

<u>Family-Related Legal Services</u>. In the 2007-2008 grant cycle Legal Services of Northern California served 4,742 (20%) clients on family-related matters and Legal Aid Society of Orange County served 4,779 (42%) clients on family-related matters. Wilson Dec. ¶20, Ex. K at 31; ¶18, Ex. I at Section VII.

<u>Other Legal Services Provided</u>. Other substantive areas of the law these organizations have addressed on indigent clients' behalf include consumer/finance, education/employment, juvenile, health, income maintenance and individual rights. *See generally*, Wilson Dec. ¶¶10-21. In total, LSC grantees in the 2007-2008 grant cycle alone served more than 90,000 clients. *Id.*

These organizations serve population groups substantially similar to the population groups the CRLA serves. Wilson Dec. ¶7. Consequently, these member organizations' confidentiality concerns are similar to those of the CRLA. Because each of these organizations receive LSC funding, each one is at risk of receiving a subpoena similar to the subpoena served on the CRLA in this case. Each of these organizations serve the vulnerable low-income individuals who are reluctant to seek legal assistance even when assured that their information will remain confidential. Hoerger Dec. ¶¶19-39[1]; Scarlett Dec.[2] ¶9; Katz Dec.[3] ¶11. This group may be further deterred from seeking much-needed legal assistance, fearing that other member organizations will also be forced to disclose their client's confidential information if the CRLA is forced to disclose the names, addresses and phone numbers of its clients.

---

[1] Declaration of William G. Hoerger in Opposition to Petition for Summary Enforcement of Administrative Subpoena Duces Tecum ("Hoerger Dec.") filed on September 14, 2007, Case No. 1:07-MC-00123-EGS.

[2] Declaration of Teri Scarlett in Support of Attorney-Interveners' Opposition to Petition for Summary Enforcement of Administrative Subpoena ("Scarlett Dec.") filed on September 14, 2007, Case No. 1:07-MC-00123-EGS.

[3] Declaration of Phyllis Katz in Support of Attorney-Interveners' Opposition to Petition for Summary Enforcement of Administrative Subpoena ("Katz Dec.") filed on September 14, 2007, Case No. 1:07-MC-00123-EGS.

### B. LSC Resources Are Vital To The Operation Of The Member Organizations That Receive LSC Grants

#### 1. California Suffers From An Overwhelming "Justice Gap" Between The Needs Of Its Low-Income Residents And The Legal Assistance They Receive

Low-income Californians, especially underserved groups such as the elderly, disabled, children and non-English speaking residents, are in dire need of legal services. Declaration of Archana Ojha in Support of the Brief of *Amicus Curiae* Legal Aid Association of California ("Ojha Dec.") ¶1, Ex. X at 3-6 (*Equal Access to Justice: Action Needed to Close the Justice Gap*, K. Baker, Counsel, Assembly Judiciary Committee, February 13, 2007.) A 1996 Needs Study found that the legal needs of three out of four low-income Californians were not being met at all and the needs of the other twenty-five percent were only being partially met. *Id.* While California's overall legal aid resources have improved, as of 2005, legal aid programs were still not able to provide even a minimal level of legal advice and assistance for sixty-seven percent of the legal needs of California's low-income population. Ojha Dec. ¶2, Ex. Y at 9 (A REPORT OF THE CALIFORNIA COMMISSION ON ACCESS TO JUSTICE, ACTION PLAN FOR JUSTICE, April 2007).

Since 1980, California's population has increased forty percent while the number of Californians in poverty has increased sixty percent. Ojha Dec. ¶2, Ex. Y at 8. Growing income inequalities, the failure of wages to keep up with inflation, and escalating housing costs deprive many California residents of basic necessities. *Id.* Consequently, many Californians lack the educational or financial resources to obtain legal representation for even the most basic legal needs such as divorce, child support/custody, domestic violence, housing loss, employment and discrimination. *Id.*

Although California has one of the largest low-income populations, at $16.25 per low-income person per year, California spends far less per low-income person than many other states.

