## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
UNITED STATES OF AMERICA                )
                                        )
and                                     )
                                        )
RONALD MERRYMAN, ACTING                 )
INSPECTOR GENERAL OF THE                )
LEGAL SERVICES CORPORATION,             )
                                        )     Misc. No.  1:07-mc-00123 (EGS)
          Petitioners,                  )
                                        )
          v.                            )
                                        )
CALIFORNIA RURAL LEGAL                  )
ASSISTANCE, INC.,                       )
                                        )
          Respondent,                   )
                                        )
JEANNIE BARRETT, ALEGRIA DE LA CRUZ,    )
VANESSA FRANK GARCIA, PHYLLIS KATZ,     )
TERI SCARLET, ARTURO RODRIQUEZ, and     )
KIRK AH-TYE,                            )
                                        )
          Attorney-Intervenors.         )
_____ )

## PETITIONERS' UNOPPOSED LCvR 7(d) MOTION FOR LEAVE
## TO FILE A COMBINED REPLY BRIEF IN EXCESS OF 25 PAGES

Petitioners respectfully request leave to file a combined reply brief in excess of 25 pages

in response to CRLA's and Attorney-Intervenors' oppositions to Petitioners' Petition for

Summary Enforcement of Subpoena Duces Tecum.  Local Civil Rule 7(e) provides that a "reply

memorandum shall not exceed 25 pages, without prior approval of the court."  Petitioners have

combined their responses to CRLA's and Attorney-Interveners' lengthy arguments in a single,

combined reply brief in order to prevent duplication of arguments.  The combined reply brief is

30 pages long – well under the 50 pages that Petitioners are afforded under the Local Rules for

two separate briefs – and only slightly in excess of the page limitation that would be permitted

for only one reply brief.  Because judicial economy is served by the combination of arguments,

and because neither CRLA nor Attorney-Interveners oppose this request, Petitioners respectfully

request that the Court grant leave for Petitioners to file a combined reply brief in excess of 25

pages.  The combined reply brief is attached as Ex. A to this motion.

Pursuant to Local Rule 7(m), undersigned counsel conferred with counsel for CRLA and

Attorney-Interveners.  Neither opposes this motion.

Respectfully submitted,


PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney


/s/ Helen H. Hong
OF COUNSEL:                              ARTHUR R. GOLDBERG, D.C. Bar 180661
LAURIE TARANTOWICZ                       HELEN H. HONG, CA Bar 235635
LSC-Office of Inspector General          Attorneys, Department of Justice
3333 K Street, N.W., 3rd Floor           20 Massachusetts Ave., N.W., Room 6107
Washington, D.C. 20007                   Washington, D.C.  20530
Tel: (202) 295-1660                      Tel: (202) 514-5838
                                         Fax: (202) 616-8470
                                         E-mail: helen.hong@usdoj.gov
                                         Attorneys for Petitioners

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 12, 2007, a true and correct copy of the foregoing

Petitioners' Unopposed LcvR 7(d) Motion for Leave to File a Combined Reply Brief in Excess

of 25 Pages was served electronically by the U.S. District Court for the District of Columbia

Electronic Document Filing System (ECF) and that the document is available on the ECF

system.

/s/ Helen H. Hong
HELEN H. HONG

# EXHIBIT A

**(Petitioners' Unopposed LCvR 7(d) Motion to File a Combined Reply in Excess of 25 Pages)**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| and | ) | |
| | ) | |
| RONALD MERRYMAN, ACTING | ) | |
| INSPECTOR GENERAL OF THE | ) | |
| LEGAL SERVICES CORPORATION, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Misc. No.  1:07-mc-00123 (EGS) |
| | ) | |
| CALIFORNIA RURAL LEGAL | ) | |
| ASSISTANCE, INC., | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| JEANNIE BARRETT, ALEGRIA DE LA CRUZ, | ) | |
| VANESSA FRANK GARCIA, PHYLLIS KATZ, | ) | |
| TERI SCARLET, ARTURO RODRIQUEZ, and | ) | |
| KIRK AH-TYE, | ) | |
| | ) | |
| Attorney-Intervenors. | ) | |

———————————————————————

**PETITIONERS' COMBINED REPLY TO CRLA'S AND
ATTORNEY-INTERVENERS' OPPOSITIONS TO PETITION FOR SUMMARY
ENFORCEMENT OF ADMINISTRATIVE SUBPOENA DUCES TECUM**

**PRELIMINARY STATEMENT**

Through their oppositions, CRLA and Attorney-Interveners seek to amend, and request

that this Court rewrite, Congressional legislation requiring the disclosure of information by

grantees of federal funds, like CRLA, under the Legal Services Corporation Act, 42 U.S.C.

§ 2996, et seq. ("LSC Act"), and other applicable law.  Congress legislated in unambiguous

terms that "financial records, time records, retainer agreements, client trust fund and eligibility records, and client names . . . shall be made available to any auditor or monitor" of the grantees of LSC Act funds. See Omnibus Consolidated Recisions and Appropriations Act of 1996, Pub. L. No. 104-134, § 509(h), 110 Stat. 1321, 1358-59 (1996) ("1996 Appropriations Act") (emphasis added). Aside from providing exceptions for federal attorney-client privileged information, Congress placed no limitation on the mandatory disclosure of the enumerated records. On the contrary, the statute requires that such records "shall be made available" to any monitor of a grantee, like the LSC-OIG, unrestricted by professional responsibility obligations set forth in the Canons of Ethics and the Codes of Professional Responsibility of the American Bar Association, state-imposed ethics obligations, or a grantee's contrary demands. Unless Congress amends or rescinds its legislation, CRLA, like all grantees, is bound by Congress's legislative judgment.

Both CRLA and Attorney-Interveners also seek to direct LSC-OIG's investigative techniques. In similar circumstances, however, this court has instructed that it "is not the province of this court to decide the best way for LSC-OIG to carry out its responsibilities." United States v. Legal Serv. for New York City, 100 F. Supp. 2d 42, 47 (D.D.C. 2000) ("LSNYC I"), aff'd, 249 F.3d 1077 (D.C. Cir. 2001) (LSNYC II"). Although CRLA and Attorney-Interveners would prefer to transform LSC-OIG's comprehensive investigation of misconduct into a more limited audit, and dictate that only random sampling of information be undertaken, if any at all, neither CRLA nor Attorney-Interveners has the legal basis for making such a claim for relief. They demand "compelling reasons" for and "close[] tailor[ing]" of the requests to LSC-OIG's investigation, even though Congress and this court have recognized that record requests

which are relevant to a lawful investigation (or at least not "obviously wrong") must be enforced. (CRLA's Mem. of P.&A. in Opp'n to Pet. for Summary Enforcement of Administrative Subpoena Duces Tecum ("CRLA Opp'n") at 40.)  Given LSC-OIG's statutory obligation to investigate credible and serious allegations of wrongdoing provided, as here, by an independent, confidential source, LSC-OIG's request for information designed to disprove or confirm such allegations is, at a minimum, not "obviously wrong."