Ojha Dec. ¶2, Ex. Y at 31. For example, New Jersey spends $57.00 per low-income person, per year. *Id.* Over a twelve-year period from 1993 to 2005, core legal services funding in California, which represents the basic, ongoing funding upon which programs rely to pursue their core mission, decreased $9.8 million. Ojha Dec. ¶2, Ex. Y at 34. As of 2005, the gap between the total resources available and the amount required to meet the legal needs of California's low-income community was $394.1 million. Ojha Dec. ¶2, Ex. Y at 9.

California legal aid organizations woefully lack the funds they need to even marginally serve their low-income communities. Thus, LSC grants are vital to the survival and operation of the LAAC member organizations that receive such funding. In 2006, LSC grants were the largest single source of funding for these member organizations, ranging from 31 percent to 73 percent of total funding. Wilson Dec. ¶¶10-21, Exs. A-M. With resources already so scarce, these organizations cannot afford to forego LSC grants in order to preserve the confidentiality of their clients' information.

### C. In Many Rural Areas LSC-Funded LAAC Organizations Are The Only Organizations Serving The Poor

The continued existence of the LSC-funded LAAC member organizations is crucial for serving the low-income communities in many California regions. Many low-income communities would not have access to any legal services whatsoever if the LAAC member organizations were to close due to lack of financial resources. For example, the low-income residents of the communities such as those the Greater Bakersfield Legal Association and Central California Legal Services serves do not have alternative means of obtaining the necessary and vital legal assistance. The low-income populations in these communities are located in remote rural areas without the means to travel long distances to seek legal aid.

Moreover, the low-income individuals' ability to seek aid from distant legal services

organizations is further hampered because of their need for secrecy. Hoerger Dec. ¶19-39; Scarlett Dec. ¶9; Katz Dec. ¶11. In most instances, these low-income individuals are fearful that their employers, landlords or abusers will learn that they are attempting to seek legal assistance and will retaliate. *Id.* Mere hint of a desire to seek legal assistance for any matter can lead to dire consequences for the low-income individual. As a result, many low-income individuals forego seeking legal assistance.

As referenced above, Greater Bakersfield Legal Assistance, Inc. ("GBLA") is the only LAAC member organization serving the residents of Kern County, which has a population of 750,000 and is considered among the fifteen poorest regions in the nation. Wilson Dec. ¶8, 15, Ex. F at 2. GBLA assists clients in preventing homelessness, accessing healthcare, securing financial resources, and ensuring economic and family stability, physical security and access to high quality education. *Id.* Notably, in 2006 alone, GBLA served 477 clients through the Long-Term Care Ombudsman Program of Kern County, provided 887 individuals with immediate access to preventative health care through the Kern Health Consumer Center, the Farm Worker Health Ombudsman Program and the HMO Enrollee Information & Education Center of Kern County, and served 1,092 individuals through the Guardian Self-Help Center. Wilson Dec. ¶15, Ex. F at 12. But for the existence of GBLA, these individuals would have no access to legal assistance to meet their healthcare needs.

Similarly, the Central California Legal Services ("CCLS") is the only program that provides legal assistance to low-income residents of rural Central Valley communities such as those in Merced, Tuolumne, Mariposa, Fresno, Kings and Tulare counties. According to a 2005 article in the *Fresno Bee*, Fresno is among the major U.S. cities with the highest concentration of residents in extreme poverty. Wilson Dec. ¶14, Ex. E at 2. Tulare County, Fresno County and

Merced County report the highest poverty levels of all California counties. *Id.* This area suffered great economic distress in early 2007, when a freeze devastated its citrus industry. *Id.* As a result, thousands of farm workers and low-wage employees were adversely affected. *Id.* CCLS provides legal assistance in areas of domestic violence and elder abuse prevention, tenant/landlord matters, healthcare access, education/youth law, consumer law, public benefits access, community economic development, employee rights and taxpayer assistance. Wilson Dec. ¶14, Ex. E at 20. CCLS also conducts community education campaigns, and distributes printed materials through community and cultural events, workshops and outreach clinics. *Id.* Once again, these rural Central Valley communities would go unserved without the critical services that the CCLS provides.