At base, CRLA and Attorney-Interveners' justification for non-disclosure is an attempt to write the grantees' record disclosure obligations out of the 1996 Appropriations Act.  Both parties invoke considerations common to <u>all</u> legal aid providers as justification for their non-disclosure of records  – including their clients' concerns for confidentiality, as well as such clients' speculative fears of job loss or other forms of retaliation.[1]  In the 1996 Appropriations Act, however, there is no indication that Congress intended to authorize LSC-OIG to collect information from grantees, while simultaneously depriving it of any ability to do so by allowing such varied (and essentially illimitable) considerations to override grantees' disclosure obligations.

Nor did Congress condition the LSC-OIG's investigative authority on the happenstance of a grantee's location.  Whether located in New York or California, each grantee is bound by

---

[1]Because most of the factual assertions made by CRLA and the Attorney-Interveners, whether in their briefs or the declarations submitted in support thereof, are not relevant to the legal issue in this case, the LSC-OIG has not undertaken a point-by-point rebuttal.  This should not be taken as an admission of the so-called facts set out therein.  Similarly, most of the arguments raised by amici are either irrelevant – because they describe California's professional responsibility obligations – or repeat what the parties themselves have already raised.  By not identifying specific disagreements, LSC-OIG does not concede the validity of amici's arguments.

the federal laws governing the proper use of federal funds, and each is subject to LSC-OIG's uniform, federal investigative authority.   To suggest that LSC-OIG's oversight authority is stronger in certain jurisdictions than in others is inconsistent with the relevant federal statutes and defies common sense.  In the 1996 Appropriations Act, Congress authorized LSC-OIG "to conduct on-site monitoring, audits, and inspections in accordance with <u>Federal</u>," not 50-state, "standards," Pub. L. No. 104-134, § 509(g) (emphasis added); in the Inspector General Act, Congress empowered LSC-OIG to gather "<u>all</u> information" necessary to investigate a target.  5 U.S.C. app. 3 § 6(a)(4) (emphasis  added).  The powers conferred on LSC-OIG by these two statutes include the authority to require, in all U.S. jurisdictions,  disclosure of  records commonly understood to aid in investigative efforts.  <u>See</u> <u>id.</u>; Pub. L. No. 104-134, § 509(h).

It is the unfortunate continuing reality of persons "fac[ing] an economic barrier to adequate legal counsel" that motivates Congress to "serve best the ends of justice" by funding LSC.  42 U.S.C. § 2996(2).  By the same token, however, Congress also enacted oversight mechanisms to ensure that the public fisc would be used to provide legal services appropriately, lawfully and in light of the purposes of the LSC Act.  As even CRLA acknowledges, LSC-OIG "fills a very important role in our government, and it appropriately has oversight responsibilities over the Legal Services Corporation and its grantees."  (CRLA Opp'n, Ex. LL at 64.)  LSC-OIG here is simply abiding by Congress's directive to investigate credible allegations of wrongdoing; so that it may finally conclude its investigation, LSC-OIG respectfully requests that the Court enforce the subpoena.

## DISCUSSION

It is well established that "[a]n administrative subpoena must be enforced if the information sought is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." <u>Resolution Trust Corp. v. Walde</u>, 18 F.3d 943, 946 (D.C. Cir. 1994) (internal citations and quotation marks omitted). For the reasons that follow and as shown in the Petition and opening memorandum points and authorities in support of the Petition, LSC-OIG has amply satisfied this standard in the current action.

## I.    LSC-OIG ISSUED THE SUBPOENA FOR A LAWFUL PURPOSE WITHIN ITS STATUTORY AUTHORITY

While neither CRLA nor Attorney-Interveners directly contends that LSC-OIG is without statutory authority to issue subpoenas, <u>see</u> <u>United States v. Hunton & Williams</u>, 952 F. Supp. 843, 848 (D.D.C. 1997), CRLA, at least, suggests that LSC-OIG is improperly motivated by some invidious purpose in seeking the subpoenaed records. (<u>See</u> CRLA Opp'n at 3, 33-36.) Moreover, both CRLA and Attorney-Interveners assert that LSC-OIG's request (1) seeks federally-privileged records to which LSC-OIG is not entitled, and (2) unlawfully interferes with their state ethical obligations in violation of 42 U.S.C. § 2996e(b)(3). (<u>See</u> CRLA Opp'n at 18-26, 36-42; Attorney-Interveners' Opp'n to Petition for Summary Enforcement of Administrative Subpoena Duces Tecum ("Attorney-Intervener Opp'n") at 24-27.) Neither contention has merit.

### A.    LSC-OIG Has Broad Investigatory Authority, Which It is Exercising Lawfully Here

In this case, LSC-OIG's lawful exercise of its statutory investigatory powers requires disclosure of the requested records. LSC-OIG, like all Inspectors General, is authorized "to make such investigations and reports relating to the administration of the programs and

operations of the applicable establishment as are, <u>in the judgment of the Inspector General</u>, necessary or desirable." 5 U.S.C. app. 3 § 6(a)(2) (emphasis added). Thus, LSC-OIG has considerable statutory discretion to fashion investigations that are, in its "judgment," necessary or desirable. <u>See Kreis v. Sec'y of the Air Force</u>, 866 F.2d 1508, 1513 (D.C. Cir. 1989) (stating that statute phrased in subjective terms – as is § 6(a)(2) – "fairly exudes deference" to decision-maker). The scope of that judgment encompasses all aspects of investigations into grantees' compliance with the LSC Act, as well as the practice restrictions set forth in § 504 of the 1996 Appropriations Act.

LSC-OIG came to exercise that discretion in late 2005 upon receipt of a complaint from a confidential source forwarded by then-Chairman Chris Cannon of the Subcommittee on Commercial and Administrative Law, Committee of the Judiciary ("Subcommittee") and Representative Devin Nunes. (CRLA Opp'n, Ex. DD.) The confidential source, a former employee at CRLA, alleged that CRLA had been advancing its own social and political agenda <u>to the detriment</u> of basic legal services to prospective clients. (Tarantowicz Decl., Ex. 3 at 1.) The source provided a sworn statement with sweeping allegations, identifying potential areas of CRLA misconduct, including CRLA staff involvement in cases without a client, or on behalf of ineligible clients; solicitation of clients; her own provision of services to undocumented aliens; and an environment focused on impact work leading to a decline in services to individual clients and fostering solicitation and search for clients.[2] (<u>Id.</u>, Ex. 3 at 2, 7.)

---

[2] As LSC-OIG has stated, the investigation is not focused on whether impact work itself was problematic, but whether the focus on impact issues has led to unlawful solicitation of clients and the undertaking of work without clients. (<u>See</u> Tarantawicz Decl., Ex. 3 at 14.)

LSC-OIG was able to substantiate the allegations that CRLA improperly solicited clients in two of the cases brought to its attention and as a result LSC placed CRLA on month-to-month funding, with additional grant conditions and reporting requirements.  As an example of as yet unsubstantiated allegations concerning CRLA's alleged practice of soliciting clients in violation of the the 1996 Appropraitions Act, Pub. L. 104-134, § 504(18), 45 C.F.R. § 1638, the source stated that CRLA employees called for a search to "obtain a client and investigate the pattern of law enforcement" that led to gang sweeps in Ceres, California in 2005, an issue of interest to CRLA management.  That search, the source alleged, resulted in lawsuits being filed against the police department in Ceres, with two CRLA employees (as well as the wife and cousin of other CLRA employees) as plaintiffs.  (Id., Ex. 3 at 7 n.15.)  Another knowledgeable witness contended that CRLA management had been uninterested in cases involving three mobile home parks until they learned that one had predominantly Hispanic residents and that management directed a CRLA staff attorney to find Hispanic clients.[3]  (Id., Ex. 3 at 8 n.15; see also id, at 13, 33 (describing allegations of client solicitation).)   The OIG's planned work will review these allegations as well as the whether there is a pattern of solicitation resulting from a focus on impact cases to the detriment of cases brought on behalf individual eligible clients seeking legal services.