Inland Counties Legal Services and Legal Services of Northern California also serve regions where alternate sources of legal aid are practically non-existent. Wilson Dec. ¶8. The regions Inland Counties Legal Services covers have three additional programs that are very small: Legal Aid Society of San Bernardino (San Bernadino County), Inland Empire Latino Legal Aid (San Bernardino and Riverside counties), and Public Service Law Corporation of Riverside (Riverside County).[4] Wilson Dec. ¶8. Similarly, as referred in Section II.A, *infra*, there are three small programs for senior citizens only which serve Legal Services of Northern California's area. Otherwise, there are no legal aid service available.

Based on CRLA's circumstance, the LSC-funded organizations apparently face the risk of forced disclosure of confidential client information as part of OIG's investigative efforts but must accept LSC's funding to survive. They organizations can ill-afford to spend their limited

---

[4] In 2006, Legal Aid Society of San Bernardino employed only two full-time attorneys and nine other full-time staff members, compared to ICLS's 20 full-time attorneys and 40 other full-time staff. Wilson Dec. ¶¶16, 22, Ex. G. Licensed attorneys at Inland Empire Latino Lawyers Association consisted entirely of volunteers. Wilson Dec. ¶23. Likewise, Public Service Law Corporation of Riverside's legal staff consisted of temporary and volunteer staff that in 2006 provided 1644 hours of service. Wilson Dec. ¶24.

funds on costly discovery disputes and litigation in order to protect their clients' confidences.

### D. In Many Instances LSC Grant Assurances Conflict With Grant Assurances From Other Funding Sources

A ruling against CRLA will impose conflicting duties on LSC-funded LAAC member organizations, hampering their efforts to secure much needed funding for the legal services they provide. While relying heavily on LSC for funding, none of the LAAC member organizations rely exclusively on LSC as their solitary funding source. These organizations seek and accept funding from multiple government and private entities. *See, e.g.*, Wilson Dec. ¶10, Ex. A at 19. Just like the LSC, many of these other entities require the LAAC member organizations to sign grant assurances containing restrictions and guidelines that the organizations must follow as a condition for receiving funds. *See, e.g.*, Wilson Dec. ¶ 25, Ex. P at 1-7.

For example, in addition to receiving funds from LSC, Bay Area Legal Services receives funds from the Office on Violence Against Women. As a recipient of funds from the Office on Violence Against Women, Bay Area Legal Services must comply with legal and administrative requirements, including submitting to audits to ensure effective use of the granted funds. Wilson Dec. ¶¶ 1-9, 26, Ex. Q at 1 (Special Conditions by the Office on Violence Against Women in the Department of Justice in 2006). The terms of an administrative memorandum issued by the Director of the Office on Violence Against Women further bind Bay Area Legal Services. That memorandum explicitly states:

> grantees and subgrantees may not disclose personally identifying information about victims served with OVW funds without a written release unless the disclosure of the information is required by a statute or court order. This applies whether the information is being requested for an OVW grant program or another Federal agency, state, tribal or territorial grant program. . . . 'Personally identifying information' means *individually identifying information for or about an individual including information likely to disclose the location of a victim* of domestic violence, dating violence, sexual assault, or stalking, including (but not limited to) a first and last name[.]

Wilson Dec. ¶ 27, Ex. R at 2, (Memorandum of Diane M. Stuart) (emphasis in original).

Consistent with the Office on Violence Against Women's recognition that a client's confidential information must be protected, the Office on Violence Against Women only authorizes the release of "nonpersonally identifying data *in the aggregate*[.]" *Id.* at 2 (emphasis in original). The Violence Against Women and Department of Justice Reauthorization Act of 2005 explicitly forbids grantees and subgrantees from "disclos[ing] any personally identifying information or individual information collected in connection with services requested, utilized, or denied through grantees' and subgrantees' programs." P.L. 109-162, § 3(b)(2)(B)(i). Revealing individual client information requires informed, written consent. *Id.* at § 3(b)(2)(B)(ii). If release is compelled by statute or court order, grantees must make reasonable attempts to provide notice to the victim and take "steps necessary to protect the privacy and safety of the persons affected by release of the information." *Id.* at § 3(b)(2)(C)(i) & (ii).