CRLA responded to the Subcommittee, addressing each of the confidential source's allegations in a 69-page, single-spaced document and denying all wrongdoing.  (CRLA Opp'n at Ex. LL.)  CRLA acknowledged that the source had information about specific cases on which

---

[3]  The suggestion was not, as CRLA suggests, that assistance to Hispanic residents is somehow wrong, but rather that potential biases in favor of certain groups left other demographic groups unassisted.  (Id. at 33.)

CRLA had provided services, but generally denied the import ascribed to the work by the source. In its opposition here, CRLA similarly denies the bulk of the allegations, contending that the absence of merit in the allegations divests the LSC-OIG of authority to investigate.  (Id. at 33-36.)  The issue, however, is not whether CRLA may plausibly deny the allegations, but whether LSC-OIG has the authority to complete its investigation and determine for itself whether the allegations have merit.  As LSC-OIG informed the Subcommittee in 2006, its preliminary investigation revealed concerns that justified a continued, comprehensive review of CRLA's practices, indicating a need for further information from CRLA that would enable it "to undertake a comprehensive review of the allegations."[4]  (Tarantowicz Decl., Ex. 3 at 2.)

CRLA does not contest LSC-OIG's general authority to investigate allegations of grantee misconduct, but instead disputes the merits of the allegations against it.  CRLA's objections aside, LSC-OIG certainly has the authority to make an independent judgment about the accuracy of any allegations and to request relevant records to make that determination.  Just as it could not be seriously disputed that records were properly requested in a "congressionally-mandated assessment of LSC recipients' case statistics," it cannot be seriously disputed that LSC-OIG has the authority to conduct and complete investigations into, for example, a grantee's improper solicitation of clients or implicit encouragement of client solicitation by its employees.  LSNYC I, 100 F. Supp. 2d at 47.  Given the propriety of the investigation, and LSC-OIG's statutory

---

[4]  Indeed, CRLA admits that there have been prior instances of improper solicitation. While those instances of improbity have been uncovered based on the information provided to LSC-OIG, LSC-OIG simply seeks to confirm that unlawful solicitation is not a "widespread practice" by completing a comprehensive review.  (CRLA Opp'n at 35.)

authority to investigate complaints about misconduct, the subpoena is an appropriate

investigative tool for LSC-OIG and must be enforced.

**B.**    **§ 509(h) Records Not Protected By the Federal Attorney-Client Privilege Must Be Disclosed**

**1.**    **§ 509(h) is not limited by 42 U.S.C. § 2996e(b)(3) or by principles of federalism**

Both CRLA and Attorney-Interveners advance an interpretation of section 509(h) that

requires this court to ignore unambiguous language in a Congressional enactment, in violation of

well-settled principles of statutory interpretation.  Section 509(h) plainly states, as courts in this

jurisdiction have recognized, that "<u>notwithstanding</u>" 42 U.S.C. § 2996e(b)(3), "financial records,

time records, retainer agreements, client trust fund and eligibility records, and client names . . .

<u>shall be made available</u>" to LSC-OIG.  Pub. L. 104-134, § 509(h); <u>see also</u> <u>LSNYC II</u>, 249 F.3d

at 1083 ("The restrictions in § 2996e(b)(3) <u>notwithstanding</u>, § 509(h) explicitly authorizes

auditors of the Corporation to compel production of 'time records, retainer agreements, . . . and

client names.'") (emphases  added).  By its plain terms, section 509(h) therefore requires

disclosure of client-identifying information "despite," or "in spite of," any contrary limitations or

restrictions on disclosure set forth in § 2996e(b)(3), <u>see</u> Black's Law Dictionary (8th ed. 2004)

(defining "notwithstanding"), and serves as an "explicit exception to § 2996e(b)(3)."  <u>LSNYC II</u>,

249 F.3d at 1083 n.6.

Notwithstanding Congress's explicit intention to except § 509(h) from the strictures of §

2996e(b)(3), CRLA and Attorney-Interveners nonetheless attempt to narrow § 509(h) to require

only disclosure consistent with § 2996e(b)(3) or state professional responsibility restrictions.[5]

(Attorney-Interveners' Opp'n at 25-27; CRLA Opp'n at 37-40.)  By ignoring the plain language

of § 509(h), however, CRLA and Attorney-Interveners run afoul of well-established principles of

statutory interpretation.  See, e.g., TRW, Inc. v. Andrews, 534 U.S. 19, 31 (2001) ("It is a

cardinal principle of statutory construction that a statute ought, upon the whole, to be so

construed that, if it can be prevented, no clause, sentence or word shall be superfluous, void or

insignificant.").  In effect, by reading § 509(h) to require disclosure of client names only "if the

release of those names would not interfere with the grant recipient attorney's state ethical duties

or invade the sanctity of the attorney-client relationship" (Attorney-Intervener Opp'n at 26),

CLRA and Attorney-Intervenors replace the statutory term "notwithstanding" with an antonym,

"in accord with."[6]  Such nullification of express statutory language is impermissible, however, as

is CRLA's and Attorney-Interveners' attempt to read additional language into § 509(h) that is

directly contrary to Congress's manifest intent.  See TRW, 534 U.S. at 31.

   This is particularly true given that Congress has indicated in express terms when state

law may restrict access to information from LSC Act grantees.  In the Departments of

---

[5]  Because the language of section 509(h) is clear, the cases cited by Attorney-Interveners
relating to implied repeals of predecessor statutes are inapplicable.  By their own admission, if a
"later statute expressly contradicts the original act," the canon disfavoring repeals by implication
is inapposite.  (Attorney-Intervener Opp'n at 25.)  Similarly, while there is a presumption that
appropriations bills do not repeal or substantively alter the terms of an original statute, the
presumption is rebutted by clear language to the contrary.  Here, section 509(h) does not repeal
the entirety of 42 U.S.C. § 2996e(b)(3), but rather carves out, in explicit terms, an exception for
enumerated records that must be disclosed.  Such clear language, even in an appropriations bill,
must be given effect.  See Calloway v. District of Columbia, 216 F.3d 1, 9 (D.C. Cir. 2000).

[6]  As set forth below, CRLA and Attorney-Interveners also misread the breadth of
§ 2996e(b)(3), even assuming that the restrictions in § 2996e(b)(3) apply to subpoenas issued by
LSC-OIG.