The Office on Violence Against Women and the underlying federal statute thus obligate Office on Violence Against Women grantees to agree to protect, to the furthest extent possible, the identities and confidential data of their clients. The LSC's grant assurance imposes different requirements: the grant applicant "shall, upon request, provide access to and copies of financial records, time records, retainer agreements, client trust fund and eligibility records, and client names, except for those reports or records that may be properly withheld due to applicable law governing attorney-client privilege." Wilson Dec. ¶¶ 11, 25, Ex. P at 3-4, (LSC Grant Assurances for 2008).

Interpreting this restriction to require disclosure of the clients' personal information contrary to the clients' expectation of confidentiality and privacy would create a dilemma for an organization such as Bay Area Legal Services that receives funding from both the LSC and the

- 13 -

Office on Violence Against Women. The organization must either forego much needed funding from one of these sources and thus reduce its legal services to a population that is already grossly underserved, or engage in costly discovery and litigation disputes to attempt to protect client confidences and thus divert scarce resources which should be used instead to serve the poor. A ruling requiring disclosure may deter organizations such as the Office on Violence Against Women from providing funding to programs that also accept funding from LSC for fear that its grantee may not be able to protect its' clients' private information.

### III.    NON-LSC FUNDED PROGRAMS COULD BE SIMILARLY AFFECTED

A ruling compelling CRLA to disclose confidential client information including client names, addresses and phone numbers will have a chilling effect on all legal aid organizations, not just the CRLA or the eleven LSC-funded LAAC member organizations. Just as the clients of LSC-funded organizations are apprehensive about seeking legal assistance, so are the clients of organizations that do not receive LSC funding. In many instances potential clients do not seek legal help unless assured that their confidentiality will be maintained. Hoerger Dec. ¶19-39; Scarlett Dec. ¶9; Katz Dec. ¶11. Public interest attorneys at either LSC or non-LSC funded programs will not be able to provide such assurances if CRLA or its attorneys are ordered to disclose the clients' confidential information. Even if a public interest attorney provided such assurances, a potential client is likely to be skeptical.[5]

---

[5] These potential clients already have a tendency not to trust those in authority. Sometimes this mistrust stems from a potential client's cultural background. See Steven W. Bender, *Consumer Protection for Latinos: Overcoming Language Fraud and English-Only in the Marketplace*, 45 Am. U. L. Rev. 1027, n. 13 ("there is a culturally rooted mistrust of government shared by Hispanics. . . ."). Undocumented immigration status or having undocumented family members can also lead to apprehension. William R. Tamayo, *The Role of the EEOC in Protecting the Civil Rights of Farm Workers*, 33 U.C. Davis L. Rev. 1075, 1082 (2000). Yet in other instances, those who have been failed by social institutions harbor a deep sense of resentment and mistrust of authority figures. Martha Delaney & Scott Russell, *Working Effectively with Pro Bono Clients*, 62 Bench & B. Minn. 24, 25 (August 2005). Clients from battered women's shelters fall into this category. The same holds true, for example, in the case of a noncustodial father which the child protection system wrongly blames by for his child's neglect and abuse, when attempting to regain parental time or custody. *Id*. This mistrust negatively affects the attorney-client relationship. *Id*.

After such a ruling low-income, legal services organizations' clients would have no guarantees that their confidential information will in fact remain confidential. Moreover, these low-income individuals likely would not distinguish LSC-funded programs from non-LSC funded programs, and consequently they will be equally apprehensive about seeking aid from *any* legal aid program.

## IV. CONCLUSION

Because of the potentially far-reaching adverse impact of an order enforcing the OIG's subpoena, the LAAC respectfully requests that this Court quash the OIG's subpoena and protect the identities of the vulnerable poor served by the LAAC member organizations.

Dated: September 21, 2007

By: *Carl Bretscher*
Carl P. Bretscher
(DC Bar No. 463,985)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Phone: 202.739.3000
Fax: 202.739.3001

Attorneys for *Amicus Curiae*
LEGAL AID ASSOCIATION OF CALIFORNIA