Commerce, Justice, and State, the Judiciary and Related Agencies Appropriations Act of 1998, Congress added a public disclosure obligation, requiring grantees to provide "to the public in written form, upon request, . . . the name and full address of each party to the legal action unless such information is protected by an order or rule of a court or by State or Federal law or revealing such information would put the client of the recipient of such Federal funds at risk of physical harm."  Pub. L. 105-119, § 505(a)(1), 111 Stat. 2440, 2512 (Nov. 26, 1997) ("1998 Appropriations Act") (emphases added).  Moreover, the 1998 Appropriations Act expressly adopted the "requirements of section 509 of Public Law 104-134," including § 509(h), which limits disclosure only of records covered by the federal attorney-client privilege.

As Congress has shown that it knows how to give state law disclosure restrictions effect when it means to do so, this court should be reluctant to read into § 509(h) any such limitations on disclosure in the absence of express statutory language.  See, e.g., Franklin Nat'l Bank v. New York, 347 U.S. 373, 378 (1954) (finding "no indication that Congress intended to make this phase of national banking subject to local restrictions, as it has done by express language in several other instances"); Meghrig v. KFC Western, Inc., 516 U.S. 479, 485 (1996) ("Congress . . . demonstrated in CERCLA that it knew how to provide for the recovery of cleanup costs, and . . . the language used to define the remedies under RCRA does not provide that remedy"); FCC v. NextWave Personal Communications, Inc., 537 U.S. 293, 302 (2003) (when Congress has intended to create exceptions to bankruptcy law requirements, "it has done so clearly and expressly"); Dole Food Co. v. Patrickson, 538 U.S. 468, 476 (2003) (Congress knows how to refer to an "owner" "in other than the formal sense," and did not do so in the Foreign Sovereign Immunities Act's definition of foreign state "instrumentality"); Whitfield v. United States, 125 S.

-11-

Ct. 687, 692 (2005) (observing that Congress has imposed an explicit overt act requirement in twenty-two conspiracy statutes, yet has not done so in the provision governing conspiracy to commit money laundering).

Principles of federalism do not compel a different result. CRLA and Attorney-Interveners suggest § 509(h) should be read narrowly to ensure the federal government does not intrude on regulatory matters, like attorney governance, traditionally left to the states. (See Attorney-Intervener Opp'n at 26; CRLA Opp'n at 38-39.) Of course, nothing in § 509(h) purports to control how states regulate their attorneys or otherwise tell states how to "conduct their own governments." (CRLA Opp'n at 39.) Thus, Section 509(h) is not the type of coercive regulation courts sometimes read narrowly to avoid constitutional concerns that might be raised by a federal usurpation of traditional state functions. See, e.g., New York v. United States, 505 U.S. 144, 181 (1992). Rather, consistent with its Spending Clause powers, Congress has, in § 509(h), simply required grantees of federal funds to disclose information to aid in enforcing federal limits on expending those funds. Such conditions on the expenditure of federal funds have repeatedly been upheld by the courts. See, e.g., South Dakota v. Dole, 483 U.S. 203, 206 (1987) ("Incident [to Spending Clause] power, Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'") (internal citation omitted).

Thus, the disclosure requirements of § 509(h) represent an entirely proper exercise of Congress's legislative judgment, see, e.g. West Virginia v. U.S. Dept. of Health and Human Serv., 289 F.3d 281, 295 (4th Cir. 2002) ("[I]f the federal action is not impermissibly coercive

and is in all other respects a proper exercise of the spending power, a Tenth Amendment

violation will not be found simply because the federal action operates in an area that would

otherwise be left to the states or because the action reflects what the state perceives to be a bad

policy decision."), and one that grantees could and should share with potential clients.[7]  Indeed,

CRLA accepted these disclosure obligations when it accepted federal funds.  (See Tarantowicz

Decl., Ex. 1 at 2 ¶ 9 ("As provided in the LSC statutes applicable during the grant terms,

notwithstanding any other grant assurance, . . . § 2996(e)(b)(3), or any rule of professional

responsibility, it shall, upon request, provide access to and copies of financial records, time

records, retainer agreements, client trust fund and eligibility records, and client names, except for

those reports or records subject to the attorney-client privilege[.]").[8]  Because the terms of §

509(h) are clear, records not protected by the federal attorney-client privilege must be disclosed.

> **2.      All § 509(h) information called for in the subpoena must be produced, except federal attorney-client or federal workproduct-protected material**

LSC-OIG has never requested from CRLA information protected by the federal attorney-

client privilege.  CRLA and Attorney-Interveners agree that they have "never asserted that all of

the client-identifying information OIG demands is privileged[.]" (CRLA Opp'n at 26; see also

---

[7]  Attorney-Interveners additionally contend in one sentence that the plain terms of § 509(h) "implicate serious constitutional concerns" of privacy.  (Attorney-Intervener Opp'n at 26.)  Even if that were the case – and neither case cited by Attorney-Interveners establishes it as true – the principle of constitutional avoidance does not permit an interpretation of a statute to mean the opposite of what it says, as CRLA and Attorney-Interveners advance here.  (Id. (citing Debartolo, 485 U.S. at 575 ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.") (emphasis added).)

[8]  Thus, the grant contract alone would require disclosure of the records even if § 509(h) did not.

Attorney-Interveners Opp'n at 1 ("The point is not that <u>all</u> of the client-specific information OIG demands is privileged . . . .").)  That recognition is sufficient to require enforcement of the subpoena and compel production of the admittedly non-privileged client-identifying information. As uniformly recognized, only federal privileges are applicable in federal subpoena actions.  <u>See, e.g.</u>, <u>Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.</u>, 5 F.3d 1508, 1513 (D.C. Cir. 1993) (only federal privileges govern scope of a subpoena issued under federal law).  Congress imposed no other limitations on LSC-OIG's access to records under § 509(h).  Consistent with Congress's mandate, CRLA must, like all other grantees, provide its non-privileged client-identifying information.

Specifically, CRLA must provide, in response to Request 1 of the subpoena (Petition, Ex. B), non-privileged data in those fields that it has refused to disclose (including client names, spouse names, client addresses, phone numbers, and alien status information).[9]  Attorney-Interveners acknowledge that they "would be able to identify particular situations in which CRLA's clients' names are themselves privileged and/or the clients' names linked to other client-specific information are privileged."  (Attorney-Intervener Opp'n at 24.)  LSC-OIG merely requests that CRLA and Attorney-Interveners undertake that task and produce all non-privileged information in those KEMPS data fields.  <u>See</u> <u>LSNYC II</u>, 249 F.3d at 1082 ("[A]s always, the burden of demonstrating the applicability of the privilege lies with those asserting it. . . . That burden requires a showing that the privilege applies to <u>each</u> communication for which it is asserted.") (emphasis added).  Moreover, any other records produced with  information

_____

[9]  LSC-OIG inadvertently omitted that the same time period limiting its request in the prior data call limited Request 1 to information for data between January 1, 2003 and October 31, 2005 in the KEMPS data fields from the CLIENTSW table.

called for under § 509(h) redacted in part (or wholly withheld) based on grounds other than federal privilege, must be disclosed.  (See, e.g., CRLA Opp'n, Ex. P (indicating client name was not disclosed, but not establishing that client name is protected by federal attorney client privilege); see also Pet., Ex. A (Request 2 (time records covered by § 509(h)); Request 4 (seeking client names, retainer agreements, intake sheets covered by § 509(h)); Request 5 (same).)

Although CRLA claims that it "laboriously made specific and detailed redactions of the privileged portions of the documents by hand, noting the basis for each redaction one by one, on the face of the document," and refers this Court to five examples of such documents (CRLA Opp'n at Exs. P, Q, R, S, T), CRLA, for the most part, did not provide any but the most broad justification for redactions on the records it produced to LSC-OIG, claiming broad privilege protections but, for example, failing to describe the information redacted.  Accordingly, LSC-OIG is at times unable to discern whether redactions were made under state or federal claims of privilege or work product and is unable to assess the validity of the privilege claim.  Only when CRLA has provided properly redacted documents with an appropriate privilege log will LSC-OIG be able to decide whether to accede to or challenge individual assertions of privilege.

### a.    CRLA and Attorney-Interveners misapply the federal privilege to requested § 509(h) records

Although neither CRLA nor Attorney-Interveners has provided LSC-OIG with specific claims of privilege to withhold particular records as required by law, see, e.g., LSNYC II, 249 F.3d at 1082, it appears that both parties assert broad-reaching interpretations of federal privilege.  (See Attorney-Intervener Opp'n at 13-16; CRLA Opp'n at 28.)  Attorney-Interveners contend, for example, that revealing client names amounts "in many cases, to requiring

-15-

production of privileged attorney-client communication, as the disclosure would reveal the fact

that the clients had <u>contacted</u> CRLA."  (Attorney-Interveners Opp'n at 13-14.)  The mere fact of

contact with an attorney, however, is not typically privileged under federal law, even for

potential clients.[10]  <u>See, e.g.</u>, <u>Abels v. JBC Legal Gp., P.C.</u>, Civ. No. 05-2435, 2005 WL

3839308, * 3 (N.D. Cal. Oct. 21, 2005) (potential client identities not privileged); <u>United States</u>

<u>v. Robinson</u>, 121, F.3d 971, 976-77 (5th Cir. 1997) (same).  Indeed, this Circuit teaches,

consistent with its sister circuits, that "the general subject matters of clients' representations are

not privileged."  <u>See</u> <u>LSNYC II</u>, 249 F.3d at 1083.  Accordingly, disclosure of the same types of

client names and problem codes at issue in LSC-OIG's current subpoena has previously been

compelled by this court , with an understanding that no additional "confidentiality" protections

are required.  <u>See</u> <u>id.</u> ("Since we conclude that grantees' ethical obligations do not prevent the

Inspector General from compelling production of client names associated with problem codes,

we need not reach the sufficiency of the Chinese wall instituted to prevent that association.").

_____

[10]  Attorney-Interveners appear to conflate desire of confidentiality with the attorney-client privilege, noting that "an example of the type of client who would not want the fact of his or her <u>contact</u> with CRLA disclosed is a domestic violence victim."  (Attorney-Intervener Opp'n at 14.)  While LSC-OIG is sensitive to and aware of the confidentiality concerns of a grantee's clients, desires of confidentiality are insufficient to transform client identities into privileged matters.  Moreover, Congress expressly limits the disclosure of information provided under § 509(h) to only law enforcement officials or officials of an appropriate bar association for the purpose of enabling the official to conduct an investigation of a rule of professional conduct.  Pub. L. 104-134, § 509(i).  LSC-OIG has never disclosed any information provided under § 509(h) to anyone outside of LSC and, contrary to the assertions of CRLA and the Attorney-Interveners, consistently has assured that it will protect this information from further disclosure.  Thus, the perpetrators of domestic violence, for example, should never know that their victims contacted CRLA for legal assistance.  By the same token, however, CRLA should be informing its clients that any "confidential" information falling within the scope of § 509(h) is subject to limited disclosure obligations.

Despite CRLA and Attorney-Interveners' contrary characterization, even the generic problem codes for job discrimination, wage claims, spouse abuse, Medicaid, federally subsidized housing rights, landlord/tenant, food stamps, SSI, unemployment compensation, worker's compensation, and immigration/naturalization, do not amount to full disclosure of privileged communications.  (See Attorney-Intervener Opp'n at 15.)  Those codes do not "leave nothing to the imagination," but reveal only the general subject matter of clients' representation, which is required to be disclosed under prevailing law.[11]  (Id.)  Moreover, this Circuit instructs that § 509(h) disclosure of client-identifying information is not entirely context-specific; thus, disclosable information does not become privileged simply because "time records, retainer agreements" or other records have simultaneously been disclosed.  Indeed, any such construction of § 509(h), this court has held, would be "unnatural:  if Congress had intended to require production of 'time records, retainer agreements, . . . and client names" only when disassociated from one another, surely it would have said so in terms different from the simple conjunctive phrasing in § 509(h)."  LSNYC II, 249 F.3d at 1083.  In their briefs, and in prior studies conducted by CRLA, CRLA and Attorney-Interveners provide examples of information that is

---

[11]  As an example, CRLA contends that "virtually all cases coded [with problem code 75, SSI] thus involve clients who are either seeking to establish their eligibility for SSI, or who have a similar eligibility issue, such as an overpayment."  (CRLA Opp'n, Ex. II at 11.)  Accordingly, CRLA states that the "client's motivation in seeking our services is clear: to establish or maintain eligibility for SSI."  (Id.)  But that is clearly not so:  by CLRA's own admission, only "virtually all," but not "all" cases coded with problem code 75 relate to SSI eligibility or maintenance requests.  Further, even assuming protection for such information, the mere fact that a client approached CRLA with an SSI matter clearly does not reveal whether the client is even currently receiving SSI benefits, thus not revealing whether the motivation was to establish eligibility, to maintain such eligibility, to inquire about SSI eligibility generally, or to inquire about a spouse's eligibility.  In any event, absent additional information, no specifics related to requests for representation in SSI matters may be divined from a person's name, date of request, SSI code, and income alone.

-17-

putatively privileged because of the cumulative effect of the codes revealed from the KEMPS database.  (Attorney-Intervener Opp'n at 15-16; CRLA Opp'n at 10-12, CRLA Opp'n, Ex. II (describing putatively privileged information).)  Although no particular claims of privilege have yet been asserted with respect to specific redactions or withholdings, LSC-OIG would simply note in this connection that many of CRLA's and Attorney-Interveners' cited examples are plainly inconsistent with the narrow demands of the attorney-client privilege.

**b.    § 509(h) extends broader than client names**

CRLA and Attorney-Interveners also contend that some of the requested client-identifying information does not fall within the categories of mandatory disclosure provided in § 509(h), and is therefore protected by state confidentiality restrictions on disclosure under § 2996e.  (See CRLA Opp'n at 40-42; Attorney-Intervener Opp'n at 24.)  Specifically, CRLA and Attorney-Interveners object to disclosing addresses, telephone numbers, green card numbers, spouse names, and potential clients' names.  (CRLA Opp'n at 41.)  As each admits, however, that information appears on retainer agreements and, significantly, in "eligibility records" required for disclosure under § 509(h) for both potential and retained clients.[12]

Attorney-Interveners state that "when a potential client contacts CRLA . . . the client is asked to fill out . . . an 'intake' form.  This form captures numerous, specific pieces of information about the potential client, including that person's name, address, telephone number, date of birth, social security number, income and assets (in great detail), gender, race, alien

---

[12]  For this reason, all retainer agreements that have been produced by CRLA in response to the subpoena must be provided with only federal attorney-client and work-product-protected material, if any, redacted.  Although CRLA has not provided explanations for the redactions, many appear to be of client names and other identifying information that is required to be disclosed under § 509(h).

-18-

status, and other immigration-related information, language, disability status, spouse's name, a description of the legal problem, and the identity of the adverse party or parties." (Attorney-Intervener Opp'n at 6 (emphasis added).) This information is then entered into a database with a problem code, and "CRLA then makes a determination of the potential client's eligibility." (Id.) The intake sheet is itself an "eligibility record," as is all data that is entered into the database from the intake sheet; as such, it "shall be made available" to LSC-OIG at its request, unless a specific claim of federal privilege is made. No contrary state professional responsibility obligation prevents disclosure.[13] Cf. LSNYC II, 249 F.3d at 1083 ("Disclosure of retainer agreements associated with client names would reveal exactly the sort of information appellant refuses to disclose: the general matter of individual clients' representations.").

### C.     Non-§ 509(h) Information Must Also Be Disclosed

The subpoena also calls for information that does not fall within the categories set forth in § 509(h), but that should nonetheless be produced by CRLA. (See, e.g., Petition, Ex. A, Request 3 (seeking, among other records, performance plans, employee plans, board meeting agendas); Request 4 (statements of facts, co-counsel agreements); Request 5 (same); Request 6 (conference attendees); Request 7 (conference materials and agendas); Request 8 (Board of Directors meeting packets); Request 9 (task force meeting minutes).) CRLA and Attorney-Interveners contend that "confidential information" within the meaning of California Business & Professions Code § 6068(e)(1), in addition to federal attorney-client and work product protected information, may be withheld.

---

[13] Even if § 2996e(b)(3) prevented disclosure, CRLA and Attorney-Interveners would have to make specific claims of state privilege to withhold any records. As shown below, however, § 2996e(b)(3) does not prevent disclosure under California laws.

By its terms, 42 U.S.C. § 2996e(b)(3) prohibits LSC[14] from interfering with:

> any attorney in carrying out his professional responsibilities to his client as established in the Canons of Ethics and Code of Professional Responsibility of the American Bar Association (referred to collectively in this subchapter as 'professional responsibilities'), or abrogate as to attorneys in programs assisted under this subchapter the authority of a State or other jurisdiction to enforce the standards of professional responsibility generally applicable to attorneys in such jurisdiction. The Corporation shall ensure that activities under this subchapter are carried out in a manner consistent with attorneys' professional responsibilities.

42 U.S.C. § 2996e(b)(3) (emphasis added). "Professional responsibilities" as used in § 2996e(b)(3) are thus defined in the ABA canons and codes, in contrast to the state-specific "standards of professional responsibility generally applicable to attorneys in such jurisdiction" that are relevant for state enforcement proceedings. Accordingly, contrary to CRLA and Attorney-Interveners' contention, § 2996e(b)(3) requires that LSC abstain from interfering with the professional responsibility standards established by the ABA, not those of the 50 states. On the other hand, the statute prohibits LSC from usurping the states' enforcement authority over their attorneys, and does not transfer any such authority to LSC or LSC-OIG for lawyers employed by grantee organizations.

This statutory bifurcation of national and state-specific law is particularly relevant in the context of a subpoena enforcement action. As the D.C. Circuit has observed, federal courts should decline "the opportunity to adopt a particular state's privilege law where, as here, the documents in question are sought by a governmental agency with nationwide mandate to redress matters of pressing public concern." Linde Thomson, 5 F.3d at 1514. Congress evidently

---

[14] We assume, without conceding, that § 2996e(b)(3) applies to LSC-OIG as well.

-20-

recognized the benefit of uniform laws for the conduct of LSC's activities, consistent with this

Circuit's instruction that:

> [t]he serious risk that inconsistent state privileges might unduly constrict [an
> IG's] discretion in contravention of its congressional mandate makes it
> abundantly clear that this is a situation in which state privileges may not be
> adopted costlessly.  A uniform rule, rather than <u>ad hoc</u> borrowing, will better
> promote federal policy objectives.

<u>Id.</u>

ABA Canon 4, entitled "A Lawyer Should Preserve the Confidences and Secrets of a

Client," provides that "the obligation to protect confidences and secrets obviously does not

preclude a lawyer from revealing information when his client consents after full disclosure, when

necessary to perform his professional employment, when permitted by a Disciplinary Rule, <u>or

when required by law</u>."  ABA Canon 4, <u>available at</u>

<u>http://www.law.cornell.edu/ethics/aba/mcpr/MCPR.HTM</u> (last visited October 3, 2007).  ABA

Disciplinary Rule 4-101, entitled "Preservation of Confidences and Secrets of a Client" defines

confidence as "information protected by the attorney-client privilege under applicable law, and

"secret" as "information gained in the professional relationship that the client has requested be

held inviolate or the disclosure of which would be embarrassing or would be likely to be

detrimental to the client."  <u>Id.</u>  ABA Disciplinary Rule 4-101 states that a lawyer shall not reveal

a confidence or secret unless the lawyer gains the client's consent or as "permitted under

Disciplinary Rules <u>or required by law</u> or court order."  <u>Id.</u> (emphasis added); <u>see also</u> ABA

Model Rule 1.6(b)(6) (permitting disclosure of secrets or confidences when required by law or

court order).

Under these provisions, the legal obligation to comply with a lawful subpoena and any

court order enforcing such a subpoena overrides an attorney's ethical duties to his clients.  <u>See</u>

Hunton & Williams, 952 F. Supp. at 856 & n.35.  Thus, even assuming § 2996e(b)(3) applies to LSC-OIG, that provision (and the ABA standards it incorporates) poses no bar to the disclosure of information required to be produced by subpoena.  Accordingly, any responsive material not protected by § 509(h) must be disclosed unless protected by the federal attorney-client privilege or federal work product doctrine.

Nevertheless, while contending the burden is on LSC-OIG to contest specific redactions to Exhibits P-T, CRLA has improperly redacted information on the basis of state work product and privilege considerations.  Thus for Exhibit P, anything redacted under Notes 2, 3, 4, 5, or 6 must be provided.  Moreover, CRLA applies a broader work-product protection to its records than is available under federal law, which requires litigants asserting the privilege to "demonstrate that documents were created 'with a specific claim supported by concrete facts which would likely lead to litigation in mind,' not merely assembled in the ordinary course of business or for other nonlitigation purposes."  Linde Thomson, 5 F.3d at 1515 (internal citation omitted).

In addition, CLRA's work-product claims sweep far too broadly, and have not been adequately substantiated.  For example, CLRA claims work-product protection for material describing certain "task force" meetings, in which "CLRA advocated from different locations and with different levels of experience . . . share strategies, tactics, and ideas to advance the interests of CLRA's clients in litigation, administrative proceedings and other advocacy." (CLRA Opp'n at 22.)  While courts have held documents protectable as attorney work product even where particular litigation has not yet commenced, see, e.g., Kent Corp. v. NLRB, 530 F.2d 612, 623 (5th Cir. 1976), the contours of the doctrine have never been stretched

so wide as to encompass any and all discussions between attorneys, so long as they concern legal "strateg[y], tactics, and ideas[.]"  At a minimum, the proponent of the work product doctrine must identify some "foreseeable litigation, even if no specific claim is contemplated," Schiller v. NLRB, 964 F.2d 1205, 1208 (D.C. Cir. 1992), and demonstrate how the information at issue relates to such future litigation, see also Coastal States Gas Corp. v. Department of Energy, 617 F.2d 854, 865 (D.C. Cir. 1980) ("We need not decide here whether litigation need be consciously contemplated by the attorney; the documents must at least have been prepared with a specific claim supported by concrete facts which would likely lead to litigation in mind, and that has not been demonstrated here.") (FOIA case).

In addition, with respect to Exhibits Q, R, S and T, LSC-OIG is informed that at least some task force documents have been provided to third parties.  Under such circumstances, any otherwise applicable privilege has been waived and the document must be produced in its entirety, unless CLRA meets its affirmative burden of demonstrating that the privilege has not been waived.  See Von Bulow v. Von Bulow, 811 F.2d 136, 144 (2d Cir. 1987) ("It is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship.").

## II.    THE REQUESTED RECORDS ARE RELEVANT TO LSC-OIG's INVESTIGATION

Despite the low bar for relevance required of IG subpoenas, CRLA faults LSC-OIG for not providing "detailed" justification for the requested records.  (CRLA Opp'n at 33-36.) "Reasonably relevant[, however,] means merely that the information must be relevant to some (any) inquiry that the agency is authorized to undertake."  Hunton & Williams, 952 F. Supp. at 854 (internal quotations omitted, emphasis in original).  A "court must defer to the agency's

appraisal of relevancy in connection with an investigative subpoena as long as it is not

'obviously wrong.'" Id. Here, it is indisputable that LSC-OIG has authority to investigate

allegations of wrongdoing at CRLA raised by a former employee of CRLA, and that the

subpoena is relevant to some (any) inquiry that LSC-OIG is authorized to undertake.  Although

CRLA takes issue by closely cropping (and improperly characterizing) justifications for the

subpoena, LSC-OIG's stated justifications – as well as those contained in the Report to the

Subcommittee, Tarantowicz Decl., Ex. 3 – more than justify the requests.[15]

CRLA suggests that LSC-OIG is investigating only whether CRLA is conducting

"impact work," independent of any other considerations, and that such an investigation would be

improper.  As stated in the Report and the Petition, however, the confidential source alleged that

CRLA's focus on "impact work" drove CRLA to violate statutory restrictions by soliciting

clients for work on CRLA management's agenda, or by working with ineligible clients.  As

described above, one allegation relating to the Ceres Police Department suggests that CRLA

management may have sought to "obtain" a client, and that it may have drawn upon CRLA

employee and relative ranks, including spouses, to do so.[16]  As set forth in the declaration of

Ms. Tarantowicz, disclosure of the subpoenaed information is therefore required for LSC-OIG

"to complete a thorough investigation, . . . [into] the makeup of [CLRA's] clientele and the types

of cases CRLA litigates and the types of other work CRLA undertakes."  Tarantowicz Decl. ¶

12.  Under such circumstances, client names and other client-identifying information are

---

[15]  This is particularly true when disclosing all of the specific details of an investigation may, as here, compromise the integrity of the investigation.

[16]  For this reason, spouse names are reasonably relevant to the scope of LSC-OIG's investigation.

certainly "directly relevant to the OIG's investigation into CRLA's activities." Hunton & Williams, 952 F. Supp. at 854.

Similarly, LSC-OIG does not question the legitimacy of CLRA's representation of Latino and farmworker clients, but is attempting to determine whether CLRA's focus on such clients has improperly precluded other, eligible clients from gaining CRLA representation. Client-identifying information is certainly relevant to that inquiry, as it is to an investigation concerning allegations that CLRA is serving ineligible clients or soliciting clients. At base, CRLA and Attorney-Interveners cannot show that the requested information is "plainly incompetent or irrelevant to any lawful purpose of the agency." Hunton & Williams, 952 F. Supp. at 854-55; LSNYC II, 249 F.3d at 1083 ("The Inspector General asserts that 'the most reliable way to detect errors and irregularities in grantee case reporting [is] to obtain the actual client names themselves.' . . . We certainly cannot say that the Inspector General is obviously wrong."). Access to client names, thus, is central to LSC-OIG's investigation of whether CRLA solicits clients or engages in litigation work without having any client at all. In the two cases which were the subject of specific allegations, LSC-OIG found access to client names critical, enabling it to determine that CRLA violated the law by soliciting clients and began work on the cases before having any client. Access to the names will be equally critical to conducting an investigation into whether improper solicitation of clients is a widespread practice at CRLA.

At bottom, LSC-OIG proceeded constructively and responsibly in formulating its data request, as it does with all requests for information. Mindful of the sensitivity of certain information and the potential demands on CRLA's time and resources, LSC-OIG undertook a critical review to determine precisely what information was required to conduct its investigation

and whether alternative means of obtaining the information would suffice.  LSC-OIG exercised

its judgment in concluding that it would not be possible to conduct a complete and fair inquiry

without access to all the information requested.  LSC-OIG determined that it could not

restructure the request in any way to gain, for example, all the client-identifying information that

was required for a comprehensive investigation.  Thus, LSC-OIG's determination of relevance,

granted the deference it is due under the law, is more than adequate to justify its document

requests here.

**III.    THE SUBPOENA DOES NOT POSE AN UNREASONABLE OR UNDUE
BURDEN**

CRLA objects to providing the client-identifying information because of the alleged

burden of locating potentially privileged information among the 39,000 client names called for

by the subpoena.  (CRLA Opp'n at 29-32.)  The task of proving the unreasonableness of a

subpoena, however, "is not easy where, as here, the agency inquiry is pursuant to a lawful

purpose and the requested documents are relevant to that purpose."  Hunton & Williams, 952 F.

Supp. at 855.  Respondents' burden should be particularly onerous where Congress has made the

legislative judgment that grantees should shoulder the responsibility of producing § 509(h)

documents, which "shall be made available" unconditionally to LSC-OIG.  Unlike other

document disclosure provisions that require disclosure when "necessary" or "desirable," §

509(h) is written without restriction:  all "client names . . . shall be made available to any auditor

or monitor of the recipient, . . . except for reports or records subject to the attorney-client

privilege."  Pub. L. 104-134, § 509(h).  To permit nondisclosure based on a claim of

burdensomeness, in effect, disrupt the legislature's determination that the probative value of

disclosure outweighs the possible burdens of searching for privileged records.

-26-

This is especially so where the commingling of potentially privileged and non-privileged information is common for all grantees. At base, CRLA and Attorney-Interveners' justification for non-disclosure amounts to writing grantees' record disclosure obligations out of the 1996 Appropriations Act. Yet, it is unreasonable to suggest that, in enacting § 509(h), Congress authorized in unambiguous language the collection of all information – except privileged records – while silently intending that any difficulty a grantee might encounter in searching for those privileged records would justify nondisclosure. In sum, Congress did not recognize "defenses" common to all grantees to justify non-disclosure.[17]

Moreover, CRLA's claim of burdensomeness appears vastly overstated. Indeed, in response to a recent LSC-OIG audit, CRLA admittedly "expended significant resources" to comply with LSC-OIG records requests. Stmt. of Jose Padilla, March 31, 2004 before Subcommittee, available at http://commdocs.house.gov/committees/judiciary/hju92831.000/hju92831_0f.htm (last visited Oct. 5, 2007). The Executive Director stated at that time that "[a]lthough CRLA has no final estimate, after 16 of the 30 months of the audit, CRLA had expended 4,479 staff hours in audit-related work, at a cost of more than $113,000." Id. Nonetheless, CRLA was able to continue its operations, provide services to its clientele, and eventually produce the records

---

[17] For that reason, CLRA's and Attorney-Intervenors' recitation of the "chilling" effects disclosure of the subpoenaed records will have on client representation is without legal significance. Any debate about the policy implications of compelling disclosure has been closed by Congress. See also Hunton & Williams, 952 F. Supp. at 855 n.32 ("H&W further argues that requiring it to reveal client identities is unduly burdensome because doing so will cause a 'chilling' effect on its client relationships. The role of the court in determining whether to enforce an administrative subpoena is 'strictly limited.' It is therefore well beyond the scope of this court's authority to determine what, if any, effect the disclosure of such information will have on the firm's client relationships.").

requested.  This is consistent with LSC-OIG's experience when requesting documents from other legal services organizations as well.[18]  For example, the Legal Services Corporation of New York City was able to conduct successfully and expeditiously a privilege review and produce requested client names in KEMPS data fields after unsuccessfully challenging LSC-OIG's authority to do so.  Although LSC-OIG has suggested that CRLA discuss the review protocol with LSNYC, CRLA has, to LSC-OIG's understanding, refused to do so.

CRLA's estimates of burden are flawed as well.  CRLA also relies on its review of sample files (see CRLA Opp'n, Exhibit GG-1 and GG-2, Protocol for Reviewing Sample Client Files to Determine Whether Revealing Client Identity to LSC/OIG Will Violate Federal Attorney Client Privilege and/or California Client-Confidentiality Obligations, hereinafter "Review Protocol") for estimating the burden that purportedly will be engendered by compliance with the LSC-OIG subpoena.  First, to the extent that the Review Protocol relies on California law and California rules of professional conduct to estimate burden it is clearly invalid.  Secondly, the Review Protocol misapplies federal law governing attorney client privilege, requiring a review of irrelevant matters and resulting in a vastly overstated burden estimation.  In this regard, the Review Protocol requires a thorough review of whether the client name had previously been disclosed (not the standard for determining whether a communication is privileged) and requires a review of whether the client was involved in certain administrative proceedings or in sealed proceedings, neither of which protects the client name from disclosure to LSC-OIG under § 509(h) of the 1996 Appropriations Act (or, for that matter, under the laws governing those

---

[18]  This is likely consistent with the experience of other law firms required to turn over client lists to the government.  See e.g., Inspector General of the Resolution Trust Company v. Rose Law Firm, 867 F. Supp 1111, 1113 (D.D.C. 1994).

administrative proceedings).  Additionally, the Review Protocol incorrectly assumes that certain

LSC problem codes are in and of themselves indicative of a client's specific motivation for

seeking legal services and also incorrectly assumes that the disclosure of client names with other

§ 509(h) information already provided to the LSC-OIG provides a valid privilege claim, both

arguments held invalid in this jurisdiction.  See LSNYC I, 100 F. Supp. 2d at 47.  Finally, the

Review Protocol itself is unnecessarily complicated, making any burden outcome all but

guaranteed.  The Review Protocol, for example, comprises forty pages, including attachments,

and includes multiple tables with numerous irrelevant but required steps.  In sum, these few

examples clearly illustrate the inadequacy of CRLA's Review Protocol as a basis for estimating

the purported burden of CRLA's compliance with a valid LSC-OIG subpoena.

Based on the purported burdensomeness of LSC-OIG's subpoena, both CRLA and

Attorney-Interveners also effectively seek to direct LSC-OIG's investigative techniques.  In

similar circumstances, however, this court instructed that it "is not the province of this court to

decide the best way for LSC-OIG to carry out its responsibilities."  LSNYC I, 100 F. Supp. 2d at

47.  Although CRLA and Attorney-Interveners would prefer to transform LSC-OIG's

comprehensive investigation of misconduct into a more limited audit, and dictate that only a

random sampling of information be undertaken, if any at all, neither CRLA nor Attorney-

Interveners has any legal basis for such a demand.  This is particularly so where Congress has

indicated that representative sampling is appropriate in other circumstances, but saw fit to

require unconditional disclosure of § 509(h) records.  Under § 509(b), for example, auditors are

directed to "select and test a representative number of transactions and report all instances of

noncompliance to the recipient."  Id. § 509(b).  This is consistent with the general objectives of

an audit.[19]  For investigations prompted by allegations of misconduct, however, LSC-OIG may

determine that representative sampling is inadequate and seek full disclosure.

## **CONCLUSION**

For the foregoing reasons, this court should enforce the adminstrative subpoena duces

tecum, requiring full production of records, with only specific claims of federal attorney-client or

work product protections permitted to justify nondisclosure.

Respectfully submitted,


PETER D. KEISLER
Assistant Attorney General


JEFFREY A. TAYLOR
United States Attorney


/s/ Helen H. Hong
OF COUNSEL:                          ARTHUR R. GOLDBERG, D.C. Bar 180661
LAURIE TARANTOWICZ                   HELEN H. HONG, CA Bar 235635
LSC-Office of Inspector General      Attorneys, Department of Justice
3333 K Street, N.W., 3rd Floor       20 Massachusetts Ave., N.W., Room 6107
Washington, D.C. 20007               Washington, D.C.  20530
Tel: (202) 295-1660                  Tel: (202) 514-5838
                                     Fax: (202) 616-8470
                                     E-mail: helen.hong@usdoj.gov
                                     Attorneys for Petitioners

---

[19]  Even in an audit, full disclosure may be appropriate.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| and | ) | |
| | ) | |
| RONALD MERRYMAN, ACTING | ) | |
| INSPECTOR GENERAL OF THE | ) | |
| LEGAL SERVICES CORPORATION, | ) | |
| | ) | Misc. No.  1:07-mc-00123 (EGS) |
| Petitioners, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CALIFORNIA RURAL LEGAL | ) | |
| ASSISTANCE, INC., | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| JEANNIE BARRETT, ALEGRIA DE LA CRUZ, | ) | |
| VANESSA FRANK GARCIA, PHYLLIS KATZ, | ) | |
| TERI SCARLET, ARTURO RODRIQUEZ, and | ) | |
| KIRK AH-TYE, | ) | |
| | ) | |
| Attorney-Intervenors. | ) | |

_____)

**[PROPOSED] ORDER ON PETITIONERS' UNOPPOSED LCvR 7(d) MOTION FOR
LEAVE TO FILE A COMBINED REPLY BRIEF IN EXCESS OF 25 PAGES**

Having considered Petitioners' Unopposed LcvR 7(d) Motion for Leave to File a

Combined Reply Brief in Excess of 25 Pages, it is hereby

ORDERED that the motion be, and hereby is, GRANTED.

Signed this ____ day of _____, 2007.

_____

EMMET G. SULLIVAN
United States District Judge